# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| JUST CITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:24-cv-02540-TLP-tmp |
| v. | ) | |
| | ) | |
| SHERIFF FLOYD BONNER, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING PRELIMINARY INJUNCTION AND MOTIONS TO DISMISS

Just City, Inc. sued Sheriff Bonner, Judge Lee Wilson,[1] and the Shelby County judicial commissioners in their official capacities to prevent enforcement of HB 1719, a Tennessee statutory amendment that prohibits a judicial officer from considering a detainee's "ability to pay" when setting bail. Just City moved for a preliminary injunction and expedited declaratory relief, arguing that the statute is unconstitutional. (ECF No. 2.) Defendants opposed the motion on the grounds that neither form of requested relief is appropriate. (ECF No. 37.) The State of Tennessee then intervened and also opposed the motion, contending that Just City lacks standing to assert these claims and that the *Younger* abstention doctrine applies. (ECF No. 40-1.) Defendants and the State then separately moved to dismiss for lack of standing, *Younger* abstention, and failure to state a claim. (ECF Nos. 44, 52.)

---

[1] Just City originally sued Bill Anderson as the Presiding Shelby County General Session Criminal Court Judge, but, because the suit brings only official-capacity claims, later substituted Anderson for Lee Wilson under Federal Rule of Civil Procedure 25(d).

## BACKGROUND

Just City is a nonprofit organization "dedicated to fighting discrimination based on race, ethnicity, and income in Shelby County criminal proceedings." (ECF No. 1 at PageID 3.) As part of its mission, Just City operates a charitable bail fund. And in 2022, Just City and others entered a "Memorandum of Understanding" ("Agreement") with Shelby County to create procedural safeguards for detainees in Shelby County jail. (*Id.*; ECF No. 2-6.) Among the anticipated reforms was the requirement that the County use a specific written assessment to calculate and "evaluate the arrestee's ability to pay" when setting bail. (ECF No. 2-6 at PageID 98.) But shortly after Just City and Shelby County formalized the Agreement, the Tennessee legislature passed HB 1719, which amended Tenn. Code Ann. § 40-11-118(b), the bail statute, to require judicial officers setting bail to consider a detainee's "financial condition; provided, that, the defendant's ability to pay shall not be considered."[2] Just City alleges that this amendment

---

[2] Tennessee's bail statute states that,

> [i]n determining the amount of bail necessary to reasonably assure the appearance of the defendant while at the same time protecting the safety of the public, the magistrate shall consider the following:
> (1) The defendant's length of residence in the community;
> (2) The defendant's employment status and history and financial condition; provided, that, the defendant's ability to pay shall not be considered;
> (3) The defendant's family ties and relationships;
> (4) The defendant's reputation, character and mental condition;
> (5) The defendant's prior criminal record, record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;
> (6) The nature of the offense and the apparent probability of conviction and the likely sentence;
> (7) The defendant's prior criminal record and the likelihood that because of that record the defendant will pose a risk of danger to the community;
> (8) The identity of responsible members of the community who will vouch for the defendant's reliability; however, no member of the community may vouch for more than two (2) defendants at any time while charges are still pending or a forfeiture is outstanding; and

2

made "Shelby County officials abandon their constitutional obligations and the terms of the

[A]greement," and it sued here.  (ECF No. 1 at PageID 2.)

      In fact, Just City alleges HB 1719 violates the Due Process and Equal Protection Clauses

of the Fourteenth Amendment by preventing judicial officers from considering a detainee's

ability to pay when setting a bail amount.  (*Id.* at PageID 12–13.)  It seeks an expedited

declaratory judgment that the statute is unconstitutional and a preliminary injunction to prevent

enforcement of bail orders entered without considering the detainee's ability to pay.  (*Id.* at

PageID 13.)  Defendants and State oppose both forms of relief and have each moved to dismiss.

(ECF Nos. 37, 40-1, 44, 52.)

      In opposition to the preliminary injunction, the State argues that Just City lacks standing

for its claims (ECF No. 40-1 at PageID 378–82) and that *Younger* abstention prohibits the Court

from deciding the matter (*id.* at 382–86).  And the State and Defendants contend that declaratory

and injunctive relief are inappropriate.  (*Id.* at 386–95; ECF No. 37 at 350–360.)  The State and

Defendants repeat the standing and *Younger* abstention arguments in their motions to dismiss.

(ECF No. 44 at PageID 409–12; ECF No. 52-1 at PageID 484–93.)  And the State also argues

Just City has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (ECF No.

52-1 at PageID 493–500.)  Lastly, Defendants ask the Court to dismiss the official capacity

claims and restyle the action "as against only Shelby County Government."  (ECF No. 44 and

PageID 412–13.)  The Court will address each of these motions, and the arguments related to

them, in turn.

---

      (9) Any other factors indicating the defendant's ties to the community or
          bearing on the risk of the defendant's willful failure to appear, including,
          but not limited to, whether the defendant is lawfully present in this state.

Tenn. Code Ann. § 40-11-118(b).

## PRELIMINARY INJUNCTION

Preliminary injunctions are an "extraordinary remedy." *Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*, 958 F.3d 532, 535 (6th Cir. 2020). They "preserve the status quo until a trial on the merits" and courts should not award them without "a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing, Co.*, 860 F.3d 844, 848–49 (6th Cir. 2017) (quotation marks and citations omitted). In determining whether to grant a preliminary injunction, courts in the Sixth Circuit consider "(1) the movant's chances of succeeding on the merits; (2) if the movant would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest." *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018).

The court must balance these factors. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) ("These four considerations are factors to be balanced, not prerequisites that must be met." (quotation marks and citation omitted)). But "[i]n constitutional cases, the first factor is typically dispositive. That's because '[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed.' And no cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citations omitted). The Court next considers the factors.

## I.    Likelihood of Success on the Merits

The first factor to consider in a preliminary injunction analysis is the movant's likelihood of success on the merits of its claim. *McGirr*, 891 F.3d at 610. The movant need not "prove his case in full" to show a right to a preliminary injunction, but he still "must show more than a mere

possibility of success." *Ne. Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012)

(quotation marks and citation omitted). And, because this factor "is generally the most important

one," "[i]f a movant is highly unlikely to succeed on the merits, there is little reason for a court

to take the drastic step of enjoining the opposing party at the onset of a suit." *Higuchi Int'l Corp.

v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024). This is especially true in constitutional

cases. *See Vitolo*, 999 F.3d at 360 ("In constitutional cases, the first factor is typically

dispositive.").

When a "plaintiff has raised questions going to the merits so serious, substantial, difficult,

and doubtful as to make them a fair ground for litigation and thus for more deliberate

investigation," *Ne. Ohio Coalition*, 696 F.3d at 591 (quoting *Six Clinics Holding Corp., II v.

Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)), that plaintiff may be able to show enough

of a likelihood of success for a preliminary injunction. But at the same time—and particularly in

cases that raise federalism concerns—doubt surrounding an outcome may be the exact reason a

plaintiff cannot show likelihood of success. *See L.W. v. Skrmetti*, 73 F.4th 408, 415–16 (6th Cir.

2023) (explaining that when the movant "seek[s] to extend the constitutional guarantees to new

territory[,] . . . it does suggest that the key premise of a preliminary injunction—likelihood of

success on the merits—is missing").

With that in mind, the State claims that Just City is unlikely to succeed because this Court

should abstain from hearing the case under the *Younger* abstention doctrine. The Court will

therefore turn to that argument.

### A.    *Younger* Abstention

The State argues that *Younger* abstention applies, meaning that this Court should refrain

from deciding the issues here. (ECF No. 40-1 at PageID 382–86; ECF No. 52-1 at PageID 488–

93.)  And of course, when resolving the question of whether a party is likely to succeed on the merits of its claims, a court has to consider how likely it can, or will, hear the claim rather than abstain from hearing the case.  *See Rainey v. Perkins Twp. Bd. of Trs.*, No. 24-3564, 2024 U.S. App. LEXIS 19960, at \*4–6 (6th Cir. Aug. 7, 2024) (beginning an analysis of success on the merits with a discussion of *Younger* abstention).  For that reason, the Court will first consider whether the *Younger* abstention doctrine applies here.

Generally, when a federal court has jurisdiction over a claim, it has a "virtually unflagging" obligation to exercise that jurisdiction and to resolve the case.  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).  But the *Younger* abstention doctrine, which originates from principles of comity and equity, provides an exception to that rule and allows federal courts to abstain from deciding the matter.  *Id.*; *see also Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention applies only to three types of cases, known as *NOPSI* category cases: (1) ongoing criminal prosecutions, (2) certain civil enforcement proceedings that "are akin to criminal prosecutions," and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Doe v. Univ. of Ky.*, 860 F.3d 365, 368–69 (6th Cir. 2017) (quoting *Sprint*, 571 U.S. at 72; *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*")).

When one of these three *NOPSI* category cases arises, the court next looks to see whether the case also meets the *Middlesex* factors.  *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34 (1982).  Under *Middlesex*, the federal court will abstain from exercising jurisdiction only when "(1) state proceedings are currently pending; (2) the proceedings involve an important state interest; and (3) the state proceedings will provide the

federal plaintiff with an adequate opportunity to raise his constitutional claims." *Doe*, 860 F.3d at 369; *see also Middlesex*, 457 U.S. at 432–34.

