**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

**Just City, Inc.**, and class representatives
**Deangelo Towns** and
**Marshawn Barnes**,
on behalf of themselves and all others
similarly situated,
Plaintiffs,

v.

Floyd Bonner Jr.,
**Shelby County Sheriff**;

Lee Wilson,
**Presiding Shelby County General Sessions Criminal Court Judge**; and

John Marshall, Robert Barber, Rhonda Harris, Kevin Reed, Christopher Ingram, Shayla Purifoy, Ross Sampson, Serena Gray, Terita Hewlett, Mischelle Best, Kenya Smith, Zayid Saleem, Kathy Kirk Johnson, Leslie Mozingo,
**Shelby County Judicial Commissioners**,

in their official capacities,
Defendants.

Case No. 2:24-cv-2540-TLP-tmp

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................... 1

STATEMENT OF FACTS ..................... 3

A. How Shelby County's Bail Practices Changed Because of HB 1719 ..................... 3

B. Considering Ability to Pay Did Not Lead to Increased Administrative Burden ..................... 7

C. Considering Ability to Pay Did Not Lead to Increased Public Safety Risk ..................... 9

D. HB 1719 Is Unprecedented, Undefined, and Incompatible With the Statutory Scheme ..................... 9

E. HB 1719 Causes Wealth-Based Detention and Risks Unnecessary Detention ..................... 11

F. HB 1719 Harms Just City's Ability to Provide Services to Clients ..................... 15

ARGUMENT ..................... 18

I. HB 1719 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES THE DUE PROCESS CLAUSE ..................... 18

II. HB 1719 PREVENTS ARRESTEES FROM RECEIVING A "MEANINGFUL" OPPORTUNITY TO BE HEARD UNDER *MATHEWS V. ELDRIDGE* ..................... 23

III. HB 1719 CAUSES DISCRIMINATORY WEALTH-BASED DETENTION IN VIOLATION OF *BEARDEN* ..................... 28

IV. THE COURT SHOULD ENTER PERMANENT INJUNCTIVE RELIEF AGAINST THE SHERIFF AND DECLARATORY RELIEF AGAINST ALL PARTIES ..................... 32

A. A Permanent Injunction Against the Sheriff Is Warranted ..................... 32

B. Declaratory Relief Against All Parties Is Warranted ..................... 34

CONCLUSION ..................... 35

## TABLE OF AUTHORITIES

### Cases

*ACLU Fund of Mich. v. Livingston Cty.*,
796 F.3d 636 (6th Cir. 2015) ... 34

*ACLU of Ky. v. McCreary Cty.*,
354 F.3d 438 (6th Cir. 2003) ... 33

*Alkire v. Irving*,
330 F.3d 802 (6th Cir. 2003) ... 28

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*,
502 F.3d 545 (6th Cir. 2007) ... 18, 19

*Audi AG v. D'Amato*,
469 F.3d 534 (6th Cir. 2006) ... 32

*Bearden v. Georgia*,
461 U.S. 660 (1983) ... 1, 28, 29

*Belle Maer Harbor v. Charter Twp. Of Harrison*,
170 F.3d 553 (6th Cir. 1999) ... 19, 20, 21

*Bill Johnson's Rests. v. NLRB*,
461 U.S. 731 (1983) ... 19

*Brangan v. Commonwealth*,
477 Mass. 691 (2017) ... 30

*Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
29 F.4th 792 (6th Cir. 2022) ... 35

*Carolina Youth Action Project v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ... 21

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
363 F.3d 427 (6th Cir. 2004) ... 34

*Cole v. City of Memphis, Tenn.*,
108 F. Supp. 3d 593 (W.D. Tenn. 2015) ... 33

*Cunney v. Bd. of Trs. of Grand View*,
660 F.3d 612 (2d Cir. 2011) ... 21

*Daves v. Dallas Cnty.*,
22 F.4th 522 (5th Cir. 2022) ... 29

*Daves v. Dallas Cnty.*,
63 F.4th 616 (2023) .......... 29

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) .......... 15

*Fowler v. Benson*,
924 F.3d 247 (6th Cir. 2019) .......... 23

*Hill v. Colorado*,
530 U.S. 703 (2000) .......... 18

*In re Humphrey*,
11 Cal. 5th 135 (2021) .......... 30

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*,
226 F.Supp.3d 320 (D.N.J. 2016) .......... 19

*Johnson v. City of Cincinnati*,
310 F.3d 484 (6th Cir. 2002) .......... 23

*Kolender v. Lawson*,
461 U.S. 352 (1983) .......... 18, 21

*Konikov v. Orange County*,
410 F.3d 1317 (11th Cir. 2005) .......... 22

*Maben v. Thelen*,
887 F.3d 252 (6th Cir. 2018) .......... 18

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 1, 23

*McNeil v. Cmty. Prob. Servs., LLC*,
945 F.3d 991 (6th Cir. 2019) ("*McNeil II*"). .......... 32, 33, 34

*McNeil v. Community Probation Services, LLC*,
2019 WL 633012 (M.D. Tenn. Feb. 14, 2019),
*aff'd*, 945 F.3d 991 (6th Cir. 2019) .......... 28, 29, 30, 31

*Memphis Ctr. for Reprod. Health v. Slatery*,
14 F.4th 409 (6th Cir. 2021) .......... 19

*Miller v. City of Cincinnati*,
622 F.3d 524 (6th Cir. 2010) .......... 19

*N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*,
730 F.Supp.3d 185 (M.D.N.C. 2024), *aff'd*, 155 F.4th 298 (4th Cir. 2025) .......... 22

*ODonnell v. Harris Cty.*,
892 F.3d 147 (5th Cir. 2018), *aff'g* 251 F. Supp.3d 1052 (S.D. Tex. 2017) ........................ 29, 31

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*,
822 F.2d 1390 (6th Cir. 1987) ........................................................................................ 33

*Republican Nat'l Comm. v. N.C. State Bd. Of Elections*,
120 F.4th 390 (4th Cir. 2024) ........................................................................................ 15

*Rodriguez v. Providence Cmty. Corr., Inc.*,
155 F. Supp. 3d 758 (M.D. Tenn. 2015) ................................................................ 25, 33, 34

*Springfield Armory v. City of Columbus*,
29 F.3d 250 (6th Cir. 1994) ................................................................................ 19, 20, 23

*Stack v. Boyle*,
342 U.S. 1 (1951) ..................................................................................................... 24, 26

*Torres v. Collins*,
2023 WL 6166523 (E.D. Tenn. Sept. 21, 2023) ........................................................ 24, 25, 29

*United States v. Bogle*,
855 F.2d 707 (11th Cir. 1988) ........................................................................................ 33

*United States v. Brandon*,
158 F.3d 947 (6th Cir. 1998) .......................................................................................... 23

*Valdez-Jimenez v. Eighth Judicial Dist. Court of Nev.*,
136 Nev. 155 (2020) ...................................................................................................... 30

*Walker v. City of Calhoun*,
901 F.3d 1245 (11th Cir. 2018) ................................................................................ 28, 30

*Weatherspoon v. Oldham*,
2018 WL 1053548 (W.D. Tenn. Feb. 26, 2018) ........................................................... 28, 29

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ...................................................................................................... 23

**Statutes**

2024 Tenn. Pub. Acts Ch. 869 (May 1, 2024) .................................................................. 10

Tenn. Code Ann. § 40-11-102 .......................................................................................... 24

Tenn. Code Ann. § 40-1-111(a)(1)(A)(iv) ............................................................................ 7

Tenn. Code Ann. § 40-11-118 ............................................................................................ 4

Tenn. Code Ann. § 40-11-118(a)(2) .......... passim

Tenn. Code Ann. § 40-11-118(b)(2) (1996) (amended 2024) .......... 3, 10

Tenn. Code Ann. § 40-11-119(b) .......... 12

Tenn. Code Ann. § 8-8-201(a)(1)(3) .......... 12

TENN. CONST. art. I, § 15 .......... 24

**Rules**

Fed. R. Civ. P. 56(a) .......... 18

**Webpages**

*Analysis of the Pretrial Detention System in Shelby County, Tennessee: 2025 Report*, University of Memphis, School of Urban Affairs and Public Policy, available at: https://www.memphis.edu/ccre/pretrial_ccre_commission_20250326.pdf .......... 9

## PRELIMINARY STATEMENT

By prohibiting judicial officers setting bail from considering an arrestee's ability to pay, HB 1719 results in pretrial detention of arrestees based on fundamentally unfair bail proceedings that violate the arrestee's constitutional rights. The Tennessee legislature passed this unprecedented law in reaction to agreed-upon reforms to Shelby County's bail system. Before the law, Shelby County implemented a process that required judicial officers to consider and make findings regarding an arrestee's ability to pay bail. Seeking to overturn that practice, HB 1719 adopted a vague rule that entirely prohibits judicial officers from considering ability to pay at all. The amended statute is now internally inconsistent and undermines the ability of judicial officers to satisfy the statute's specific requirement that bail must be set at the lowest amount necessary to reasonably ensure an arrestee's court appearance and public safety.

