# Exhibit 1:

# Shelby County Jail Monitor Report, *Busby v. Bonner*, No. 20-cv-2359 (W.D. Tenn.)

**SABOT**
C O N S U L T I N G

SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

# First Covid-19 Follow Up Inspection of the Shelby County Men's Jail at 201 Poplar Avenue, Memphis TN 38103 On March 17, 2021

## Final Report

**Submitted to**:

Andrea Woods
Attorney at Law
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, New York 10004

Nathan Tilly
Attorney at Law
162 Murray Guard Drive, Suite B
Jackson Tennessee 38305

**Produced by**:
Mike Brady
Director
Sabot Consulting

April 11, 2021



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

THE JAIL SETTING.................................................................................. 6

INSPECTION OBSERVATIONS – March 17, 2021 .................................. 7

COVID-19 SCREENING FOR EMPLOYEES ......................................... 8

INTAKE/BOOKING/RELEASE................................................................ 9

MEDICAL................................................................................................ 10

MENTAL HEALTH ................................................................................ 11

MEDICAL ISOLATION LOWER LEVEL PODS A-K............................ 12

FLOORS 1-4............................................................................................ 14

FLOORS 5-6............................................................................................ 16

POPULATION MANAGEMENT ............................................................ 17

STAFFING SHORTAGES........................................................................ 19

JAIL VENTILATION SYSTEM.............................................................. 20

PREVIOUS RECOMMENDATIONS ...................................................... 21

CURRENT FINDINGS AND RECOMMENDATIONS............................ 28

CONCLUSION........................................................................................ 32

# INTRODUCTION

My name is Michael K. Brady, and I am the Director of the Criminal Justice Division for Sabot Consulting. I am a nationally recognized expert in prison and jail operations, the Americans With Disabilities Act, and the prevention and mitigation of the spread of infectious diseases and public health in the correctional setting from an operational and non-clinical perspective.

On June 18, 2020, in the matter of Busby V Bonner ( No. 2:20-cv-2359-SHL), pursuant to Federal Rule of Evidence 706, United States District Judge For The Western District of Tennessee, Western Division, The Honorable Sheryl H. Lippman, appointed me as the neutral expert witness in the field of jail and prison operations as it relates to the prevention and mitigation of the spread of infectious diseases and public health in the correctional setting.

The Inspection Order states in pertinent part:

> **"…The appointed expert shall provide information to the Court responsive to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 2) and render an expert opinion on the current health and safety of medically-vulnerable Plaintiff-detainees at the Shelby County Jail ("the jail") in light of the Covd-19 pandemic, including but not limited to the Facility's compliance with the pertinent CDC and Shelby County Public Health guidelines and other applicable standards. The expert's findings shall include, if warranted, recommendations regarding corrective measures that, in his expert opinion, should be implemented at the jail, to protect the medically-vulnerable from the COVID-19 virus at the facility…."**

The medically-vulnerable detainees to which the inspection order applies are defined as follows:

1. People 65 years and older
2. People with chronic lung disease or moderate to severe asthma (including chronic obstructive pulmonary disease (COPD) (including emphysema, and chronic bronchitis),
3. Idiopathic pulmonary fibrosis and cystic fibrosis;
4. People who have serious heart conditions (including heart failure, coronary heart disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension);
5. People who are immunocompromised (including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications);
6. People with severe obesity (body mass index [BMI] of 40 or higher);
7. People with Diabetes;
8. People with chronic kidney disease undergoing dialysis;
9. People with chronic liver disease, including cirrhosis; and

Case 2:24-cv-02659-SHL... Document 212-3 Filed 07/31/24 Page 5 of 35 PageID 5384

SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

10. People with hemoglobin disorders, including sickle cell disease and thalassemia.

11. All persons currently or in the future held at the jail in pretrial custody during the COVID-19 pandemic who are at increased risk of Covid-19 complications or death because of disabilities as defined in the Americans With Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.

On the 28th of January, Judge Lipman signed an order preliminarily approving the Class Action Settlement between the parties to this action in which it was agreed that I would continue in my role as the Rule 706 Court-Appointed Independent Inspector pursuant to the agreed upon terms and conditions contained in the Consent Decree attached to the Court's January 28, 2021 order.

Pursuant to paragraph 4. **Reporting** on page 2 of the Consent Decree, Defendants are required to provide me with a report containing certain information. Defendants did comply with the paragraph 4 provision except as to a subpart of 4(b). Defendants gave me the data on the number of Covid-19 tests conducted on detainees and for staff at the jail in the aggregate, but Defendants did not provide me with the information "by pod and the results of those tests" by pod.

In addition, in paragraph 5 on page 2 of the Consent Decree, Defendants did provide me with lists of the Class and Subclass as defined by the Court, and they did specify whether the class or subclass member is housed in a single cell, shared cell, or dormitory, but I find that information of little value without additional information and sorted in a different way. I will make recommendations on what additional information I will need on how it should be displayed to make my time more efficient and cost effective, and my report more valuable to the parties going forward.

I also reviewed my prior recommendations with Lt. Styles and found that some have been implemented, some have been implemented in a manner that the Defendants determined works best for them, and some have not been implemented because of population size and physical plant restrictions. I will cover what has been implemented and what has not in the recommendations section of this report.

There are several issues that are of great concern to me:

1. The inability of the Shelby County Jail to properly social distance inmates because of population size and physical plant restrictions in the higher security level units.

2. The manner in which the Court Expeditor interprets her responsibilities to present information to the Court regarding the inmates in the Class and Subclass as defined in the June 18, 2020 order, in subsequent orders, and in the proposed Consent Decree is limited to those inmates over 60 years of age, and those inmates who are medically fragile that Wellpath brings to the Court Expeditor's attention on occasion. There is not a systematic or uniform process of review, analysis or presentation of Class Member or Subclass member medical conditions that put them at risk of serious illness or death from Covid-19, nor is there any information regarding the ability of the inmate to be safely placed in alternative forms of



custody in the community. The manner in which the limited information she gathers is presented to the court is not uniform, nor is it organized, and as a result, I could not determine the process or the outcome of the few cases about which she was able to provide documentation. The Court Expeditor does not have a tracking system developed that allows me to look at the number of Class or Subclass member cases that have been presented to the court with a recommendation for release or placement into an alternative form of custody. The Court Expeditor must go back through her emails to try and find information on cases she has presented to the Court and even then it is very difficult to discern what information she presented and what her recommendations were. The failure or inability to provide me with the work she did on behalf of the Class and Subclass members for the previous 60 days from the date of my inspection leads me to the conclusion that very little has been done.

3. The number of at risk Class and Subclass members who remain in custody in Housing Units when there is no ability to social distance in accordance with CDC guidelines, and, as a result, are subjected to an unreasonable risk of serious illness or death.

4. Gaps in the contract tracing process as a result of contract tracing occurring in what appears to be silos vs an integrated fashion.

5. Staffing shortages at the Shelby County Jail cause Class and Subclass members to be locked in their cells oftentimes for days if not weeks at a time. In addition, Class and Subclass members have not gotten any outdoor large muscle group exercise since my last inspection in June of 2020. The lack of large muscle group exercise, and being confined in their cells for extended periods of time negatively impacts the mental and physical well being of this already immunocompromised Class and Subclass population.

