# Exhibit 4:

# June 30, 2025

# Rule 30(b)(6) Deposition of Lead Judicial Commissioner John Marshall

# (Excerpted)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

_____

JUST CITY, INC. and CLASS

REPRESENTATIVES DEANGELO TOWNS

and MARSHAWN BARNES, on Behalf

of Themselves and All Others

Similarly Situated,

      Plaintiffs,

  v.                      Case No.

FLOYD BONNER JR., SHELBY COUNTY   2:24-cv-2540-TLP-tmp

SHERIFF; LEE WILSON, PRESIDING

SHELBY COUNTY GENERAL SESSIONS

CRIMINAL COURT JUDGE, and JOHN

MARSHALL; ROBERT BARBER; RHONDA

HARRIS; KEVIN REED; CHRISTOPHER

INGRAM; SHAYLA PURIFOY; ROSS

SAMPSON; SERENA GRAY; TERITA

HEWLETT; MISCHELLE BEST; KENYA

SMITH; ZAYID SALEEM; KATHY KIRK

JOHNSON; and  LESLIE MOZINGO,

SHELBY COUNTY JUDICIAL

COMMISSIONERS,

Page 2

in Their Official Capacities,

            Defendants.

_____

   DEPOSITION OF 30(b)(6) CORPORATE REPRESENTATIVE FOR

               DEFENDANTS - JOHN MARSHALL

DATE:          Monday, June 30, 2025

TIME:          2:30 p.m.

LOCATION:      Remote Proceeding

               Memphis, TN 38103

REPORTED BY:   Jay Frederick

Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS JUST CITY, INC.; DEANGELO

TOWNS; AND MARSHAWN BARNES:

JARED QUIGLEY, ESQUIRE (by videoconference)

Simpson Thacher & Bartlett LLP

425 Lexington Avenue

New York, NY 10017

jared.quigley@stblaw.com

(212) 455-2000


ASHIKA VERRIEST, ESQUIRE (by videoconference)

Pro Hac Vice, ACLU Foundation

Criminal Law Reform Project

125 Broad Street, 17th Floor

New York, NY 10004

averriest@aclu.org

(347) 302-2797


STELLA YARBROUGH, ESQUIRE (by videoconference)

ACLU Foundation of Tennessee

P.O. Box 120160

Nashville, TN 37212

syarbrough@aclu-tn.org

(615) 320-7142

Page 4

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS FLOYD BONNER JR., LEE WILSON,

JOHN MARSHALL, ROBERT BARBER, RHONDA HARRIS, KEVIN

REED, CHRISTOPHER INGRAM, SHAYLA PURIFOY, ROSS

SAMPSON, SERENA GRAY, TERITA HEWLETT, MISCHELLE BEST,

KENYA SMITH, ZAYID SALEEM, KATHY KIRK JOHNSON, AND

LESLIE MOZINGO:

        JASEN DURRENCE, ESQUIRE (by videoconference)

        Shelby County Attorney's Office

        160 N. Main Street, Suite 900

        Memphis, TN 38103

        jasen.durrence@shelbycountytn.gov

        (901) 222-2132


ON BEHALF OF STATE OF TENNESSEE INTERVENORS:

        BRIAN ENRIGHT, ESQUIRE (by videoconference)

        Office of the Attorney General of Tennessee

        P.O. Box 20207

        Nashville, TN 37202

        brian.enright@ag.tn.gov

        (615) 741-1442

Page 5

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Clio Gates, Paralegal, ACLU (by videoconference)

Davianna Velasco Valdivieso, Intern, ACLU (by

videoconference)

Page 6

I N D E X

EXAMINATION:                                          PAGE

        By Mr. Quigley                                10

        By Ms. Verriest                               58


                        E X H I B I T S

NO.               DESCRIPTION                         PAGE

Plaintiff:

Exhibit 1      Notice of Rule 30(b)(6) Deposition

               of Defendants                          12

Exhibit 2      Action News 5 Article                  43

Exhibit 3      Daily Memphian Article,

               "Re-Arrests Down After New Standing

               Bail Order, Report Shows"              45

Exhibit 4      Daily Memphian Article, "It's All

               About a Balance"                       47


            QUESTIONS INSTRUCTED NOT TO ANSWER

                    PAGE        LINE

                     87          3

                     88          14

I N D E X (Cont'd)

D O C U M E N T S   R E Q U E S T E D

NO.          DESCRIPTION                          PAGE

1            Sample of Completed Bail Hearing

             Order Forms and Bail Hearing

             Recordings                           111

Page 8

P R O C E E D I N G S

THE REPORTER:  Good afternoon.  My name is Jay Frederick.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 2:30 p.m.

This is the deposition of John Marshall as 30(b)(6) representative for Defendants, taken in the matter of Just City, Inc., et al. vs. Floyd Bonner Jr., et al., case number 2:24-cv-2540-TLP-tmp on Monday, June 30, 2025, via remote Zoom.

I'm a licensed court reporter authorized to take acknowledgements and administer oaths in Tennessee.  Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

Page 9

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, beginning with the witness.

MR. MARSHALL:  I'm John Marshall, lead Shelby County judicial commissioner.

MR. QUIGLEY:  I'm Jared Quigley representing Plaintiffs.

MR. DURRENCE:  Jasen Durrence, Shelby County Attorney's Office, representing the defendants.

MS. VERRIEST:  Ashika Verriest, ACLU National Criminal Law Reform Project, representing the plaintiffs.

MS. YARBROUGH:  Stella Yarbrough from ACLU of Tennessee, also here for the plaintiffs.

MR. ENRIGHT:  Brian Enright on behalf of the Attorney General's Office here for the third party intervenor, State of Tennessee

MS. GATES:  Clio Gates, paralegal at ACLU National Criminal Law Reform Project, here for the plaintiffs as well.

THE REPORTER:  Thank you.  Hearing no objection, I will now swear in the witness.

```
                                                    Page 10
```

                    Please raise your right hand.

WHEREUPON,

                         JOHN MARSHALL,

called as a witness and having been first duly sworn

to tell the truth, the whole truth, and nothing but

the truth, was examined and testified as follows:

                    THE REPORTER:  Thank you.

                    You may proceed.

                         EXAMINATION

BY MR. QUIGLEY:

     Q    Good afternoon, Commissioner Marshall.  My

name is Jared Quigley.  I'm with the law firm of

Simpson Thacher & Bartlett LLP.  And we represent

Plaintiffs in this proceeding.

          Can you state your full name for the record?

     A    Full name is John Walker Marshall.

     Q    Is there any reason why you can't testify

fully and completely today?

     A    No, there's not.

     Q    Have you had your deposition taken before?

     A    No, I have not.  Never.

     Q    But I assume you're familiar with deposition

procedure?

     A    A little bit.  I have mostly been in

Page 18

of the time, they're already going to be set before the person is arraigned.

