# Exhibit 5:

# June 30, 2025

# Rule 30(b)(6) Deposition

# of

# Pretrial Services Executive Director Llana Greer

# (Excerpted)

Page 2

in Their Official Capacities,

            Defendants.

_____

   DEPOSITION OF 30(b)(6) CORPORATE REPRESENTATIVE FOR

               DEFENDANTS - LLANA GREER

DATE:          Monday, June 30, 2025

TIME:          10:55 a.m.

LOCATION:      Remote Proceeding

               Memphis, TN 38103

REPORTED BY:   Jay Frederick

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS JUST CITY, INC.; DEANGELO

TOWNS; AND MARSHAWN BARNES:

JARED QUIGLEY, ESQUIRE (by videoconference)

Simpson Thacher & Bartlett LLP

425 Lexington Avenue

New York, NY 10017

jared.quigley@stblaw.com

(212) 455-2000

ASHIKA VERRIEST, ESQUIRE (by videoconference)

Pro Hac Vice, ACLU Foundation

Criminal Law Reform Project

125 Broad Street, 17th Floor

New York, NY 10004

averriest@aclu.org

(347) 302-2797

STELLA YARBROUGH, ESQUIRE (by videoconference)

ACLU Foundation of Tennessee

P.O. Box 120160

Nashville, TN 37212

syarbrough@aclu-tn.org

(615) 320-7142

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS FLOYD BONNER JR., LEE WILSON, JOHN MARSHALL, ROBERT BARBER, RHONDA HARRIS, KEVIN REED, CHRISTOPHER INGRAM, SHAYLA PURIFOY, ROSS SAMPSON, SERENA GRAY, TERITA HEWLETT, MISCHELLE BEST, KENYA SMITH, ZAYID SALEEM, KATHY KIRK JOHNSON, AND LESLIE MOZINGO:

JASEN DURRENCE, ESQUIRE (by videoconference)

Shelby County Attorney's Office

160 N. Main Street, Suite 900

Memphis, TN 38103

jasen.durrence@shelbycountytn.gov

(901) 222-2132

ON BEHALF OF STATE OF TENNESSEE INTERVENORS:

BRIAN ENRIGHT, ESQUIRE (by videoconference)

Office of the Attorney General of Tennessee

P.O. Box 20207

Nashville, TN 37202

brian.enright@ag.tn.gov

(615) 741-1442

Page 5

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Clio Gates, Paralegal, ACLU (by videoconference)

Davianna Velasco Valdivieso, Intern, ACLU (by

videoconference)

                                                            **Page 6**

                          **I N D E X**

**EXAMINATION:**                                            **PAGE**

        By Mr. Quigley                                      10

        By Ms. Verriest                                     96


                      **E X H I B I T S**

**NO.**                **DESCRIPTION**                      **PAGE**

**Plaintiff:**

**Exhibit 1**          **30(b)(6) Deposition Notice**       **12**

**Exhibit 2**          **Bail Packet**                      **26**

**Exhibit 3**          **Hearing Transcript of Preliminary**

                       **Injunction**                       **47**

**Exhibit 4**          **Previous Bail Screening Form**      **51**

**Exhibit 5**          **Current Bail Screening Form**       **53**

**Exhibit 6**          **Shelby County Judicial Annual**

                       **Report**                           **74**

**Exhibit 7**          **Resolution of the Shelby County**

                       **Board of Commissioners**           **90**

**Exhibit 8**          **Bail Hearing Order Form**           **97**

I N D E X (Cont'd)

D O C U M E N T S   R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Documents in Front of Witness During Deposition | 94 |
| 2 | Documents From Bail Packets Sent to Judicial Commissioners | 94 |
| 3 | Bail Hearing Orders for Individuals Discussed in Deposition | 95 |
| 4 | Recordings of Bail Hearings for Individuals Discussed in Deposition | 96 |
| 5 | Sample of Completed Bail Hearing Order Forms | 97 |

Page 8

P R O C E E D I N G S

THE REPORTER:  Good morning.  My name is Jay Frederick.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 10:55 a.m.

This is the deposition of Llana Greer as 30(b)(6) representative for Defendants, taken in the matter of Just City, Inc., et al. vs. Floyd Bonner Jr., et al., case number 2:24-cv-2540-TLP-tmp on Monday, June 30, 2025, via remote Zoom.

I'm a licensed court reporter authorized to take acknowledgements and administer oaths in Tennessee.  Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

Page 9

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, beginning with the witness.

MS. GREER:  Llana Greer.

THE REPORTER:  Yes, ma'am.  Could you please speak up a little bit?

MS. GREER:  Llana Greer, administrator of Pretrial Services.

MR. QUIGLEY:  Jared Quigley, Simpson Thacher & Bartlett, for Plaintiffs.

MR. DURRENCE:  Jasen Durrence, Shelby County Attorney's Office, for the defendants.

MS. VERRIEST:  Ashika Verriest, ACLU National Criminal Law Reform Project, for the plaintiffs.

MS. YARBROUGH:  Stella Yarbrough, ACLU of Tennessee, for the plaintiffs

MR. ENRIGHT:  Brian Enright with the Attorney General's Office in Tennessee on behalf of the State of Tennessee Interveners.

MS. VELASCO VALDIVIESO:  Davianna Velasco Valdivieso, ACLU Nationwide Criminal Law

Page 10

Reform Project, on behalf of the plaintiffs.

MS. GATES:  Clio Gates, ACLU Criminal
Law Reform Project, on behalf of the Plaintiffs.

THE REPORTER:  Thank you.  Hearing no
objection, I will now swear in the witness.

Please raise your right hand.

WHEREUPON,

LLANA GREER,
called as a witness and having been first duly sworn
to tell the truth, the whole truth, and nothing but
the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

You may proceed.

MR. QUIGLEY:  Thank you.

EXAMINATION

BY MR. QUIGLEY:

Q    Good morning.  My name is Jared Quigley.
I'm with the law firm of Simpson Thacher & Bartlett,
LLP.  We represent the plaintiffs in this proceeding.

Now that we're on the record, can you please
state your full name?

A    My full name?  Llana Renee [ph] Greer.

Q    Thank you.  Is there any reason why you
can't testify fully and completely today?

Page 22

Pretrial Services employee interviews the person who was arrested?

A    Just the employee and the arrestee.

Q    How long after booking do these interviews typically take place?

A    I can't say.

Q    And can you estimate?  Is there a general ballpark?

A    Roughly about four hours, anywhere from two to four hours.

Q    But sometimes it can be longer than that?

A    Yes -- yes.

Q    And sometimes shorter; right?

A    Yes.

Q    When the Pretrial Services employee arrives to conduct the interview, do they bring anything with them?

A    No, they're not -- they're not -- they're stationed there.

Q    Got it.  And what do they have with them?

A    Just the computer and the paperwork.

Q    What paperwork?

A    During the course of the interview, the arrestee is asked additional questions as to whether

Page 23

or not they want a head start for their children.  We do referrals for that.  So if they do, they will sign off on that.

And also courtesy text messaging, if they want to be -- to receive a text message, they can sign a form saying they want a text message.