Even when a federal court may properly abstain under the *NOPSI* categories and *Middlesex* factors, it will not abstain from hearing a case when there are "extraordinary circumstances" justifying federal intrusion. *Younger*, 401 U.S. at 45 (citation omitted). These circumstances include "bad faith, harassment, flagrant unconstitutionality, or another unusual circumstance warranting equitable relief." *See Tindall v. Wayne Cnty. Friend of the Ct.*, 269 F.3d 533, 538 (6th Cir. 2001). The Court will next address the *NOPSI* categories and the *Middlesex* factors in turn.

### 1.    *NOPSI* Categories

The three types of cases in which *Younger* abstention may be appropriate—state criminal prosecutions, some civil enforcement proceedings, and proceedings involving inherently judicial functions—are known as the *NOPSI* categories. *See Doe*, 860 F.3d at 368–69 (quoting *Sprint*, 571 U.S. at 72; *NOPSI*, 491 U.S. at 368); *see also Younger*, 401 U.S. at 44. If a case falls outside these categories, abstention is inappropriate. *See Doe*, 860 F.3d at 369. The parties here do not argue that this case implicates the second or third *NOPSI* category, but they disagree about whether the state bail proceedings constitute an ongoing criminal prosecution for abstention purposes. The State and Defendants argue that the bail proceedings are integral to criminal prosecutions, so they fall within the first *NOPSI* category. (*See* ECF No. 40-1 at PageID 382–84; ECF No. 44 at PageID 410–11.) But Just City counters that the bail proceedings are collateral to, and will not affect the merits of, the criminal prosecutions, so this case falls outside the scope of the first *NOPSI* category. (ECF No. 45 at PageID 419–20 (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).)

There is some guidance about when a case interferes with an ongoing criminal prosecution under the first *NOPSI* category. In *Gerstein v. Pugh*, the Supreme Court explained that *Younger* abstention did not apply to the plaintiff's challenge to pretrial detention hearings because

> [t]he injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits.

*Gerstein*, 420 U.S. at 108 n.9. Relying on *Gerstein*, some circuits have similarly refused to apply *Younger* to challenges to pretrial proceedings. *See Walker v. City of Calhoun*, 901 F.3d 1245, 1254–55 (11th Cir. 2018) (determining that *Gerstein* covered plaintiff's suit for "prompt bail determinations for himself and his fellow class members"); *Arevalo v. Hennessy*, 882 F.3d 763, 766 (9th Cir. 2018) ("[B]ecause the question of whether the petitioner is entitled to a constitutional bail hearing is separate from the state prosecution, and would not interfere with those proceedings, *Younger* abstention is not appropriate."); *Stewart v. Abraham*, 275 F.3d 220, 225 (3d Cir. 2001) (not applying *Younger* when "the equitable relief requested is not aimed at state prosecutions, but at the legality of the re-arrest policy and the pretrial detention of a class of criminal defendants"); *Campbell v. McGruder*, 580 F.2d 521, 525–26 n.6 (D.C. Cir. 1978) (not applying *Younger* where "plaintiffs could not raise as a defense to the criminal charges pending against them in [state court] the unconstitutionality of the conditions of their confinement").

But the State cites *O'Shea v. Littleton*, 414 U.S. 488 (1974), and *Parker v. Turner*, 626 F.2d 1 (6th Cir. 1980),[3] to challenge what looks like a classic *Gerstein*-type case here. (ECF No. 52-1 at PageID 489; ECF No. 63 at PageID 654.) In *O'Shea*, plaintiffs alleged that a county

---

[3] The State cited this case in its Reply in support of its Motion to Dismiss rather than to oppose the preliminary injunction. But the Court will consider it here.

judge violated the constitutional rights of defendants in setting bonds, sentences, and trial fees.

*Id.* at 492.  And the district court in *O'Shea* awarded, or at least contemplated, very broad relief.[4]

The Supreme Court ruled that the district court should have applied the *Younger* abstention

doctrine, reasoning,

> Respondents do not seek to strike down a single state statute, either on its face or as applied; nor do they seek to enjoin any criminal prosecutions that might be brought under a challenged criminal law. . . . What they seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials. . . . Apparently the order would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners.  This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris, supra*, and related cases sought to prevent.

*O'Shea*, 414 U.S. at 500.[5]  But that is not the situation here.

---

[4] The district court, Court of Appeals for the Seventh Circuit, and Supreme Court are somewhat vague about what specific relief was sought or awarded.  *O'Shea*, 414 U.S. at 493 n.1 ("While the Court of Appeals did not attempt to specify exactly what type of injunctive relief might be justified, it at least suggested that it might include a requirement of 'periodic reports of various types of aggregate data on actions on bail and sentencing.'" (quoting *Littleton v. Berbling*, 468 F.2d 389, 415 (7th Cir. 1972))).

[5] The Fifth Circuit recently ruled that the federal court should abstain from reviewing the Texas bail system.  *See Daves v. Dallas Cnty.*, 64 F.4th 616, 621 (5th Cir. 2023) (en banc).  That court relied on *O'Shea*, instead of *Gerstein* and cases applying it, in its second en banc review of a constitutional challenge to Texas's offense-based bail schedule that "allegedly prevented consideration of the defendants' ability to pay" when setting bail.  *Id.* at 621.  In *Daves*, the plaintiffs sought "a variety of fundamental alterations in the pretrial decisional process" and "the appointment of a federal monitor over the Dallas County criminal justice system" who would receive "periodic reports."  *Id.* at 621–22.  In its analysis of the *Middlesex* factors (rather than as part of the *NOPSI* discussion), the Fifth Circuit determined *Younger* abstention was proper: "categorically excluding from the ambit of *Younger* abstention . . . constitutional claims involving bits and pieces of the criminal process, e.g., bail bonding . . . , is fundamentally at odds with comity and federalism."  *Id.* at 626 n.17.

But *Daves* and *O'Shea* are dramatically different from this case because they sought much more invasive relief.  Indeed, the facts of *Daves* presented a simple analogy to *O'Shea*.  And even though the en banc Fifth Circuit overturned its own precedent, distinguishing the case from *Gerstein*, questioning subsequent out-of-circuit cases relying on it, and expanding the scope of *O'Shea*, *see generally id.*, this Court sees no need to make such a sweeping rule.  Rather, this Court recognizes that the Supreme Court applied *Younger* in *O'Shea* because the movant

Unlike *O'Shea*, the relief Just City seeks is discrete.  Just City moves for a declaration that a single statute is unconstitutional and for an injunction to prevent state officials from enforcing bail decisions made without considering the defendant's ability to pay.   It is not requesting ongoing supervision over state court proceedings.  *O'Shea*, 414 U.S. at 500.  And like *Gerstein*, whether the state court considers a detainee's ability to pay during the state pretrial bail hearing would "not prejudice the conduct of the trial on the merits" of the criminal case. *Gerstein*, 420 U.S. at 108 n.9.

And in *Parker*, the plaintiffs challenged civil contempt proceedings for nonpayment of child support and alimony.  626 F.2d at 2.  Despite the factual dissimilarities between *Parker* and this case, the State still asserts that "the Sixth Circuit clarified long ago [in *Parker*] that *Gerstein* only avoided *Younger* abstention because the 'existence of a hearing right was at issue' and that issue 'could not be raised in any pending state proceeding.'"  (ECF No. 63 at PageID 654 (quoting *Parker*, 626 F.2d at 8).)  But the State overlooks the thrust of the Sixth Circuit's opinion.  Only two paragraphs later, the Sixth Circuit added that "[t]he critical questions are whether the issue raised is collateral to the principal state proceeding and whether state court relief is available.  For example, where hearing rights are clearly set out in a statute or court rule, a federal court can pass upon their constitutional adequacy."  *Parker*, 626 F.2d at 8 (citing *Fernandez v. Trias Monge*, 586 F.2d 848, 851 n.2 (1st Cir. 1978) ("The instant claim addresses the statutory procedure [for pretrial detention], not its daily administration; relief, fashioned after *Gerstein v. Pugh*, [420 U.S. at 123,] would outline only the minimum due process standard, leaving the choice of procedures and the operational details to the Commonwealth [of Puerto

---

essentially requested an "ongoing federal audit" of state proceedings and acknowledges that Just City does not seek similar relief here.

Rico].")).  And based on that language, the Sixth Circuit found that claims like those here are

exactly the type to trigger *Gerstein*.  Just City challenges pretrial detention procedures "collateral

to the principal state proceeding" and the "constitutional adequacy" of "hearing rights . . . clearly

set out in" Tennessee's bail statute.  *See Parker*, 626 F.2d at 8 (citations omitted).

Just City's position aligns with how most circuits have applied the *Younger* analysis to

pretrial proceedings.  And so, based on *Gerstein* and the differences between this case, *O'Shea*,

and *Parker*, the Court finds that *Younger* abstention does not apply here.