Plaintiffs are two individuals who were detained on unfair bail orders issued by judicial officers who did not consider the amount of bail they could afford, a certified class of similarly situated individuals, and Just City, a mission-driven non-profit organization that operates a charitable bail fund. They are entitled to summary judgment as a matter of law on three constitutional claims. First, HB 1719 violates due process because it is unconstitutionally vague. Second, HB 1719 violates due process because it prevents arrestees from receiving a meaningful opportunity to be heard under *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Third, HB 1719 violates *Bearden v. Georgia*, 461 U.S. 660 (1983), because it causes discriminatory wealth-based detention.

More specifically, HB 1719 is unconstitutionally vague because it simultaneously requires that judicial officers setting bail "shall" consider an arrestee's "financial condition" and prohibits them from considering the arrestee's "ability to pay." The undisputed overlap between the two terms invites arbitrary enforcement by judicial officers who are not provided with any reasoned

basis to distinguish between the information they must consider and the information they must not consider when setting bail. HB 1719 also results in unfair bail proceedings that violate *Mathews* because the law prevents arrestees from presenting—and judicial officers from considering—arguments about whether a potential bail amount is affordable or would serve as a de facto detention order before depriving arrestees of their physical liberty. The undisputed record establishes that these arguments are standard practice in bail hearings around the country and impose no meaningful administrative burden. Indeed, Tennessee is the only state relying on money bail that prohibits judicial officers from considering ability to pay. As the undisputed record shows, the law risks erroneous pretrial detention without serving, and, in fact, undermining the statutory mandate to set the lowest bail that reasonably assures the arrestee's court appearance and public safety. Finally, HB 1719 violates *Bearden* because judicial officers cannot reliably set bail at the lowest amount necessary to ensure court appearance and public safety without considering the amount of bail a person can afford. Lacking this essential information, judicial officers more frequently set bail amounts that indigent arrestees cannot afford, resulting in increased wealth-based detention.

As a direct result of HB 1719, Shelby County locks up arrestees who are too poor to afford their bail amounts following bail proceedings that violate their constitutional rights. Permanent injunctive relief is therefore warranted against the Sheriff, who enforces unconstitutional bail orders. Plaintiffs are also entitled to declaratory relief against all Defendants.

## STATEMENT OF FACTS

### A. How Shelby County's Bail Practices Changed Because of HB 1719

Under Tennessee law, judicial officers[1] must set bail "as low as the court determines is necessary to reasonably ensure the safety of the community and the appearance of the defendant as required." Tenn. Code Ann. § 40-11-118(a)(2). Judicial officers setting bail must know the amount of bail a person can afford to comply with the statute.

Tennessee law always permitted consideration of ability to pay—until HB 1719. Tenn. Code Ann. § 40-11-118(b)(2) (1996) (amended 2024). Even so, before 2023, judicial officers setting bail in Shelby County did not consider the amount of bail arrestees could afford. Ex. 1, Shelby County Jail Monitor Report, *Busby v. Bonner*, No. 20-cv-2359 (W.D. Tenn.) ("*Busby* report") at 3, 30. This practice led to the widespread detention of people "who simply cannot afford even a minimum bond" even though this system was "not necessary to ensure future court appearances or to protect public safety." *Id.* To address these ongoing constitutional violations, Shelby County implemented a new Standing Bail Order in February 2023. Ex. 2, Standing Bail Order ("SBO"). The SBO was the result of negotiations between Shelby County entities (including Shelby County, the General Sessions Criminal Court Divisions, and the Sheriff's office) and advocacy groups, including Plaintiff Just City, a Memphis-based nonprofit organization that operates a charitable bail fund and the ACLU, ACLU-TN, Stand for Children TN, and the Official Black Lives Matter Memphis Chapter. Ex. 3, June 9, 2022 Memorandum of Understanding ("MOU") ¶¶ 1, 9.

The SBO requires judicial officers to make findings regarding the amount of bail a person

---

[1] This brief uses the term "judicial officers" to refer to any individual who has the authority to set bail, including General Sessions judges and judicial commissioners.

can afford to comply with the statute's mandate to set bail at the lowest amount necessary to reasonably ensure the safety of the community and the appearance of the defendant. Ex. 2, SBO at 3-4; Ex. 4, June 30, 2025 Rule 30(b)(6) Deposition of John Marshall ("Marshall Dep.") at 27:10-28:1; *see* Tenn. Code Ann. § 40-11-118(a)(2). Judicial officers may set unaffordable bail that serves to detain the arrestee only if no other combination of release conditions would reasonably ensure the goals of public safety and court appearance. Ex. 2, SBO at 4; *see* Tenn. Code Ann. § 40-11-118.

The bail process in Shelby County under the SBO follows four stages. First, after a person is arrested and booked into the Shelby County jail, a Pretrial Services employee interviews the arrestee about their background, including arrest history and pending cases. Ex. 5, June 30, 2025 Rule 30(b)(6) Deposition of Llana Greer ("Greer Dep.") at 23:12-23. Pretrial Services also asks arrestees questions about their income, assets, and expenses. *Id.* at 27:10-28:1. Pretrial Services staff enter this information into an affordable bail calculator, a tool created by the Vera Institute that calculates the amount of bail the arrestee can afford. *Id.* at 27:6-9; Ex. 6, Sample Affordable Bail Calculator. The interview takes seven to twelve minutes, Ex. 5, Greer Dep. at 25:6, and using the affordable bail calculator takes an additional three to four minutes. *Id.* at 36:13-16.

Second, Pretrial Services completes a bail packet and notifies the on-call judicial officer that the arrestee is ready for bail setting at an initial bail screening proceeding. *Id.* at 33:3-4. The bail packet includes the completed interview form, pretrial case records, and bail forms for the judicial officer to complete. *Id.* at 31:5-11, 31:18-19. The judicial officer and Pretrial Services employee then discuss by phone each arrestee's situation, including prior criminal history, pending cases, and personal circumstances including employment status. *Id.* at 41:2-13; 42:2-6. Pretrial Services then sends the judicial officer the bail forms to complete and part of the bail packet. *Id.*

at 44:3-13. The other bail packet documents are available in each arrestee's case file upon request from a judicial officer. *Id.* at 58:18-59:4.

Before the passage of HB 1719, the judicial officer and Pretrial Services also discussed the amount of bail that the arrestee can afford. *Id.* at 37:15-38:2. After HB 1719, Pretrial Services still asks the arrestee questions about their income, assets, and expenses and determines an affordable bail amount using the affordable bail calculator. *Id.* at 24:5-24. However, because of HB 1719, Pretrial Services no longer provides the affordable bail amount to the judicial officer, either on the phone or through paperwork. *Id.* at 25:1-3, 37:15-22. Other than employment status, Pretrial Services does not provide any other information about an arrestee's ability to pay or financial condition to the judicial officer nor does the judicial officer inquire into the arrestee's ability to pay or financial condition. *Id.* at 41:20-42:10. Instead, Pretrial Services merely stores the information in its own files. *Id.* at 24:23-24.

Third, the judicial officer sets bail using an initial screening form. *Id.* at 53:7-55:16. The form lists all the statutory factors that judicial officers must consider when setting bail, and judicial officers check boxes to indicate the factors upon which they rely when making their bail decisions. Ex. 7, Revised Bail Screening Form.

Before HB 1719, judicial officers considered the arrestee's maximum affordable bail amount when deciding the lowest bail amount necessary to ensure public safety and court appearance. Ex. 4, Marshall Dep. at 27:20-28:1; Ex. 5, Greer Dep. at 53:12-54:14; Ex. 8, Sample Bail Screening Form. This information auto-populated into the initial screening form that they completed. Ex. 5, Greer Dep. at 53:20-23. After HB 1719, the form no longer includes the arrestee's maximum affordable bail amount. *Id.* at 81:7-10; *compare* Ex. 8, Bail Screening Form *with* Ex. 7, Revised Bail Screening Form. Judicial officers no longer consider an arrestee's

affordable bail amount when setting bail nor do they inquire about or enter findings regarding an arrestee's ability to pay bail. Ex. 4, Marshall Dep. at 57:15-21.

Fourth, once a judicial officer sets bail, arrestees who can afford to pay bail or who do not have bail set are released, and those who cannot afford to pay bail remain detained. Ex. 5, Greer Dep. at 56:15-57:4. Arrestees who are detained are arraigned, usually the day after arrest, and they are appointed counsel if the court deems them indigent. *Id.* at 78:11-19. If they have not posted bail, they then receive a bail hearing before a judicial officer. *Id.* at 61:21-62:2. The arrestee, defense counsel, the District Attorney, and Pretrial Services are present at the bail hearing. *Id.* at 63:21-64:4. Judicial officers presiding at the hearing must set bail at the lowest amount necessary to ensure court appearance and public safety. Tenn. Code Ann. § 40-11-118(a)(2); Ex. 2, SBO at 5.