6. When bail is considered in Shelby County, the judicial commissioner setting bail does not take into account the economic ability or inability of the detainee to post bond. Nor does the Court Expeditor uniformly present to the Court health information about all at risk Class and Subclass members who could be placed in alternative structured and supervised environments thereby reducing their risk of serious illness or death without jeopardizing the safety of the public. Thus, in my expert opinion, the manner in which bond amounts are set discriminates against Class Members and Subclass members who may not be a current threat to public safety, but who are people of color and who simply cannot afford even a minimal bond. The current system is not necessary to ensure future court appearances or to protect public safety. Under this system, the Class Members and Subclass Members, most of whom are poor and people of color, are disproportionately held in custody simply because of their inability to afford to post a bond, and they are not being considered for alternative placements in structured and supervised environments despite their underlying health issues. This discrimination results in a disproportionate number of Class and Subclass, immunocompromised poor people of color, being subject to an unreasonable risk of serious illness or death from the



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

Sars-COV-2 virus because they are held in custody solely because they are economically disadvantaged. According to data I reviewed, as of September 2020, there were 351 inmates housed in the Shelby County Jail with bonds of less than $2,000. While, I do not have the most recent data, I have no reason to believe the numbers are substantially different.

I was originally scheduled to conduct my first unannounced follow up inspection of the Shelby County Jail on March 8, 2021, but because of an extraordinarily cold winter storm in the south that caused damage to the water pipes in the Shelby County Jail and surrounding community, I was unable to conduct my follow-up inspection on that date.

The water issues in the jail and in Shelby County were largely resolved that week, and on March 17, 2021, I was able to complete my first follow-up Covid-19 inspection of the Shelby County Jail.

I arrived at the Shelby County Jail at 0830 hours on March 17, 2021 where I was met by Lt. Styles and Captain Harris who were my security escorts and resources for any and all matters related to my follow-up Covid-19 inspection.

During the course of my independent onsite Covid-19 inspection on March 17, 2021, I requested relevant documents from Custody and Wellpath at the Shelby County Pre-Detention Jail located at 201 Poplar Avenue, Memphis, Tennessee, 38103.

Moreover, from 0830hrs until approximately 2130hrs on March 17, 2021, I conducted multiple in depth interviews with key personnel with the Shelby County Jail, key personnel with the contract medical provider, key personnel with the Government Maintenance Crew, walked the decks on each floor of the jail, inspected each of the living units, dayrooms, common areas, showers, toilets, medical clinic, intake/booking/release, interviewed staff and inmates on the first (0600-1400hrs) and second watch (1400hrs-2200hrs), inspected the holding cells, the court tunnel, the upstairs court holding cells, and from the control center on the lower level observed inmates being escorted through the court tunnel, placed in the holding cells, escorted upstairs to and from the General Sessions Court and Criminal Courts, and back to through the tunnel toward their living units.

I continue to be very fortunate to have Lieutenant Styles as my security escort and guide along with the new Compliance Unit Captain, Captain Harris. They are intimately familiar with all aspects of the Shelby County Jail operations and were responsible for the seamless scheduling of staff and inmate interviews, escorting me through any and all parts of the jail, gathering documents that I needed as a result of my interviews and observations throughout the day of my inspection. They were my security escorts, schedulers, facilitators, problem solvers, and reservoirs of knowledge, from 0830 to 2230hrs during my March 17, 2021 onsite inspection. We continue to communicate as needed for any additional information I may need or questions I need answered as I pen this report. Without their assistance, it would have been impossible for me to have accomplished what I needed to accomplish for this Covid-19 follow-up inspection. Thank you Captain Harris and Lt. Styles.

I also want to acknowledge Chief Fields, his staff, Wellpath's Medical Director, Dr. Donna Randolph, and HSA Jeremy Sanders, for allowing me to repeatedly take time away from



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

their busy schedules to answer my questions and provide me with the documents I needed to verify that the policies, procedures and practices about which they spoke were in writing. They are consummate professionals who care deeply about the inmates in the Shelby County Jail.

At all times of the day or night, I had unrestricted access to key personnel and the jail facility. Shelby County Jail command staff and Wellpath leadership continue to be transparent, responsive and open to new approaches in addressing the opportunities for improvement that I discovered during my court ordered inspection.

**SABOT**
C O N S U L T I N G

SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## THE JAIL SETTING

County Jail operations have many unique characteristics:

- Jails operate continuously, 24 hours per day, 365 days per year.
- Jails provide a wide spectrum of services, activities, and programs for inmates.
- Jails are high-risk settings where inmates are often dangerous to themselves and others.
- Jail populations have a significant percentage of inmates with chronic diseases serious medical conditions, serious mental illness, and disabilities
- Jail populations can fluctuate widely throughout the year, and even on a day-to day basis.
- Many jail inmates spend only a few hours in jail or a few days especially in light of pretrial release programs, and other court actions.
- Many other inmates remain in jail for months or years because of the serious nature of their charges, their inability to make even the lowest bail amount, and the delays of trial calendars.
- Admission and release procedures require much staff effort, but the peak periods of admission are often difficult to anticipate (special events, parole/probation sweeps, gang sweeps, homeless camp sweeps, demonstrations, DUI checkpoints, etc.).
- Extensive Documentation is required for all activities and procedures at the jail.
- Perimeter security and internal movement must be controlled at all times.
- Supervision needs vary for different classifications of inmates.
- Jail staff, administrators, and funding officials can be held liable for substandard/constitutional deficient jail operations and conditions.
- Transportation to and from outside medical appointments, inpatient hospitalizations are difficult to anticipate and staff.
- Jails now are one of the largest and most challenging mental health treatment facilities in the country.
- The provision of quality medical care to an older, sicker, inmate population is incredibly expensive and challenging.

In recent years, recruiting and maintaining adequate badge staff has been extremely difficult in jails across the country, and current events have exacerbated the problem. Many jails are short staffed and have to employ robust mandatory overtime initiatives that are unsustainable.

Couple these challenges with the current attempts to limit the spread of the highly contagious and deadly Covid-19 virus in the Shelby County Men's Pre-Detention Facility (hereinafter "the jail"), and it becomes exponentially more difficult.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

### INSPECTION OBSERVATIONS – March 17, 2021

It goes without saying that these are extraordinarily difficult and dangerous times in which we continue to find ourselves thrust today. Operating a large county jail such as the Shelby County Jail is challenging, complex, and labor intensive.

Attempting to prevent/mitigate/eradicate the Covid19 virus within the secure perimeter of the jail, adds an additional daunting and extraordinarily labor intensive layer of multidisciplinary work that must be implemented with precision, armed with the flexibility to adapt to new discoveries, guidance and directives from the CDC and Public Health in real time, and monitored with hypervigilance to ensure its effectiveness.

As you can imagine, each county jail is unique and there is not a single Covid-19 operational response model that is effective for all jails. The core principals of social distancing, testing, tracing, and isolation must be present, but how those four core principals are implemented are oftentimes restricted because of the physical plant, population size, and staffing. Shelby County is no different.