Q   Let me just clarify that slightly.  She said that, like, a decision on bail could be made at an arraignment, like the bail could be altered?

A   Well, it could, yeah.  Well it could be -- it could be.  Yeah.  Just to --

Q   I don't want to mischaracterize her testimony.

A   Yeah.  Right.

Q   How does Shelby County establish bail setting practices?

A   There is no per se set practice for setting bail.  It's an individual decision by that magistrate or that judge.  There's -- there's no instruction how -- how to set bail.

Q   How did Shelby County come up with the procedures used?

A   How did they come up with the procedures used?

Q   Yes.

A   Well, that procedure -- that basic procedure has been in use since before I was commissioner.  So as long as 2006.

Page 19

I mean, the basic where Pretrial calls us to set the bond, that was going on before my time working as a commissioner.  So that has been going on at -- at least 20 years, that -- that procedure of doing it that way.

Q    Understood.  In terms of the -- like, what appears on the different forms, who makes decisions about changing, for example, the bail screening form?

A    Changing the form?  Well, there was no form before the standing bail order.  The standing bail order is what created all the paperwork we have to do.

And that comes from the standing bail order.  So that -- that's a direct product of that.  That's basically the ACLU forms that we've taken and modified with -- with them, with the ACLU.

Q    Who at Shelby County is responsible?  Like, who's the decision maker on the Shelby County side with respect to bail forms, et cetera?

A    The forms -- what, the language on the forms?

Q    Yeah.

A    Well, that was essentially negotiated between the County Attorney's office and the ACLU and myself, and myself representing the judges and the

Page 20

commissioners.  It was a back -- back and forth negotiation.

I -- I would -- I went back to the judges from time to time when we were working out the language.

I mean, I didn't -- I didn't have the authority to -- you know, I had to get the judges.  Let's be clear.  The general session judges are our bosses.

The judicial commissioners are essentially an arm of the general session judges.  We work under them.  Everything we do is under them.

Q    So when you were working on the standing bail order --

A    Yes.

Q    -- did you have decision making ability to, like, finalize the standing bail order?  Or was that a general sessions judge?  Who's defining --

A    Not -- not without running it by the general sessions judges first.

Q    So the ultimate decision maker is --

A    The general sessions judges.

Q    Is there, like, a head of the judges who's the decision maker?  Is it, like, a general consensus

                                                    Page 21

among the judges?  How does that work?

     A    There's a -- they have two positions.
There's an administrative judge who is -- that's a
position that rotates every year.

          And then we -- there's a judge who is what
we call the supervising judge of the judicial
commissioners.

          And at the time when I became the lead
commissioner, Judge Lee Wilson was the lead
commissioner.  And he was elected in August of '22.

          And then I was elected by the judges to
replace him.  And there wasn't a judge supervising us
at first.

          So I went to Judge Montesi, who was the
administrative judge, when we were working out the
language with the forms.  So I -- I went to the
administrative judge to get him to sign off on the
forms and the language.

          Usually, County Attorney Iverson would email
me and Judge Montesi or ask me to talk to Judge
Montesi about the forms.

     Q    Understood.  We're going to discuss the
standing bail order and HB1719.  Are you familiar with
HB1719?

Page 22

A    Well, I get them mixed up, that and 1642. Is that -- is that the one about the ability to pay?

Q    It is, yes.

A    Okay.  Yeah.  Okay.  That's 1719?

Q    Yeah.

A    Yeah.

Q    When I use the term HB1719, I'm referring to the Tennessee law that prohibits consideration of ability to pay when setting bail.

A    Okay -- okay.

Q    And when we reach those, we'll discuss, you know, the details of who was responsible for, you know, setting the Shelby County bail practices with respect to both the standing bail order and the decisions made after HB1719.

But we can start with some more basic questions.  Who makes bail decisions in Shelby County?

A    Generally, the judicial commissioners.  It can also be a judge.  Sometimes judges will do what's called preset a bond.

Law enforcement will go directly to a judge when they're getting an arrest warrant.  And the judge will go ahead and put a bond on the warrant.  So that's done occasionally.

Page 26

setting bail and a process -- a process so that all defendants would get a bail hearing to have their -- have their bond reviewed shortly after their arrest, that they would have a bail hearing with an attorney and a chance to produce witnesses and evidence and whatnot.

And the State would have the burden to show why the bond needed it to be as it was.  And so that -- that was an agreement, an order that the judge has signed.

Q    And you said you were not involved in negotiating the standing bail order?

A    No.

Q    Who was involved on behalf of Shelby County?

A    The County Attorney.  And I suppose the judges -- general sessions judges somewhat.  But I -- I wouldn't be able to speak to that because I don't have direct knowledge of that.

Q    Were you involved in implementing the standing bail order?

A    I was involved in -- I would say in implementing it because, when I became the lead commissioner in September 2022, it was to go into effect on February the 15th of 2023.

Page 27

So there was a lot to do to -- as you could say -- implement it, to get it set up, to get the bail hearing room set up, how's it going to work, the forms we're going to use, et cetera.

So I -- I was involved in a number of Zoom meetings with the parties and trying to get it worked out.

Q    What processes did Shelby County adopt through the standing bail order?

A    That we would use the -- the main thing is that the initial bail screening form, which is -- is essentially written findings that we would produce, written findings on our decision, both at initial bail and at the bail hearing review stage.

And the affordable bail calculator was introduced at that point.  We were given a number by Pretrial of -- essentially the affordable bail calculator was essentially net income, net expenses, spit out a number.

Pretrial gave us that number.  That was what the person said they could afford.  That was a number for us to consider if we felt that was sufficient to set the bond.

If we could, it would be deemed an

Page 28

affordable bail.  If we did not think that was sufficient, if it was a number higher than that, it would be what was considered an unaffordable bail.

And then it was automatically flagged to go ahead and have a bail review hearing set automatically, if it was deemed to be unaffordable.

So that was all, you know, built into the paperwork.  And that was part of the process.  And then the person -- the way it was first set up, it wasn't that well-thought through in my opinion, in some ways.

It had people going to have a bail hearing first, which wasn't going to work.  And it was decided among all the parties that the person needed to be arraigned first because we do not see the defendant when we do the initial bail.

We cannot appoint counsel because, under the statute, they have to be present in front of us.  And I kept telling everyone that, and nobody would listen to me.

And then the judges, once it started, said, "No, you can't be appointing counsel down in the jail when you're not seeing the defendant."

So anyway, it was all arranged that the

Page 29

person would have the arraignment first, at which time they would be appointed counsel.  And then the following day, the bail hearing would be scheduled the following day.

But it's actually automatically -- as soon as the person is booked in and charged, they're given an arraignment date.  And the following day, they're automatically set for bail hearing.

Q    Understood.  Let's speak briefly about the implementation of the standing bail order.  How did you implement the process under the standing bail order?