Q    So those are the two, like, physical paper forms and then everything else is on the computer?

A    Correct.

Q    What questions are asked during this initial interview?

A    Their address; residency; how long they've been in Shelby County; how long they've lived at that address; who do they live with; telephone numbers; references; employment; highest education; if they have arrests in any other jurisdiction; do they have anything that they would like to report; again, are they interested -- if they have children 3 to 5, would they like a referral to Head Start; if they would like text messaging; if it's a domestic violence case, how are they related to the victim; are they on parole or probation; and do they have any other cases pending; and military.

Q    Are the same questions asked every time?

Page 24

A    Yes.

Q    And those are all of the questions?

A    Those are all the questions that I can think of right now.  Yes.

Q    So there -- are there any questions asked about the person's income?

A    Oh, well, I said employment.  But yes, that's not the interview itself.  That's the affordable bail calculator.  We still complete that.

Q    So you still complete the affordable bail calculator even today?

A    Yes.

Q    What do you do with the information once you've received it for the affordable bail calculator?

A    Nothing.

Q    So you ask the questions, you collect the -- like, the answers to the questions about the affordable bail calculator.

And then it just -- it -- that's recorded on the, like, interview sheet.  But that's it.  There's no further action?

A    It is not a part of the actual interview.  It is a separate document.  And it is just, you know, stored in the file, in the Pretrial file.

Page 25

Q    But it is not transmitted to the judicial commissioners?

A    No.

Q    How long do the interviews typically take?

A    It really depends on the -- the employee. So I'm going to average it out to say 7 to 12 minutes based on whether they're senior employees or new employees.

Q    Got it.  What documents are filled out during the initial screening?

A    During the initial bail interview?

Q    Yeah, the bail interview we were just discussing.

A    The interview itself is completed.  And the affordable bail calculator is completed.  The courtesy text messaging, if they elect to do that, and the referral to Head Start if they want that as well.

Q    I'm going to introduce -- I'm going to mark as an exhibit a document that was produced in this litigation, which is a bail packet we've received those produced by the defendants.  And I'm going to show it on my screen right now.  I believe this is Exhibit 2.

//

Page 26

(Plaintiff Exhibit 2 was marked for

identification.)

This is a bail packet.  Does this -- not this specific one, but does this generally look like a bail packet, the -- you have the order on the first page?

A     Yes.

Q     This form.  So this form is called the Shelby County Pretrial Services Bail Setting Form.  Is this filled out during the initial interview?

A     No.

Q     What -- when is it filled out?

A     When they complete the bail packet.

Q     Got it.  And the same thing is true for this report, the Offender Interview and Public Safety Assessment, PSA report?

A     That is the interview itself.

Q     So is this form filled out during the initial interview?

A     Yes, that is the interview.

Q     Got it.  And this is the only form that is filled out during the interview other than Head Start and text messaging, I believe you said.

A     And the affordable bail.

Page 27

Q     And the affordable bail.  Correct.  And Shelby County has conducted these initial interviews both before and after the passage of HB17; is that correct?

A     Yes.

Q     Earlier you mentioned the ability to pay calculator.  What is the ability to pay calculator?

A     It is a -- the affordable bail calculator developed by the Vera Institute.

Q     What questions do the Pretrial Services employees ask about the bail calculator during the initial interview?

A     They ask the -- how much an arrestee makes, whether it is per week, per month, per year, and then ask questions regarding itemized expenses, checking account, savings account, any other additional income.

Q     How many questions approximately?

A     Twenty, I'm guessing twenty.

Q     And the questions include questions about the arrested person's income and benefits?

A     Yes.  Any income.

Q     And about the arrested person's assets?

A     Yes.

Q     And about the arrested person's expenses?

Page 28

A    Yes.

Q    Are there any other questions that I missed?

A    No.

Q    Why does Pretrial Services continue to ask these questions during the initial interview?

A    Because of the standing bail order.

Q    Is it difficult to ask these questions?

A    No.

Q    How long does it typically take to ask the questions?

A    Three to four minutes.

Q    Were there any changes in the PSA report before or after HB1719 was passed?

A    The PSA report?  No.

Q    Were there any changes at all to the initial interviews after HB1719 was passed?

A    No.

Q    You oversaw Pretrial Services while the standing bail order was implemented; is that correct?

A    Yes.

Q    So you oversaw Pretrial Services while the ability to pay calculator was part of the process?

A    Yes.

Q    Did you conduct any trainings related to the

Page 29

implementation of the ability to pay calculator?

A    Yes.

Q    How many?

A    How many trainings?  I really couldn't say.
Each staff was trained until they were able to do it.

Q    Can you give a ballpark, an estimate?

A    It is fairly simple.  So I would say two to
three times.  And then monitoring for accuracy
afterwards.

Q    How would you monitor for accuracy?

A    Have the supervisor sit with them and/or
review the information after they've completed it.

Q    Do you think the trainings were successful?

A    Yes.

Q    Were the employees able to understand what
they had to do regarding the ability to pay
calculator?

A    The lawyers?

Q    The employees.  Sorry.

A    Yes.

Q    Were they able to successfully implement the
ability to pay calculator?

A    Yes.

Q    Would you agree that the Pretrial Services

Page 30

employees were able to easily incorporate the ability
to pay calculator into the Pretrial process?

A    I would agree that we were able to do it,
yes.  I did not -- I wouldn't use easily.

Q    But it was not difficult to implement?

A    It was not difficult to complete the form
itself.  No.

Q    So after the initial interview, what happens
next?

A    I hesitate to say next in that things are
happening kind of simultaneously.  The 24-hour clerks
are -- well, the sheriff's department is verifying
fingerprints.

Once fingerprints are verified, the clerks
are charging, which is giving them a court date and a
division.

All of that is going on while we are doing
the interview.  So once we've interviewed and we see
that that person has a court date or division -- and
division, then we begin completing the bail packet.

Q    And what is -- what does the bail packet
consist of?

A    The information you just showed on the
screen, that was the bail packet.

Page 31

Q    Well --

A    Yes, that was a bail packet.

Q    And for the record, what documents are included in the bail packet?

A    The interview, the PSA bail setting, the criminal arrest history locally, the criminal arrest history from the NCIC, warrant checks from both Odyssey -- well, not -- from Odyssey and from OMSE, affidavit, arrest tickets, and an order granting bail if it's a domestic, and the bail screening form for the judicial commissioners.

Q    Are any other documents included in the bail packet?

A    That's what makes up the bail packet.

Q    Are any other documents ever included in the bail packet?

A    Oh, I'm sorry.  The -- we now have a conviction summary, which is -- we have the full criminal history.

But we also have a conviction summary that some -- that lists all the convictions.  And we also have -- have access to a pending case summary.  But all that information is also listed in the full criminal history.

Page 32

Q    Where does the Pretrial Services employee put together the packet?

A    In the same general area where the interview is completed.  And we also have the ability to do it from our main office on the eighth floor.

Q    And the person who was arrested, they -- where do they go after the interview room?