## 2.    *Middlesex* Factors

When a case falls within one of the *NOPSI* categories, the court then applies the

*Middlesex* factors[6] to see whether abstention is appropriate.  *See Sprint*, 571 U.S. at 78 ("We

have not applied *Younger* outside these three 'exceptional' categories, and today hold, in accord

with *NOPSI*, that they define *Younger*'s scope.").  Since this case falls outside the *NOPSI*

categories, the Court need not examine the *Middlesex* factors.  But for the same reason this case

does not present an ongoing criminal proceeding for purposes of *NOPSI*, there is no ongoing

criminal proceeding under *Middlesex*.  *See Gerstein*, 420 U.S. at 108 n.9.  And even if the first

---

[6] Under *Middlesex*, federal courts abstain from hearing a case when "(1) state proceedings are
currently pending; (2) the proceedings involve an important state interest; and (3) the state
proceedings will provide the federal plaintiff with an adequate opportunity to raise his
constitutional claims."  *Doe*, 860 F.3d at 369; *see also Middlesex*, 457 U.S. at 432–34.  Only if
the case meets all three factors does *Younger* abstention apply and the federal court would
decline to exercise jurisdiction.  *Doe*, 860 F.3d at 369; *see also Middlesex*, 457 U.S. at 432–34.
Of course, the process for setting bail involves important state interests because pretrial
detention, and release, protects the public and ensures a defendant's presence for trial.  And the
state proceedings provide adequate opportunity for a detainee to challenge the constitutionality
of his detention through state appeals.  *See* Tenn. Code Ann. § 40-11-144 ("The actions by a trial
court . . . in granting, denying, setting or altering conditions of the defendant's release shall be
reviewable in the manner provided in the Tennessee Rules of Appellate Procedure.").

factor were met, satisfying the *Middlesex* factors is not enough for abstention when this case falls outside the *NOPSI* categories.[7]

For those reasons, Just City's challenge to pretrial bail proceedings does not persuade the Court to refrain from deciding the case because *Younger* seldom applies to challenges to pretrial procedures that do not affect the merits of the criminal prosecution. *See Gerstein*, 420 U.S. at 108 n.9. Since the Court is not applying it, *Younger* abstention does not weigh against Just City in the preliminary injunction analysis. Next the Court will consider whether Just City has standing to assert the claim here.

### B.      Standing

The State argues that the Court should deny the motion for preliminary injunction because Just City lacks standing to bring its claims. (ECF No. 40-1 at PageID 378–82; ECF No. 52-1 at PageID 484–88.) Whether a party can succeed on the merits of its claims of course depends on whether the party has standing to bring the claims in the first place. *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) ("To establish a likelihood of success in a lawsuit, a plaintiff must, of course, have standing to bring it."); *see also Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 901 (6th Cir. 2024) (per curiam) (explaining, in the context of staying a preliminary injunction, that "the 'merits' in this likelihood-of-success context include what otherwise seems like a non-merits question: Does the plaintiff have standing to raise the claims on which it won an injunction?").

---

[7] Sometimes when a case satisfies *NOPSI* and *Middlesex*, courts may determine that "extraordinary circumstances" warrant exercising jurisdiction over a matter even though abstention would ordinarily be appropriate under *NOPSI* and *Middlesex*. *Younger*, 401 U.S. at 45; *see Tindall*, 269 F.3d at 538. These circumstances may include "bad faith, harassment, flagrant unconstitutionality, or another unusual circumstance warranting equitable relief." *See Tindall*, 269 F.3d at 538. But since the abstention argument fails under *NOPSI* and *Middlesex*, the Court finds that abstention is not otherwise appropriate here.

12

For starters, under Article III of the Constitution, federal courts only have jurisdiction over "Cases" and "Controversies." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 378 (2024); U.S. Const. art. III, § 2. To ensure compliance with this requirement, courts have developed the standing doctrine to limit who can bring suit to enforce a right. *FDA*, 602 U.S. at 379. For standing, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380 (citation omitted).

An injury in fact must be "concrete" and "particularized." *Id.* at 381 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). And an injury in fact must be more than an ideological offense or harm, no matter how deeply held the plaintiff's belief or conviction. *Id.* ("Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action."). The injury must also "be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon. And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citations omitted). "In sum, to sue in federal court, a plaintiff must show that he or she has suffered or likely will suffer an injury in fact." *Id.* at 382.

For causation, the plaintiff must show the defendant's conduct caused, or likely will cause, the plaintiff's injury. *Id.* When a plaintiff "challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish. That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.* at 382–83 (quotation marks and citations

13

omitted).  For courts to find standing based on an injury from government regulation, that injury cannot be too attenuated or speculative.  *Id.* at 383.

Just City argues it has standing to bring this action on three separate grounds.  First, Just City claims that it has organizational standing to bring the action on its own behalf because HB 1719 interferes with the Agreement between Just City and Shelby County.  (ECF No. 45 at PageID 418.)  Second, Just City argues that it has organizational standing because the modification to the bail statute has led to increased bail amounts which, in turn, hinders Just City's ability to post bail for qualified detainees.  (*Id.* at PageID 423.)  Third, Just City contends it has third-party standing to sue on behalf of the detainees because "(1) it has a close relationship with the arrestees and (2) there is a hindrance to the arrestees' ability to protect their own interests."  (*Id.* at PageID 417.)

As discussed below, it seems Just City's interest in enforcing its Agreement with Shelby County cannot support standing because Just City is not suing on the contract.  And its other arguments to establish organizational or third-party standing are questionable because recent case law casts doubt about whether Just City has suffered an injury in fact.

### 1.    Organizational Standing

Generally, an entity or organization "may have standing 'to sue on their own behalf for injuries they have sustained.'"  *FDA*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)).  Organizational standing requires the plaintiff organization to show the same elements of standing that individual plaintiffs must show: injury in fact, causation, and redressability.  *Id.* at 393–94.  Just City claims organizational standing through its Agreement with the County and its increased post-amendment costs.

14

a.    **Contract**

As noted above, in 2022, Just City and others agreed with Shelby County to create

procedural safeguards for detainees in Shelby County jail.  (ECF No. 2-6.)  According to Just

City, when the Tennessee legislature passed HB 1719, it left Shelby County with a choice: it

could either violate state law or violate that Agreement with Just City.  So far, it has allegedly

violated the Agreement by failing to use the ability-to-pay calculator, thereby directly harming

Just City.  As a result, Just City alleges it has standing.  To be sure, as a party to the Agreement,

Just City has Article III standing to sue *on the Agreement*.  For instance, Just City has standing to

allege breach of contract against Shelby County for violating the Agreement's provisions.  But

whether the contract gives it standing to assert *a claim based on an alleged Fourteenth*

*Amendment violation, and not on the Agreement,* is a different question.[8]  *See Town of Chester v.*

*Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross.  To the

_____

[8] Just City asks the Court to "declar[e] that HB 1719 violates the Fourteenth Amendment" and to
"enjoin[] the Shelby County Sheriff from enforcing secured bail orders that are issued without a
determination of ability to pay . . . ."  (ECF No. 1 at PageID 13.)  But this is not a contract claim
on the Agreement.  Just City is not requesting specific performance, that the Court reinstitute the
terms of the Agreement, or that the County use the specific ability-to-pay calculator negotiated in
the Agreement.  Without a logical connection between the factual basis for standing (the breach
of the Agreement) and the alleged claims (Due Process and Equal Protection violations), Just
City cannot show it has suffered an injury in fact.  *See Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to
press . . . ." (quotation marks and citations omitted)).
     One conceivable basis for a constitutional challenge based on the breach of the
Agreement could arise under the Contracts Clause, but that claim would also fail under these
circumstances.  "The Contracts Clause restricts the power of States to disrupt contractual
arrangements. It provides that '[n]o state shall . . . pass any . . . Law impairing the Obligation of
Contracts.'"  *Sveen v. Melin*, 584 U.S. 811, 818 (2018) (quoting U.S. Const., Art. I, §10, cl. 1).
But Just City did not sue the state directly, and it did not assert a claim under the Contracts
Clause for state impairment of its Agreement.  Instead it seeks, via § 1983, to invalidate the law
on Fourteenth Amendment grounds.  Contracts Clause claims are not cognizable under § 1983
anyway, *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017), so the Clause could not
somehow create standing for Just City's § 1983 claim.

contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each

form of relief that is sought." (quotation marks and citations omitted)).

Just City cites *Springer v. Cleveland Clinic Emp. Health Plan Total Care* in support of its

position that the denial of "a specific contractual right" or the loss of the benefit of the bargain

creates standing.[9]  900 F.3d 284, 287–88 (6th Cir. 2018) (citing cases from the Fifth, Ninth, and

Eleventh Circuits).  But *Springer* and the cases it cites ("*Springer* cases") are unpersuasive.  The

facts in the *Springer* cases differ greatly from the facts here.  For example, the *Springer* cases

relate to private contracts governing healthcare insurance, and none challenge the

constitutionality of a statute affecting those contractual rights.  The cases "held that the denial of

plan benefits is a concrete injury for Article III standing even when patients were not directly

billed for their medical services." *Id.* at 287.  And *Springer* explained that, "like any private

contract claim," the plaintiff's injury created standing when the plaintiff lost the benefit of the

bargain.  *Id.*

Just City's claims do not deal with a private contract, or even with a contract claim.