Before HB 1719, judicial officers inquired into and entered findings regarding the arrestee's ability to pay during bail hearings. Pretrial Services often provided information about an arrestee's ability to pay in response to inquiries from the judicial officers. Ex. 5, Greer Dep. at 68:12-69:1. Defense counsel also presented arguments that their clients could not afford to pay bail. *Id.* at 70:5-8. Judicial officers referenced the arrestee's ability to pay approximately 30% of the time when setting bail, *id.* at 69:13-21, and entered findings regarding the arrestee's ability to pay in the bail hearing order form they completed, Ex. 4, Marshall Dep. at 106:19-107:4. After HB 1719, judicial officers no longer inquire into the arrestee's affordable bail amount, income (other than employment status), benefits, expenses, or finances during bail hearings. Ex. 5, Greer Dep. at 65:10-66:2. Pretrial Services does not bring up the arrestee's ability to afford bail. *Id.* at 68:1-4. Defense counsel do not argue that their clients cannot afford bail as often as they did before. *Id.* at 70:5-11. Judicial officers no longer enter findings regarding the arrestee's ability to

pay bail either on the record, *id.* at 67:20-24; Ex. 4, Marshall Dep. at 107:5-12, or when completing the bail hearing order form, *id.* at 107:1-4.

The General Sessions judges made the decision to stop using the affordable bail calculator solely to comply with HB 1719. *Id.* at 51:16-20, 53:14-18. The presiding or administrative judge is responsible for deciding on any changes to the forms, *id.* at 21:14-18, and judicial commissioners must follow bail guidelines set by that judge. *Id.* at 20:10-12; Tenn. Code Ann. § 40-1-111(a)(1)(A)(iv). The administrative judge convened a meeting right before passage of HB 1719, Ex. 4, Marshall Dep. at 53:4-7, 51:23-52:7, and ordered the judicial commissioners to stop getting information from Pretrial Services regarding the affordable bail calculator and change the forms to "take any discussion about affordable and unaffordable out." *Id.* at 57:15-21. The judicial commissioners followed these instructions. *Id.* at 51:1-7; Ex. 9, May 23, 2024 Email from Commissioner Purifoy to judicial commissioners and Pretrial Services ("Please do not include affordable bail information, numbers, or Vera calculator information. Gov. Lee signed law prohibiting us from considering it effective immediately").

### B. Considering Ability to Pay Did Not Lead to Increased Administrative Burden

HB 1719 did not identify administrative or fiscal burden as a reason for the law. Ex. 10, February 12, 2024 Fiscal Memorandum on HB 1719 ("Fiscal Memorandum"). Indeed, Shelby County implemented processes ensuring that judicial officers considered an arrestee's ability to pay with minimal added burden. Even before the SBO, Shelby County's longstanding practice involved Pretrial Services interviewing arrestees upon booking, Ex. 5, Greer Dep. at 27:1-5, preparing bail packets, *id.* at 33:5-7, and providing information to judicial officers setting bail, *id.* at 46:7-13; Ex. 4, Marshall Dep. at 19:1-5. The SBO merely added a step by which Pretrial Services also asked questions to obtain the affordable bail amount, which they provided to the

judicial officers setting bail. Ex. 5, Greer Dep. at 28:4-6, 33:15-22; Ex. 4, Marshall Dep. at 31:4-10. It took only an additional three to four minutes to complete these additional questions and obtain the affordable bail amount. Ex. 5, Greer Dep. at 36:13-16. Pretrial Services employees were able to successfully implement the affordable bail calculator after "two or three trainings." *Id.* at 28:24-29:9. The SBO also added forms for judicial officers to complete both at the initial release screening and at the bail hearing to show they considered the amount of bail a person can afford before setting the lowest amount necessary to ensure public safety and court appearance. Ex 2, SBO at 3-4; Ex. 4, Marshall Dep. at 27:8-14. Overall, Shelby County was able to successfully implement the SBO, *id.* at 36:2-4, and did not incur any additional costs, Ex. 5, Greer Dep. at 81:15-18.

Shelby County worked with pretrial consultant Spurgeon Kennedy to implement these reforms. Ex. 11, Expert Report of Spurgeon Kennedy ("Kennedy Expert R.") ¶¶ 21-23 & Ex. A ¶ 2. He has 44 years of experience in the pretrial services field, providing consulting services to state and local justice systems interested in improving their bail systems. *Id.* at Ex. A ¶¶ 1-2. In Kennedy's experience, courts consider arrestees' ability to pay with little or no fiscal or administrative burden. *Id.* ¶¶ 7, 15, 20, 24. Shelby County was no exception. When facilitating discussions between Shelby County and the advocacy groups, Kennedy did not hear any concerns or complaints from judicial officers, Pretrial Services employees, or court staff that administering the calculator would lead to increased costs or administrative burden. *Id.* ¶ 23.

Further, Commissioner Marshall testified that the affordable bail calculator was a straightforward device that represented a person's disposable income. Ex. 4, Marshall Dep. at 48:10-12. Judicial officers were able to use the information from the affordable bail calculator to determine the lowest amount of bail necessary to comply with the bail statute. *Id.* at 70:19-71:11.

### C. Considering Ability to Pay Did Not Lead to Increased Public Safety Risk

Implementation of the SBO did not lead to increased public safety risk or failures to appear in court, according to undisputed data analysis. The Center for Community Research and Evaluation (CCRE) at the University of Memphis found that the SBO did not result in increases in rates of rearrest, broader recidivism, or failure to appear.[2]

Commissioner Marshall affirmed the CCRE's report's conclusions. Ex. 4, Marshall Dep. at 44:8-9. His testimony reaffirmed statements he had made publicly before HB 1719 to address what he perceived as incorrect assumptions about the SBO's impact on public safety risk. *Id.* at 46:19-47:18. He stated: "Bottom line is [rearrests] didn't change very much one way or the other" after the SBO. *Id.* at 44:6-9. He also stated that "the jail did not become a revolving door because of the standing bail order." *Id.* at 47:16-18. He clarified that, based on his review of the data, "it seemed a lot of the rearrest cases were domestic violence where you have a lot of rearrests and misdemeanor thefts." *Id*. at 45:5-8. Regarding violent rearrests, he stated: "There are some violent rearrests, but not as many as the public has perceived." *Id.* at 46:1-6. By way of example: "I did not see a pattern of someone committing a violent crime like carjacking, bonding out, and committing another carjacking." *Id*. at 44:12-16.

### D. HB 1719 Is Unprecedented, Undefined, and Incompatible With the Statutory Scheme

HB 1719 modified TN Code § 40-11-118(b)(2) to maintain the requirement that judicial officers consider the defendant's "financial condition," but added: "provided, that the defendant's ability to pay shall not be considered." 2024 Tenn. Pub. Acts Ch. 869 (May 1, 2024).

---

2 *Analysis of the Pretrial Detention System in Shelby County, Tennessee: 2025 Report*, University of Memphis, School of Urban Affairs and Public Policy, available at: https://www.memphis.edu/ccre/pretrial_ccre_commission_20250326.pdf, at 29-36.

"Tennessee is the only state that expressly prohibits courts from considering ability to pay when setting bail." Ex. 11, Kennedy Expert R. ¶ 6. Other state laws explicitly require or permit judges to consider ability to pay or financial condition or resources. *See* Order Denying PI and MTD, ECF 64 at 27 n.11 (collecting laws). In practice, courts generally rely on pretrial services agencies or court staff to collect information about arrestees' ability to pay, Ex. 11, Kennedy Expert R. ¶¶ 7, 15, defense counsel often present arguments regarding the amount of bail their clients can afford, judges generally consider such representations when making bail decisions, and judges may reduce bail orders to affordable amounts upon finding that a lower bail amount is sufficient to meet the purposes of bail. *Id.* ¶¶ 6-8, 10-11. Some jurisdictions use affidavits that collect information about an arrestee's income, dependents, and expenses, *id.* at ¶ 24, and some specifically document the affordable bail amount, *id.* at ¶ 16. Regardless of the specific process, it is "standard practice for judges to consider an individual's ability to pay or financial resources when setting bail in all other states that rely on money bail." *Id.* ¶ 6. HB 1719 is the first law to prohibit it.

HB 1719 does not define "financial condition" or "ability to pay" nor does it explain how judicial officers must consider one but not the other. In fact, its legislative history treats "financial condition" as an aspect of a defendant's "ability to pay." Ex. 10, Fiscal Memorandum at 1-2 (noting that the law would "require the magistrate to not consider [the defendant's financial] condition in the context of the defendant's ability to pay").

HB 1719 also does not explain how judicial officers can comply with the bail statute without considering ability to pay. Tennessee law requires judicial officers to set bail "as low as the court determines is necessary to reasonably ensure the safety of the community and the appearance of the defendant as required." TN Code § 40-11-118(a)(2). As Kennedy states, "If a

judge does not know—and indeed, is prohibited from eliciting—information about the amount of bail that a person can afford, that judge would not have the information they need to adequately assess the least restrictive condition necessary to meet the purposes of bail." Ex. 11, Kennedy Expert R. ¶ 13. Further, "[w]ithout that information, there is a risk that judges will set higher bail amounts than necessary to meet the purposes of bail, resulting in erroneous detention of people who are too poor to afford the amount of bail set." *Id.* ¶ 14. "When judges set bail at an amount that exceeds what a person can afford, that bail acts as a de facto detention order." *Id.* ¶ 12.