On Wednesday morning, March 17, 2021 at approximately 0730hrs, I notified my security escort, Lt. Styles that I would be conducting my inspection of the Shelby County Jail and that I would be arriving at the Shelby County Detention Facility at 0830. The date and time of my inspection was officially unannounced until one hour prior to my arrival. However, because of the deep freeze and extraordinary snow storm in the southern part of the United States, it was necessary for me to ensure that the Shelby County Jail was not on a "boil water alert". As a result, I was in contact with Lt. Styles on Friday to make sure that the water issues at the jail were resolved. While she did not know the exact date I was coming, it wasn't hard to figure out a three or four day window in which I would be arriving. So it was only partially an unannounced inspection. I do not believe the lack of surprise negatively impacted my ability to witness an honest picture of daily operations at the jail. I am a very experienced corrections operations expert, and I can tell when somebody is trying to put lipstick on a pig. Chief Fields directed his staff to let me see and have whatever I needed, and I believe that Chief Fields wants to fix any problems that are identified, and he will adopt any recommendations that will make their operation better where possible. Lt. Styles and Captain Harris met me at a secure parking lot off Washington Street and we entered the jail through the employee entrance. I was wearing a surgical mask, as were Captain Harris and Lt. Styles.

## COVID-19 SCREENING FOR EMPLOYEES

As it was last June, immediately upon entering the jail outside the secure perimeter, there was an employee/contractor screening table. I was asked to fill out a "Coronavirus Screening" questionnaire which posed the following questions:

1. In the past 14 days, have you been outside of the United States and/or, on a cruise or been in contact with anyone who has? Yes_ No_ If so, When___ Where___
2. In the past 14 days have you been in crowded areas, (for example Airports, Conferences, Concerts, etc.)  YES__NO__ If so, When__ Where__
3. Have you or anyone you have had close contact with been diagnosed with or quarantined for Coronavirus? (The incubation period is 2-14 days) YES__NO__
4. Do you have a fever, cough, difficulty breathing, diarrhea, headache, loss of taste or smell or symptoms of lower or upper respiratory illness? YES__ NO__

My temperature was taken and recorded on the questionnaire.

At the bottom of the questionnaire, the final statement was "If answered yes to any of the questions above, please see the immediate Supervisor of the area."

The Supervisor of the area cleared me for entry into the secure perimeter of the jail.

While in the employee screening area, I paused and observed several employees enter the facility through that entrance and all were wearing face masks, filled out the questionnaire and had their temperatures taken. I was provided with the temperature logs from the employee screening area for the last 90 days.

I was provided with the appropriate PPE including an N95 mask, a Tybex Suit, goggles, gloves, and hand sanitizer.

Once inside the secure perimeter, I met with Chief Fields. I informed Chief Fields who I wanted to speak with and what documents I needed from them. We made arrangements for me to meet with Medical, Mental Health, Public Health, Transportation, the Court Expeditor, the Court Tunnel Lt., and the Facility Maintenance crew responsible for maintaining the ventilation system.

## INTAKE/BOOKING/RELEASE

I began my facility inspection in the Intake/Booking area and the Sally Port where all law enforcement are required to bring arrestees for screening and booking. There are a few changes that have been made to this process that are consistent with CDC guidelines.

24 hours a day, 7 days a week, 365 days a year all arresting agencies who enter the sally port are required to keep the inmate in the agency vehicle until it is there turn to present the arrestee for a pre-booking Covid19 healthcare screening. They are asked a series of healthcare questions about any symptoms they may be experiencing related to Covid19, and they are administered a temperature strip which is then passed back through a glass barrier to the nurse on the other side.

If the inmate is asymptomatic, they are issued a mask and placed in a holding cell inside the secure perimeter, and they go through the normal booking process. The inmate is searched, photographed, fingerprinted, and interviewed by pretrial services. Pretrial Services administers the Public Safety Assessment tool, an algorithmic risk assessment, along with an assessment questionnaire to determine if the inmate is eligible for release on his own recognizance (ROR). If he is not released on recognizance, he will have a bond set by the Commissioner. The bond is set within 24 hours.

If they are not eligible for ROR or they cannot make bond, the inmate will be dressed out, processed through classification and housed in a general population isolation unit that is cohorted for 14 days. (Lower Level A-G).

If the inmate is symptomatic, the inmate is escorted immediately over to a tent area on the far end of the Sally Port, and healthcare staff and security staff come out in full hazmat PPE and conduct a more in depth healthcare screening to determine if the arrestee is suitable for confinement (Not in acute respiratory distress or suffering from some other medical condition that requires the inmate to be transferred to the ER at Region1 Medical). If the inmate is suitable for confinement, the inmate is placed in full PPE including a hazmat jumpsuit, booties, facemask and eye protection and escorted to a medical quarantine area where he will remain for 14 days. Inmate is tested immediately with the nasal pharyngeal test for Covid19. While in quarantine, the positive inmates' temperatures and vitals are taken daily. Unfortunately, the refusal rate for the PCR is approximately 66 percent.

If an inmate is a confirmed positive, his clothing is placed in a hazmat bag and disposed of as hazardous material.

Previously, Wellpath had a non-test based strategy for asymptomatic inmates, but based on my previous recommendation, they are now offering PCR Covid-19 tests to all newly booked inmates who are "keepers" on day 12 of their incarceration. Unfortunately, there is a refusal rate of approximately 66 percent. The 14 day medical isolation with or without a Covid-19 test is consistent with the current CDC guidelines.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## MEDICAL

The next area I re-inspected was the medical clinic area. There is no outpatient housing unit or infirmary in the jail. Anyone requiring those services must be transported to an outside facility. The Wellpath staff conduct regular sick call. During the early stages of the pandemic Wellpath used telemedicine for much of their physician appointments. They have now returned to face to face sick call appointments. I observed the clinic area, and, at a different location, I spoke with several nurses. The area was clean. All participants were wearing appropriate PPE and were properly social distancing.

During this inspection, when asked about outside specialty appointments for chronic diseases and serious medical conditions, Wellpath's Medical Director, Dr. Donna Randolph, and HSA Jeremy Sanders told me that Regional One Health were accepting chronic care appointments again. There is a dialysis clinic that occurs at the jail regularly, and the dialysis patients have not experienced any recent delays in their care. I spent a considerable amount of time with Dr. Randolph and Mr. Sanders, and I continue to find them to be well informed and passionate about delivering competent, patient centered, medical care to the inmate population.

Finally, contact tracing is occurring in silos. Custody is conducting their own contact tracing, Wellpath is conducting their own. Public Health is conducting an unknown amount. I got several different answers regarding who is actually conducting contract tracing and when. I am concerned that there are gaps in contract tracing. The various disciplines are relying solely on schedules and anecdotal information about who has been exposed rather than cameras, logs and other records.