Were there trainings for the judicial commissioners?  What was done?  You know, what did you do to implement the standing bail order?

A    Well, the -- the County, we had a couple of different County Attorneys' offices put on a couple of -- I guess you would say seminars, presentations -- that all the judicial commissioners had to come to.

I believe I can't remember.  I think there were a couple of them at least.  And so there was quite a bit of discussion on going over it.  And I'm sure at some point we -- we went over the forms.  And

Page 30

we just started doing it.

Q    When you say we went over the forms, who is we?

A    The judicial commissioners.  I don't remember if we had a specific meeting.  I'm sure we did to go for -- I -- I'm quite sure we did.

We probably had -- we probably had a Zoom meeting or maybe it was a couple of Zoom meetings to kind of go over -- go over the forms and see if anyone had, you know, questions about -- about them 'cause it was a lot of check boxes in places.  It was -- it was kind of confusing what went where.  A lot of it was redundant.

And so I'm sure we had some Zoom meetings probably just to discuss it and go over, make sure everybody understood, you know, the different parts of the form such as that.

Q    Earlier Ms. Greer testified that the calculator figure, the figure that the calculator spit out for affordable bail, would auto-populate onto a blank bail screening form that would be received by the judicial commissioner.  Is that accurate?

A    That's accurate.  They also, when they were talking to us on the phone -- because we -- we don't

Page 31

even see that form while we're talking to Pretrial and making that decision.  We usually don't have that form in front of us.

So they would tell us verbally, "The affordable bail calculator for this person is $100." And we jot that down in our notes, generally how we did it.

But then when the form came to us, it -- it would have that figure on it.  But just to be clear, we already knew.

That's why this whole process is so -- and time-consuming because we -- we have to double up.  We have to listen to it all.  And then get the forms, fill them out, turn it around, et cetera, et cetera.

But they would tell that to us verbally.  So we would have that number when we were making our decision.

Q    Understood.  And are you familiar with how many questions Pretrial Services had to ask people who were arrested to fill out the calculator?

A    Well, we would see when they would send us the packet, what we call the packet for us to sign, when we fill out the initial bail screen, it included the affordable bail calculator sheet.

Page 32

So we saw the actual sheet, which, you know, how it was -- the questions they were asking.  So we -- we saw that for everyone.  So we -- we actually got a copy of that in the packet.  So -- so yes, somewhat we were.

Q    So the -- in the email from Pretrial Services to the judicial commissioner, there would be a printout of the ability to pay calculator inputs?

A    Yes -- yes.  There's two emails in this -- the process.  They would email us first the affidavit.

That's our cue.  They used to just call us on the phone and say, "I have four bonds I need to be set; we've got four defendants."  And we'd sit down with our notebook, and we'd go over it.

Once we have to start working with standing bail order and there was so much paperwork, we had to go back, needed a copy of the affidavit to actually be able to refer back more carefully.

So we asked them to start emailing us a copy of the affidavit.  So we changed our procedure with them where they would email us the affidavits.

Let's say they have four defendants ready.  They would email us those four affidavits.  So we

Page 33

would have a chance to print them out and look at them.

And then we would call them when we're ready to set the bond.  And then after we set the bond, then they would email us back with the initial bail screening, the affordable bail calculator sheet, and two or three other pieces of paper.

And we would fill that out electronically. And then we send that back to them and to the clerk's office.

Q    But the bail decision was made before you received those documents?

A    Correct because they had already -- those documents didn't have any -- that -- that affordable bail number was on those documents.  But they had already told us what that number was when we -- when we made our decision.

Q    But today, they no longer tell you what that number is when they call?

A    No.

Q    Before HB17 was -- went into effect and was implemented -- strike that.  Sorry.

Let's move on to my next set of questions. You said the -- who trained the judicial commissioners

Page 34

regarding how to follow the standing bail order?

A    Well, as I said before, the County, Shelby County, had a couple of different seminars or sessions about it.

And then I went over with them.  I'm sure in a couple of different Zoom meetings we went over the forms.

And then some of it, of course, was just, you know, trial and error and trying to get the forms right 'cause, as I said, it was kind of confusing, different parts of it.

So we probably had to meet again and -- and talk about it, make sure we all understood it, that we were putting the right number in the right place, that sort of thing.

I think the basic concept, you know, the commissioners are all lawyers have been in criminal law for some time.  They understood what the basic concept was.

It -- it was just a matter of the technicality of forms that we had to talk about, make sure the right box was checked so that it would ensure that it was going to automatically be assigned to the bail room, you know, things like that.

Page 35

You're dealing with 13 other people.  You know, you got to get everybody on the same page.  So in terms of training, it was probably just some meetings between ourselves.

Q    Do you think everyone did get on the same page eventually?

A    Oh, sure.  Yeah.

Q    And how long do you think that took?

A    I don't -- I -- I don't know.  Maybe a couple of months or so.  We started using the affordable bail number a few months before just so we would get used to it just as a trial run.

So that -- that's why I said that whole concept was familiar.  We -- we started.  They started giving us that number a little bit ahead before it started so we would get used to that.

But the forms was a whole different ball game.  That completely changed how we're structured, how we schedule ourselves, everything.

Q    By the time of HB17 last May, was -- were things running smoothly?  You know, was there -- was it burdensome for the judicial commissioners to, you know, consider ability to pay?  I'm sorry.  Let me ask that --

Page 36

A    We did not --

Q    Were the judicial commissioners able to successfully implement the standing bail order?

A    Yes, I think so, yeah.

Q    And what was your role in making -- like, in making sure that happened?

A    With just answering their questions.  And often I would see the -- the forms and see where they might have checked something in the wrong place, just making sure that they, you know, were -- as I said, everybody was on the same page about how the forms are filled out.  So I -- I think, yeah, by -- by that time.

But there's always -- you know, things always -- as the lead commissioner, you know, there -- there are issues and things that come up from time to time that you just don't plan on.

I've had commissioners who've been with us for two years.  And then they encounter some new situation that has ever come up before.

So from time to time, things come up. There's something on the forms to this day that -- that probably needs to be changed.  It's kind of redundant.

Page 37

But it took an arm and a leg every time we wanted to change something.  We'd have to go through County Attorney Iverson and go through your client, go through all this rigamarole.

So it's just not worth it sometimes.  But there -- there's still things about it that probably need to be clarified.

Q    Do you know if there's any recordings of the trainings you mentioned?

A    No.

Q    No, there are not; or no, you don't know?

A    No, there are not.

Q    Any PowerPoints, document handouts, meeting --

A    I don't know how to do a PowerPoint.  I'm very low tech.

MR. DURRENCE:  No PowerPoints from Commissioner Marshall.

THE WITNESS:  It was -- purely have been Zoom -- Zoom conversations that weren't recorded.

BY MR. QUIGLEY:

Q    Did the documents judicial officers receive change after the standing bail order was put into place?  And if so, how?