A    They return to the intake area.  They're seated there until classification assigns them to a housing pod.

Q    And then they get transferred into that housing pod?

A    Yes.

Q    How long does it take the Pretrial Services employee to prepare the bail packet?

A    It really depends on the length of the record.  I'm going to say anywhere from 15 minutes to 35 minutes depending on how long of a criminal history they have.

Q    And what is the Pretrial employee doing during this time?

A    They're printing out all of the paperwork.  They're reviewing the criminal history.  For instance, I would say domestic cases, you have to determine how

Page 33

many prior domestic charges.

They're summarizing it for the judicial commissioners.  And once they compile the packet, then they notify the commissioners.

Q    How long has Shelby County been preparing these bail packets?

A    Estimated year around 1993, '94, estimated.

Q    Is the packet -- is the bail packet different now than it was before HB1719 went into effect?

A    No.

Q    Did the bail packet formerly include a sent-out of the ability to pay calculator?

A    I'm sorry.  Say again?

Q    How was the ability to pay calculator information transmitted to judicial commissioners before HB1719?

A    It was -- it would -- it was on the screening document, the bail -- the bail screening form that the judicial commissioner gets that -- the amount that that arrestee could afford would appear on that document.

Q    So the Pretrial Services employee would input it somewhere.  And it -- how would it -- sorry.

Page 34

Strike that.

How would it appear on that document?

A    We would enter it into the events tab in Odyssey so that when that document is printed, it would print out on the document.

Q    But it would not be included in the bail packet?

A    No.  We would not send it over to the judicial commissioner.  No.

Q    How long does it take to enter the ability to pay questions into the calculator?

A    Three to four minutes.

Q    And does that happen simultaneously with when the interview is being conducted?

A    We complete the interview first.  And then the packet is the last thing most staff will do.  It's individual.  I mean, they could do it first if they so choose.  But most times it's the last thing.

Q    And specifically with the ability to pay calculator, is the standard practice that the Pretrial Services employee who conducts the interview would fill out the calculator while they were conducting the interview?

Or would they conduct the interview, get the

Page 35

answers to the questions, and then fill out the

calculator?

A    The proper steps would be to conduct the

interview.  Once you finish the interview, then

complete the calculator.

Q    So it would be, you know, I think you said

three to four minutes of questions and then three to

four minutes of entering the answers into the

calculator.  Is that accurate?

A    The -- the calculator and the questions are

entered at the same time.  The calculator's on the

screen.  So when you ask the question, you are

entering it at the same time.  It's so --

Q    So it is filled out during the interview?

A    I'm not sure how to answer that.  So I'm

going to say the same person that completes the

interview does the affordable bail calculator.  Yes.

Q    Let me try it a different way.

A    Okay.  Yeah.

Q    Sorry.  How many minutes total does it take

to do the Vera -- calculate the ability to pay

calculator when you take both the questions asked and

putting the answers into the calculator?  How long

does that add total to the total time of the

Page 36

interview?

A    From the time we sit down and ask, "Where do you live?" until the time we complete the affordable bail calculator?  Is that what you're asking?

Q    I'm -- let me try it one more time.

A    Okay.

Q    The number -- the -- it takes three to four minutes to answer the questions.  Is that correct?

A    To ask and enter the questions.  Let me say it like that.  "How much do you make?"  Enter it. "How much do you" -- enter it.  So to ask and enter, I'm going to say three to four minutes.

Q    So the whole ability to pay calculator process takes three to four minutes total?

A    Yes.  Estimate.

Q    Okay.  Thank you.  How does -- let me just make sure that I have the -- what is in the bail packet down before we move on to the next step.

It's the criminal arrest history, NCIC, warrant checks from Odyssey and OMSE, the affidavit, the arrest tickets, and then the order granting bail if it was a domestic violence incident.  What did I miss?

A    Did you say the PSA bail setting form and

Page 37

the screening document?

Q    Right.  Those two documents as well.
Anything else?

A    I don't think you missed anything else.  No.
Oh, the -- I'm sorry.  The conviction summary and the
pending case summary.

Q    And what databases are those pulled from?

A    Say again?

Q    What databases are those pulled from?

A    Odyssey.  Navigator now.

Q    Is there anything different about the
packet -- bail packet preparation process that is
different now compared to before HB1719?

A    Can you repeat that?

Q    Is there anything different about the bail
packet preparation compiling that is different now as
compared to before HB1719 went into effect?

A    The only difference is that we don't include
any information about the affordable bail.

Q    Was that included in the bail packets
previously?

A    Prior to the new law, yes.

Q    Where was it included?

A    On the bail screening form.

Page 38

Q    That is sent to the judicial commissioner?

A    Yes.

Q    And other than that one area where the number appeared, were there any other locations where that would -- where ability to pay would be considered?

A    No -- no.

Q    Is any information about an arrested person's financial condition included on the -- in the bail packets today?

A    Yes.  We ask about employment and salary, how long you've worked there.

Q    Where is that reflected?

A    In the interview.

Q    Is there any other information other than current employment and current salary?

A    Employer's name, how long you've worked there, whether it's full-time, part-time, or seasonal.

Q    So other than current employment, are there any pieces of information that go to financial condition in the bail packets?

A    No.

Q    I think we've been going for about an hour. I think a five-minute break might be in order if you

Page 39

would like, Ms. Greer.  Otherwise we can keep going.

A     We can keep going.

Q     Okay.  I think I realized I'm using two terms that we haven't really spoke about yet.  One is ability to pay and one is financial condition.  What is financial condition?

A     What is financial condition?  I couldn't tell you at this moment.  I'm not clear on your question.

Q     When you hear the term financial condition, what do you think I mean by that term?

A     The amount of bail that a commissioner will place on an individual prior to release.

Q     When -- I'm trying to speak in terms of the arrested person.

A     Okay.

Q     What is an arrested person's financial condition?

A     Are you talking about their employment status?

Q     So I -- earlier I said is there any information about financial condition on the bail -- in the bail packets?  When I asked you that question, what did you think I meant by financial

Page 40

condition?

A    Employment status.

Q    And are there any other factors that come to mind?

A    No.

Q    And when I use the term ability to pay, what does that mean?

A    How much that individual can afford to pay to be released.

Q    So after the packet is prepared, what happens next?

A    The judicial commissioner is notified that that particular person is ready for bail setting.

Q    How are they notified?

A    Through the email.

Q    Who sends the email?

A    Pretrial.

Q    And is it sent to -- what email address is it sent to?

A    To the judicial commissioner group email account.

Q    And who monitors that email account?

A    All on-duty commissioners.

Q    And once they receive that email, what

Page 41

happens next?

A    They will at -- when they're ready, contact Pretrial so that the bail can be set.

Q    And how do they contact Pretrial?

A    By phone.

Q    What is discussed in that conversation?

A    Pretrial Services goes through the bail packet over the phone with the commissioner summarizing the number of convictions, felonies, misdemeanors, other criminal history information, if there are any pending cases, give them the bond amounts, court dates, whether they're on parole or probation.

The commissioner asks questions during that bail setting process to which we provide the answers if they're available.