*Springer* clarifies the standing requirements for a contracting party to sue under ERISA.  But it

does not support Just City's assertion that its Agreement with the County creates Article III

standing for an Equal Protection or Due Process challenge to a state statute that arguably impacts

---

[9] Just City's briefs in opposition to the motions to dismiss include additional cases that rely on
*Springer* or argue that the breach of a contract that protects the interests of a third party is enough
for Article III standing.  (ECF No. 51 at PageID 460; ECF No. 62 at PageID 627.)  But these
suffer from the same shortcomings as the ERISA cases it cited in support of a preliminary
injunction.  (*See* ECF No. 45 at PageID 418.)  The Court agrees that breach of a contract could
give rise to Article III standing for claims on the contract.  But the Fourteenth Amendment
claims here are not claims on the Agreement.  The Court therefore finds the cited authority
unpersuasive.

16

the County's performance under the Agreement. Next the Court will consider Just City's other

arguments supporting standing.

**b.    Increased Bail Amounts**

Just City can show organizational standing like any other individual plaintiff: injury in

fact, causation, and redressability. *See FDA*, 602 U.S. at 393–94. Redressability refers to

whether "the injury likely would be redressed by the requested judicial relief," which essentially

asks whether the court can render relief that would resolve the plaintiff's problem. *See id.* at

380. With this in mind, Just City asserts that the injury it suffers is an increased cost in posting

bail for qualified detainees because HB 1719 prohibits state judges from considering an

individual's ability to pay. (ECF No. 1 at PageID 11.) And if this Court grants the requested

relief—which is declaring the statute unconstitutional—then, according to Just City, state judges

could consider a defendant's ability to pay bail again, and bail amounts would decrease. (*See id.*

at PageID 11–13.) Just City thus alleges redressability here, though it has a harder time showing

causation and injury in fact.

For example, Just City argues that by removing any consideration of a detainee's ability

to post bail, the challenged statute has caused judges to increase bail amounts for defendants and,

as a result, Just City has diverted its resources or paid more from its bail fund to post bail. (*See

id.* at PageID 11.) But this alleged causal link between HB 1719 and Just City's harm is

questionable. Just City provided no evidence of the cause of the increased bail costs beyond

Josh Spickler's affidavit claiming the statute has caused judicial commissioners to set higher bail

amounts. (*See* ECF No. 2-3 at PageID 46.) To be sure, the statute may have caused the bail-

setting judges to increase the bail amounts. But other causes might also be responsible. Because

the statute calls for an individual assessment based on many factors, the increased costs of bail

17

may stem from any of the factors listed in the statute.  *See* Tenn. Code Ann. § 40-11-118(b).  By way of example, the bail amounts may be higher because of the nature of crimes charged and the likelihood of conviction, or the detainees' criminal history and the danger the detainees pose to the community or their risk of flight.  And because Just City has not provided evidence of causation, it has not shown it likely has standing.

Also whether the allegedly higher bail amounts have injured Just City is similarly unclear because the law on whether an organization may show an injury based on diverting its resources has undergone recent shifts.  The diversion-of-resources theory on which Just City relies first arose in *Havens*, but the 2024 Supreme Court decision in *FDA* has questioned the viability of the approach moving forward.  *See FDA*, 602 U.S. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context.").  And the Sixth Circuit echoes these uncertainties in *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888 (2024) (per curiam).

In *Havens*, the plaintiff, Housing Opportunities Made Equal ("HOME"), sued Havens Realty under the Fair Housing Act, 42 U.S.C. § 3604, for engaging in racial steering.  *Havens*, 455 U.S. at 366–67.  Racial steering is a practice by which housing complexes provide inaccurate information about available units in an effort to "steer" people of different racial backgrounds away from certain residences.  *Id.* at 366 n.1.  After receiving information that Havens Realty was engaging in racial steering, HOME sent one black and one white "tester" employee to a Havens Realty property to ask about the availability of apartments in the complex. *Id.* at 368.  Havens Realty told the black "tester" employee that there were no available units, but it informed the white "tester" employee that there were apartments for rent.  *Id.*  As a result of Havens Realty's misrepresentation about housing availability, HOME expended resources that

18

otherwise could have been allocated to their "counseling and referral services for low- and moderate-income home-seekers." *See id.* at 379. And the Court reasoned that, because Havens Realty's racial steering practices "frustrated" and "perceptibly impaired" HOME's "counseling and referral services, with a consequent drain on resources," there was enough to confer standing on HOME. *Id.* at 369, 379. This approach has become known as the diversion-of-resources theory of standing.

That said, the theory has limited application outside of *Havens*'s "unusual" facts—especially after the Supreme Court's June ruling in *FDA*. In *FDA*, multiple medical associations brought a challenge under the Administrative Procedures Act against an FDA regulation that relaxed restrictions on the abortion drug mifepristone. *FDA*, 602 U.S. at 372–73. The medical associations argued that "FDA has 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id.* at 394. They also contended that the FDA's new regulation required the associations to "'expend considerable time, energy, and resources'" to oppose, research, and educate on mifepristone and the regulation, thereby draining resources that could have been allocated to other activities. *Id.* The Court reasoned that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* It thus decided that the associations lacked standing to challenge the regulation. *Id.*

The Court also explained why, despite plaintiffs' arguments, *Havens* did not govern the facts of that situation. The Court emphasized,

> Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers." In other words, Havens's actions

19

directly affected and interfered with HOME's core business activities—not
dissimilar to a retailer who sues a manufacturer for selling defective goods to the
retailer.

      That is not the kind of injury that the medical associations have alleged here.
FDA's actions relaxing regulation of mifepristone have not imposed any similar
impediment to the medical associations' advocacy businesses.

. . .

      *Havens* was an unusual case, and this Court has been careful not to extend
the *Havens* holding beyond its context. So too here.

*Id.* at 395–96 (citations omitted).

Only weeks after the Supreme Court issued its opinion in *FDA*, the Sixth Circuit issued
an opinion in *NAACP* about where to draw the line between *FDA* and *Havens*. *See FDA*, 602
U.S. 367 (decided June 13, 2024); *NAACP*, 105 F.4th 888 (decided June 28, 2024). In *NAACP*,
the NAACP sued Tennessee election administrators to challenge voter registration laws and
registration forms that impacted felons. *NAACP*, 105 F.4th at 890. The District Court for the
Middle District of Tennessee granted summary judgment for the NAACP and enjoined certain
registration practices shortly before the election. *Id.* On emergency motion, the Sixth Circuit
stayed the injunction under *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam) (instructing
courts to not interfere with state elections when close in time to the election), and on standing
grounds. *NAACP*, 105 F.4th at 890, 901–05.

The Sixth Circuit acknowledged how the Supreme Court in *FDA* said that "pocketbook"
harm was not enough to support standing and emphasized that the Supreme Court found standing
in *Havens* based on its "unusual" facts and the effect on HOME's "core business activities." *Id.*
at 903–05. The Sixth Circuit then placed the facts of *NAACP* somewhere between *FDA* and

20

*Havens* before side-stepping the diversion-of-resources standing issue and deciding the case on other grounds.[10]

Still, the Sixth Circuit reflected on the three cases and explained how applying the diversion-of-resources standing theory may be harder post-*FDA*. *See generally id.* After all, "[i]f the associations' expenditures did not suffice in [*FDA*], why should the NAACP's expenditures suffice in this one?" *Id.* at 905. And yet, "[i]f a customer's expenditure for the commodity sufficed to give it standing, why shouldn't the NAACP's expenditure for its voter-registration efforts?" *Id.* (noting *FDA*'s "approving[]" citations to "many other cases in which the Court has allowed 'unregulated' parties to sue a defendant even though the defendant's conduct harmed those parties indirectly").

Like *NAACP,* this case seems to fall somewhere between Just City trying to "spend its way into standing" by voluntarily posting bail for qualified detainees (which did not establish standing for the plaintiff associations in *FDA*) and HB 1719 "perceptibly impair[ing] [Just City]'s ability to" perform its "core business activit[y]" of posting bail (which satisfied the standing requirements in *Havens*). *FDA*, 602 U.S. at 394–95 (quoting *Havens*, 455 U.S. at 379). The uncertain legal landscape that *NAACP* paints about the diversion-of-resources theory undermines Just City's position that it has standing for purposes of preliminary injunctive relief, which also casts doubt on whether it will likely succeed on the merits. The Court will next address Just City's claim that it has third-party standing.

---

[10] The Sixth Circuit explained that "whether or not the NAACP's standing theory remains tenable, its president's declaration likely fails to" show standing at the summary judgment stage. *Id.* at 905. Of course, this case is not at the summary judgment stage, so this portion of the *NAACP* opinion has limited application to Just City's claims.

2.        **Third-Party Standing**

Just City argues that it has third-party standing to bring its claims.  Although a party may

typically assert only its own rights, the limited doctrine of third-party standing allows a plaintiff

to "raise a constitutional claim on behalf of a third party."  *Moody v. Mich. Gaming Control Bd.*,

847 F.3d 399, 402 (6th Cir. 2017).  To do so, the plaintiff must show (1) its own injury in fact,

(2) a close relationship between itself and the third party whose rights it intends to assert, and (3)

an obstacle or hindrance to the third party raising his own claim.  *Id.*; *see also FDA*, 602 U.S.