Shelby County's experience illustrates the law's problems. Shelby County officials have been unable to make sense of how to apply the law, leaving judicial officers to interpret the law as they see fit. Commissioner Marshall testified that "financial condition" is "a very broad vague term," Ex. 4, Marshall Dep. at 76:22-77:1, and that "ability to pay . . . means different things to different people . . . that's the whole problem," *id.* at 75:9-12. Distinguishing between financial condition and ability to pay is "an individual decision, [left to] each magistrate and judicial official." *Id.* at 87:13-20. Every judicial commissioner could have their own interpretations of what ability to pay and financial condition mean. *Id.* at 77:15-23. Shelby County has issued no policies or training on how to apply the law or what the terms mean. *Id.* at 77:2-14, 87:17-21. All it has done is prohibit use of the affordable bail calculator. *Id.* at 51:16-20, 53:14-18.

**E. HB 1719 Causes Wealth-Based Detention and Risks Unnecessary Detention**

HB 1719 increases the number of arrestees who are detained because they cannot afford their bail. Shelby County judicial officers enforce HB 1719 by detaining arrestees without considering ability to pay, and the Sheriff enforces bail detention orders. Tenn. Code Ann. § 8-8-201(a)(1)(3) ("It is the sheriff's duty to take charge and custody of the jail . . . and of the prisoners therein; receive those lawfully committed, and keep them . . . until discharged by law . . . "); Def. Ans. to Am. Compl. (ECF 81) ¶ 5.

Plaintiffs (and class representatives) Deangelo Towns and Marshawn Barnes were detained on secured bail orders that they could not afford to pay. Ex. 12, Towns Decl. ¶¶ 2, 3; Ex. 13, Barnes Decl. ¶¶ 2, 3. When they were arrested, they were subject to an initial screening where the judicial officers did not inquire into or enter findings regarding their ability to pay. Ex. 12, Towns Decl. ¶ 7; Ex. 13, Barnes Decl. ¶ 7. Instead, the judicial officers set their bails at amounts exceeding what they could afford. Ex. 12, Towns Decl. ¶ 5; Ex. 13, Barnes Decl. ¶ 5. They were each then scheduled for a bail hearing, where the judicial officers again did not inquire into or enter findings regarding their ability to pay and maintained their bails at the same unaffordable amounts. Ex. 12, Towns Decl. ¶¶ 8-10; Ex. 13, Barnes Decl. ¶¶ 8-10. They therefore remained in jail because they could not afford bail. *Id.* They represent a certified class of all people in the custody of the Shelby County Sheriff who are detained under bail orders issued by Shelby County judges pursuant to Tenn. Code Ann. § 40-11-119(b), as amended by HB 1719, without considering their ability to pay. Order Granting Class Cert. (ECF 113) at 19.

Plaintiff retained Ryan Carroll to provide expert testimony on HB 1719's impact on pretrial detention, including wealth-based detention rates. Ex. 14, Expert Report of Ryan Carroll ("Carroll Expert R.") ¶ 14. Carroll holds an M.S. in mathematics and serves as Chief Technology Officer for a technology startup building a case management system. *Id.* ¶¶ 1, 11. He is an expert in analyzing large volumes of criminal legal data using standard statistical analysis. *Id*. ¶¶ 1-2. His expert report relies on publicly available data from Shelby County's Odyssey case management system and booking information from the Sheriff's Office. *Id.* ¶ 20. To evaluate impacts on indigent arrestees, he used two proxies for indigency: (1) whether they were provided court-appointed counsel and (2) residential ZIP code, matched to ZIP Code Tabulation Area poverty rates from the U.S. Census. *Id.* ¶ 21.

Carroll first examined wealth-based disparities in pretrial detention in Shelby County before HB 1719 to set a baseline from which to analyze the impacts of HB 1719. *Id.* ¶ 23. He found significant wealth-based disparities in pretrial detention that implementation of the SBO reduced. *Id.* ¶¶ 24-29, 32-35. Specifically, he found that implementation of the SBO led to more indigent defendants obtaining release on their own recognizance, affordable bail orders, and shorter stays in jail. *Id*. Non-indigent defendants also received better outcomes, including greater rates of release on their own recognizance. *Id.* The disparities between indigent and non-indigent defendants in ability to afford bail, release rates, and lengths of stay all reduced. *Id.* Carroll's analysis and the CCRE report show that considering ability to pay reduced wealth-based detention without increasing public safety risk or failure to appear rates. *Id.* ¶ 35; *see* Section C, *supra*.

From that baseline, Carroll analyzed the impact of HB 1719. He found that HB 1719 led to increased unaffordable bail amounts; increased pretrial detention despite decreases in charge levels, past convictions and past failures to appear; and increased wealth-based detention. *Id.* ¶ 23.

Carroll first examined whether any changes to bail amounts post-HB 1719 could be explained by the nature of the charges, arrestees' criminal histories, or past failures to appear. *Id.* ¶ 39. He found that violent charges, maximum charge levels, and past convictions decreased significantly after HB 1719. *Id.* ¶ 40. In addition, failures to appear decreased, though not significantly. *Id.* ¶ 39. That means that if judicial officers were setting bail solely based on "risk level"—as measured by charge levels, criminal histories, and past failures to appear—bail amounts should have decreased after HB 1719 because risk levels decreased. *Id.* at ¶ 40.

Instead, HB 1719 led to significantly higher bail amounts that fewer arrestees could afford to obtain release across all charge levels, prior convictions, and failure-to-appear histories. *Id.*

¶¶ 42-43, 49. As a result of HB 1719, more people were detained pretrial and for longer periods of time than before HB 1719. *Id.* ¶¶ 51-52. The number of indigent arrestees post HB 1719 also increased. *Id.* ¶¶ 39-40. Indigent arrestees who could not afford to pay bail remained in jail for much longer periods than before HB 1719 across all charge levels, prior convictions, and failure-to-appear histories. *Id.* ¶¶ 56-57.

HB 1719 led to increased detention untethered from the state's interests in public safety and court appearance because more people remained in jail for longer periods of time despite presenting less risk on average. *Id.* ¶¶ 47-53. HB 1719 also led to more wealth-based detention because indigent defendants were particularly unlikely to be able to afford bail and, as a result, remained in jail for much longer than their non-indigent counterparts not because of their risk level, but because of their inability to pay. *Id.* ¶¶ 54-57.

Carroll's conclusions are further supported by the testimony of Ms. Greer, the executive director of Pretrial Services. Pretrial Services collects data on bail setting and stores that information in Odyssey. Ex. 5, Greer Dep. at 88:1-90:1. On behalf of Shelby County, Ms. Greer testified that, since HB 1719, bail amounts have increased and pretrial release has decreased. *Id.* at 92:10-15. She further stated that there was no explanation for the change other than passage of the law. *Id.* at 93:1-4.

Carroll's conclusions and Ms. Greer's testimony directly contradict the assumptions underlying the fiscal memorandum accompanying HB 1719 (FM1542). The fiscal memorandum stated that, given that judicial officers consider other bail statutory factors: "it is assumed that the amount of bail set will not ordinarily deviate significantly . . . were the ability of the defendant to pay included in the consideration. Accordingly, it is not estimated to result in a significant number of additional defendants failing to meet bail, that otherwise would have, due to the bail being set

at an unattainable amount." Ex. 10, Fiscal Memorandum at 1-2. The fiscal memorandum did not identify how the law served state interests. *Id.* Its assumptions are false: Bail amounts and, as a result, pretrial detention increased significantly after HB 1719. Ex. 14, Carroll Expert R. ¶ 23. As Shelby County must shoulder the costs of unnecessary detention, HB 1719 risks overburdening Shelby County's jails and criminal courts. *See* Ex. 15, August 9, 2022 Shelby County Board of Commissioners Resolution at 5 (supporting consideration of ability to pay in part because the "Board of Commissioners find it fiscally prudent to reduce the cost of unnecessary pretrial detention"); Ex. 11, Kennedy Expert R. ¶ 26.

Increased unnecessary pretrial detention also harms communities. Not only are individuals who are detained subject to jail conditions, they also experience a higher risk of unemployment and higher rates of unfair convictions, sentencing disparities, and reoffending. Ex. 11, Kennedy Expert R. at ¶¶ 26, 26 n.3-5.

### F. HB 1719 Harms Just City's Ability to Provide Services to Clients

Just City's core mission is operating a charitable bail fund to fight discrimination based on race, ethnicity, and income in Shelby County criminal proceedings.[3] Ex. 16, Declaration of Josh Spickler in Support of Plaintiffs' Motion for Summary Judgment ("Spickler Decl.") ¶ 3. Just City has been operating its bail fund since 2017—long before Tennessee passed HB 1719. *Id.* ¶ 5. It has been posting bail for arrestees who cannot afford their bail amounts for more than eight years, paying more than $4,500,000 in cash bail for more than 2,000 people. *Id.* ¶ 7.