I recommend a representative from Medical, Public Health, and Custody meet whenever there is an exposure to review the various mediums of information to determined who was exposed, when and where, and public health should contact those exposed individuals to inform them of their exposure and the need to quarantine.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## MENTAL HEALTH

I spoke with Ms. Geeter regarding the Mental Health Program, and she stated that the Mental Health Treatment Program continues to function in the manner as outlined in my previous report. One interesting fact is that with the SMI population Ms. Geeter has assembled a multi-disciplinary group to regularly meet with and encourage the SMI population to take the Covid-19 PCR test when offered and according to Ms. Geeter, the refusal rate is approximately 1 percent. Ms. Geeter is to be commended for her creativity and success in working with this extremely vulnerable population regarding taking the Covid-19 tests when offered. I am hopeful this group will do the same with regard to vaccinations.

## MEDICAL ISOLATION LOWER LEVEL PODS A-K

Previously, in their Covid-19 response policies, procedures and practices, Wellpath and the jail represent that asymptomatic newly incarcerated inmates are medically isolated for 21 days and then released to general population living units commensurate with their security level.

However, as noted in my June 29, 2021 inspection report, that was not actually occurring because the Shelby County Criminal Courts were requiring inmates to be brought to the holding cells for the courts in large numbers even if they were in medical isolation.

During this follow-up inspection, as explained below, I found that practice has been discontinued and a new much safer practice of a combination of video court appearances and in person court hearings has been implemented. I also found that the medical isolation practice has been reduced to 14 days consistent with CDC guidelines.

I met with Lt. Lee from the Shelby County Sheriff's Office who oversees the holding cells, inmate movement through the court tunnel for court appearances, and inmate appearances for video arraignments. We discussed the changes that were made based on my previous findings.

Currently, there are not large numbers of inmates occupying the court holding cells awaiting their court appearances from general population as well as medical isolation as was the prior practice. Rather inmates who are on the court's calendar are only called down to appear for a video appearance as and if the court needs them. The court's bailiff emails the deputy in the court muster area who is in charge of calling the housing units to ask that an inmate be sent down for a court appearance/video arraignment. The Housing Unit officer then sends the inmate from the Housing Unit down through the court tunnel to the court muster area. The inmate(s) must wear a mask properly and if there is more than one inmate coming from a Housing Unit, those inmates must properly social distance as they walk from their Housing Units to the court muster area.  The inmates are greeted by Deputies who place them in the appropriate holding cells that are designated for specific courtrooms. The holding cells have markers on the bench upon which the inmates are instructed to sit. Those markers are 6 feet apart. The inmates are required to wear their masks properly over their nose and mouths at all times. There is a Deputy assigned to each holding cell, and those Deputies are charged with enforcing the social distancing, mask compliance and coordination for video arraignment appearances/court appearances. Outside the holding cells are a series of chairs properly spaced six feet apart. Those chairs are occupied by inmates come out of the holding cells and take their place in line for their video court appearance or face to face court appearance. The inmates are called into the video arraignment booths or to the upstairs courtroom by a Court Bailiff one at a time as the court needs them. Once the inmate is finished with their court appearance, they are sent back to their Housing Unit. If the inmate is a higher security inmate, they are escorted back to their Housing Unit by one or more Deputies depending on the inmate's security classification.

12



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

Inmates from the medical isolation are only called for court appearances if they can potentially be released and those decisions are made by the court and counsel for the defendants. If an inmate in medical isolation is brought down to court, all movement is stopped, and the medically isolated inmate is brought directly to the video court appearance by a Deputy and then immediately escorted back to the medical isolation unit by a Deputy. There are no Covid-19 positive inmates brought to a video arraignment or in person court appearances. The video arraignment areas are sanitized after every use.

Court remands are taken outside and booked through the sallyport through the normal booking process. They are not co-mingled with the inmates who are from the Housing Units.

On this follow up inspection, I was able to observe both a morning court calendar and an afternoon court calendar inmate movement and video arraignment process. I also inspected the holding cells that were occupied by inmates during both the morning and afternoon court calendars. I found they were properly wearing masks, were properly social distanced, and that the new process was much safer and more efficient than the previous process. It would be fundamentally unfair to the inmates who can potentially be released from jail to not be allowed the opportunity to appear in court via video or in person in an effort to secure their own release. My understanding from Lt. Lee is that this process will remain in place even after the court resumes normal operations.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## FLOORS 1-4

During this follow-up inspection, I inspected random Housing Units on these floors for the presence of adequate soap, masks, cleaning supplies, cleaning supplies and cleaning schedules. There was adequate soap, masks, cleaning supplies, and hand sanitizers. I continue to be concerned about the cleaning schedules in these units. From the schedule of DeWayne Johnson, the person in charge of disinfecting these Housing Units, it appears that these Housing Units are not disinfected on a daily basis. In addition, I found at least one Housing Unit by the Nurses Station that houses the most medically fragile inmates to be dirty. The floors were not clean, the showers were not clean, the entire unit was dirty. This simply cannot happen in an area where medically fragile, immunocompromised inmates are being housed.

Moreover, in virtually all of the Housing Unit Pods on these floors, social distancing was not occurring, nor is it possible for it to occur at the current population levels. These Housing Units contain higher security level inmates and many are at 85 percent plus occupancy. I observed some units out for dayroom time and there were 14-16 inmates seated in the dayroom right next to each other at the dayroom tables playing cards, games, or watching TV.

I asked Chief Fields about the issue of social distancing and Chief Fields was very candid about the inability of the Shelby County Jail to properly social distance inmates on these floors because of physical plant restrictions and the size of the inmate population. He also stated that if they were to try and social distance inmates on these floors, the inmates would get even less out of cell time than they are getting.

If the jail would use the rooftop recreation yards it may help with this issue some, but, in my expert opinion, there would still be insufficient space in the Housing Units on these floors to properly social distance. Because these very same Housing Units contain many, if not most of the Class and Subclass medically vulnerable inmates, the inability to properly social distance these inmates creates a heightened risk of serious illness or death as the Sars-COV-2 (Covid-19) virus is introduced into these Units.

As I mentioned earlier in my report, because of staffing shortages, the inmates in the Shelby County Jail are not getting their regular out of cell time and are locked down days at a time if not weeks at a time because of a lack of staff to supervise these Housing Units. See my June 29, 2021 report regarding staffing shortages at the Shelby County Jail.

The inability of inmates to get out of their cells regularly for dayroom time and large muscle group exercise, negatively impacts their physical health as well as their mental health. This creates an increased risk of suicide, and further deterioration of their physical health from the lack of large muscle group exercise. The ACA core standards recommends at least 7 hours of recreation time per week for inmates in general population and 5 hours a week for inmates who are in restrictive housing. The Department of Justice 2016 Study on



Restrictive Housing recommends 2 hours of out of cell time per day of out of cell time. The Shelby County Jail is out of compliance with these standards.

It is a well settled fact that extended periods of inmate's being locked in their cells 23-24 hours a day, is harmful to their physical and mental health.

Given the staffing shortages that currently exist at the Shelby County Jail, there is little chance that inmates could have access to the rooftop recreation yards, nor can the inmates expect regular out of cell time in the dayrooms. I recommend that they Shelby County Jail institute a mandatory overtime program for all posted positions.