Page 43

(Plaintiff Exhibit 2 was marked for identification.)

This is a document titled "Data shows fewer rearrests since implementing new Shelby County bail system."

This is a -- I'll share my screen.  This is an article in Action News 5 dated September 19, 2023. Do you see this document?

A    Yes.

Q    And it speaks about how those -- the title says "Data shows fewer rearrests since implementing new Shelby County bail system."

Is that an accurate statement regarding how rearrests were affected by the new Shelby County bail system?

MR. DURRENCE:  Object to the form.

You can go ahead and answer.

THE WITNESS:  Well, it later proved not to be because the way they had calculated that was not exactly correct.

And the Pretrial Services along with County IT, we had created these massive spreadsheets of every case.

And they calculated the rearrest for

Page 44

the period before the standing bail order and the period after the standing bail order.

But later on, we realized that the two periods didn't -- didn't exactly match up.  So there were some problems with that ultimately.

I -- I think the U of M studies have later showed -- they showed one thing; Just City showed it was a little bit different.  Bottom line is it didn't change very much one way or the other.

BY MR. QUIGLEY:

Q    On this page, we have a statement from you.  It says "I did not see a pattern of someone committing a violent crime like carjacking, bonding out, and committing another carjacking."  Is that an accurate statement?

A    Yes.

MR. DURRENCE:  I'm going to object to the form.

But you can go ahead and answer.

THE WITNESS:  Yes.  I think from -- from my -- just looking at the spreadsheet, which showed the rearrest cases, a lot of those were misdemeanor thefts.

//

Page 45

BY MR. QUIGLEY:

Q    I lost the audio.

A    Can you hear me?

Q    Yes.

A    From -- from just my looking at the -- the spreadsheet, it seemed a lot of the rearrest cases were domestic violence where you have a lot of rearrests and misdemeanor thefts.  So yes, that -- that was my observation from just looking at the spreadsheet.

Q    Would that observation be different based on the error you referred to in the spreadsheet?

A    No, not necessarily because the -- the error that we found was a matter of numbers, percentages.

Q    Understood.  I'm going to take this exhibit down.

I'd like to introduce another exhibit.  This is a Daily Memphian article titled "Re-arrests down after new standing bail order, report shows."

            (Plaintiff Exhibit 3 was marked for
             identification.)

And there's a picture of yourself.  Do you see this document?

A    Yes.

Page 46

Q    On page 3, you said "There are some violent rearrests, but not as many as the public has perceived."

A    Yes.

Q    Is that an accurate statement?

A    Yes.

Q    And would that be affected by the error that you referred to earlier?

A    No, not necessarily.

Q    And down here, we have a statement where an individual refers to the jail as a, quote, "revolving door," end quote.

And then it says that you disagreed with that statement.  And you said that the rearrest is lower than you thought.  But, you know, this, you thought is only a snapshot.  Is that an accurate statement?

A    Yes.

Q    So you do not believe the jail to be a revolving door; is that right?

A    Not to the extent the public believes.  It is for some people.  But the public had the perception with the standing bail order -- they had the wrong perception because of this affordable bail calculator

Page 47

number.

And I've been in seminars, people in the public had the impression that we were just setting bonds whatever the person said they could afford, whether it was a hundred dollars or whatever, which was of course totally inaccurate.  And I made that statement to try to show this -- that that's not what is happening.

Now, it is a revolving door for some people. About 25 percent of the cases we have had for the last several years are people who are being rearrested.

We have too many people in the system who already have a pending case.  That -- that's not new. That's been the case.  Standing bail order doesn't really have anything to do with that.

Q    But you agree that the jail did not become a revolving door because of the standing bail order?

A    Yes, I would agree with that statement.

Q    I'll take this document down.

I'm going to introduce another exhibit. This one is called "It's all about a balance."

(Plaintiff Exhibit 4 was marked for

identification.)

It is a Daily Memphian article titled "'It's

Page 48

all about a balance:' Lead Judicial Commissioner on affordable bail, public criticism".  And it's a picture of you.  Do you see this article?

A    Yes.

Q    If we go to page 3, you discuss the calculator.  You say:  "It's nothing more than a person's monthly disposable income.  There's no great magic about it."  Is it your view that the calculator is a pretty straightforward device?

A    Yes.  Yeah, my point being there was it was just a simple -- essentially the person's disposable income.

Q    Do you think it was difficult for Pretrial Services to get the information for the calculator and put the information into the calculator?

A    I don't know if my personal opinion really matters.  I think it was a waste of time.  Essentially, they have enough to do.

In my opinion, if we want to reform our system, we need to have a jail that has the facilities where we could interview the defendant in person and get that kind of information.

Instead, we have this hugely clunky system that has been complicated with all this paperwork and

Page 49

emails.  And yeah, I think it's a burden for Pretrial to have to collect that information.

We only use -- only 7 percent of the cases did it even matter, did we even do an affordable bail. Only 7 percent, two thirds of the cases that we set, the number was unaffordable.

About 25 percent, we released the person. So only about 7 percent got an affordable bail in the first study that we did and we looked at.

So yes.  I think there could be a much better way to do this than the affordable bail calculator.

Q    Do you think it's possible to consider someone's ability to pay?

A    I think we can consider their -- I think we can consider their financial circumstances.  We find out about their employment all the time.  We find out about their employment or their own public assistance.

But a -- but a number you just come up with that's not just what somebody says, I think that's the -- the public had a lot of distrust of it because of that, which caused huge perception problems and a lot of criticism from the public.

I think we, in a bail hearing, find out more

Page 50

about the defendant's circumstances than what's on a little sheet that's taken Pretrial's time to collect.

Q   Do you think judicial commissioners should be able to ask questions regarding a defendant's ability to pay at their bail hearing?

MR. DURRENCE:  Object to the form.

Go ahead and answer.

THE WITNESS:  I think -- I think we should follow the law.  We will follow the Tennessee State law.

BY MR. QUIGLEY:

Q   Why don't we talk about the law for a second.  When you say financial condition, what do you -- what does Shelby County -- how does Shelby County interpret the term financial condition?

A   I can't speak for Shelby County.  We've never had -- it's each individual magistrate or judge. There is no policy or direction about how to consider that.

Q   Shelby County conducted no training regarding the implementation of HB17?

A   You mean 1719?

Q   1719.

A   No.  About the implementation of it?

Page 51

Q    Why don't we back up a step?  Did Shelby County make any changes to its bail setting practices after the passage of HB1719?

A    Yes.

Q    What were those changes?

A    We took out the language and the forms that referred to affordable and unaffordable bail.

Q    Who was responsible for making those changes?

A    The judges directed us to do that.  I spoke to the County Attorney's office.  All the changes have always been made by the County Attorney's office.

The -- the physical going in and changing the form with the knowledge of the ACLU, every time we've changed the form.

The forms were changed because the judges told us in the court as of the new state law to change the forms to take out that language.