And they then -- they already have the affidavit, so we don't read that to them any.  And then they set the bail.

Q    Is that -- are there any -- is there any discussion of the person's financial condition or ability to pay?

A    No.

Q    How long do these conversations usually

Page 42

take?

A     Again, can I back up one -- when you say discussion of -- of whether they're employed or not, that question may be asked by some commissioners, whether they're employed.  But discussion of their ability to pay, no.

Q     Is there any discussion of their financial condition other than some commissioners asking about their current employment?

A     No.

Q     How long after the initial interview do these phone calls take place?

A     That varies depending on the commissioner.

Q     Is there a ballpark?

A     Once we notify the commissioner that a packet is ready, they're also doing the intake where they're signing off on affidavits and so it kind of depends on how busy they are.  It could be ten minutes to an hour.

Q     Got it.  And how do they receive the packet of documents from the Pretrial Services employee?

A     Once they have made a determination of the bond, that bond is entered into the paperwork.  And then we print it and email it to the commissioner for

Page 43

signatures.

Q    Well, I was trying to ask, they received the bail packet that we were just talking about that was prepared by Pretrial Services.  Do they receive that in the email that is sent by Pretrial Services?

A    That is discussed verbally over the phone.

Q    The -- how did -- how do the judicial commissioners receive the packet that Pretrial Services puts together?

A    They don't get the actual hard copy.  That is done -- presentation is done over the telephone.

Q    So the judicial commissioners do not review the bail packet.  The Pretrial Services employee summarizes the bail packet to the judicial commissioner; is that correct?

A    Correct.  They get the criminal case summary convictions.  But they do not actually get the hard copy of the bail pack.

Q    And I believe you said criminal history is kind of the primary topic of conversation; is that correct?

A    No, I'm -- I'm --

Q    Maybe I missed --

A    Sorry.  Primary topic of conversation?  No,

Page 44

we discussed the whole packet.  They get a copy of the printed criminal history.

Q    What do they receive copies of?  What documents?

A    They receive copies of the bail -- the PSA bail setting form.  They receive copies of the bail screening form, the criminal conviction summary, and the order granting bail if it's a domestic violence.

Q    So what documents from the bail packet do they not receive?

A    They do not physically get through the email a copy of the interview, the full criminal history printout, the warrant screen checks, and the NCIC.

Q    Are the interview and the PSA report different documents?

A    Yes.

Q    I'm going to pull up on the screen.  I believe this is Exhibit 2, which is the bail packet we've received as a sample.

I'm just going to scroll through this slowly.  And can you tell me to stop when you see the interview?

A    That's the interview.

Q    This is?

Page 45

A    Yes.

Q    And then what is the PSA report?

A    Scroll up.  That's the PSA bail report.

Q    Okay.  Thank you very much.  How do the judicial commissioners receive those documents?

A    How do they receive the warrants that they get?  They get them through the email.

Q    Got it.  After the phone call, how long does it generally take for the judicial commissioner to fill out the bail screening form?

A    Again, it -- it varies on the commissioner.  But it can be anywhere from 15 minutes to an hour depending on what other things they have that they're doing.

Q    Are there any other documents the judicial commissioners fill out other than the bail screening form?

A    Not that I'm aware of, no.

Q    Is anyone else present when the judicial commissioners make their bail decision?

A    Anyone else present with Pretrial?

Q    With the judicial commissioner.

A    They're offsite.  I wouldn't know.

Q    If an arrested person doesn't have a lawyer,

Page 46

have they been appointed a lawyer by this point?

        A    No.

        Q    How long have the judicial commissioners been conducting these internal screenings?

        A    How long have they been using the bail screening form?

        Q    How long have they been receiving information from Pretrial Services and setting a bail at this initial stage before, like, a bail hearing, for example, down the line?

        A    Since roughly around 1993, '94.  No, I'm sorry.  Judges, before we got commissioners, did that back then.

                I -- I honestly can't tell you when, whenever the commissioners were hired.  It started with judges.  So I can't tell you when the commissioners were hired.

        Q    Do judges still do this screening ever, or is it only judicial commissioners?

        A    Commissioners, judicial commissioners.

                    MR. QUIGLEY:  I've reached a point where it makes sense to take a short break.  I think maybe five, ten minutes.

                    And then we can maybe go for another

Page 47

hour and then take a lunch if that sounds good to everybody.

MR. DURRENCE:  That's fine with me.

THE WITNESS:  That's fine.

THE REPORTER:  All right.  The time is now 11:58.  And we are off the record.

(Off the record.)

THE REPORTER:  The time is now 12:10 p.m.  And we are back on the record.

BY MR. QUIGLEY:

Q    I'm going to ask a couple additional questions about the steps we've already spoken about. And then we can go back to moving forward through the remaining few steps.

I'm going to start with marking another exhibit.  This is going to be Exhibit 3.

(Plaintiff Exhibit 3 was marked for identification.)

And I'm going to share it on my screen. I'll represent to you that this is a transcript from a hearing that we had in this action.  There was a preliminary injunction hearing.  And both sides presented argument.

On page 29, we have -- this is the counsel

Page 52

public.  And it's about whether the arrested person poses a risk of safety to the public.

And it has this line here, which is about the defendant's employment status and history and financial condition.

What does the term financial condition mean right here in this statement?

A    That would have to be responded to by a judicial commissioner.  Pretrial wouldn't determine that.

Q    Do you understand you're here to testify on behalf of Shelby County today?

A    Yes.

Q    How does Shelby County interpret the term financial condition?

A    When we are looking at it from the release, the Pretrial bail set, if someone's condition -- sets a financial condition, it is dealing with their release from custody.

Q    What does -- how does Shelby County interpret the term financial condition as it is used on the bail screening form in the sentence "Defendant's employment status and history and financial condition"?

Page 53

A     I can't answer that.

Q     I'm going to take that document down.

Has Shelby County had any trainings about what the term financial condition means since the passage of HB1719?

A     Not to my knowledge.

Q     The next point was we were speaking about how the affordable bail -- I'll actually introduce another exhibit, which I believe is Exhibit 5.

(Plaintiff Exhibit 5 was marked for identification.)

And I'll represent to you that we believe this to be the bail screening form that was in effect before the passage of HB1719.  Does this document look like a bail screening form?

A     Yes.

Q     And then when we scroll down to section 3, it says "Affordable bail amount"?

A     Yes.

Q     Is the -- is this where the information that we were discussing earlier would auto-populate on the form once it was entered by Pretrial Services?

A     Yes.

Q     So the judicial commissioner would receive

Page 54

or would open the form on their computer.  And it would be a blank form.  But it would have the affordable bail amount listed?

A    Yes.

Q    I'm going to take this down for a second. I'd like to speak briefly about the two bail screening forms, which I have just marked as exhibits.

This is the one we were just looking at, which has the section 3 release on affordable bail. And this would auto-populate.

So the -- it did not take any time for the judicial commissioners to enter this information on the form; is that correct?

A    Correct.

Q    And this says "3A. Affordable Bail Amount." And then there's "A. Maximum affordable bail amount as calculated by Vera Tool."