393 n.5 (explaining that in third-party standing cases, "the litigants themselves still must have

suffered an injury in fact . . . .  The third-party standing doctrine does not allow doctors to

shoehorn themselves into Article III standing simply by showing that their patients have suffered

injuries or may suffer future injuries").

Just City argues that it has third-party standing to assert the rights of detainees because

"(1) it has a close relationship with the arrestees and (2) there is a hindrance to the arrestees'

ability to protect their own interests."  (ECF No. 45 at PageID 417.)  As support for this claim, it

cites another bail fund case: *Nashville Cmty. Bail Fund v. Gentry*, 496 F. Supp. 3d 1112 (M.D.

Tenn. 2020) ("*NCBF*").

In *NCBF*, a bail fund much like Just City's sued the Criminal Court Clerk under the

Eighth and Fourteenth Amendments.  The bail fund alleged that the Clerk subtracted fees and

charges from the posted bail amount and, at the end of the case, returned only that reduced sum

(rather than the full sum) to whoever posted bail.  *Id.* at 1122.  The court explained that a third

party has a "close relationship" when the relationship between the parties allows the plaintiff to

be "as effective a proponent of the right as the" third party.  *Id.* at 1130.  Because NCBF shared

22

an interest in low bail amounts and offered charitable services to the detainees it assisted, the court found that NCBF met the "close relationship" requirement for third-party standing. *Id.*

For the hindrance requirement, the court noted that the Sixth Circuit has recognized "imminent mootness of a case, or systemic practical challenges to pursuing one's own rights" as sufficient hindrances. *Id.* (collecting cases). According to the court, the plaintiff showed "imminent mootness" because a detainee's "pretrial release might end during litigation, leaving him with no redressable injury" and rendering the case moot. *Id.* at 1131. And the recipients of NCBF's bail fund services, "by definition, have extremely limited resources," creating a "systemic practical challenge[]" for those detainees to assert their own rights. *See id.* at 1130.

The *NCBF* court's analysis on the "close relationship" and hindrance requirements for third-party standing is persuasive. This Court finds that Just City meets those two requirements as well. But the court in *NCBF* also found that the plaintiff suffered an injury in fact. And so we return to the same question for third-party standing as for organizational standing: Has Just City suffered its own injury in fact? And as the discussion about the *Havens*, *FDA*, and *NAACP* cases in the organizational standing section explains, Just City cannot show that it likely has suffered an injury in fact at this stage in the litigation.

In sum, Just City may have a difficult time showing causation. And as far as an injury in fact, its breach-of-contract argument does not support organizational standing for its Fourteenth Amendment claims. And even though Just City has presented a real, viable argument for organizational and third-party standing, it asserts an injury in fact under the diversion-of-resources theory, which similarly might not be enough. Recent precedent—and the uncertainty of applying it—casts doubt on the diversion-of-resources theory and suggests that Just City may lack standing to bring its claims, making it unlikely that it would succeed on the merits. *See*

*L.W.*, 73 F.4th at 415–16 (considering the novel nature of a constitutional inquiry as suggesting there was not a likelihood of success on the merits).  Not only has Just City failed to show likelihood of success on these standing issues, but a closer look at the constitutional questions reveals Just City may have similar problems proving likelihood of success on the merits of the substantive claims.

### C.    Constitutionality

Just City asserts two Fourteenth Amendment challenges to HB 1719.  The first count alleges that the procedures for a bail hearing are fundamentally unfair in violation of the Due Process Clause.  (ECF No. 1 at PageID 12–13.)  The second count alleges that the amendment leads to wealth-based detentions that violate the Equal Protection and Due Process Clauses.  (*Id.* at PageID 13.)  For neither claim has Just City shown a likelihood of success on the merits to support preliminary injunctive relief because Supreme Court and Sixth Circuit precedent and canons of statutory interpretation favor the State and Defendants.  The Court will first address the binding cases that guide review of challenges to wealth-based detentions.

#### 1.    Level of Scrutiny – Due Process or Equal Protection

The law surrounding detention of indigent defendants is somewhat confusing.  *See, e.g.*, *Walker*, 901 F.3d at 1265 (debating the proper level of scrutiny, analytical framework, and minimum requirements of due process and noting that "[t]he confusion is perhaps unsurprising because . . . *Bearden* . . . is [not] a model of clarity in setting out the standard of analysis to apply").  In *Bearden v. Georgia*, the Supreme Court addressed the revocation of probation for failure to pay a fine.  461 U.S. 660 (1983).  The Court explained that

> [d]ue process and equal protection principles converge in the Court's analysis in
> these cases. See *Griffin v. Illinois*, [351 U.S. 12, 17 (1956)]. Most decisions in this
> area have rested on an equal protection framework, although Justice Harlan in

24

> particular has insisted that a due process approach more accurately captures the
> competing concerns. See, *e. g.*, [*id.*] at 29–39 (Harlan, J., dissenting); *Williams v.*
> *Illinois*, [399 U.S. 235, 259–66 (1970)] (Harlan, J., concurring).  As we recognized
> in *Ross v. Moffitt*, [417 U.S. 600, 608–09 (1974)], we generally analyze the fairness
> of relations between the criminal defendant and the State under the Due Process
> Clause, while we approach the question whether the State has invidiously denied
> one class of defendants a substantial benefit available to another class of defendants
> under the Equal Protection Clause.

*Id. at* 665.  The Court added that, "[w]hether analyzed in terms of equal protection or due

process, the issue . . . requires a careful inquiry into such factors as 'the nature of the individual

interest affected, the extent to which it is affected, the rationality of the connection between

legislative means and purpose, [and] the existence of alternative means for effectuating the

purpose . . . .'"  *Id.* at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)).

The Fourteenth Amendment contains a "right not to lose [one's] liberty due to

indigency."  *Alkire v. Irving*, 330 F.3d 802, 816 (6th Cir. 2003); *see also Bearden*, 461 U.S. 660.

And, in some cases, courts have found that "fundamental fairness requires a court to inquire into

whether a criminal defendant is able to pay a fine."  *Powers v. Hamilton Cnty. Pub. Def.*

*Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (quotation marks omitted) (quoting *Bearden*, 461

U.S. at 673).  But while courts recognize these principles, they have not created an unqualified

right for an indigent defendant to receive treatment identical to wealthier defendants at all stages

of litigation.  For example, indigent defendants do not have a constitutional right to counsel for

discretionary appeals but defendants with more financial resources can certainly hire one.  *See,*

*e.g.*, *Ross*, 417 U.S. at 616–18.  The courts therefore ask whether the indigent person suffers "an

absolute deprivation of the desired benefit" rather than a diminished or delayed benefit.  *See San*

*Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 23–24 (1973).

25

The Supreme Court has not yet extended these rulings to pretrial bail proceedings. Although it may be logical to do so, given that some differential treatment based on wealth may be permissible, the answer is unclear.  This lack of clarity suggests there is not a likelihood of success based on these binding cases alone.  And Sixth Circuit caselaw on assessing likelihood of success, which the Court will discuss next, agrees.

### 2. Sixth Circuit's Approach to Injunctions in Constitutional Cases

When a case presents a novel issue or one that falls outside established precedent, courts may be wise to refrain from issuing an injunction.  The Sixth Circuit in *L.W. v. Skrmetti*, a case challenging a law prohibiting certain healthcare treatments for transgender minors under the Equal Protection and Due Process Clauses, clarified that,

> while the challengers do invoke constitutional precedents of the Supreme Court and our Court in bringing this lawsuit, not one of them resolves these claims.  In each instance, they seek to extend the constitutional guarantees to new territory.  There is nothing wrong with that, to be sure.  But it does suggest that the key premise of a preliminary injunction—likelihood of success on the merits—is missing.  The burden of establishing an imperative for constitutionalizing new areas of American life is not—and should not be—a light one, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue.  *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997).

73 F.4th at 415–16.  The Sixth Circuit then stayed the preliminary injunction that the district court had entered.

Just City challenges the constitutionality of HB 1719 through questions "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Ne. Ohio Coalition*, 696 F.3d at 591 (citation omitted).  But because neither the Constitution nor any binding courts hold that a bail-setting court must consider the detainee's ability to pay, Just City is asking this Court to recognize a constitutional right beyond

26

the scope of existing precedent.  In other words, it "seek[s] to extend the constitutional

guarantees [of the Fourteenth Amendment] to new territory," on an issue about which Tennessee,

and the 47 other States whose bail statutes or rules refer to a detainee's ability to pay or financial

situation,[11] "are currently engaged in serious, thoughtful debates."  *L.W.*, 73 F.4th at 415–16