The purpose of the bail fund is to post bail for as many indigent arrestees who cannot afford

[3] Plaintiffs include this section to address the Court's questions about Just City's standing. The undisputed record establishes that Just City has organizational standing because HB 1719 has "directly affected and interfered with [its] core business activities." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Republican Nat'l Comm. v. N.C. State Bd. Of Elections*, 120 F.4th 390, 396-97 (4th Cir. 2024).

to pay their bails as possible. *Id.* ¶ 6. If Just City has available funds, it will pay the full bail amount for qualifying indigent arrestees referred by the Shelby County Public Defender's office. *Id.* Just City does not have unlimited funds to post bail to obtain release for qualifying arrestees. *Id.* ¶ 20. It relies on fundraising and grant funding, *id.*, and sets limits on when it posts bail, including a cap on the maximum bail amount it will post for each arrestee, *id.* ¶¶ 22-24.

In Josh Spickler's experience overseeing Just City's bail fund, judicial officers set higher bail amounts and fewer release orders for individuals whose circumstances indicate that they would have received lower bail amounts or release before HB 1719. *Id.* ¶ 10. After HB 1719, Just City more frequently posts bail for clients with charges related to food insecurity and theft of household items such as toiletries, clothes, and paper towels. *Id.* ¶¶ 11-12. For example, Just City posted a $100 bail for a client charged with trespass for standing in the Wendy's drive-through asking for food. *Id.* at ¶ 11. Based on Spickler's experience, a similarly situated client would likely have been released before HB 1719. *Id.*

Just City's experiences illustrate what Shelby County data shows. After HB 1719, judges set higher bail amounts and released arrestees less frequently. Ex. 14, Carroll Expert R. ¶¶ 42-43, 46 49; Ex. 5, Greer Dep. at 92:10-15; Section E, *infra*. This trend cannot be attributed to a change in risk levels. Ex. 14, Carroll Expert R. ¶¶ 39-40; *see* Ex. 5, Greer Dep. at 93:1-4; Section E, *infra*.

Higher bail amounts and fewer release orders post HB 1719 directly increase the costs to Just City of serving similarly situated clients as before, thereby inhibiting its ability to serve as many indigent clients as possible. Ex. 16, Spickler Decl. ¶¶ 16, 18. When bail amounts increase, posting bail for each client costs more, and more indigent people cannot afford to post bail, therefore requiring Just City's services to obtain release. *Id.* ¶¶ 13-14. The group of arrestees who qualify for Just City's bail fund post-HB 1719 are assigned higher bail amounts than their risk

levels indicate they would have received pre-HB 1719. Ex. 14, Carroll Expert R. ¶¶ 81-85. This means that Just City would need to spend more money now—approximately $393,000—to serve the same group of qualified arrestees as it did pre-HB 1719, thereby limiting its ability to serve clients. *Id*. Another group of arrestees whose risk levels indicate that they would have received bail amounts at or below Just City's maximum bail amount cap pre-HB 1719 now receive bail amounts exceeding that cap. *Id.* ¶¶ 86-89. Just City can therefore no longer serve that group of approximately 310 arrestees. *Id.* ¶ 88.

Also, when fewer arrestees are released, more indigent clients need Just City's services of posting bail to obtain release. Ex. 16, Spickler Decl. ¶ 15. Judicial officers released fewer arrestees post HB 1719 despite no change in their average underlying risk, which means that a group of low-risk arrestees whose risk levels indicate that they would previously have obtained release before HB 1719 now require Just City's services. Ex. 14, Carroll Expert R. ¶ 61. It would cost Just City an estimated additional $1,370,624 to serve this group. *Id.* ¶ 79.

Increased costs and increased client demand harm Just City's longstanding mission of posting bail for as many indigent arrestees as possible to fight wealth-based discrimination. Ex. 16, Spickler Decl. ¶¶ 18-19. HB 1719 therefore makes it harder for Just City to engage in its core activities of operating a bail fund. *Id.* After HB 1719, Just City spends more money posting bail and serves more clients than before. *Id.* ¶ 17. For the twelve months preceding HB 1719, Just City posted $281,273 in bail for 162 clients. *Id.* For the twelve months following HB 1719, Just City posted $441,650 in bail for 216 clients, and in the last eight months, Just City posted $388,720 in bail for 229 clients. *Id.*

To counteract the harm resulting from HB 1719, Just City conducted more fundraising and adjusted its policies to ensure it maintains the necessary funds for its bail fund to operate in light

of increased costs after HB 1719. *Id.* ¶¶ 21-24. It requested and obtained more grant funding to post bails on December 6, 2024. *Id.* ¶ 21. Absent this infusion, it would have been able to serve fewer clients post HB 1719. *Id.* It also set a weekly limit on the amount of cash bail it can post and lowered the maximum bail amount cap from $5,000 to $4,000 and then to $3,000 to serve more arrestees with low bail amounts. *Id.* ¶¶ 22, 24.

## ARGUMENT

A procedural due process claim includes two elements: "(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate process." Order Granting Class Certification (ECF 113) at 8 (citing *Novak v. Federspiel*, 140 F.4th 815, 821 (6th Cir. 2025)). The Court should grant Plaintiffs' motion for summary judgment because there are no genuine disputes as to any material facts and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 261 (6th Cir. 2018).

## I. HB 1719 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES THE DUE PROCESS CLAUSE

Due process requires that "laws must provide explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[T]he more important aspect . . . is the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). The doctrine "protects citizens against the impermissible delegation of basic policy matters for resolution on an *ad hoc* and subjective basis,

with the attendant dangers of arbitrary and discriminatory application." *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (internal quotations omitted). A law that is "fundamentally irrational and impossible to apply consistently" is unconstitutionally vague and therefore void. *Springfield Armory v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994).

HB 1719 is subject to a stringent vagueness test requiring a "high level of definiteness" because it implicates several constitutional rights. *See Belle Maer Harbor v. Charter Twp. Of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999); *Ass'n of Cleveland Fire Fighters*, 502 F.3d at 551; *Memphis Ctr. for Reprod. Health v. Slatery*, 14 F.4th 409, 429 (6th Cir. 2021) ("The most stringent vagueness test applies when a law threatens to inhibit the exercise of constitutionally protected rights.") (internal quotations omitted) (abrogated on other grounds); *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F.Supp.3d 320, 354 (D.N.J. 2016) (applying the stringent vagueness test where challenged ordinance implicated the constitutional right of free exercise of religion). HB 1719 threatens to inhibit an arrestee's rights to pretrial liberty, against wealth-based detention, against excessive bail, and to bail under the Tennessee constitution. Section II, *supra*. It also interferes with an arrestee's First Amendment right to petition the court for release on a lower, affordable bail amount. *See Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 741 (1983) ("the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"). The undisputed record shows that defense counsel across the country often raise arguments about the amount of bail arrestees can afford, Ex. 11, Kennedy Expert R. ¶ 11, and, after passage of the law, defense counsel in Shelby County raise them less often, Ex. 5, Greer Dep. at 70:5-11. HB 1719 imposes a content-based restriction that chills these constitutionally protected arguments by barring judicial officers from considering them. Therefore, HB 1719 must have a "high level of definiteness" to "withstand facial constitutional

scrutiny." *Belle Maer Harbor*, 170 F.3d at 557. There is no "definiteness" in HB 1719.

Indeed, under any standard of review, HB 1719 is unconstitutionally vague because there is no reasoned basis for judicial officers to apply a statute that simultaneously requires them to consider an arrestee's financial condition and prohibits them from considering the arrestee's ability to pay bail. The Sixth Circuit's decision in *Springfield Armory* is instructive. In that case, the Court of Appeals struck an ordinance banning unspecified assault weapon models with "slight modifications or enhancements of firearms listed" because there was "no reasoned basis" to determine which assault weapons were subject to the ban. *Springfield Armory*, 29 F.3d at 251-53. The law did not provide a statement of purpose or explanation for the way it was drafted, did not include definitions of unclear terms, and did not achieve the stated goal of the legislature. *Id.* at 252-53. HB 1719 suffers from the same flaws. The statute does not define either term, the ordinary meanings of the terms overlap, and the legislative history, far from clarifying the difference, treats "financial condition" as an aspect of a defendant's "ability to pay." Ex. 10, Fiscal Memorandum at 1-2 (noting that the law would "require the magistrate to not consider [the defendant's financial] condition in the context of the defendant's ability to pay").

In addition, there is no reasoned basis to apply HB 1719 because it does not serve—and indeed, undermines—the rest of the bail statute. Tennessee law requires judicial officers to set bail at the lowest amount necessary to reasonably assure public safety and court appearance. Tenn. Code Ann. § 40-11-118(a)(2). HB 1719 prevents judicial officers from complying with the statute because it prohibits them from considering whether bail is affordable. *See* Ex. 11, Kennedy Expert R. ¶ 13. Without that information, judicial officers cannot assess whether a bail amount is affordable and will function as an effective release condition, *see* Ex. 4, Marshall Dep. 70:12-71:20, or whether a bail amount is unaffordable and will instead function as a detention order, *id.*

at 67:7-12. Shelby County's experience exemplifies the risks inherent in this irrational framework, as the levels of pretrial detention and wealth-based detention have increased since HB 1719. Ex. 14, Carroll Expert R. ¶¶ 37-53. HB 1719 is therefore not only internally inconsistent but also inconsistent with the bail statute as a whole.