## FLOORS 5-6

These floors are dormitory style housing and inmate have sufficient space to properly social distance, and they have access to the dayrooms within the dormitory settings for the vast majority of each day.

Having said that, inmates, even when assigned bunks that are 6 feet apart and they are instructed to social distance, tend to cluster in groups to talk, play cards, games, and watch TV throughout the day.

The inmates on floors 5-6 do not have access to the rooftop recreation yards either.



## POPULATION MANAGEMENT

As of March 5, 2021, the inmate population of the Shelby County Jail is 1,926 inmates. On June 29, 2020, the population was 1,854. The jail has a capacity of 2600. The jail currently books approximately 38 inmates a day on average and releases 24 inmates a day on average. The jail is an older jail that was built in the 1980's and as a result, most of the cell doors are open bars at the top and are operated electronically via a control panel and Folger keys. Since my last inspection, plexiglass has been installed on some cells so they are similar to solid door cells. Approximately 8 different law enforcement departments within Shelby County book arrestees in the jail. Additionally, surrounding counties will request that the jail take some of their inmates when they reach capacity. The jail also currently houses Tennessee Department of Correction inmates who come back to Shelby County for court matters.

Reducing the population of the jail in these unprecedented times is challenging but is necessary to comply with CDC guidelines on social distancing and to prevent/mitigate serious illness or death of Class and Subclass members. The jail, as a matter of law, cannot refuse to book an arrestee who is medically fit for incarceration. Further, it has been represented to me by the Shelby County Jail Command staff that the Sheriff does not have the authority to release inmates to alternative forms of custody such as active GPS, supportive housing in the community, shelters, recovery homes, home detention, work release, etc. Currently the jail has a Case Expeditor to try and move cases along, but she is not providing the court with the necessary information for Class and Subclass members to be seriously considered for placement in alternative structured and supervised environments in the community. The Court Expeditor function is short staffed and the manner in which this important service is being handled has proven ineffective and dysfunctional. In addition, from my observations during my follow up inspection, the current practice of the Shelby County Courts and the attorneys representing the inmates continues to create a significant backlog that is contributing to the size of the jail population. Cases continue to be postponed multiple times for lengthy periods of times allegedly without the consent or time waiver of the inmates. The inmates are not being provided their discovery packets until months after their arrest and detention. Attorneys are not visiting their clients and discussing their cases. Offers are not being made in an effort to resolve cases. The vulnerable inmates that I interviewed during my inspection continue to complain about the lack of information, the failure of their defense attorneys to visit them, and the failure of their attorneys to consult with them regarding waiving their constitutional right to a speedy trial. The court allegedly is refusing to release inmates who have committed non-violent crimes and are not a current threat to public safety. Defense attorneys are allegedly failing to present medical evidence of their client's serious medical condition to the court that would demonstrate the inmate is not currently a threat to public safety or to argue for placement in alternative forms of custody. They cannot present the evidence because they allegedly are not meeting with their clients and gathering the necessary evidence to present to the court.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

Moreover, towns in Shelby county continue to bring inmates to the Shelby County Jail when their jails reach capacity, and surrounding counties also bring inmates to the jail when their jails are allegedly at capacity.

As a result, the population has grown to over nineteen hundred and twenty five with no room to enforce social distancing within the living units in the jail. I am concerned that it will slowly creep up making controlling the Covid-19 virus even more difficult. At certain periods of time over the last six months, the jail population has increased to over two thousand inmates. With the jail population at these levels, social distancing is not possible. Couple that with severe staffing shortages, and the problem has reached critical mass.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## STAFFING SHORTAGES

Currently the jail has 157 security staff vacancies, and the Sheriff's Department is experiencing difficulty in their recruitment efforts to fill those vacancies. In addition, a recent staffing study that was completed found that the actual need for security staff is over 300 positions. Having significant staffing shortages like these is a contributing factor to consistently providing routine services to the vulnerable inmates in the jail. On this follow-up inspection, the staffing shortages were clearing the major contributing factor to the Class and Subclass members being locked down for days if not weeks at a time.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## JAIL VENTILATION SYSTEM

I met with the men who are responsible for the Shelby County Jail ventilation system. Shelby County has spent 1.1 million dollars on the installation of Global Plasma Ionizers in the ventilation system. According to the marketing materials the Ionizers are 98 percent effective in killing the Covid-19 virus. I am unqualified to make that determination, but I did review the marketing materials and contract with the vendor. The ventilation expert contemplated by the consent decree should be consulted in determining whether the GPS ionizers are sufficient to render the air quality in the jail safe. I understand there may be concerns, including within the CDC and ASHRAE, that these ionizers are not sufficient to mitigate the risk of aerosol spread of COVID-19.

## PREVIOUS RECOMMENDATIONS

These findings and recommendations are not in order of importance.

RECOMMENDATION #1

1. It is recommended that Wellpath move to a 14-day medical isolation with a nasal pharyngeal test-based strategy for symptomatic and asymptomatic inmates who are newly booked in the jail. The tests should occur between day 3 and day 6 for the initial test, and between day 10 and day 12 for the second test. All inmates in medical isolation must be asymptomatic for two consecutive days subsequent to the final test results being received before they can be released to general population. Covid-19 test refusals should be considered positive tests and subject to a 21 day isolation with no movement. Implemented w a single PCR Test at day 12. This date was chosen because of high inmate turnover from day 2-11. Unfortunately, the refusal rate is approximately 66%.

2. It is recommended that Wellpath and the jail command staff identify living units where the vulnerable population can be sequestered away from the rest of the general population inmates without losing their privileges or dayroom time consistent with their security level. The most medically fragile inmates and the inmates that are at the highest risk of serious illness or death if they contract the Covid-19 virus should be housed near the medical unit in case there is a white alarm. Areas that could be considered are the third floor and the Annex. Custody might be able to open the sixth floor living units which have 192 beds for the Level 7 inmates currently housed on the 3rd floor, and move some 3rd floor inmates to the empty cells in the Annex. Implemented to the best of their ability given the physical plant limitations. Some of the most medically fragile inmates are located by the nursing station on the second floor of the jail. Some have been moved to a solid door setting in the Jail Annex. Some remain in Housing Units where there are open bars, but the jail has placed plexiglass over the open bars to emulate a solid door cell. The majority remain in Housing Units with open bars.

RECOMMENDATION #2

1. Consult with Dr. Bruce Randolph, Shelby County Health Officer, to see if he would be amenable to adding detention facilities to Shelby County Health Directive #7 or issuing a separate health directive for detention facilities in Shelby County. The language in the directive could read that "Any person detained in a detention facility should be isolated from the rest of the inmate population for 14 days if they are not eligible for ROR and cannot make bond. If the detained person is eligible for ROR or can make bond, they should be released, provided with a copy of Shelby County Health Directive #7 dated June 22, 2020 and instructed to follow that directive upon release. Nothing in this directive is intended to delay or impede the release of

21



detained individuals if they are eligible to be released". This is in the best interest of public health. Detained people are members of the Shelby County community and should be protected from unreasonable risks of infection just like non-detained persons in Shelby County. The Jail in consultation with the Courts, have implemented a new process by which inmates are only brought down to the court holding cells when they are needed for their court appearance in person or via video conference. No positive inmates are making court appearances of any kind, and only inmates who may have a chance to be released on their own recognizance are brought to the holding cells in small numbers for video or in person visits. I am satisfied that this practice is much safer.