Q    When you say the judges, who are the judges?

A    The general sessions criminal court judges.

Q    And when you say you, you mean yourself and who else?

A    The general sessions criminal court judges instructed me to get back with the County Attorney's

Page 52

office to make sure the forms were changed.

Q    How did they instruct you to do so?

A    In a meeting.

Q    When was the meeting?

A    An in-person meeting.  I have no idea what date the meeting was.  I would assume it was right -- right as the law was about to go into effect.

Q    Can you just describe the meeting to me? Tell me about the meeting.

A    It was in a -- one of the divisions downstairs in general sessions -- I can't remember which division -- with the judges and myself and possibly County Attorney Iverson was there.  I'm pretty sure she was.

Q    You said that there were judges there. Which judges?

A    All -- all of them.  All, to my knowledge. All eight of them.  If not all eight of them, most of them.

Q    And then yourself and then --

A    I -- I believe County Attorney Iverson was there.  I believe she was.

Q    Were any other judicial commissioners there?

A    No.

Page 53

Q    How long did the meeting last?

A    Not long.  Probably 30 minutes at the most, probably.

Q    Who led the meeting?

A    Whoever the administrative judge would have been at that time, which I can't remember exactly if that was May of '24.

Can't remember if that was still Judge Montesi or -- or who it would've been.  It might've been -- there was a year that Judge Anderson was both administrative judge and supervising judge with the commissioners.  So it might've been Judge Anderson that called the meeting.

Q    And what did Judge Anderson say at the meeting?

A    I can't remember exactly straightforward. But the state law has been changed.  So we've got to comply with it.

Q    And this was Judge Anderson telling the room that State law has changed and we need to comply with this?

A    Yeah.

Q    And then was there a debate at all?  Like, what --

Page 54

A    There was very, very little debate from what I recall.  It's pretty much unanimous consent.  This is the law; this is what we have to do.

Q    And how did Shelby County decide what to do?

A    When you say Shelby County, who do you mean exactly?

Q    The judicial commissioners and the judges, the people at the meeting.

A    From what I can recall, I can't really recall.  Like I said, it was pretty straightforward straight.

They just all agreed.  I don't -- I don't think there was a vote or anything like that 'cause there was no debate about it really.

I think it was just, like I said, unanimous.  I -- I was told you need -- you need to change the forms.

Q    Was there any more specific instruction about how you needed to change the forms?

A    Just to take out, you know, the references to affordable and unaffordable, that -- any references to that to take out.

Q    Was that the only instruction from the meeting?

Page 55

A    Yeah, it was pretty general.

Q    Did anyone take notes during the meeting?

A    Not to my knowledge.

Q    Are there minutes of the meeting?

A    No.

Q    Was there any discussion at the meeting about what financial condition meant versus what ability to pay meant?

A    I can't recall exactly.

Q    Do you recall anything on this topic?

A    About that, about exactly discussion about that, no.  Not -- no, I -- I can't recall anything specifically.  I can't recall anything about whether there was discussion about that or not.

Q    I guess, I'm just confused about how the meeting took half an hour if it was just an instruction to change the forms.

A    Well, that may not have been all we were talking about.  Let me tell you.  The general session judges don't -- they're very hard to get to sit down at a table and meet.

They don't do it very often.  And -- and it's not the easiest thing in the world to get them all together.

Page 56

And usually it's in the early afternoon or whenever they can try to get together.  So it doesn't happen very often.

And it could be that that was not the only topic of the meeting -- meeting.  Very likely it probably wasn't.

Now I'm not privy to, of course, all -- all of their meetings.  I usually know when they're meeting.  But they don't meet very often.

So I'm pretty sure that was not the only topic of conversation.  And I could be wrong about it. It might have been 20 minutes.  But I'm pretty sure there were other things to talk about besides that.

Q    And do you know how long was spent talking about HB1719?

A    I couldn't say to that.

Q    Could you ballpark it?

A    I -- I don't know.  Five or ten minutes. Again, it's pretty straightforward of a State law's been passed; we're going to follow the law.

Q    Do you remember what other topics were discussed at this meeting?

A    No.

Q    Does -- did one person at the meeting have

Page 57

final decision making authority?

A    I'm sorry.  Did you say, "Did one person have final" --

Q    Decision making authority.

A    No, it was -- it was as a body of judges. All of them.

Q    And there was --

A    There was no dissent.

Q    There was no discussion about the meaning of HB1719 and what was necessary?

A    About what?

Q    Like, the meaning of the law and what was necessary.  It was a -- either five minutes or half an hour conversation about --

A    They interpreted it to mean that we were to stop using the affordable bail calculator and that that was the clear intent of it.

And therefore we needed to stop getting that information from Pretrial and to change our forms to take any discussion about affordable and unaffordable out.

Q    Do you remember who spoke at the meeting?

A    No, not specifically.

Q    Did you speak at the meeting?

Page 58

A    I'm sure I did at -- at some point.

MR. QUIGLEY:  I -- can we take a five-minute restroom break and hop back on?

MR. DURRENCE:  That'll be fine.

MR. QUIGLEY:  Thank you.

MR. DURRENCE:  All right.

THE REPORTER:  All right.  The time is now 4 p.m.  And we are off the record.

(Off the record.)

THE REPORTER:  The time is now 4:08 p.m.  And we are back on the record.

EXAMINATION

BY MS. VERRIEST:

Q    Good afternoon, Commissioner Marshall.

A    Hi, Ms. Verriest.

Q    Nice to see you again.

A    Good to see you too.

Q    You stated earlier that Pretrial Services provided you a printout of the ability to pay calculator before HB1719.  Is that right?

A    Yes, that's right.

Q    Can you tell me about the ability to pay calculator?

A    The ability to pay calculator, from what I

Page 62

paperwork, not how it was logistically and practically going to work.

All it's done is clog our system up more. So yes, it would be much better if the commissioner could just ask, cut out all the steps.  Yes.

Q    What would the commissioners ask in this ideal system you are envisioning?

A    We would -- we could ask questions.  We know so much more in a bail hearing.  I will -- I will give you this.

Having the bail hearings, when we see the defendant and can talk to them or -- or their counsel, you can get so much more about what their real living situation is like.

Who are they living with?  Are they supporting dependents, or is someone supporting them? You can get a feel for the person.

It's so much more than just this piece of paper that, is again, more paperwork for Pretrial Services that is burdened with all of this.  Yes.  It would be much more efficient.

Q    You said that you ask about their living situation.  Is that right?

A    That's right.

Page 63

Q    So would their living situation be relevant to the judicial commissioners in making their decisions?

A    I want to know as much information as I can.

Q    So is that a yes, that the living situation would be relevant to the judicial commissioners in making a decision?

A    Yes.

Q    You also said you'd like to know about, I believe, who they support. Is that right?

A    Yes.