Then there's "B. Actual affordable bail amount ordered, if different from Vera Tool."  And then there's "C. Defendant was unavailable."  Did I read that correctly?

A    Can you repeat that?

Q    It says "3A. Affordable Bail Amount."  And then it says:  "A. Maximum affordable bail amount as

Page 55

calculated by Vera Tool.  B. Actual affordable bail amount ordered, if different from Vera Tool."

And then:  "C. Defendant was unavailable, which prevented Pretrial from determining an affordable bail amount.  Therefore, affordable bail amount is unknown."  Did I read that correctly?

A    Yes.

Q    And now I'm going to show the current version of the bail screening form.  I'm going to scroll to where that part used to be.  That part is no longer on the bail screening form; is that correct?

A    Yes.

Q    Is that information anywhere else on the version of the bail screening form that is currently being used by Shelby County?

A    No.

Q    Before HB17 was passed, would the Pretrial Services employee discuss the affordable bail number with the judicial commissioner during the phone call they would have, the initial screening call sometimes, ever?

A    We would give them the information.  If they had questions, we would reply to that.  That was -- yes.

Page 56

Q    Okay.  So the answers the arrested person gave in response to the questions related to their income, assets, and expenses was sometimes discussed?

A    If it was available and the judicial commissioner requested or had questions about it, yes.

Q    Are the conversations between the judicial commissioners and Pretrial Services the same length now as they were before HB1719 was passed?

A    They would approximately be the same.  Yes.

Q    So after the -- what options does the judicial commissioner have when they're considering whether to set bail or not after they've completed the bail screening form?

A    What options do they have?

Q    Let me rephrase.  Can a judicial commissioner set bail through the bail screening form?

A    Yes.

Q    What are the other options if they do not set bail?  Can they release the individual?

A    Oh, okay.  Yes.  Pretrial considers that bail.  So just ROR bail.  Okay.  I understand that. Yes, they can release a defendant on their own recognizance.  It's still using the bail screening form.

Page 57

They can set a money bail, or they can set -- indicate no bail set, which means it would go to court before they get a bail. But all of that is using the screening form.

Q    How does the person who was arrested find out what the judicial commissioner did on the bail screening form?

A    If the person receives an ROR bail, then Pretrial will call them back to the office and go over any conditions of their release so that they'll be aware of it.

If it's with supervision, we will set them up for orientation so they'll know when they're to report to their supervising counselor.

If it's without supervision, we would just simply give them the information for the automated call-in to remind them of their court dates and things like that.

If it's a money bond, the officers in the jail would normally be the ones that would relay that information.

Q    For the people who are being released, what happens next?

A    Once we receive the paperwork back from the

Page 58

judicial commissioner, we call the defendant down.  We have -- we go over the rules and regulations of any supervised release.

Again, we tell them about non-supervision and the automated system where they can get their court dates and check in.

We then -- if they are domestic, we will get them to sign the order granting bail, also explaining those conditions to the person.

Once they've received copies of all of that -- well, I'm sorry.  Not copies.  Once they've signed all of that information, they are escorted around to release where they will be processed out.

Release will give them copies of all of their documents.  We give them the OR paperwork. Release will give them the order granting bail paperwork.

Q    And what happens to the bail packets that the judicial commissioner reviewed?  Or excuse me. What happens to the bail packets that Pretrial Services put together?

A    It is stored with our department.  If that person has a bail hearing, those packets are taken to the bail hearing room.

Page 59

And at that time, whoever the presiding commissioner, if they want to physically see the packet at that time, they can see hard copies of everything that we verbally went over with them.

Q    Does Pretrial Services upload those packets onto a database?

A    Yes.  They're stored in our Odyssey supervision database -- Navigator.  I'm sorry.  They just recently switched over.  Navigator database.

Q    And if a judicial officer sets bail, meaning the person is not being released, is the person appointed counsel?

A    Not at that time, no.  That is done during their arraignment.

Q    Got it.  How does Shelby County decide whether to appoint counsel?

A    That is the judge's decision at arraignment. They fill out an indigency form in court and swear before the judge.  And then the judge makes the determination.

Q    How does Shelby County notify the appointed counsel that they were appointed?

A    The general sessions court clerks will normally notify the appointed counsel to come to court

Page 60

at that time.

Q    And how long has Shelby County been following these procedures for the appointment of counsel?

A    I couldn't tell you.  I don't know.

Q    Are there any differences in how counsel is appointed now compared to before HB1719 when it went into effect?

A    Not to my knowledge, no.

Q    So then the next -- is the next step the arraignment?

A    Yes.  The arraignment happens at the same time, usually, when a counsel is appointed.  And the bail hearing comes after that.

Q    And how long between when the judicial commissioner makes that decision that's reflected on the bail screening form and the arraignment?  How much time is between those two events?

A    If they are charged, given a court date and division prior to midnight, they go to court at nine o'clock that morning for arraignment.  Anyone charged after midnight will go to court the following business day for arraignment.

Q    And what happens at the arraignment?

Page 61

A    The courts or the judge will go over their charges and determine whether or not to appoint them a public defender, decide whether or not they will remain on bail review hearing if they are still in custody, and then set them for report date.

Q    Who speaks at the arraignment?

A    I can't say for sure.  We are in and out of court.  So in some courtrooms, the prosecutor and the defendant may be allowed to say something.  I can't say for sure because we're not always in the courtrooms.

Q    Where does the arrested person go after the arraignment?

A    If they have not posted bond, they'll be returned to their housing unit.

Q    Are there any differences in how arraignments are conducted now as opposed to before HB1719?

A    Not to my knowledge.

Q    And then what happens next?

A    If the -- if the arrestee, the person, individual has not posted bond, they will remain on the bail review hearing docket.

And depending on the charge, they will go to

Page 62

the bail review hearing room or they will have a bail review hearing in the courtroom the following day.

Q    How long after amendment do generally the bail hearings happen?

A    They're scheduled for the next day.

Q    And where do the bail hearings take place?

A    Some take place on the second floor in the bail review hearing room.  And others take place in the actual court.

Q    Who is the bail hearing in front of?

A    The second floor bail review hearing is in front of a judicial commissioner.  The courtroom hearings bail reviews are done based on the assigned judge for that courtroom.

Q    Who decides which room an arrested person goes to?

A    It depends on the charge that the person has, whether or not they will -- can be seen in bail review hearing and also the judge themselves.  Some prefer to see their own cases and not send them to bail review.

Q    So there are certain categories of crimes that are not eligible for the bail hearing room?

A    Correct.

Page 63

Q    And what are those?

A    Murder charges.  I want to say class A and class -- anything that's a class A and aggravated assault charges.  There may be others that I can't remember right now.  But those are the charges.

Q    How are judicial commissioners scheduled for the bail hearing room?

A    The lead commissioner makes out their schedule.

Q    Does the same judicial commissioner that did the initial screening conduct the bail hearing for the arrested person, or is it a different judicial commissioner?

A    Depending on the schedule, it could possibly be.  But majority of the time, I've never seen it happen.  But it could possibly be, yes.