---

[11] Just City claims that "[f]orty-one states explicitly *require* consideration of ability to pay," but this description is not precise.  (ECF No. 2-1 at PageID 30.)  In fact, twenty-one states explicitly require considering the detainee's ability to pay as part of the analysis.  *See* Alaska Stat. § 12.30.011(c)(8) (2024) ("assets available to the person to meet monetary conditions of release"); *In re Humphrey*, 11 Cal. 5th at 143; Haw. Rev. Stat. § 804-9 (2024) ("defendant's financial ability to afford bail"); Ind. Code Ann. § 35-33-8-4(b)(2) (2024) ("defendant's ability to give bail"); Ky. Rev. Stat. § 431.525(1)(e) (2024) ("financial ability of the defendant"); La. C.Cr.P. Art. 316(4) (2024) ("ability of the defendant to give bail"); 15 Me. Rev. Stat. § 1026(4)(C)(4) (2024) ("defendant's financial resources, including the ability of the defendant to afford a financial condition"); Md. R. 4-216.1(b)(2) ("the ability of the defendant to meet a special condition of release with financial terms"); Mich. Ct. R. 6.106(F)(1)(f) (employment and financial history "insofar as these factors relate to the ability to post money bail"); Mo. R. Crim. P. 33.01(e) ("financial resources, including ability to pay"); Mont. Code Ann. § 46-9-301(6) (2023) ("financial ability of the accused"); Neb. Rev. Stat. § 29-901(3) (2024) ("defendant's financial ability to pay a bond"); Nev. Rev. Stat. Ann. § 178.498(2) (2023) ("financial ability of the defendant to give bail"); N.Y. CLS CPL § 510.10(1)(f) (2024) ("principal's individual financial circumstances, and, in cases where bail is authorized, the principal's ability to post bail without posing undue hardship"); R.I. Super. Ct. R. Crim. P. 46(c) ("financial ability of the defendant to give bail"); Tex. Code Crim. Proc. Art. 17.15(a)(4) (2023) ("ability to make bail"); Utah Code Ann. § 77-20-205(7)(a) (2024) ("the individual's ability to pay"); 13 Vt. Stat. Ann. § 7554(b)(1) (2024) ("accused's ability to post bail"); Va. Code Ann. § 19.2-121(A) (2024) ("financial resources of the accused or juvenile and his ability to pay bond"); W. Va. Code § 62-1C-1a(a)(3)(A) (2024) ("[t]he ability of the arrested person to give bail"); Wyo. R. Crim. P. 46.1(d)(3)(A) ("financial resources").

And another twenty states require considering a detainee's *financial condition or resources*.  *See* Ariz. Rev. Stat. § 13-3967(B)(7) (2024) ("financial resources"); Ark. R. Crim. P. 9.2(c)(ii) ("his employment status, history and financial condition"); Colo. Rev. Stat. Ann. § 16-4- 103(3)(a) (2024) ("the person's financial condition"); Conn. Gen. Stat. § 54-3b(b)(6) (2024) ("defendant's financial resources"); Fla. Stat. § 903.046(2)(c) (2024) ("financial resources"); Ga. Code Ann. § 17-6-1(e)(2)(A)-(C) (2024) ("financial resources and other assets, including whether any such assets are jointly controlled;" "earnings and other income;" and "financial obligations, including obligations to dependents"); 725 Ill. Comp. Stat. Ann. 5/110-5(a)(3)(A) (2024) ("financial resources"); Iowa Code § 811.2(2) (2024) ("financial resources"); Kan. Stat. Ann. § 22-2802(8) (2024) ("financial resources"); Mass. Gen. Laws Ann. ch. 276, § 57 (2024) ("the person's financial resources"); Minn. R. Crim. P. 6.02(2)(e) ("financial resources"); Miss. R. Crim. P. 8.2(a)(13) ("defendant's financial condition"); N.M. R. Crim. P. Dist. Ct. 5-401(C) ("financial resources"); N.C. Gen. Stat. § 15A-534(c) (2023) ("financial resources"); N.D. R.

(quotation marks omitted). And an effort to extend a constitutional right "suggest[s] that the key premise of a preliminary injunction—likelihood of success on the merits—is missing." *Id.* at 415.

### 3. Just City's Authority

Even though Just City invokes Supreme Court and Sixth Circuit precedent in support of its position, it cites no case that directly resolves its claims here. Instead, the cases occur in different procedural stages, challenge bail schemes unlike Tennessee's, or seek varying types of relief. Just City cites eight cases for its claim that "[c]ourts in Tennessee, and across the country, have applied this requirement [that courts must consider the defendant's ability to pay] to bail determinations." (ECF No. 2-1 at PageID 31.) These cases suggest that Just City has an argument which might prevail in the end, but they fail to show *likelihood of success on the merits* because no binding case recognizes "ability to pay" as the constitutional touchstone for setting bail.[12]

---

Crim. P. 46(a)(3)(C) ("financial resources"); Ohio Rev. Code Ann. § 2937.011(E)(4) (2023) ("financial resources"); 234 Pa. Code Ch. 5, Rule 523(A)(2) (2024) ("financial condition"); Brill v. Gurich, 965 P.2d 404, 406 (Okla. Crim. App. 1998) ("financial condition"); S.D. Codified Laws § 23A-43-4 (2024) ("financial resources"); Rev. Code Wash. § 10.21.050(3)(a) (2024) ("financial resources").

Six other states explicitly *allow*, but do not require, similar considerations. *See* Ala. R. Crim. P. Rule 7.2(a)(3)(xiii) ("defendant's financial condition"); Idaho Crim. R. 46(c)(1) ("financial condition"); N.H. Rev. Stat. Ann. § 597:2(III)(b)(3) (2024) ("all relevant factors bearing upon a person's ability to post bail"); N.J. Stat. § 2A:162-20(c)(1) (2024) ("financial resources"); S.C. Code Ann. § 17-15-30(A)(3) (2024) ("financial resources"); Wis. Stat. Ann. § 969.01(4) (2024) ("the ability of the arrested person to give bail"). And two states do not address the issue. *See* 11 Del. C. § 2104 (2019); Ore. Rev. Stat. § 135.265 (2024). Tennessee's statute is the only one that prohibits consideration of a detainee's ability to pay. *See* Tenn. Code Ann. § 40-11-118(b).

[12] It is particularly difficult to believe that "ability to pay" is the constitutional touchstone when it is a permissible, but not mandatory, consideration in so many statutes across the country. Even still, the change to the Tennessee statute is troublesome. It is one thing for the statute to guide judges' discretion by suggesting that the bail-setting court need not base the amount of bail

For example, the Tennessee cases Just City cites relate to bail schemes or procedural postures quite different from the one challenged here because HB 1719 had not been enacted at the time those cases arose.  *See Torres v. Collins*, No. 2:20-CV-00026-DCLC-CRW, 2023 WL 6166523, at *2 (E.D. Tenn. Sept. 21, 2023) ("[B]ail is set solely based on the arrestee's charges and criminal history [in an ex parte proceeding]; bail-setters do not know the arrestee's employment status, financial condition, family ties and relationships, or ties to the community."); *McNeil v. Cmty. Probation Servs., LLC*, No. 1:18-cv-00033, 2019 WL 633012, at *15 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019) (finding the bail system "constitutionally deficient in failing to provide notice and an opportunity for the arrestee to be heard, and for failing to provide oral and written findings regarding the arrestee's ability to pay, alternative conditions of release, and the need for pre-revocation detention."); *Weatherspoon v. Oldham*, No. 17-cv-2535-SHM-cgc, 2018 WL 1053548, at *7 (W.D. Tenn. Feb. 26, 2018) ("The state trial court violated [the habeas petitioner's] procedural Due Process rights by failing to consider non-monetary conditions of release" even though it considered the other factors of Tenn. Code Ann. § 40-11-118).  Although these cases refer to an indigent arrestee's "ability to pay," the challenged practices in these cases lack discussion of other parts of the statute that bail-setters consider here—like financial condition, financial ties, and the need for detention based on flight risk or danger to the community.  And so these cases suggest that considering a detainee's ability to pay is enough to pass constitutional muster when other considerations are absent, but they do not show it is a requirement.

---

solely on a detainee's ability to pay.  But HB 1719 goes further than any other state statute of which the Court is aware and removes any consideration of the detainee's ability to pay from the bail-setting court's analysis.  Perhaps that step is unconstitutional, but at this point, we do not know.

Similarly, the out-of-circuit opinions Just City cites have limited value here and fail to

show a likelihood of success.  For example, in *ODonnell v. Harris Cty.*, the Fifth Circuit

addressed a "custom and practice" of using a predetermined bail schedule that "did not achieve

any individualized assessment in setting bail."  892 F.3d 147, 153 (5th Cir. 2018) ("*ODonnell*

*I*").  Such a bail scheme does not exist here, and, even if it did, the Fifth Circuit recently

overturned *ODonnell I* on abstention grounds.  *Daves v. Dallas Cnty.*, 64 F.4th 616, 631 (5th Cir.

2023) (en banc) ("[W]e hold that pursuant to *Younger*, *O'Shea*, *Tarter* [*v. Hury*, 646 F.2d 1010

(5th Cir. 1981)], and *Wallace* [*v. Kern*, 520 F.2d 400 (2d Cir. 1975)], neither *ODonnell I* nor this

case should have been adjudicated in federal court.  We overrule *ODonnell I*'s holding against

abstention.").  And because the Tennessee statute here requires an individual evaluation of the

statutory factors for each detainee, *ODonnell I* suffers from the same shortcomings as the

Tennessee cases cited above.

Just City also cites *In re Humphrey*, in which the California Supreme Court holds that

"the court must consider the arrestee's ability to pay the stated amount of bail—and may not

effectively detain the arrestee 'solely because' the arrestee 'lacked the resources' to post bail."