The lack of guidelines invites arbitrary enforcement by delegating a policy matter to judicial officers for resolution on an *ad hoc* and subjective basis. The undisputed record shows that determining how to consider financial condition without considering ability to pay is "an individual decision" for "each magistrate and judicial official." Ex. 4, Marshall Dep. at 87:13-20. As "ability to pay . . . means different things to different people", *id.* at 75:9-12, and "financial condition" is "a very broad, vague term," *id.* at 76:22-77:1, the statute permits each judicial officer setting bail to adopt different interpretations. *Id.* at 77:15-23. "Where the legislature fails to provide such minimal guidelines . . . policemen, prosecutors, and juries" are allowed "to pursue their personal predilections." *Kolender*, 461 U.S. at 358. The Sixth Circuit and other courts around the country have invalidated statutes where the record shows that vague language invites inconsistent interpretations by those enforcing it and risks arbitrary enforcement. *See, e.g.*, *Belle Maer Harbor*, 170 F.3d at 557-59 (holding that ordinance restricting open water areas to a "reasonable radius" invited arbitrary enforcement, citing testimony from enforcement officer that "one person's idea of a reasonable radius would vary from another's"); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 784 (4th Cir. 2023) (finding statute void where it lacked "any meaningful standards" and the record showed police officers "deploy[ed] a glorified smell test to determine whether a student's disorder was disorderly enough to be criminal"); *Cunney v. Bd. of Trs. of Grand View*, 660 F.3d 612, 621-22 (2d Cir. 2011) ("Defendants' various interpretations of [the ordinance's] requirements serve only to reinforce our view that the ordinance's vagueness

authorizes arbitrary enforcement."); *Konikov v. Orange County*, 410 F.3d 1317, 1330-31 (11th Cir. 2005) (finding evidence of an "inherent risk of discriminatory enforcement" when those enforcing the challenged code had different opinions on what would trigger a violation); *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 730 F.Supp.3d 185, 201-02 (M.D.N.C. 2024) (finding statute void based on "[r]ecord evidence demonstrating [an] inconsistency in District Attorneys' interpretation and enforcement of the Challenged Statute," which "compels the conclusion that the Challenged Statute permits a 'standardless sweep' that allows prosecutors to 'pursue their personal predilections'") (quoting *Kolender*, 461 U.S. at 358), *aff'd on other grounds*, 155 F.4th 298 (4th Cir. 2025). HB 1719 fails this well-established test.

Defendants' attempt to rationalize the statute only highlights its constitutional flaws. Defendants argued during the class certification hearing that, "[e]ssentially, what the new bail statute says is that you cannot discuss your client's height in feet. If your client is 5 feet tall, you can't tell the court that. You can tell the Court your client is 60 inches tall and let them – let the Court come to the conclusion of how tall your client is." Ex. 17, Hearing on Motion for Class Certification (Transcript) at Tr. 39:12-39:17. This analogy to different units of the same measurement demonstrates the impossibility of applying HB 1719. Defendants' proposed reading makes no sense and has no basis in the statutory text, the legislative history or the factual record of how the statute is being applied in practice. Just as an individual's height is the same whether measured in inches and centimeters, an analysis of an individual's "financial condition" and "ability to pay" involves the same inquiry. Merely converting a measurement from inches to centimeters, or more aptly from dollars to euros, changes nothing of substance or meaning under the statute. The statutory text and undisputed record confirm that judicial officers have no reasoned basis to distinguish between the information they *must* consider related to financial condition and

the information they *must not* consider related to ability to pay. HB 1719 is therefore void for vagueness. *See, e.g.*, *Springfield Armory*, 29 F.3d at 251-53.

## II. HB 1719 PREVENTS ARRESTEES FROM RECEIVING A "MEANINGFUL" OPPORTUNITY TO BE HEARD UNDER *MATHEWS V. ELDRIDGE*

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). HB 1719 deprives arrestees of a meaningful opportunity to be heard by prohibiting judicial officers from considering their ability to pay bail when setting bail. HB 1719 subjects Mr. Barnes, Mr. Towns, and all class members to pretrial detention based on fundamentally unfair proceedings that violate the due process clause.

To determine the procedural safeguards required before the government may deprive an individual of a liberty interest, the Sixth Circuit balances the *Mathews* factors: (1) "the private individual's interests," (2) "the value of the suggested procedural requirements," (3) "the risk of erroneous deprivation of the individual's rights that is inherent in current procedures," and (4) "the government's interests, including the fiscal and administrative burdens at stake." *United States v. Brandon*, 158 F.3d 947, 953 (6th Cir. 1998) (citing *Mathews*, 424 U.S. at 335). Here, all four factors weigh against HB 1719.

First, the private interest at stake here is the right to physical liberty, which is "the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979)). Pretrial bail setting directly implicates the "fundamental" rights to pretrial liberty and against wealth-based detention. *Johnson v. City of Cincinnati*, 310 F.3d 484, 503 (6th Cir. 2002) (citing *United States v. Salerno*, 481 U.S. 739, 750 (1987)) (pretrial liberty); *Fowler v. Benson*, 924 F.3d 247, 260–61 & n.7 (6th Cir. 2019) (wealth-based detention). HB 1719's prohibition

against considering ability to pay also implicates the right against excessive bail under the Eighth Amendment, *Stack v. Boyle*, 342 U.S. 1, 4-5 (1951), the First Amendment right to petition the court, Section I, *supra*, and the right to bail under the Tennessee Constitution, TENN. CONST. art. I, § 15 (other than people charged with capital offenses, "all prisoners shall be bailable by sufficient sureties"). The strength and number of these private interests weigh heavily against HB 1719.

For the second and third factors, courts emphasize the value in allowing judicial officers to consider an arrestee's ability to pay and the risk of erroneous deprivations when judicial officers are prohibited from doing so. Under Tennessee law, before a judicial officer decides to set an amount of bail as a condition to pretrial release, the judicial officer must have already determined that bail is appropriate under the circumstances. *See* Tenn. Code Ann. § 40-11-102. Without considering an arrestee's ability to pay, the judicial officer cannot determine if the bail amount will function as an incentive to appear in court or as a de facto detention order. Kennedy Expert R. ¶¶ 12-14. Nor can the judicial officers determine if the bail amount is the lowest amount necessary to reasonably ensure the arrestee's court appearance and public safety, as specifically required by Tennessee law. *Id.*; Tenn. Code Ann. 40-11-118(a)(2).

Accordingly, courts recognize that a bail order that an arrestee cannot pay "acts as a barrier to release, and additional procedural safeguards must be provided 'to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the [arrestee] has a participatory role in the process.'" *Torres v. Collins*, 2023 WL 6166523, at *9 (E.D. Tenn. Sept. 21, 2023) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). Due process therefore requires, among other safeguards, notice to an arrestee that they can "put forth [their] own evidence for a lower bail amount" and an "opportunity to show . . . that they cannot afford the bail amount." *Id.* at 10; *see also Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F.Supp.3d

758, 770 (M.D. Tenn. 2015) (finding violation of due process because probationers "never get the chance to raise indigency"). Consideration of other factors, such as charges, criminal history, and information contained in the affidavit of indigency, *see Torres*, 2023 WL 6166523, at *2, is of course also essential, but does not alter these requirements, which are themselves necessary for arrestees to have the "opportunity to be *heard* in a *meaningful* manner." *Torres*, 2023 WL 6166523, at *2, *10 (emphasis in original). Depriving arrestees of an opportunity to be heard creates "a substantial risk that arrestees will be erroneously deprived of their pretrial liberty." *Id.* at *10.

The undisputed record confirms that HB 1719 deprives Plaintiffs of notice and opportunity to be heard. Because of the law, Plaintiffs Barnes and Towns, like all class members, did not receive meaningful notice or opportunity to present arguments about their ability to pay bail at either the initial screening or a later bail hearing before being detained on unaffordable bail orders. Ex. 13, Barnes Decl. ¶¶ 2-10; Ex. 12, Towns Decl. ¶¶ 2-10; Ex. 5, Greer Dep. at 37:15-24, 41:20-42:10, 65:10-66:2. The law's denial of a meaningful opportunity to argue that the Plaintiff class members cannot afford bail necessarily risks erroneous detention. Kennedy further explains: "Without that information, there is a risk that judges will set higher bail amounts than necessary to meet the purposes of bail, resulting in erroneous detention of people who are too poor to afford the amount of bail set." Ex. 11, Kennedy Expert R. ¶ 14.

The risk of erroneous detention occurs because, under Tennessee law, judicial officers are required to set bail as low as they determine is necessary to reasonably assure the arrestee's appearance in court and the safety of the public. Tenn. Code Ann. § 40-11-118(a)(2). "If a judge does not know—and, indeed, is prohibited from eliciting—information about the amount of bail that a person can afford, that judge would not have the information they need to adequately assess the least restrictive condition necessary to meet the purposes of bail." Ex. 11, Kennedy Expert R.