2. Consult with the General Sessions Court and Criminal Court and ask the Judges to use the existing video technology located in holding tanks LLR and LLS for arraignments, bond hearings, and other court proceedings that would not violate the inmate's 5th or 6th amendment rights. In March, the Tennessee State Supreme Court issued an emergency order suspending in person court appearances for two weeks, but I am unaware of the validity of this order today. Technology such a Skype, Zoom, Microsoft Team, and Webex are also available and could be deployed in a cost effective and efficient manner while limiting the exposure of vulnerable inmates to infection. Ms. Best, the Sheriff's Office Expeditor, is a former judge and an attorney and could be very helpful in explaining the risk of spreading the Covd-19 virus among the inmate population if the court continues to demand the inmates appear in, at, or near the Courts in large holding tanks. The use of video arraignments, bond hearings, and other appearances would go a long way in reducing the risk of vulnerable inmates getting infected with the Covid-19 virus. The jail and the Courts have substantially increased video court appearances. However, the Courts resumed normal operations on March 15, 2021, and this could increase the risk of inadvertently introducing the virus into the jails. Having said that, from my observations during the follow-up inspection, I believe that a good faith effort has been made to mitigate the introduction of the Covid-19 virus into the jails.

3. Wellpath leadership needs to be more aggressive and more vocal about protecting the vulnerable inmates in their care. There are several practices that take place in the jail that are potentially harmful to their patients, and they should not be allowed to continue. I recognize that Wellpath leadership feels powerless to insist that those harmful practices be discontinued, but in my expert opinion, Wellpath should have brought those harmful practices, at a minimum, to the attention of Dr. Bruce Randolph and documented that those harmful practices were brought to the attention of whatever entity they notified including the Court. Judges can be dismissive, but it is the responsibility of the medical provider to protect the health of the inmates in their charge and to speak up and advocate for the safety of their patients. I know this is an uncomfortable recommendation, but it is the right thing to do. Doing the right thing is not always easy, but it is always the right thing to do. See above. This is a difficult situation to be in, but I believe that Wellpath is now

more of an active participant than on my last visit. The Court Expeditor does not seek information from Wellpath on the Class and Subclass members on a regular basis. She only looks at inmates over 60 and those that are the most medically fragile that Wellpath brings to her attention. This needs to change.

FINDING #3

1.  The Shelby County Jail is not maximizing its efforts to enforce social distancing in its living units and should consider rethinking how it programs inmates in all areas of the jail. Unfortunately, except in the dormitories on the 5th and 6th floors, social distancing is not possible at the current population levels. Severe custody staffing shortages limit the Jail Command Staff from using the rooftop exercise yards simultaneously with dayroom time in the Housing Units. Even if that were to occur regularly, proper social distancing would not be achievable in my expert opinion.

RECOMMENDATION #3

1.  Jail Command Staff could consider allowing fewer inmates in the dayroom area at the same time. By reducing the number of inmates in the dayroom at one time while continuing to enforce the mandatory mask order for staff and inmates who are in the dayroom, the risk of infecting others with the Covid-19 virus will be reduced. As an example, only allowing 6-8 inmates out in the dayroom at the same time on the 3rd, 4th, 5th, and 6th floors vs allowing 20 inmates out in the dayroom at the same time will substantially reduce the risk of person to person infection. In the dormitory living units, staff can put some inmates on bunk status until it is time for them to program in the dayroom. It is critical that the security officers enforce the directive that inmates properly wear masks. I did not physically go into the asymptomatic medical isolation units, but those inmates should only be coming out alone with masks properly worn until their medical isolation is lifted. Social distancing compliant with CDC guidelines is not possible in this jail given the size of the inmate population and the physical plant limitations. Social distancing consistent with CDC guidelines will only be possible by reducing the jail population to 50% of design capacity if then. There are a significant number of inmates in the Shelby County Jail that could be safely placed in structured and supervised environments in the community, and some that only remain in jail because they are economically disadvantaged people of color who cannot afford even a minimal bond.

RECOMMENDATION #4

1.  At the daily shift supervisors meeting, jail command staff should issue a directive to the floor Sergeants, Lieutenants, and Captains requiring them to direct living unit security staff to distribute free soap to the inmates in every unit twice a week until further notice. Furthermore, living unit security staff should provide each new inmate who enters the living unit with an information sheet that provides the inmate

with Covid-19 education materials and a statement that they are entitled to free soap twice a week and that they will not be written up if they have more than one bar of soap in their possession. If security staff do not follow this directive, they should be disciplined. Soap, Mask, and Hand Sanitizer availability has improved dramatically. I did not see any evidence of systemic problems with the distribution of these materials. I will review again on my next follow-up inspection.

RECOMMENDATION #5

1. Twice a week, every living unit in the jail should have a deep cleaning overseen by the security officer and the living units should be inspected by the floor sergeant. Inmates should have the opportunity to clean their cells every day at a specified time that does not take away from their dayroom time. If the living unit is not spic and span, the inmate's dayroom time should be suspended until such time as the living unit is spic and span. In addition, the living unit security officer should be disciplined for not keeping their living unit clean. Taking pride in your work area is a fundamental principal and best practice for a paramilitary organization. While there was some improvement in this area, during my follow-up inspection, I still found Housing Units and showers that were unsanitary including one right across from the 2nd floor Nursing Station that housed medically fragile inmates. This is inexcusable. The newly appointed Compliance Captain, Captain Harrison, should routinely inspect the Housing Units, common areas and showers to ensure they are clean and disinfected regularly.

RECOMMENDATION #6

1. Floor Sergeants, Lieutenants, and Captains need to be hypervigilant in enforcing the mandatory mask directive for staff and inmates. In fact, they need to be hypervigilant in enforcing all of the Covid-19 policies, procedures, and practices. There was a vast improvement in this area. I did not see any custody staff or healthcare staff with their masks down below their noses. All staff and 95 percent of inmates were mask compliant in the Housing Units and in the Court holding cells. No jail will ever be perfect in this area, and the Shelby County Jail is no different, but the Command staff should be commended for the increased compliance in this area.

2. It is critical that supervisors maintain their professional distance from subordinates. Overfamiliarity breeds contempt and as a result supervisors become unwilling to enforce policy and discipline non-compliant subordinates. This will poison the well, and all the great work that management has done to fight the spread of this virus will go for naught. Many of the vulnerable inmates will unnecessarily become seriously ill and die. This issue has been resolved. I did not see any overfamiliarity or clustering of staff during the course of my follow-up inspection.

3. I recommend that Chief Fields and Assistant Chief Hubbard increase their presence on the decks and spot check compliance with the Covid-19 policies, procedures, and practices including the cleanliness of the living units, dayrooms, and bathrooms. While I did not ask about this directly, from the source documents I reviewed, it is clear that Chief Fields' and Assistant Chief Hubbard's presence and active participation in the day to day operations of the Shelby Jail are seen and felt.