Q    So is the support they provide people relevant to the judicial commissioner's decision making?

A    The bail setting decision is a very individual process. For each magistrate, it's different.

I would say for me -- this is not about me. But when I'm setting the bail, I want to get a feel for all of that.

Q    The questions in the Vera calculator, such as income, is that something you would like to ask the defendant before you set bail?

A    I don't think I need to ask it exactly like

Page 64

that.  I'd like to know what kind of job they have.
We understand that the vast majority of our defendants
don't have any money.

We already know that.  We're spending a lot
of time worried about that.  We know that most of our
defendant -- the majority of the defendants on the
affordable bail calculator reported zero.  And the
vast majority of the others, it was less than a few
hundred dollars.

My point is, we're spending so much time
worried about this little calculator sheet when
it's -- it's really irrelevant.

Nobody is going to report more than a few
hundred dollars anyway.  They didn't.  We did it for a
year and a half or whatever.  Overwhelmingly, there
was hardly anybody that ever could afford more than,
like, $300.

Q     Are you saying --

A     All it was doing was taking a lot of time to
find out what we already know.

Q     Is the fact that the person can afford $0
relevant for the judge -- excuse me -- the judicial
commissioner on setting bail?

A     It is sometimes and sometimes it's not.

Page 65

MR. DURRENCE:  I'm sorry.  Object to the form.

And now you can go ahead and answer, Commissioner.

THE WITNESS:  Sometimes it's not. Sometimes it is.  And that small percentage, so many of our cases, they already have a pending case.

About 25 percent of the cases, they already have a pending case.  We have to set a bond twice what we would normally set, which is just about always more than what they said they could pay; all right?

So like I said, there was about 7 percent of the cases where it actually factored in when we -- we were using.  There are other times when, no, it does not matter.

BY MS. VERRIEST:

Q    Can you explain --

A    If it's a violent -- if it's a violent offender, no.  If it's someone who's missed court 20 times, no.

Q    Can you explain why the bail amount doesn't -- excuse me.  Let me start again.  Can you explain why the amount a person can afford to pay bail

Page 66

does not matter for violent cases?

A    Because if we want to make a decision --

MR. DURRENCE:  I'm sorry.  Objection to the form.

Now you can answer, Commissioner.

THE WITNESS:  If we want to detain them regardless, why is that really going to matter?

BY MS. VERRIEST:

Q    Are you saying that if you want to detain someone regardless, the amount they can afford doesn't matter?

A    I'm saying we know the vast majority of people are only going to say a few hundred dollars. They are not going to pay the bond.

You know, we know their relatives -- there are other people are probably going to pay the bond. If it's someone dangerous, you don't want them to get out.  So whether they can say they're going to pay $30 or $300 is really irrelevant

Q    If you don't want them to get out, do you set bail intended to detain them?

A    Right.  'Cause that's what your standing bail order said.  If -- if we were to make a decision to set money bail, it's because -- right -- because we

Page 67

felt that they should be detained, that's what the

standing bail order said.

Q    So is that a yes?

A    Yes.

Q    How -- do you know how -- let me start

again.

How do you know the bail amount required to

detain them if you don't know how much they can

afford?

A    Well, we don't really.  We're -- I'm not

going to sit there and pretend.  I would prefer we had

a federal -- like the federal system.

But we don't.  So we have to work with what

we have.  And it's like a sliding scale.  The more

dangerous they are, the higher the bond's going to be.

The more we think they're a flight risk, the higher

it's going to be.

I'm not going to argue -- you know, dispute

with you.  It's not a perfect science.  It's not a

great system.

We're not going to sit here and argue, you

know -- argue about that.  But it's what we have.  And

we are the ones making the decision.  It's on us.

That is on the -- the magistrate or the

Page 68

judge to make that decision to protect the public or ensure that person returns back to court.

And we have to work the best with what we have. The best I can explain, it's like a sliding scale.

Q   So let me just make sure I understand this. When a person is violent, the judicial commissioner sets bail intended to detain them.

That means they need to set a bail higher than the amount that the person can afford. Is that that right?

A   That's right.

Q   Are they guessing as to the amount that a person can afford before setting a bail higher than that amount?

A   They are speculating. That's the way it's always been. You know, there's a certain amount. You're -- you're right.

I've already stated I -- I wish we had a system. But I think be careful what you asked for. If you want a system of just up or down, we'd still have a lot of people to detained in our Shelby County jail.

Q   I just want to make sure I understand that.

Page 69

Without the information about the amount of bail a person can afford, judges are detaining people without knowing the amount they can afford.  Is that right?

A    The reality is, you know and I know a lot of people, what that person can afford, and the kind of bond someone -- their relative or someone will come and make their bond.

If we have a 19-year-old carjacker who obviously doesn't have any income and says zero, no, we don't -- we don't know.

You all don't want us to consider what the relatives or anybody could pay.  But we know the relatives or possibly some other gang -- fellow gang members or somebody can come up with some money to get them out.

So yes, there is a certain guess factor. There's no mystery about that.  Judges have been doing it for ages.

But if we feel like that person's a real danger, we need to set that bond high enough to detain them.

Q    When you set that bond high enough to detain them, how do you know what that bond would need to be without knowing the bail amount?

Page 70

A   I don't know 100 percent.  But I'm pretty sure that what that 19-year-old is going to say is zero.

Q   Okay.  Now let's talk about when a judge -- excuse me -- when a judicial commissioner intends to release the person.

You said that the bail amount is relevant in some percentage of cases.  Can you tell me more about those types of cases?

A   Say -- rephrase that.  I think I know what you're --

Q   Sure.  Earlier you stated that the bail amount is relevant in a certain percentage of cases.  Can you tell me more about when it would be relevant?

A   Well, let me see if this is -- is what you meant.  The only time I found the affordable bail calculator worth anything was when we had -- say you had someone at a pending case; okay?

We have to set a money bond.  Their affordable bail calculator might have said they could afford a hundred dollars; okay?  You with me?

Okay.  And in that position, perhaps they didn't have -- it was not a violent offense.  They didn't have hardly any failure to appears.  They

Page 71

really didn't have much record.

I looked at it and said, "By law I've got to give this person a bond"; right?  Because the law says I have to.

In those cases, it was -- it was helpful because the person is saying they can afford a hundred dollars.  I can set it at a hundred dollars.

I'm fulfilling my obligation for the law, giving them a money bond.  And I know because this is not someone I feel really needs to be detained.  Most of our cases are not like that.

Q    In that scenario that you just described, is that a scenario where the judicial commissioner is setting a bond that is intended to release the person?

A    Well, that was intended to be affordable, yes, when we were using that category.

Q    To determine whether a bail is affordable, do you need to know what -- the amount that the person can afford?

A    To be a hundred percent sure, yes.  But we know that most people are going to be able to come up with a $100 bond.

Q    How do you know that?