Q    So the scheduling is unrelated?

A    Correct.

Q    Got it.

A    Yes.

Q    Who is present at the bail hearing other than the arrested person and the judge or judicial commissioner?

A    In the bail review hearing room, the judge;

Page 64

the arrestee; the DA; the appointed attorney, whether it's a public defender or private; clerk; general sessions court clerk; and Pretrial in the bail review hearing; and the bailiffs.

Q    How does Pretrial decide who is in the bail hearing room on behalf of Pretrial?

A    Rotation schedule staff.

Q    And what does the Pretrial Services individual who's in the bail hearing room -- what do they do during the bail hearing?

A    We are there to respond to any other questions that the judicial commissioners or the DA or PD may have.

Basically to provide information, we have the packet.  And once the hearing starts, if they have questions, they will ask us.  And we will provide those answers.

If a person is released on their own recognizance, then we do the same thing that would happen in the jail where we would go to the defendant before they leave the courtroom, explain their RORs, have them sign the paperwork, set them up for their orientations.

Q    -- Pretrial Services employee asked about in

Page 65

the bail hearing room?

    A    By the commissioner, this is where they -- they will go into more detail.  So they will ask to actually see the hard copy of the criminal history.

        Review -- if there are any warrants out, review that information.  They may want to see the hard copies of that.  Walk through their interview again, things like that.

    Q    Does the judicial commissioner ever ask questions about the ability to pay calculator?

    A    No.

    Q    Does the judicial commissioner ever ask questions about the arrested person's income?

    A    Whether they're employed, yes.

    Q    Do they -- does the judicial commissioner ask any questions about the arrested person's expenses?

    A    No.

    Q    Does the judicial commissioner ask any questions about the arrested person's benefits?

    A    No.

    Q    Other than questions about current employment, does the judicial commissioner ask any

Page 66

questions about the person's finances?

A    No.

Q    Who speaks at the bail hearing?

A    The DA, the public defender, and the judicial commissioner are the main three. The -- there may be questions asked of Pretrial.  And if so, then we will.

There also may be questions asked of the arrestee as they're there at the hearing.  And if so, they will.

Q    What types of arguments do Defense Counsel make at the bail hearings?

A    It varies.  One is the likelihood of fleeing, you know, reliability to come to court. Discussion of limited arrest histories -- you know, community ties, things like that.

Q    Do defense counsel make arguments about a person's ability to pay the bail?

A    There are comments made saying that -- what I have heard:  "He can't afford that," based on the beginning of the bail hearing.  "The reason that we are here is he can't afford that original bond." So --

Q    So do defense counsel sometimes makes

Page 67

arguments about whether the person can afford the bail
that has been set?

A    Yes.

Q    When defense counsel makes that argument, do
the judicial commissioners ever tell them to stop
making that argument?

A    I can't answer that.  I don't know.

Q    Have you ever been in a courtroom where a
judicial commissioner asked or told defense counsel
they could not argue regarding a person's ability to
pay?

A    I personally have not, no.

Q    Have you -- are you aware of any Shelby
County Pretrial Services employees who have?

A    Not to my knowledge, no.

Q    Do judicial commissioners and judges
reference a person's ability to pay when they make
bail decisions?

A    Could you repeat that?

Q    Do judicial commissioners and judges
reference a person's ability to pay when they make
bail decisions at the bail hearing?

A    Not to my knowledge.  I haven't heard them
do that.  Not since the law changed.

Page 68

Q    Tell me more about that.  How has the bail hearings changed since the law changed?

A    The commissioner for Pretrial's interaction does not mention bail affordability anymore.

Q    And how else has the bail hearing -- how else have the bail hearings changed since HB1719, if at all.

A    That's basically it.

Q    Are there any other ways that the bail hearings have changed since HB1719 went into effect?

A    Not to my knowledge.

Q    Before HB1719, was Pretrial Services often providing information regarding the arrested person's ability to pay the bail?

A    Yes.

Q    And was that in response to questions from the judicial commissioner?

A    Yes.

Q    What kinds of questions were the judicial commissioners asking Pretrial services?

A    Prior to?

Q    Yeah, prior to HB17, with respect to ability to pay.

A    They would ask how much did the

Page 69

defendant -- is the defendant able to pay.

Q    Would they ask any other questions related to the interview answers given related to ability to pay?

A    Not -- not regarding the ability to pay. They would -- they may ask the defendant a question, but not at Pretrial.

Q    Would judicial commissioners ask Pretrial about a defendant's income?

A    Whether they're working or employed, yes.

Q    Would they ask about the person's expenses?

A    No.

Q    Would judicial commissioners reference the defendant's ability to pay before HB1719 while making their decisions?

A    Yes.

Q    And approximately how often would they do so?

A    Thirty percent of the time maybe.

Q    And they no longer do so?

A    No.

Q    So other than the judicial commissioners -- sorry.  Strike that.

        Did defense counsel make arguments regarding

Page 70

ability to pay more often before HB1719?

A    Before, yes.

Q    Tell me more about that.  How so?

A    I'm not sure what you mean.

Q    How would defense counsel argue regarding ability to pay before HB1719?

A    Just basically say their client can't afford the bond.

Q    Is that different from how they argue now?

A    I think the difference is they don't mention it as often.

Q    Are there any other differences with respect to defense counsel?

A    Not that I'm aware of right now, no.

Q    So to summarize, before HB1719, Pretrial Services would answer questions regarding the ability to pay.

Defense counsel would make arguments regarding ability to pay more often.  And judicial commissioners -- bail determinations.  Is that correct?

A    Yes.

Q    Are there any other ways --

THE REPORTER:  I'm sorry, Mr. Quigley.

Page 71

Could you repeat that question?  It buffered out on my end.

MR. QUIGLEY:  Yeah.

BY MR. QUIGLEY:

Q    To summarize, before HB1719 went into effect, judicial commissioners would mention ability to pay while entering bail orders during bail hearings.

Defense counsel would more often raise arguments regarding ability to pay.  And Pretrial Services would answer questions regarding ability to pay.  Is that correct?

A    Yes.

Q    Other than that, are there any other differences between how a bail hearing is conducted now as opposed to before HB1719 went into effect?

A    Not that I'm aware of, no.

Q    Do judicial commissioners fill out any forms at the bail hearing?

A    They fill out the bail review form.

Q    Is that the only form they fill out?

A    If it's a domestic violence, the order granting bail.

Q    What documents are in front of the judicial

Page 72

commissioner at the bail hearing?

A    At which time?

Q    At the bail hearing.

A    At the beginning of the bail hearing, there are none.  They will request if they -- they can request to see the full history, criminal history.

They can request to see the documents from the previous -- the initial bail screening that was done by the jail commissioner.

They can request the jacket from the clerk, which is seated there, which has the affidavits and other document -- other documents that I'm not aware of.  But they can also request that.

And that's the beginning of the hearing.  At -- throughout the process, at the end, they will receive the bail review form from the clerks.  And they will have that in the front of them to fill out.