11 Cal.5th 135, 143 (Cal. 2021) (quoting *Bearden*, 461 U.S. at 667–68).  But *In re Humphrey* is

a habeas case and presented a novel issue for that court.  *See id.* at 149 ("Neither this court nor

the United States Supreme Court has yet held that a judge must consider what an arrestee can

pay when fixing the amount of money bail.").  Lastly, *Black v. Decker*, 103 F.4th 133 (2d Cir.

2024), and *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017), may support Just City's position

but are habeas cases addressing bond proceedings in immigration court.

The most useful case Just City cites is *Walker v. City of Calhoun*, 901 F.3d 1245 (11th

Cir. 2018), which analyzes the scope of *Bearden*, an indigent detainee's liberty rights, and what

standards to apply to wealth-based detentions.  In *Walker*, the plaintiff challenged a standing order in the Municipal Court of the City of Calhoun, Georgia, that set cash bail at "amount[s] represent[ing] the expected fine" and required hearings within 48 hours of arrest for those who did not obtain release under the bail schedule.  *Id.* at 1252.  Those hearings gave detainees the "opportunity to object to the bail amount . . . , including any claim of indigency."  *Id.*

The district court in *Walker* enjoined the use of the standing order, finding the plaintiff was likely to succeed on his constitutional challenges to it.  *Id.* at 1257.  And the Eleventh Circuit reversed after reviewing that conclusion and addressing the appropriate scrutiny and analysis for Equal Protection and Due Process challenges.  *See id.* at 1258–65.  The Eleventh Circuit explained that, for claims that allege wealth-based discrimination, the court "generally analyze[s] the fairness of relations between the criminal defendant and the State under the Due Process Clause, while [it] approach[es] the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause."  *Id.* at 1259 (quoting *Bearden*, 461 U.S. at 665).  And it rejected arguments that heightened scrutiny was appropriate for either claim.  *Id.* at 1262–63 (explaining that "[t]he district court was wrong to apply heightened scrutiny under the Equal Protection Clause" and that the governing cases on Due Process used an analysis that was "a far cry from strict—or even intermediate—scrutiny").

For the Due Process claims, the Eleventh Circuit emphasized that "[t]he fundamental requirement . . . is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.* at 1265 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  And on the Equal Protection front, it explained that "the *Bearden* line of cases [meant] that wealth-based sanctions are impermissible when they are 'not merely *disproportionate* in impact,' but '[r]ather, they are

31

wholly contingent on one's ability to pay.'" *Id.* at 1261 (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 127 (1996)). Essentially, "differential treatment by wealth is impermissible only where it results in a *total* deprivation of a benefit *because* of poverty." *Id.* In other words, treating people differently based on their ability to pay a fee is not a constitutional problem in every instance.[13]

The Eleventh Circuit also acknowledged a constitutional right to be free from wealth-based detentions and held that using a hearing-based method of determining indigency within 48 hours of arrest did not violate that right. *See id.* at 1265–69. But it emphasized how "the Supreme Court has recognized that state systems of criminal procedure vary widely in the nature and number of pretrial procedures they provide, and it has noted that there is no single preferred approach." *Id.* at 1268 (quotation marks omitted) (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991) (quoting *Gerstein*, 420 U.S. at 123)). Given the flexibility granted to states in creating pretrial procedures and that *Walker* is a single, non-binding case, it does not show a likelihood of success on the merits here.

Just City presents strong arguments about the liberty rights associated with setting bail, especially for indigent defendants. But the cases it cites acknowledging (or, perhaps, creating) those liberty rights materially differ from the facts here and do not bind the Court, so Just City seeks to extend these cases to the situation here. And as the Sixth Circuit held in *L.W. v. Skrmetti*, when a party sues to expand constitutional rights, it "does suggest that the key premise

---

[13] The Eleventh Circuit cautions that interpreting this standard in a constitutional context can be tricky because "[a]ny government benefit or dispensation can be framed in artificially narrow fashion to transform a diminishment into total deprivation." *Walker*, 901 F.3d at 1264. For example, detainees may argue that Equal Protection is violated when "[t]he person who has money pays it *and walks away*" but "[t]he indigent can't pay, so he *goes to jail*." *Id.* at 1263. But the *Walker* court noted that one could similarly argue that "[t]he person who has money pays it and *gets express postal service*" while "[t]he indigent can't pay, so he *goes with snail mail*." *Id.* at 1264. In the end, this shows that not all wealth-based differences amount to constitutional violations.

of a preliminary injunction—likelihood of success on the merits—is missing." 73 F.4th at 415–

16. So too here, Just City fails to show likelihood of success on its constitutional claims. The

Court next addresses how the canons of statutory interpretation similarly suggest Just City is not

likely to succeed on its constitutional claims.

### D.    Statutory Interpretation

Given the parties' disagreement about how to interpret the statutory terms "financial

condition" and "ability to pay," the Court must look to the canons of statutory construction. And

those canons of statutory construction do not erase the doubt around the likelihood of success for

Just City. Where "financial condition" ends and "ability to pay" begins is unclear, and so is

whether the point between the two has constitutional significance. But when (or if) the Court

must decide that issue, interpretive principles favor Defendants and the State.[14] For example, the

canon against surplusage means that "every word and every provision is to be given effect [and

that n]one should needlessly be given an interpretation that causes it to duplicate another

provision or to have no consequence." *Donovan v. Firstcredit, Inc.*, 983 F.3d 246, 257 (6th Cir.

2020) (citation omitted). And so, were the Court to apply the canon against surplusage, the

Court would not interpret the phrases to be redundant and fail to give meaning to one or the

other. Instead, it would likely find that the two phrases refer to different subjects and it would

need to carefully determine what each phrase means.

And the canon of constitutional avoidance, which recognizes a court's duty to interpret

statutes in a way that avoids constitutional questions, would favor interpreting "financial

---

[14] Statutory interpretation is a legal issue that the Court could consider and decide now. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 672 F.3d 434, 437 (6th Cir. 2012). But without knowing whether Just City has standing to challenge the statute, the Court believes it unwise to opine on its meaning until the parties develop the record more fully and the Court can assure itself of its jurisdiction.

condition" and "ability to pay" in a way that does not violate the Fourteenth Amendment if

possible. *Bevan & Assocs., LPA v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019). Under this canon,

"[w]hen 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a

cardinal principle that this Court will first ascertain whether a construction of the statute is fairly

possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 583 U.S. 281, 296

(2018) (citation omitted). And this applies equally to interpreting state statutes because "[s]tate

statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity

is judicially declared." *Freed v. Thomas*, 81 F.4th 655, 660 (6th Cir. 2023) (citation omitted).

"Therefore, state statutes which have not been authoritatively construed by state courts should be

interpreted by federal courts so as to avoid constitutional questions."[15] *Berger v. Sup. Ct. of

Ohio*, 861 F.2d 719 (6th Cir. 1988) (internal citations and quotation marks omitted) (citing *Dale

Baker Oldsmobile v. Fiat Motors of N. Am., Inc.*, 794 F.2d 213, 221 (6th Cir.1984)).

Courts will even use this interpretive approach to avoid constitutional questions when the

reading that preserves the statute is "plainly not the best" one if it "is at least a possible one."

*Bevan*, 929 F.3d at 376–77 (quoting *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18

(2013)). The constitutional avoidance canon "comes into play only when, after the application of

ordinary textual analysis, the statute is found to be susceptible of more than one construction."

*Jennings*, 583 U.S. at 296 (citation omitted). But it likely applies in this case in which the scope

of the phrase "financial condition" is unclear and there is no clear case law identifying "ability to

---

[15] This is doubly true here because Tennessee also recognizes and applies the canon when
interpreting its own statutes. *State v. White*, 362 S.W.3d 559, 566 (Tenn. 2012) ("[W]e presume
that an enactment of the General Assembly is constitutional. We have a duty to adopt a
construction which will sustain a statute and avoid constitutional conflict if any reasonable
construction exists that satisfies the requirements of the Constitution." (citations and quotation
marks omitted)); *see also Bevan*, 929 F.3d at 376–77 (applying the canon to interpreting an Ohio
statute when Ohio law would do the same).

34

pay" as the constitutional standard for bail proceedings. To that end, if possible, the Court will likely interpret the statute in a way that preserves it, which casts doubt on Just City's likelihood of success on the merits.

For the reasons discussed above, Just City has not shown it is likely to succeed on the merits of its claims. The difficulty (and uncertainty) of the standing, the constitutionality, and the interpretation questions convinces the Court that it should deny the motion for preliminary injunction here. The Court will now address the remaining factors for preliminary injunction.

## II.    Irreparable Harm Absent the Injunction

The second factor courts consider for a preliminary injunction is whether a party will suffer irreparable harm without injunctive relief. *McGirr*, 891 F.3d at 610. Irreparable harm is an "indispensable" requirement before a court can issue an injunction. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Although the test for preliminary injunctions balances each factor, "[i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* "Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Id.* But "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Vitolo*, 999 F.3d at 360 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

The right to be free from unconstitutional detention thus amounts to an irreparable injury. And the relief Just City seeks here would terminate allegedly unconstitutional detentions and preclude the state court from ordering additional unconstitutional detentions, which favors injunctive relief. But as noted above, Just City has not shown that it likely has standing for its claims or that the bail statute here is likely unconstitutional. For that reason, the detainees may not be suffering any harm.