¶ 13. Kennedy's opinions are undisputed.

The value of considering ability to pay bail is also clear from the resounding national consensus on this issue. Every other state relying on money bail recognizes this value. Kennedy is "aware of no state other than Tennessee that relies on money bail but prohibits judges from considering the amount of bail a person can afford when making a bail decision." *Id.* ¶ 8.

The undisputed record shows that, at a minimum, the risk of unnecessary detentions has increased under HB 1719. Carroll's undisputed analysis of Shelby County data shows an increase in pretrial detention. Ex. 14, Carroll Expert R. ¶¶ 37-53. Specifically, in the wake of HB 1719, bail amounts have increased and fewer defendants have been able to afford release, even though the average "risk level" of defendants (as indicated by current charge levels, history of failure to appear, and past convictions) has declined. *Id.* The post-HB 1719 untethering of bail amounts and detention from actual risk strongly indicates that unnecessary pretrial detention has increased. *Id.* There is no plausible explanation for the increase in bail amounts other than HB 1719. Ex. 14, Carroll Expert R. ¶ 94*;* Ex. 5, Greer Dep. at 92:20-93:4. This increase represents a regression to the pre-SBO historical norm, where judicial officers' failure to consider ability to pay resulted in widespread detention of people who "simply cannot afford even a minimal bail," even if this system was "not necessary to ensure future court appearances or to protect public safety." *See* Ex. 1, Busby Report at 3, 30.

The risk of excessive bails also increased. *See Stack v. Boyle*, 342 U.S. 1, 5 (1951) (bail is excessive if it is set higher than "an amount reasonably calculated to fulfill th[e] purpose" of bail—namely, "assurance of the presence of an accused.") Arrestees whose charge levels, failure to appear history, and past convictions indicate they would have received lower bail amounts or release before HB 1719 received higher bails after HB 1719, regardless of whether they were

ultimately detained. Ex. 14, Carroll Expert R. ¶¶ 75-89. Wealth-based detention, i.e., detention due solely to inability to pay rather than other valid factors, also increased. *See* Section III, *supra*. For all the reasons above, the second and third factors weigh against HB 1719.

The fourth factor also weighs against HB 1719. Prohibiting judicial officers from considering ability to pay does not serve the statute's express requirement to set the lowest bail amount that reasonably assures court appearance and public safety. *See* Tenn. Code Ann. § 40-11-118(a)(2). Instead, the undisputed record shows that it undermines that interest because judicial officers do not have the information they need to set bail at the lowest amount necessary. *See* Ex. 11, Kennedy Expert R. ¶ 13. Nor is there any evidence that HB 1719 otherwise advances the interests of court appearance and public safety in some general manner. To the contrary, it is undisputed that every other State that uses monetary bail either requires or allows judicial officers to consider ability to pay. *Id.* ¶ 8.

Further, the undisputed record shows that considering the amount of bail an arrestee can afford is not administratively or fiscally burdensome. The affordable bail calculator tool used in Shelby County prior to HB 1719 was a "pretty straightforward device," Ex. 4, Marshall Dep. at 48:8-12, that takes no longer than three to four minutes to use, Ex. 5, Greer Dep. at 30:5-6, 36:7-15. Implementing the tool was not costly. *Id.* at 29:6-9, 81:15-18. The record shows that Pretrial Services has continued to collect this information after HB 1719 was enacted but does not provide it to the judicial officers. *Id.* at 24:5-25:3, 37:15-22. There would be no additional burden in providing information that is already collected. Setting aside the calculator, obtaining information about an arrestee's income, assets, expenses, and/or other aspects of their financial condition through other means would similarly present no added burden to bail proceedings. Indeed, Kennedy is not "aware of any jurisdiction in which the consideration of ability to pay has led to

an increase in administrative or fiscal burden." Ex. 11, Kennedy Expert R. ¶ 7. A more plausible and wasteful source of fiscal burden is the increased cost of unnecessary detention that flows from *not* considering ability to pay. *See id.* ¶ 26.

Weighing the *Mathews* factors establishes that HB 1719 deprives arrestees of due process. HB 1719 unconstitutionally subjects Plaintiffs and class members to unfair proceedings and prevents them from receiving a "meaningful" opportunity to be heard before they are detained.

## III. HB 1719 Causes Discriminatory Wealth-Based Detention In Violation of *Bearden*

The Fourteenth Amendment guarantees the "right not to lose [one's] liberty due to indigency." *Alkire v. Irving*, 330 F.3d 802, 819 (6th Cir. 2003); *see also Bearden*, 461 U.S. 660, 672 (1983) (holding unconstitutional the revocation of probation for failure to pay absent consideration of ability to pay and alternatives to detention). HB 1719 violates this principle by preventing judicial officers from making the ability to pay determination that is necessary to avoid detention due to indigency.

Though the Supreme Court has not addressed the specific question of whether *Bearden* applies to pretrial bail setting, every court to consider the issue has held that it does. Pl. Opp. to State MTD (ECF 62) at 13-16 (collecting circuit court, district court, and state high court cases). The Sixth Circuit affirmed that *Bearden* governs the "imposition of secured bail for pretrial release." *McNeil v. Community Probation Services, LLC*, 2019 WL 633012, at *7 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019) (addressing bail proceedings similar to those in Shelby County). Other courts have reached the same conclusion, holding that *Bearden* applies to criminal proceedings where judges set bail upon arrest, and arrestees are detained pending payment of bail. *See, e.g., Weatherspoon v. Oldham*, 2018 WL 1053548, at *4-7 (W.D. Tenn. Feb. 26, 2018); *Walker v. City of Calhoun*, 901 F.3d 1245, 1259-60 (11th Cir. 2018).

This consensus is not surprising, as *Bearden*'s logic is readily transferable to the bail

context. *Bearden* set forth procedures intended to prohibit criminal systems from detaining individuals only because they are unable to pay a financial requirement. 461 U.S at 672-73. Applying these requirements to bail practices, *McNeil* held that the bail system there violated *Bearden* in large part because judges did not inquire into, nor make findings related to, an arrestee's ability to pay bail. *McNeil*, 2019 WL 633012, at *13. Courts have consistently held that bail systems that similarly fail to consider ability to pay violate *Bearden*. *See, e.g.*, *ODonnell v. Harris Cty.*, 892 F.3d 147, 161-63 (5th Cir. 2018), *aff'ing* 251 F. Supp. 3d 1052, 1150-55 (S.D. Tex. 2017), *overruled on other grounds by Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) *and Daves v. Dallas Cnty.*, 63 F.4th 616 (5th Cir. 2023); *Weatherspoon*, 2018 WL 1053548, at *4-7.

"Due process and equal protection principles converge" in *Bearden* claims. 461 U.S. at 665. Whether applying due process or equal protection, courts must inquire into "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating that purpose." *Id.* at 666-67. A bail system that fails to "provide notice and an opportunity for the arrestee to be heard" regarding ability to pay violates due process. *McNeil*, 2019 WL 633012, at *15. Wealth-based detention violates *Bearden* when the bail system does not further the state's interests in ensuring public safety and court appearance, which results in individuals being detained based solely on their access to wealth. *Id.* at *14-15 (finding *Bearden* violation where defendants "presented no proof to suggest that the current bail system furthers those interests," such as statistical evidence of court appearance or re-arrest rates).

Heightened scrutiny applies under *Bearden* when judges do not consider ability to pay at any point in the pretrial proceedings. *Id.* at *13 (applying heightened scrutiny where judges do not consider ability to pay at initial screenings nor at later hearings); *Torres*, 2023 WL 6166523,

at *6; *Cf. Walker*, 901 F.3d at 1261-62 (heightened scrutiny may not apply when wealth-based detention occurs only *pending* an ability to pay hearing). Under heightened scrutiny, courts examine whether the bail system is narrowly tailored to the state's interests. HB 1719 must therefore satisfy heightened scrutiny because it expressly bars judicial officers from considering ability to pay at any point in the process.

Failing to assess ability to pay violates *Bearden* even if judges evaluate other factors relevant to setting bail under Tennessee law, such as financial circumstances. *McNeil* is again instructive. There, judges sometimes considered "materials and financial information available in the probationer's case file" when setting bail. 2019 WL 633012, at *3. The court nonetheless found that the bail system did not serve "any compelling governmental interest" because, by failing to consider ability to pay, it perpetuated arbitrary wealth-based discrimination, namely, effectuating the release of wealthy defendants while detaining indigent defendants, all without any connection to court appearance or public safety. *Id.* at *13-14. Thus, while other factors are certainly relevant to assessing appropriate release conditions, assessing ability to pay is necessary to protect against arbitrary discrimination based on wealth. *See also Brangan v. Commonwealth*, 477 Mass. 691, 699-700 (2017) (holding that, even if the judge considered other relevant factors, the judge must still consider the amount of bail a defendant can afford to comport with due process and equal protection); *Valdez-Jimenez v. Eighth Judicial Dist. Court of Nev.*, 136 Nev. 155, 165 (2020) (same); *In re Humphrey*, 11 Cal. 5th 135, 154 (2021) (same).