4. I recommend that the jail consider creating a compliance unit whose sole responsibility is to audit compliance with department policies, procedures, and practices. This unit can develop an internal audit tool and audit the jail quarterly for compliance. A quarterly report then should be filed with command staff and a corrective action plan should be developed to correct any identified deficiencies. This is important to protect the vulnerable inmates from an unreasonable risk of harm due to policy violations. A Compliance Unit of one has been created and Compliance Captain Harris accompanied me throughout my follow-up inspection. This Unit will go a long way to ensure consistent compliance with the Covid-19 policies, procedures and directives, and she will be able to immediately address any episodic violations that are occurring.

RECOMMENDATION #7

1. Create a Covid-19 information sheet that is at a 6th grade reading level. This information sheet should be provided to every inmate who is booked in the county jail and again when they reach their assigned housing unit after being taken off medical isolation. It should also be posted on the wall of every living unit. The living unit security officer should make sure the inmate understands the information on the sheet when they orient the inmate to the living unit rules and regulations. This information sheet should be available in audio and large print for the visually impaired, hearing impaired, and blind. I did see Covid-19 fact sheets and educational materials on the wall, but I did not inquire about the 6th grade reading level materials on this follow-up inspection. I will examine this issue more closely on my next follow-up inspection.

FINDING #8

1. Cleaning supplies for high touch surfaces such as telephones and kiosks are not readily available for inmates to use after each inmate uses those high touch items. I did see cleaning supplies in bottles in each Housing Unit available for inmate use.

RECOMMENDATION #8

1. Place an EPA approved cleaning solution in a spray bottle with a supply of paper towels in an area in the living unit where inmates can readily access it for cleaning the phone, kiosk and other high touch surfaces after every use. The jail is a direct supervision jail, and security staff are in the living units and can easily supervise its

use or assign a pod worker to that responsibility. Many inmates are indigent and assigning inmates with a pay number at .20 to .50 cents an hour will allow the inmate pod worker job to be attractive. First Watch and Second Watch can each have their own pod workers to assist the housing unit security officer with the management of the cleaning supplies. The cleaning supplies were readily available.

RECOMMENDATION #9

1.  Issue the inmate population two cloth masks one of which can be exchanged with the weekly laundry exchange. During laundry, the masks should be inspected and replaced if they are in disrepair. Masks should not be sprayed with Biovex. The manufactures warnings state that Biovex is considered to be a mild irritant and can cause irritation of the eyes, ears and throat. Vulnerable inmates may have an adverse reaction to this substance being sprayed on their masks especially those with COPD or moderate to severe asthma. Inmates I interviewed had adequate cloth masks and they can be exchanged during laundry exchange. Biovax is no longer used on masks. Some inmates choose to launder their own masks.

RECOMMENDATION #10

1.  Wellpath may want to consider hiring a Clinical Psychologist to test for intellectual disabilities and learning disabilities. Some experts have found that there may be as many as 2-4% of the inmate population that are intellectually disabled with a much smaller percentage being profoundly intellectually disabled needing high adaptive supports and protection from victimization. This recommendation was not adopted.

FINDING #11

1.  During my inspection and interviews, I came to the conclusion that there is no concentrated and coordinated effort to assemble and present information to the courts regarding an inmate's medical conditions that may make him vulnerable to serious illness or death while housed in the jail. Moreover, while I find Mischelle Best, the Court Expeditor, to be hard working and passionate about her job, I am concerned she is spread too thin and has to do the job of a competent criminal defense attorney in addition to her other duties. Nor is there any consistent multi-disciplinary effort within the jail to secure alternative custody venues for vulnerable inmates. I found that a significant number of these inmates had very serious charges, but some have been charged with garden variety felonies and, in my expert opinion, because of their medical condition, they are not a current threat to public safety if they were placed in a structured and supervised environment.

RECOMMENDATION # 11

1.  Create a multi-disciplinary task force within the jail to present the medical conditions of the inmates who along with their non-violent offenses make then good



candidates for release to alternative custodial settings. Technology has come a long way and alternatives custodial environments work well in many other states and jurisdictions. I left this finding AND recommendation in because this is such a critical component to not exposing Class and Subclass members to an unreasonable risk of serious illness or death from being exposed to the Covid-19 virus or any of the significantly more contagious and more deadly variants like the B.1.1.7 variant or others from South Africa, Brazil, etc.

The Court Expeditor function is understaffed, and the manner in which the data is collected is unorganized, sporadic, and ineffective. The manner in which the information regarding the medical conditions of the immunocompromised is monitored, collected and presented to the Courts with recommendations for alternative placements in the community is dysfunctional, unorganized, inconsistent, and ineffective.

The Court Expeditor has many tasks and has received little or no guidance on how to interface with medical and mental health on a daily basis, the breadth and depth of what information to collect, what information to present, what recommendations to make, how store and display that information, and how to track what if any action the Court has taken in response to her recommendations if she is making recommendations.

As a result, many Class and Subclass members who are immunocompromised with serious medical/mental health conditions and disabilities who could be safely placed in structured and supervised programs in the community instead are exposed to an unreasonable risk of serious injury or death in a jail that cannot enforce social distancing or provide the out of cell time and large muscle group exercise critical to the physical and mental well being of this vulnerable population.

Again I strongly recommend that Court Expeditor function be reimagined and restructured into a larger office with more personnel charged with gathering and presenting information regarding the Class and Subclass healthcare conditions, available alternative community based structured and supervised placements including but not limited to board and care facilities, residential treatment programs for substance abuse and dual diagnosis, GPS, home confinement, mental health treatment programs or being released on their own recognizance for those who are being held in jail because they are economically disadvantaged people of color.

27

SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## CURRENT FINDINGS AND RECOMMENDATIONS

FINDING #1

1. The Shelby County Jail, because of population size and physical plaint limitations, does not have the ability to properly social distance inmates in the higher security levels. If social distancing did occur consistent with CDC guidelines it would result in inmates receiving little or no out of cell time for recreation time/large muscle group exercise. Inmates receiving adequate out of cell time/large muscle group exercise has already been cut severely because of staffing shortages.

RECOMMENDATION #1

1. The size of the Shelby County Jail inmate population needs to be reduced by up to 50% in order to achieve social distancing consistent with CDC guidelines in order to effectively prevent/mitigate serious illness or death in the inmate population. Time is of the essence given the high vaccine refusal rate which is approximately 75%, The high refusal rate according to high ranking officials in the Shelby County Jail is in part because of the distrust of government by the African-American population stemming back to the "Tuskegee Experiment" and other civil rights atrocities. Moreover, at the time of my inspection only 22 inmates had been vaccinated.

RECOMMENDATION #2

1. The Shelby County Jail and Wellpath should create a comprehensive, culturally competent vaccine education program for current and future inmates that will demonstrate to the inmate population that the vaccines are safe and effective. Until the majority of inmates have been vaccinated at the Shelby County Jail, the prevention/mitigation effect is de minimis.