A    I know that from working 25 years in the

system.  If it's someone homeless, no.  I can tell you -- I can -- if some homeless vagrant, criminal trespass, I know.  I'm experienced.  I've been in -- I know I know they can't afford anything probably.  I know that from experience.

But if it's someone -- it's a first time, you know, shoplifter, doesn't have any record, has a job, you know, we know they can probably afford that.

Q    You stated that you know how much a general person can afford based on your 25 years of experience.  Is that right?

A    I didn't say I know what a general person. I said I know from the type of cases and from their history, I can -- I can have a pretty good feel, a pretty good idea.

Q    From -- let me try again then.  From their cases and from their history, you -- and based on your 25 years of experience, you have a generally good idea of what that person can afford to make in terms of bail.  Is that right?

A    I said specifically with someone who is homeless, who's been arrested for criminal trespass, for ten times in one year, I've got a pretty good idea.  Common sense tells me that person probably

Page 73

doesn't have a penny.

Q    How about for other scenarios?  How do you
know how much that person can afford?

A    I -- I don't know 100 percent.  But
you -- if someone has a job, you usually know if -- if
they're stable, they haven't been in trouble, and they
have a job, you -- you know, again, common sense would
tell you that person's probably able to make a small
bond at least.

Q    You said earlier that when HB1719 went into
effect that you had a meeting to discuss changes to
the bail setting processes.  Is that right?

A    [No audible response.]

Q    And during that meeting, the judges and
judicial commissioners agreed to stop using the Vera
calculator.  Is that right?

A    [No audible response.]

Q    I'm sorry.  I can't hear you.

A    The -- the only -- I was the only --

Q    I hate to interrupt.  But you're still very
quiet.

A    You can't hear me?

THE REPORTER:  The audio is very low.
It just -- it seems to do that every now and then.

Page 74

THE WITNESS:  Well, I'm sorry.  I --

THE REPORTER:  That's better.

THE WITNESS:  I'll try to talk as loud as possible.  I don't want to scream at you, though.

BY MS. VERRIEST:

Q    Sometimes it's, like, depending on where you sit.  It's when you move forward, I can hear you.  And then when you sit back, I can't.  I don't know if that's why.

A    Okay.  All right.  I'm sorry.  I'll try to -- I don't know if there's a way I can adjust it or not.  Okay.  I'm sorry.  Ask -- do you mind repeating questions?

Q    Sure.  You said earlier that, after HB1719 went into effect, the judicial commissioners and judges had a meeting about changes to bail setting processes.  Is that right?

A    Right.

Q    And as part of the -- that meeting, everyone agreed to stop using the ability to pay calculator; is that right?

A    Right.  Well -- and -- and I think what I was saying was I was the only actual commissioner there.

Page 75

It was the judges.  But to my recollection, all the judges were there.  And they basically said they all agreed you need to stop using the calculator.

Q    As part of stopping using the calculator, that information was no longer provided to the judicial commissioners when setting bail amounts.  Is that right?

A    That's correct.

Q    What does ability to pay mean?

A    I guess it means different things to different people.  I -- I guess you know that -- that's the whole problem.

But I think it was pretty clear what the State law's intent was.  You know, why -- why -- it's the State -- the State passed a law, which seemed pretty clear to me.

And now you're suing us because we're following the State law.  You're picking on us, the low fruit, the judicial commissioners who work for the general sessions judges.

Why aren't they named in this this lawsuit?  Why are you picking on the judicial commissioners who don't even make the final decisions, who are following the State law?

Page 76

Q    Is this a good moment to say it's not personal?

A    Well, you've dealt with me before.  Well, it just makes no sense to us.  And it doesn't seem fair.  And I -- I will stand up because I always -- the judicial commissioners.

Q    You said that the State law seemed clear.  Can you say more about that?

A    It was very clear what the authors of the bill intended.  It was all over the news.  It -- it was very clear.

We put Shelby County -- you put the Shelby County Judicial Commissioners on the map -- thank you -- with all of this.

It was very clear in the media constantly.  It was very clear what their intent was, that we stopped using the affordable bail calculator.

Q    So you believe the intent of the law was that Shelby County stops using the affordable bail calculator; is that right?

A    Absolutely.

Q    What does financial condition mean?

A    I would take financial condition to mean someone's assets.  Did they have a job?  It -- it's a

Page 77

very broad, vague term.

Q    Did Shelby County provide a definition of financial condition to the commissioners and general sessions judges?

A    No.

Q    Did Shelby County provide a definition of ability to pay to the judicial commissioners and the general sessions judges?

A    No.

Q    Did Shelby County provide instructions on how judicial commissioners and general sessions judges should consider financial condition without considering ability to pay?

A    No.

Q    You stated earlier that these bail setting decisions are individual.  Does that mean that every judicial commissioner may have a different interpretation of what ability to pay means?

A    Yes.

Q    Does that mean that every judicial commissioner could have a different interpretation of what financial condition means?

A    Yes.

Q    Could every judge have a different

Page 78

interpretation of what ability to pay means?

A    Yes.

Q    I'm sorry.  You got quiet again.

A    Yes.

Q    Could every judge have a different interpretation of what financial condition means?

A    Yes.

Q    You said earlier that financial condition is a very vague term.  Is that right?

A    Yes.

Q    You also said earlier that financial condition would include someone's income and their assets.  Is that right?

A    Yes.

Q    How is that different from the questions that the ability to pay calculator asks?

A    Well, I think the problem with the ability to pay -- well, I -- I -- let me rephrase that.

I think -- I think the distrust of the ability to pay calculator is it is information that is given by the defendant who's not sworn in.

And the problem with it is it's a huge perception problem.  Huge.  And the public doesn't trust it 'cause they don't think the defendant just

Page 85

again.

Q    Let's say a judicial commissioner doesn't have your level of experience, how would they know whether the person is likely to make their bond or not?

MR. DURRENCE:  Object to the form.

THE WITNESS:  I -- I don't know.  But again, I think most of the judicial commissioners -- our judicial commissioners have -- maybe not in my years of experience but just about all of us have years work -- some years working not just in criminal justices but working at 201 Poplar.

BY MS. VERRIEST:

Q    And based on those experiences, they have a general sense of who will make their bond and won't; is that right?

A    I'm not going to -- I'm not going to speak for the other commissioners.

Q    I'll return one more time to when you stated that the financial condition includes someone's income and someone's assets.  Is that right?

A    I think that's what I said.

Q    How is that --

Page 86

A    Again, it's -- it -- that's just my personal -- it's not defined.

Q    Not what?

A    It's not -- it's not defined -- it's not defined anywhere.  I -- I'm just -- I'm saying that's my personal opinion.

That's not Shelby County's.  That's not the judicial commissioners.  I'm just saying I personally -- that that's how I would interpret it.

I think it's broader than -- ability to pay I think it's more specific and has to do with their income.