And then if it's a domestic, we will give them the order granting bail to fill out and to sign.  And then there's a waiver if they decide.  Either consent or waiver forms are also available.

Q    And what happens to those documents after the bail hearing?

A    The keepers of the record, general sessions

Page 76

A    No.

Q    And what's the name of that document?

A    Bail review -- bail review order, not form.
I'm sorry.  Bail review order.  It is prepared
by -- it is given to the commissioner by general
sessions court clerk.

Q    I'd like to introduce as the next exhibit.
I've lost track of the numbers.  This is the Shelby
County Judicial Commissioner's Annual Report.

THE REPORTER:  I'm sorry, Mr. Quigley.
So you just introduced 6.  But I didn't get a
description of 6 before.

MR. QUIGLEY:  Okay.  So let's call this
6.

THE REPORTER:  Okay.

BY MR. QUIGLEY:

Q    This is the Shelby County Judicial
Commissioner's Annual Report.  Are you familiar with
this document?

A    I've seen it, yes.

Q    I'm going to scroll down.  This is a
description of the bail hearing room and bail
hearings.

And then in this last paragraph, it states

Page 77

that "These hearings are recorded and at their conclusion a bail hearing order is completed by the Judicial Commissioner with written findings of fact" -- are of the bail hearing order, or are they a separate document?

A    They're on the order, yes.

MR. QUIGLEY:  Before we move on, I'd just like to state for the record that we have not received copies of these completed bail hearing order forms or any other written finding of fact or recordings.

Plaintiffs have requested these several times and have recently filed a motion to compel these records, completed forms.  And so to summarize, the -- completes a bail packet.

THE REPORTER:  I'm sorry.  On your summary, you buffered out and froze through the whole thing.  When you said, "To summarize," it froze.

MR. QUIGLEY:  To summarize the process we've been discussing today -- then next --

THE REPORTER:  I'm sorry.  It froze again.

MR. QUIGLEY:  I'm not sure.  I'll give it one more try.  And then maybe we can have lunch and

Page 78

come back.

THE REPORTER:  Okay.

BY MR. QUIGLEY:

Q    Okay.  To summarize the process we discussed today, a person is booked into the jail.

Then Pretrial Services does an interview with that person.  Pretrial Services next completes a bail packet.  Then Pretrial Services has a phone call with a judicial commissioner.

After which time, the judicial commissioner completes the bail screening form.  After that form is complete, there is an arraignment.

And at the arraignment, counsel is appointed for those who need counsel.  And then after the arraignment, there is a bail hearing.

Is that a correct summary of the -- of how an arrested person moves through the Pretrial process in Shelby County?

A    Yes, that's the major points.  Yes.

MR. QUIGLEY:  I think I have half an hour maybe left on this witness.  I think a lunch here makes sense.  And then we can wrap up.  Does that work for everybody else?

MR. DURRENCE:  That works for me,

Page 79

provided it works for Ms. Greer.

THE WITNESS:  Yeah, that's fine.

MR. QUIGLEY:  Okay.  So why don't we take a, let's say, 45-minute lunch, come back at 2:40 -- 2:45 -- make it an even 2:45.

MR. DURRENCE:  You mean 1:45 Central Time?

MR. QUIGLEY:  Sorry.  Yes.  Thanks. Appreciate it.

MR. DURRENCE:  So 1:45 Central Time, we'll be back with Ms. Greer.  And then -- so that I've got the next person on deck, who would you like to go to next?

MR. QUIGLEY:  I think Marshall next would be great.

MR. DURRENCE:  Okay.  I'll have him standing by then.

MR. QUIGLEY:  Perfect.

THE REPORTER:  All right.  The time is now 1:04 p.m.  And we are off the record.

(Off the record.)

THE REPORTER:  The time is now 1:47 p.m.  And we are back on the record.

//

Page 80

BY MR. QUIGLEY:

Q    Good afternoon, Ms. Greer.  Just a handful of more questions.  And then we'll be all done.

I'm going -- but there are a couple questions on each step that I kind of would like to quickly touch up on.

The first is, how long after the interview with Pretrial Services -- how long after the interview between Pretrial Services and the arrested person does the phone call between Pretrial Services and the judicial commissioner happen?

A    That's hard to say.  But I'm going to say an estimate would be around five to six hours.

Q    Does the judicial officer have anything else in front of them when they make a decision other than the documents that are emailed to them from Pretrial Services?

A    Not to my knowledge.

Q    When we spoke about the entering of the calculator number that auto-populated on the bail screening form before HB1719, I think you said that the Pretrial Services person enters that information into the events tab.  Is that accurate?

A    [No audible response.]

Page 81

Q    Oh, I didn't hear you.

A    It is in the Odyssey Navigator system.
Correct.

Q    And is that still entered today after
HB1719?

A    Yes.

Q    Do the judicial commissioners -- but then it
doesn't auto-populate onto the form because there's
nowhere for it to auto-populate; is that right?

A    Correct.

Q    Does the -- and do the judicial
commissioners ever see that number in Odyssey?

A    No.  They don't have access to our side of
Odyssey.

Q    Are you aware of any costs to Shelby County
that resulted from the addition of the ability to pay
calculator?

A    Not to my knowledge, no.

Q    How long does it generally take the judicial
commissioners to fill out the bail screening form?

A    We would normally get it back within, say,
15 minutes to an hour.

Q    Is anyone else present with the judicial
commissioners when they make their decision?

Page 82

A    Not to my knowledge, no.

Q    And where are the judicial commissioners when they make that decision?

A    Sometimes on site in the judicial commissioner's office and sometimes remotely.

Q    And how long has Shelby County had judicial commissioners filling out these screening forms?

A    The initial screening form started with bail review court -- bail review hearing room in '23.

Q    So judicial commissioners were filling out these screening forms both before HB1719 and after HB1719?

A    Yes.

Q    Does the post-HB1719 bail form include a different section other than the section we discussed being removed to -- for the judicial officer to list a person's ability to pay?

A    Can you repeat that?

Q    Yes, will do.  Does the currently-used bail form include a section where the judicial commissioner can enter the arrested person's ability to pay?

A    No.

Q    Does it include a section where the judicial commissioner can enter the person's financial

Page 83

condition?

A    No.

Q    So let's move on to arraignment.  Can the judge make a change to bail at arraignment?

A    Yes.

Q    And what would that change be based on?

A    Any new information that they may receive in the courtroom.

Q    And what kind of information would that be?

A    It could vary.  At that point, they may have an attorney.

Q    Is Pretrial Services present at arraignments?

A    Not at all arraignments, no.

Q    Some arraignments?

A    Yes.

Q    Does ability to pay ever -- is ability to pay ever discussed at arraignments?

A    No.

Q    Is someone's financial condition ever discussed at arraignments?

A    No.  Other than employment status.

Q    Earlier you stated that judicial commissioners conducting the bail hearings can request

Page 87

A    Can you repeat that?

Q    The bail hearings we were discussing, those have occurred in Shelby County both before HB1719 went into effect and now after HB1719 went into effect?

A    Yes.