35

III.    **Harm to Third Parties**

For the third factor for preliminary injunctive relief, courts assess harm to third parties if the court were to enter an injunction. *McGirr*, 891 F.3d at 610. Of course, "no cognizable harm results from stopping unconstitutional conduct." *Vitolo*, 999 F.3d at 360. But if the conduct is not unconstitutional—and Just City has not shown it likely is—then a court that grants such requested relief would create significant administrative and social harm. An injunction here would require Defendants to release detainees or conduct new bail hearings for them, and it would prevent the State from enforcing its own law in the administration of its own criminal proceedings and justice system. So the social and political consequences of ruling HB 1719 unconstitutional include interfering with Tennessee's criminal justice system and invalidating a properly enacted statute of Tennessee's legislature. The ongoing federalism and comity concerns and Just City's limited or uncertain likelihood of success all point to denying injunctive relief. This is especially true when it is unclear whether Just City even has standing to bring its claims.

IV.    **Public Interest**

The final factor courts consider when ruling on a motion for a preliminary injunction is whether that injunction would further the public interest. *McGirr*, 891 F.3d at 610. Of course, "it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo*, 999 F.3d at 360 (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).

But Just City has not shown that it can bring this claim under Article III standing, and it has not shown that the statute *likely* violates the constitution. And absent a likely violation of a detainee's Fourteenth Amendment liberty rights, denying an injunction serves other public

36

interests.  It does so by preserving a bail system that makes individual decisions on grounds including financial condition, risk of harm to the community, family relationships, criminal record, and alleged crime.  Tenn. Code Ann. § 40-11-118(b).  This bail-setting process ensures the safety of the public and the presence of the detainee at trial.

For all these reasons, the Court **DENIES** Just City's request for a preliminary injunction. The Court will now turn to the request for Expedited Declaratory Judgment.

## **MOTION FOR EXPEDITED DECLARATORY JUDGMENT**

Just City also seeks expedited declaratory judgment against the Sheriff, the Presiding Shelby County General Sessions Criminal Court Judge, and the Shelby County Judicial Commissioners under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57, which "govern[s] the procedure for obtaining a declaratory judgment."

The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations of any interested party seeking such declaration" "[i]n a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201(a).  The district court has discretion to grant declaratory judgment.  *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 796 (6th Cir. 2022) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). The Sixth Circuit focuses on five factors in deciding whether declaratory judgment is appropriate.  *Id.* at 796–97 (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  The *Grand Trunk* factors are

(1) whether the declaratory action would settle the controversy;
(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata[";]
(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

37

(5) whether there is an alternative remedy which is better or more effective.

*Id.* at 796–97 (quoting *Grand Trunk*, 746 F.2d at 326).

A ruling that the statute is unconstitutional—which is the declaratory relief Just City requests—would essentially decide the ultimate issue in this case and "settle the controversy." But, as discussed above, it is unclear whether Just City has standing here or if it is likely to succeed on the merits of its claims, making declaratory relief inappropriate at this preliminary injunction stage. And deciding that Tennessee's bail procedures are unconstitutional without any discovery on the standing issue and on other factual issues would "increase friction" with the state courts by prematurely interfering with their criminal proceedings. The Court thus defers ruling on the declaratory relief issue for now.

## MOTIONS TO DISMISS

Defendants and the State move to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing *Younger* abstention and lack of standing require dismissal.[16] (ECF Nos. 44, 52.) The State also moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 52.) The Court thoroughly discussed *Younger* abstention in the

---

[16] Defendants also asked the Court to restyle the case as against the County only and to remove the official-capacity defendants. (ECF No. 44 at PageID 412–13.) But a "plaintiff is master of her complaint—she decides who to sue, where to sue, how to sue, and what to sue about." *Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 282 (6th Cir. May 23, 2019) (citations omitted). And Just City alleges a factual basis for its official-capacity claims. (ECF No. 1 at PageID 10 ("The Judicial Commissioners started using new bail forms that did not reference ability to pay bail, which . . . [were] drafted at the General Sessions Judges' direction. The Judicial Commissioners stopped considering ability to pay when setting bail. The Sheriff began enforcing the resulting unconstitutional bail orders . . . .).) It also has legal grounds to assert those claims. *See Morgan v. Bd. of Prof'l Responsibility of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023) ("Under *Ex parte Young*, [209 U.S. 123 (1908),] 'suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment.' This doctrine applies only when the plaintiff sues for 'prospective [injunctive] relief to end a continuing violation of federal law.'" (citations omitted)). The Court therefore **DENIES** Defendants' motion to restyle the case as against Shelby County only.

likelihood of success section above, and that analysis—in which the Court ruled that abstention was improper here—applies with equal force to these motions to dismiss.

The discussion of standing and the constitutionality of the Tennessee bail statute above are similarly relevant here, but the standard for a plaintiff to survive a motion to dismiss is less demanding than for a plaintiff to show it is entitled to a preliminary injunction. *See NAACP*, 105 F.4th at 906–07 (explaining that different procedural stages of litigation have different requirements and that a plaintiff "had to prove that it *likely* had standing" to obtain a preliminary injunction but "that it *actually* had standing" for summary judgment); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). Unlike a preliminary injunction, the pleading standard to survive a motion to dismiss merely requires the plaintiff to plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And the Court accepts all factual allegations in Just City's complaint as true at this stage. *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1037 (6th Cir. 2024) ("When considering a motion to dismiss, we must accept as true all factual allegations but need not accept any legal conclusions."). So even though Just City has not shown it is *likely* to succeed on the merits of its claims, it has *plausibly alleged* enough to survive dismissal.

On the matter of standing, Just City must plausibly plead an injury in fact, causation, and redressability. *See FDA*, 602 U.S. at 380. Just City alleges Tennessee's new bail statute has resulted in unconstitutional pretrial detentions and higher bail amounts, which interferes with Just City's mission. (ECF No. 1 at PageID 10–12.) For example, Just City claims that "HB

39

1719 has inhibited Just City's mission by prohibiting judges from considering the possibility of Just City's contribution to the arrestee's ability to pay." (*Id.* at PageID 11.)  These allegations show plausible causation between the Defendants' action and Just City's harm, plausible redressability of that harm by enjoining enforcement of the statute and certain bail orders, and a plausible injury-in-fact under the diversion-of-resources theory of standing.  (*See id.* at PageID 10–12.)  *See Havens*, 455 U.S. at 369, 379.

Additional discovery about the reason for increased bail amounts, potential future harm, individual detainees Just City intends to assist, and similar facts may be relevant to deciding the issue of standing at summary judgment, but that level of detail is unnecessary to defeat a motion to dismiss.  *See NAACP*, 105 F.4th at 903 ("On summary judgment, the plaintiff must produce evidence showing the 'specific facts' that support its standing.  We thus have granted summary judgment against similar nonprofit entities that failed to back up their diversion-of-resources allegations with adequate proof." (citations omitted)); *id.* at 907 (determining the NAACP's "'conclusory allegations' may well not suffice to withstand summary judgment" when "the NAACP did not identify any specific voters, or even the number of voters, that it had helped in the past.  Nor did it provide any similar detail about its plans to help voters register in the future.")

And on the constitutional front, Just City alleges that indigent detainees remain in jail just because they lack resources.  Tennessee state judges must issue bail orders without considering their ability to pay.  (ECF No. 1 at PageID 12–13.)  *See also* Tenn. Code Ann. § 40-11-118(b).  And that "[t]he Sheriff began enforcing the resulting unconstitutional bail orders to detain arrestees who are unable to pay for their release."  (ECF No. 1 at PageID 10.)  If such orders are unconstitutional as wealth-based detentions—which existing case law suggests might be true,

*see, e.g.*, *Bearden*, 461 U.S. 660; *Walker*, 901 F.3d 1245—then these alleged facts state a plausible claim to relief on Just City's constitutional challenge to the statute.  For these reasons, the Court denies Defendants' motions to dismiss.

## **CONCLUSION**

In sum Just City has not shown a likelihood of success on the merits of its claims.  That said, it has presented real, viable arguments for standing, but the law around finding an injury in fact for diversion of resources is in flux.  Similarly, the unclear path forward in the analysis of HB 1719's constitutionality casts doubt on Just City's ability to succeed on its claims.  To be sure, the risk of harm associated with arguably unconstitutional detentions and the public interest in fair and constitutional treatment of indigent detainees favor issuing a preliminary injunction. But Just City has not shown that the Tennessee statute is likely unconstitutional or that it likely has standing to bring the action.  On balance, the Court finds that it should not employ the strong remedy of a preliminary injunction here.

Even though these challenging questions do not support preliminary injunctive relief, Just City has alleged enough to survive a motion to dismiss.  Just City plausibly alleges harm to the organization and to indigent defendants for standing purposes.  And it alleges facts about HB 1719's modification to prohibit courts from considering ability to pay when setting bail that raises a plausible question about the statute's constitutionality.

For the above reasons, the Court **DENIES** the motion for preliminary injunction and expedited declaratory relief (ECF No. 2), and also **DENIES** the motions to dismiss (ECF Nos. 44, 52).

41

**SO ORDERED**, this 29th day of November, 2024.

                      s/Thomas L. Parker
                  THOMAS L. PARKER
                  UNITED STATES DISTRICT JUDGE