The record from Shelby County demonstrates how HB 1719 violates *Bearden*. Arrestees do not receive notice or opportunity to be heard regarding their ability to afford bail at any point in the process. Further, HB 1719 results in the release of non-indigent defendants and the detention of indigent defendants without any connection to state interests in court appearance or public

safety. If two defendants, one wealthy and one indigent, with the "same charge, same criminal backgrounds, same circumstances" receive the same bail amounts that the wealthy defendant can pay but the indigent defendant cannot pay, that results in a violation of equal protection. *McNeil*, 2019 WL 633012, at *10 (quoting *ODonnell v. Harris County*, 892 F.3d 147, 163 (5th Cir. 2018)). After HB 1719, there was a statistically significant increase in bail amounts that fewer people could afford across all charge levels, prior convictions, failure-to-appear histories, and demographics. Ex. 14, Carroll Expert R. ¶¶ 42-44, 49; *see* Ex. 5, Greer Dep. at 92:20-93:4 (stating that bail amounts and pretrial detention increased post HB 1719 with no other explanation than passage of the law). As a result, indigent defendants who could not afford bail remained in jail for longer periods of time, Ex. 14, Carroll Expert R. ¶¶ 56-57, despite presenting on average *lower* risks of public safety or flight than those pre-HB 1719, *id.* ¶¶ 39-40 (measuring risk levels by charge level, history of failure to appear, and past convictions). The increase in bail amounts despite a corresponding decrease in average risk levels shows that, because of HB 1719, judicial officers are more often setting bail exceeding the amount needed to ensure court appearance in violation of *Bearden*. *See McNeil*, 2019 WL 633012, at *8 (finding that setting bail in excess of "what is necessary to reasonably assure defendant's presence at trial" violates due process and equal protection) (citing *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978).

Neither the defendants nor the State have proffered contrary evidence. The undisputed evidence shows that the law undermines rather than serves state interests. *See McNeil*, 2019 WL 633012, at *14 (relying on Plaintiff's expert evidence to find that the bail system did not serve state interests); *O'Donnell*, 892 F.3d at 154. HB 1719 therefore causes arbitrary wealth-based detention in violation of *Bearden*.

As in *McNeil*, judicial officers' consideration of other statutory bail factors does not save

the statute. To the contrary, HB 1719's prohibition on considering ability to pay undermines judicial officers' individualized assessment of the other statutory factors. The statute has predictably caused tremendous confusion in Shelby County over how judicial officers are to consider factors such as employment, financial condition, family ties and relationships, or ties to the community without considering ability to pay. *See* Ex. 4, Marshall Dep. at 77:2-14, 85:20-86:17, 87:13-21, 89:10-14; Ex. 5, Greer Dep. at 53:3-6. Judicial officers are therefore prevented from tying their bail orders to the state's purposes of ensuring public safety and return to court because HB 1719 affirmatively prohibits them from determining the lowest amount of bail necessary to meet the state's interests. Ex. 11, Kennedy Expert R. ¶ 13; *see* Ex. 4, Marshall Dep. at 70:16-71:10 (testifying that the affordable bail calculator enabled him to exercise his discretion to release a defendant on affordable bail).

## IV. The Court Should Enter Permanent Injunctive Relief Against the Sheriff and Declaratory Relief Against All Parties

### A. A Permanent Injunction Against the Sheriff Is Warranted

The Court should permanently enjoin the Shelby County Sheriff from detaining arrestees subject to bail orders issued pursuant to HB 1719. "A plaintiff seeking a permanent injunction must demonstrate that it has suffered an irreparable injury, there is no adequate remedy at law, and that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (cleaned up). The Sheriff enforces the challenged law and therefore "can be sued in an injunction action." *McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 995 (6th Cir. 2019) ("*McNeil II*").

As this Court previously concluded, arrestees detained under unconstitutional bail orders suffer irreparable harm. Order (ECF 64) at 35 ("The right to be free from unconstitutional

detention thus amounts to an irreparable injury."); *see also United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988). Not only does an unconstitutionally detained person lose their freedom, they also face "loss of work, separation from family, undue pressure to plead guilty, and other negative consequences." *McNeil*, 2019 WL 633012 at *16. Notwithstanding these specific harms, a finding of irreparable injury is "mandated" where a constitutional right is "being threatened or impaired," as it is here, and no further showing of harm is necessary. *ACLU of Ky. v. McCreary Cty*., 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As this Court also previously concluded, injunctive relief is the proper remedy for this irreparable harm. Order (ECF 64) at 35 ("[T]he relief Just City seeks here would terminate allegedly unconstitutional detentions and preclude the state court from ordering additional unconstitutional detentions, which favors injunctive relief"). The class of plaintiffs and Just City have established systemic and ongoing deprivations of arrestees' constitutional rights. For that reason, "legal remedies by themselves" are "inadequate to resolve the [County's] constitutional violations" and permanent injunctive relief is warranted. *Cole v. City of Memphis, Tenn*., 108 F. Supp. 3d 593, 607 (W.D. Tenn. 2015), *aff'd sub nom. Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) (permanently enjoining unconstitutional practice by City).

In contrast to the irreparable harm that arrestees suffer, Defendants suffer no harm by losing the ability to enforce an unconstitutional law. *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 771-72 (M.D. Tenn. 2015) ("[T]he Court declines to categorize the need to erect the proper constitutional safeguards as an injury."). Further, merely reverting to pre-HB 1719 bail processes would pose minimal administrative burden. *See* Section II, *supra*.

The public interest also weighs in favor of permanent injunctive relief because "the public

interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004); *see also ACLU Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015); *Rodriguez*, 155 F.Supp.3d at 771-72.

Under binding Sixth Circuit precedent, injunctive relief is warranted against the Shelby County Sheriff. Where, as here, the "constitutional violation is an improperly determined bail amount" and the sheriff "detains the [arrestee] until she pays the bail amount," the sheriff is a proper party against whom injunctive relief should be issued. *McNeil II*, 945 F.3d at 996. The Sheriff enforces unconstitutional bail orders issued pursuant to HB 1719 by detaining arrestees who cannot afford to pay their bail, and this Court should therefore permanently enjoin the Sherriff's wrongful detention of the plaintiff class.

**B. Declaratory Relief Against All Parties Is Warranted**

In addition to issuing a permanent injunction against the Sheriff, the Court should grant a declaratory judgment against the presiding Judge, the judicial commissioners, and the Sheriff. Declaratory relief against the judicial Defendants is warranted because they are "actively involved with administering" HB 1719, and when a "judge determines a bail amount without considering ability to pay," they play a "part in carrying out the alleged harm." *McNeil II*, 945 F.3d at 995-96. Declaratory relief against the presiding judge is further warranted because of his administrative enforcement of HB 1719 by ordering that judicial officers no longer consider nor inquire into ability to pay. *See* Ex. 4, Marshall Dep. at 57:15-21. Declaratory relief against the Sheriff is warranted for the same reasons warranting a permanent injunction.

When deciding to issue declaratory relief, the court should consider: "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being

used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata[';] (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 796 (6th Cir. 2022) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp*., 746 F.2d 323, 326 (6th Cir. 1984)).

As this Court found, "A ruling that the statute is unconstitutional—which is the declaratory relief Just City requests—would essentially decide the ultimate issue in this case and 'settle the controversy.'" Order (ECF 64) at 38. The Court also found that *Younger* abstention by the federal court is not warranted. *Id.* at 5-12. Thus, for the same reasons, a declaratory order would not "increase friction between federal and state courts" nor "encroach upon state jurisdiction." *Cardinal Health*, 29 F.4th at 796. Likewise, there is no better alternative remedy. Declaratory relief would decide the ultimate issue in this case and provide the systemic relief Plaintiffs seek.

## CONCLUSION

For the foregoing reasons, the Court should issue a permanent injunction against the Shelby County Sheriff and grant a declaratory judgment against all Defendants that HB 1719 violates due process.

Dated: January 22, 2026

Respectfully submitted,

*/s/ David Elbaum*
Craig S. Waldman* (NY Bar No. 4337986)
David Elbaum* (NY Bar No. 2779049)
Jared Quigley* (NY Bar No. 5937412)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
cwaldman@stblaw.com
david.elbaum@stblaw.com
jared.quigley@stblaw.com

*/s/ Ashika Verriest*
Ashika Verriest* (DC Bar No. 90001468)
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 17th Floor
New York, NY 10004
(347) 302-2797
averriest@aclu.org

*/s/ Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn (Tenn. Bar No. 036284)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 645 - 5067
lucas@aclu-tn.org

*Admitted *pro hac vice*.

**CERTIFICATE OF SERVICE**

I, David Elbaum, certify that on January 22, 2026, I caused a true and correct copy of the foregoing document to be filed electronically via the ECF system.

Respectfully submitted,

*/s/ David Elbaum*
David Elbaum