FINDING #2

1. The Court Expeditor function is completely ineffective in presenting Class and Subclass member healthcare information to the Court for them to consider in ROR decisions, Bond decisions, and safe alternative placements in structured and supervised environments in the community. The Court Expeditor function is severely understaffed, and the manner in which data is collected, presented, and preserved is dysfunctional and unreliable. Less than 1% of the Class and Subclass healthcare information has been submitted to the Court for consideration. This is a serious problem that places Class and Subclass members at an unreasonable risk of serious illness or death while in the Shelby County Jail.

28

## RECOMMENDATION #1

1. I recommend that the Shelby County Jail add at least two additional positions to the office of the Court Expeditor to assist in gathering the healthcare data of Class and Subclass members as well as available community based programs for presentation to the court in making its release, bond, and alternative placement decisions (such as GPS, mental health treatment programs, substance abuse treatment programs, board and care facilities, home detention, etc.)

## FINDING #3

1. Contract tracing occurs in silos in the Shelby County Jail, and there is a significant reliance on schedules and self-reporting of exposure and significantly less on cameras and other real time comprehensive contact tracing. As a result, there is a serious risk of missing individuals who have been exposed to the Covid-19 virus, and an inadvertent introduction of the virus into the jail or the community.

## RECOMMENDATION #1

1. It is my expert opinion that there should be an integrated approach to contract tracing involving reviewing camera footage, interviewing staff, reviewing schedules etc. in order to mitigate this problem.

## FINDING #4

1. Staffing shortages at the Shelby County Jail cause Class and Subclass members to be locked in their cells oftentimes for days if not weeks at a time. In addition, Class and Subclass members have not gotten any outdoor large muscle group exercise since my last inspection in June of 2020. The lack of large muscle group exercise, and being confined in their cells for 24 hours a day for extended periods of time negatively impacts the mental and physical well-being of this already immunocompromised Class and Subclass population.

## RECOMMENDATION #1

1. The Shelby County Jail Command Staff should institute a mandatory overtime program that fills all of the posted positions required to ensure the inmates in the jail get the minimum out of cell time recommended by the ACA while properly socially distancing. Inmates should have access to the rooftop yards and dayrooms from 0800hrs -2200hrs every day of the week. Giving the inmates their dayroom time and yard time will assist with their mental and physical well-being during this stressful time.

SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

---

FINDING #5

1. When bail is considered in Shelby County, the judicial commissioner setting bail does not take into account the economic ability or inability of the detainee to post bond. Nor does the Court Expeditor uniformly present to the Court health information about all at risk Class and Subclass members who could be placed in alternative structured and supervised environments thereby reducing their risk of serious illness or death without jeopardizing the safety of the public. Thus, in my expert opinion, the manner in which bond amounts are set discriminates against Class Members and Subclass members who may not be a current threat to public safety, but who are people of color and who simply cannot afford even a minimal bond. The current system is not necessary to ensure future court appearances or to protect public safety. Under this system, the Class Members and Subclass Members, most of whom are poor and people of color, are disproportionately held in custody simply because of their inability to afford to post a bond, and they are not being considered for alternative placements in structured and supervised environments despite their underlying health issues. This discrimination results in a disproportionate number of Class and Subclass, immunocompromised poor people of color, being subject to an unreasonable risk of serious illness or death from the Sars-COV-2 virus because they are held in custody solely because they are economically disadvantaged. According to data I reviewed, as of September 2020, there were 351 inmates housed in the Shelby County Jail with bonds of less than $2,000. While, I do not have the most recent data, I have no reason to believe the numbers are substantially different.

RECOMMENDATION #1

1. The Court, with the assistance of the Shelby County Jail Expeditor, should take into consideration an inmate's financial ability to post a bond as well as if they are a current threat to public safety when making release decisions, bond decisions, and placements in structured and supervised environments in the community. There is a significant number of inmates in the Shelby County Jail whose bonds are $2,000 dollars or less.

FINDING #6

1. I met with the men who are responsible for the Shelby County Jail ventilation system. Shelby County has spent 1.1 million dollars on the installation of Global Plasma Ionizers in the ventilation system. According to the marketing materials the Ionizers are 98 percent effective in killing the Covid-19 virus. I am unqualified to make that determination, but I did review the marketing materials and contract with the vendor.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

RECOMMENDATION #1

1. The ventilation expert contemplated by the consent decree should be consulted in determining whether the GPS ionizers are sufficient to render the air quality in the jail safe. I understand there may be concerns, including within the CDC and ASHRAE, that these ionizers are not sufficient to mitigate the risk of aerosol spread of COVID-19. I am unqualified to make that determination, but I applaud the Shelby County Jail Command Staff for pursuing this solution.



SHELBY COUNTY MENS JAIL
COVID19 FOLLOW-UP INSPECTION
MARCH 17, 2021 FINAL REPORT

## CONCLUSION

During the course of my initial and follow-up independent Covid-19 jail inspection, I have come to believe that the Shelby County Jail leadership team are consummate professionals who do embrace and promote the "care" component of the inmates in their custody, care, and control. They repeatedly told me that they were open to making any changes that would improve their operation and increase the health and safety of all the inmate population but especially the vulnerable inmate population. Their ability to decrease the size of the inmate population in the jail is limited commensurate with their authority to limit the intake of new inmates and by their complete lack of authority to place any inmates in alternative custodial environments. The fact that the Shelby County Jail is accredited by the ACA and the National Commission on Correctional Health Care is evidence of their desire to have a well-run jail that delivers patient centered healthcare. What I continue to find during my follow-up inspection are opportunities for improvement in some critical areas that are plagued by severe staffing shortages exacerbated by employees off with Covid-19 illnesses or exposure, lack of systemic and multi-disciplinary approaches, episodic violations of well-intentioned and well thought out policies procedure and practices designed to maximize the protection of the vulnerable inmate population.

The Shelby County Jail medical provider, Wellpath, is also dedicated to delivering patient centered, competent medical care to all the inmates but especially to the medically fragile inmates who are the most vulnerable to serious illness or death from the Covid-19 virus. The effort of Wellpath to deliver consistent care to the inmates with chronic illnesses and serious medical conditions is hampered by the limitations of the physical plant in the Shelby County Jail, and the Community based providers that limit the number of appointments available to inmates.

During this follow-up inspection, I observed many positive changes to the Shelby County Jail Covid-19 response which is reflected in the low number of Covid-19 positive inmates. It should be noted that there are zero Covid-19 positive cases in the jail as of today.

However, because of the physical limitations of the Shelby County Jail, the severe custody staffing shortages, and the ever-increasing number of inmates housed therein, it is simply not possible for the Shelby County Jail to be CDC compliant in social distancing, and ACA compliant with out of cell time and large muscle group exercise.

I strongly recommend that the inmate population at the Shelby County Jail be reduced to 50 percent of design capacity through releases to alternative forms of confinement in the community, a re-examination of Court bond practices, and a reimagining/restructuring of the Court Expeditor's function which will add tremendous value to the Court's ability to make informed decisions about Class and Subclass members' custodial status.

Thank you for the opportunity to work on this very important project.

**Signature**

Respectfully submitted,

_____          _____

Mike Brady                                April 11, 2021
Director                                  Date
Sabot Consulting