The way I would interpret financial condition is a -- is a broader, overall, more encompassing overall picture of that person's -- but again, it's vague; it's general.  I didn't write the statutes.

Q    I understand that, Commissioner Marshall. As a person implementing the statutes, what is the difference between financial condition and ability to pay?

MR. DURRENCE:  Object to the form.  I'm also going to point out that we're getting outside of the 30(b)(6) topics.  And this is veering into topics

Page 87

covered by Commissioner Marshall's deliberative process privilege.

So I'm going to instruct Commissioner Marshall to not answer.

THE WITNESS:  All right.  I won't answer that.

BY MS. VERRIEST:

Q    I'll return to the topic, topic 3, which is Shelby County's policies -- I'm sorry.  It's topic 4. Shelby County's policies concerning bail setting practices, including any policies concerning how judicial officers should make bail decisions.

In the context of that topic, any policies concerning how judicial officers should make bail decisions, how are judicial officers distinguishing between financial condition and ability to pay?

A    I don't know if I can answer that. We're -- we're not -- again, I -- I can't speak.  It's an individual decision, each magistrate and judicial official.  I -- I cannot -- there is no official County policy on that.  So I can't answer that.

Q    So just to make sure I understand, you can't answer a question about what Shelby County's process is to consider ability to pay without -- excuse me.

Page 88

Let me start that again.

Just to clarify, you can't answer a question about what Shelby County's process is to consider financial condition without considering ability to pay?

MR. DURRENCE:  I'm going to object. Asked and answered.  I believe at the end of the commissioner's answer was Shelby County does not have a policy going to defining ability to pay or financial condition.

MS. VERRIEST:  Are you instructing your witness not to answer?

MR. DURRENCE:  Oh, I'm sorry.  Yes.

Do not answer, Commissioner.

BY MS. VERRIEST:

Q    Does Shelby County have a policy instructing judicial commissioners on how to follow HB1719?

A    It's pretty clearcut and straightforward. Real simple.  We -- we stopped using the affordable bail calculator.  Nothing complicated about it.

Q    The text of HB1719 is that judicial officers must consider a financial condition as long as ability to pay is not considered.  Is that right?

MR. DURRENCE:  I'm going to object.

Page 89

THE WITNESS:  Yes.

MR. DURRENCE:  I'm sorry.  I'm going to object to that answer.  If we want to discuss the text of HB1719, let's display it on the page, display it on the screen.

I'm not going to have my witness answer to Opposing Counsel's interpretation of what the statute says.

BY MS. VERRIEST:

Q    Commissioner Marshall, does Shelby County have a policy on how judicial commissioners and judges should consider financial condition without considering ability to pay?

A    No.

MS. VERRIEST:  Okay.  Let's go off the record and come back in five minutes.

THE REPORTER:  All right.  The time is now 4:51 p.m.  And we are off the record.

(Off the record.)

THE REPORTER:  The time is now 4:59 p.m.  And we are back on the record.

BY MS. VERRIEST:

Q    So you said earlier that the email traffic between judicial commissioners and Pretrial Services

Page 105

employment over the phone to judicial commissioners.
Is that right?

A    Just employment.

Q    Just employment.  I'm sorry.  And you said
that, at bail hearings, defense counsel may raise
information about employment.  Is that right?

A    They -- they could.  And --

Q    And you also said earlier that questions
that are about income are included in the ability to
pay calculator; is that right?

A    They were.

Q    After judges and judicial commissioners
conduct bail hearings, do they complete any documents?

A    Yes, there's a bail hearing order.
It's -- it's very similar to the initial bail
screening release form.  There's some differences.
But it's a very similar form that's completed.

Q    What are the differences?

A    Well, I think -- I'm trying to think.
They're -- they're very similar.  But a lot of it has
to do with the -- the language, maybe some of the
boiler plate -- what I would call the boiler plate
language.

They are -- they are essentially your forms

Page 106

that you provided to us that we modified and changed

because it -- it's -- it's different than the initial

bail.

I think there's very little difference now. Now actually the affordable and unaffordable language has been taken out.

They're -- they're actually very similar, now that I think about it.  But it's -- it's not much -- it's not much difference.

I can tell you I can fill it out a heck of a lot quicker when I'm just sitting there on that bench than all that emailing back and forth nightmare.

Q    And just to confirm, the affordable bail amount is not included in the bail hearing form that is currently being used; is that right?

A    No.

Q    Are bail hearings recorded?

A    Yes.

Q    I just asked you whether the affordable bail amount is included in the bail hearing forms now. Were they previously -- was it previously included on the bail hearing form?

A    I -- I believe it was.  Yeah, I'm pretty sure it was.

Page 107

Q    So the bail hearing form used to include a section to include the affordable bail amount.  And now it does not, post HB1719; is that right?

A    That's correct.

Q    Okay.  When judges or judicial commissioners make bail decisions at the time of bail hearing, do their decisions reference ability to pay?

A    No.  Again, I -- I can only speak for -- you know, I can only speak -- speak for myself.  There's -- there's no language in the bail hearing order about it.  So I can't speak for other magistrates or judges.

Q    Has there been a change -- let me start that again.

Other than the change you described where the affordable bail amount has been removed from the forms, have there been any other changes to bail hearings now compared to bail hearings before HB1719 was in effect?

A    You mean the form -- the language in the form?

Q    The bail hearing process overall.

A    The bail hearing process?  No, it's -- it's exactly -- exactly the same.  It has changed in -- in

Page 108

terms of, you know, some of the judges, you know, as I stated earlier, do their own bail hearings.

And shortly, I -- I think it was a few months after we implemented the standing bail order, you know, the Tennessee legislature passed a law saying judicial commissioners could not ROR.  Well, effectively only a judge -- that ROR certain types of offenses.

And so certain judges will hear those type of cases and send their misdemeanor and lower class felonies to us in the bail hearing room.

And from time to time, some judges have changed their policy a little bit.  Some have given us a little more; some have taken more of theirs under their own wing, that -- that sort of thing.

So it -- it's changed a little bit over time in terms of which judges are hearing which cases.  And so that -- that has fluctuated and changed a little bit over time.

Q    Have you noticed any other changes to bail hearings now compared to when before HB17 was in effect?

A    Not really.  I'd say they're very -- very much the same.

Page 113

THE REPORTER:  Very good.  The time is now 5:38 p.m.  And we are off the record.

(Whereupon, at 5:38 p.m., the proceeding was concluded.)

_____

JOHN MARSHALL

Subscribed and sworn to before me

this ____ day of _____, 2025.

_____

Notary public

Page 114

CERTIFICATE OF DEPOSITION OFFICER

I, JAY FREDERICK, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JAY FREDERICK

Certified Reporter in and for the

State of Tennessee

Page 115

CERTIFICATE OF TRANSCRIBER

I, ANDREW TINGLEY-BARRAZA, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ANDREW TINGLEY-BARRAZA