Q    The process that we spent most of the morning discussing, the general process from booking to the bail hearing, that's generally the same as it was before HB1719 even though the -- some different information considering along the way, like the general steps has been the same since before and after HB1719; is that correct?

A    [No audible response.]

Q    Have you discussed the --

THE REPORTER:  I'm sorry.  Can the witness repeat the answer for that question?

THE WITNESS:  Yes.

THE REPORTER:  Thank you.

BY MR. QUIGLEY:

Q    Have you discussed the ability to pay calculator over email since January 2023?

A    Yes.

Q    Have you discussed HB1719 over email since January 2023?

Page 88

A    I can't recall.

Q    Have you discussed the changes that had to take place because of HB1719 over email since January 2023?

A    Yes.

Q    And the email you're referring to, is that your work email address?

A    Can you repeat?

Q    What email address are you referring to when you say --

A    Yes.

Q    -- emails.

A    Yes.  Work -- my work address -- email address.

Q    Do you -- does Pretrial Services collect data on the number of people who are under Pretrial Services's supervision?

A    Yes.

Q    Does it collect data on bail amounts?

A    Yes.

Q    Does it collect data on the number of people detained on unaffordable bail?

            MR. DURRENCE:  Object to the form.

            You can answer, Ms. Greer.

Page 89

THE WITNESS:  We collect the bail amounts, yes.

BY MR. QUIGLEY:

Q    Do you collect any data related to whether those bail amounts are unaffordable for the people who were arrested based on their calculator score?

A    Yes.

MR. DURRENCE:  Object to the form.

THE WITNESS:  I'm sorry.

MR. DURRENCE:  You can go ahead and answer, Ms. Greer.

THE WITNESS:  Yes.

BY MR. QUIGLEY:

Q    And do you continue to collect that data to this day?

A    Yes.

Q    Do you collect data on the number of people who qualify for appointed counsel?

A    Can you repeat?

Q    Do you collect data on the number of people who qualify for appointed counsel?

A    No.

Q    So for the data that you do collect that we were just discussing, where is that data stored?

Page 90

A      In Pretrial's database, Odyssey.

Q      I'd like to show another exhibit.

MR. QUIGLEY:  What number are we on, Jay?

THE REPORTER:  This will be 7.

(Plaintiff Exhibit 7 was marked for identification.)

BY MR. QUIGLEY:

Q      I am nearing the end.  Ms. Greer, this is the last document.  Do you see this document?

A      Yes.

Q      This is a document titled Resolution of the Shelby County Board of Commissioners.  And it is dated August 9, 2022.  Do you recognize this document?

A      I -- no.  I'm not going to say I do.  I may have seen it, but --

Q      If you scroll down to this paragraph here, there's a discussion about --

A      Is there any way you can make it a little larger?

Q      Yeah.  Oh, that's too big.  Last paragraph reads "Reports containing the information defined below from the judicial commissioner's court, clerk of the court, and/or the Shelby County Pretrial officer's

Page 91

offices that deemed necessary to review the progress of the judicial commissioner program and are due every six months for the first two years after adoption of this resolution and annually thereafter."

And then there's different categories of data on this page.  I'll give you a moment to review.

A    What year was this signed?

Q    This was 2022.

A    '22.  Okay.

Q    So some of the categories are the total number of people arrested over reporting period, a breakdown of the outcomes of the initial screening, additional case information that can be summarized, race of the defendants, et cetera, release outcomes, information about subsequent bail hearings, the timing that individuals are receiving bail court hearings, the rates of Pretrial success/failure.  Is this data collected?

A    Some of it is, yes.

Q    Which is -- what data is not collected from this page?

A    I would actually have to have the document where I could review it.  I can't tell just from the screen.

Page 92

Q     I'll take this down.

Do you know if bail amounts have increased since HB17 was passed?

A     Some have, yes.

Q     Do you know the -- like, if the average or median bail amount has increased since HB1719?

A     No.

Q     By some have, what do you mean?

A     Some bails have increased.

Q     What do you -- what?  When you say some bails, what do you mean?

A     Generally speaking, there are not as many RORs as there were previously.  So the flip side would indicate that some bails are probably in -- higher than they were.

Q     Has anything changed since the passage of HB1719 other than the passage of HB1719 that would explain why there have been less RORs?

A     Could you repeat that?

Q     I will.  You just testified that more people have been detained on bail as opposed to being ROR since the passage of HB1719.  Is that correct?

A     Yes.  That's what it -- it appears to be. It seems like that, yes.

Page 93

Q    And is there -- has anything happened since the passage of HB1719 that would explain that change other than the passage of HB1719?

A    Okay.  No.  I missed the sentence.  No.

Q    Thank you.  And the information -- the data to show that would be stored in Odyssey; is that correct?

A    Odyssey and our Pretrial database.

Q    Has the number of people on supervised release increased since the passage of HB1719?

A    It fluctuates.  But overall it's -- it has not increased.

Q    Has it decreased?  Has there been any change?

A    It's stable.  Like I said, some months are higher; some months are lower.  But it's pretty stable.

Q    At the beginning of the deposition, you testified that you had some documents in front of you today while you take the deposition?

A    Yes.

Q    What documents do you have?

A    It looks like packets, some bail packets, the workflow, and some bail packets, an analysis by

Page 94

the University of Memphis, and the -- I guess this is the -- for Just City versus Floyd Bonner and Lee Wilson.

MR. QUIGLEY:  Jasen, will you produce those documents?

THE WITNESS:  Can you repeat?

MR. DURRENCE:  We certainly will.  And I'll go ahead and tell you it's all our discovery responses.  I just had it there.  They're in hard copy in case she needed to reference them.  But I'll send it again if y'all need me to.

BY MR. QUIGLEY:

Q    Did you take any notes on those documents?

A    Uh-uh.

Q    No notes?

MR. QUIGLEY:  I think we would like to have those documents produced regardless, Jasen.  Appreciate it.

BY MR. QUIGLEY:

Q    The other category of documents I think we would like produced based on the deposition is the -- we heard that there's a packet that goes to the judicial commissioners which is different from the bail packets which were produced.

Page 99

five minutes to switch Ms. Greer out and bring
Commissioner Marshall in.

THE REPORTER:  Okay.  Just before we go
off the record, Mr. Quigley, would you like to order
the transcript?

MR. QUIGLEY:  Yes.

THE REPORTER:  Mr. Durrence, would you
like to order a copy of the transcript?

MR. DURRENCE:  Yes, please.

THE REPORTER:  Is there anyone else who
needs to order a copy of the transcript?  Thank you.

The time is now 2:22 p.m.  And we are
off the record.

(Whereupon, at 2:22 p.m., the
proceeding was concluded.)


_____
LLANA GREER


Subscribed and sworn to before me

this ____ day of _____, 2025.


_____
Notary public

Page 100

CERTIFICATE OF DEPOSITION OFFICER

I, JAY FREDERICK, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JAY FREDERICK
Certified Reporter in and for the
    State of Tennessee

CERTIFICATE OF TRANSCRIBER

I, ANDREW TINGLEY-BARRAZA, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ANDREW TINGLEY-BARRAZA