# Exhibit 14:

# Expert Report of

# Ryan Carroll

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

**Just City, Inc., and class representatives**
**Deangelo Towns and**
**Marshawn Barnes,**
on behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

**Floyd Bonner Jr.,**
 **Shelby County Sheriff;**

Lee Wilson,
 **Presiding Shelby County General**
 **Sessions Criminal Court Judge; and**

John Marshall, Robert Barber, Rhonda Harris,
Kevin Reed, Christopher Ingram, Shayla Purifoy,
Ross Sampson, Serena Gray, Terita Hewlett,
Mischelle Best, Kenya Smith, Zayid Saleem,
Kathy Kirk Johnson, Leslie Mozingo,
 **Shelby County Judicial**
 **Commissioners,**

in their official capacities,

Case No. 2:24-cv-2540-TLP-tmp

Defendants.

## DECLARATION OF RYAN A. E. CARROLL

I, Ryan Carroll, hereby declare as follows:

1. I was retained as an expert by Plaintiffs in this matter.

2. A true and correct copy of my expert report in this case is attached as Exhibit A and incorporated by reference. I continue to hold the opinions expressed in my report and believe them to be true and accurate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge. Executed on the **6th** day of _____ **January** _____, 2026.

_____

Ryan A. E. Carroll

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

**Just City, Inc.**, and class representatives

**Deangelo Towns** and

**Marshawn Barnes,**

on behalf of themselves and all others similarly

situated

        Plaintiffs.

Case No. 2:24-cv-2540-TLP-tmp

v.

Floyd Bonner Jr.,

  **Shelby County Sheriff;**

Lee Wilson,

  **Presiding Shelby County General Sessions Criminal Court Judge**; and

John Marshall, Robert Barber, Rhonda Harris, Kevin Reed, Christopher Ingram, Shayla Purifoy, Ross Sampson, Serena Gray, Terita Hewlett, Mischelle Best, Kenya Smith, Zayid Saleem, Kathy Kirk Johnson, Leslie Mozingo,

  **Shelby County Judicial Commissioners**,

in their official capacities,

        Defendants.

## EXPERT REPORT OF RYAN A. E. CARROLL

Plaintiff's counsel retained me to provide expert testimony on HB 1719's impact on wealth-based detention rates and Just City's Bail Fund's ability to post bail for clients based on publicly available Shelby County data. This report summarizes my findings, which were as follows:

(1) Before HB 1719, wealth-based disparities in pretrial detention rates were significant. People who could afford bail were often able to buy their freedom and people who could not afford bail stayed in jail for longer periods of time. However, data post-dating the Standing Bail Order, which required judges to consider a defendant's ability to pay, showed a reduction of those disparities without any increase in rates of rearrest, broader recidivism, or failure to appear, as confirmed by an independent report[1] conducted by the University of Memphis's Center for Community Research and Evaluation (CCRE).

(2) After HB 1719, bail amounts increased and fewer defendants were able to afford release. Pretrial detention became longer overall, with the greatest increases in length of stay observed among indigent defendants. These changes occurred even though the average "risk level" of defendants (as indicated by current charge levels, history of failure to appear, and past convictions) declined.

As a result, (1) unnecessary detention increased: more people were held in jail for longer periods despite presenting less risk; and (2) wealth-based detention increased: indigent defendants were disproportionately impacted and experienced greater increases in time spent in detention.

(3) These changes in bail practices post HB 1719 impose new financial burdens on Just City's Bail Fund, reducing its ability to serve the same group of low-risk defendants detained pretrial as it could before HB 1719.

The data, excluding certain personal identifying information (PII), is available at this link. A secure link to the data containing PII and/or a PDF of all data is available upon request.

I am being compensated at the rate of $250 per hour for my substantive work. This compensation is not contingent on the conclusions I reach in this report or the outcome of the above-captioned action.

I reserve the right to amend this report as more information comes to my attention.

---

[1] Center for Community Research and Evaluation (CCRE). 2025. *Analysis of the Pretrial Detention System in Shelby County, Tennessee: 2025 Report.* University of Memphis, School of Urban Affairs and Public Policy. Available at: https://www.memphis.edu/ccre/pretrial_ccre_commission_20250326.pdf

2

**Table of Contents**

I.  Background...........................................................................................................................1

II.  Focus of this Report.........................................................................................................3

III.  Data and Methodology....................................................................................................3

IV.  Findings..............................................................................................................................6

A.  Before HB 1719, wealth-based disparities in pretrial release were significant. However, data post-dating the Standing Bail Order, which required judges to consider a defendant's ability to pay, showed a reduction of those disparities without any increase in rates of rearrest, broader recidivism, or failure to appear.......................................................7

A.1  Lengths of pretrial detention vary widely even at the same bail amount....................7

A.2  Time to Attain Pretrial Release Is Stratified by Poverty Indicators............................8

Table 1. Low-level, non-zero bail amounts have disparate impacts on indigent defendants...............................................................................................................8

A.3  The impacts of the Standing Bail Order demonstrated how considering the ability to pay does not compromise "public safety" but can potentially mitigate wealth-based disparities................................................................................................................8

Table 2. Pretrial Outcomes for Indigent Defendants Before and After the SBO...........9

Table 3. Wealth-Based Disparities Before and After the SBO....................................10

A.4  Implications for HB 1719 Impact Analysis..............................................................10

B.  After HB 1719, overall bail amounts, detention rates, and lengths of stay increased significantly despite defendants' lower average risk profiles. These increases disproportionately impacted length of stay for indigent defendants.......................................10

B.1 Risk profiles of defendants in the Post-HB 1719 period were slightly lower than in the Pre-HB 1719 period...........................................................................................11

Table 4. Comparison of Defendant Risk and Demographic Indicators Before and After HB 1719..........................................................................................................11

B.2  Bail amounts increased overall for all offense levels and risk levels despite defendants' lower average risk profiles post HB 1719................................................12

B.2.1 Ordinary Least Squares Regression: Bail Amount.....................................12

B.2.2. Logistic Regression: Probability of ROR................................................13

B.3 Increased bail amounts post-HB 1719 corresponded with decreases in affordability and increases in pretrial detention length of stay. This means that fewer defendants could afford bail post HB 1719 and more defendants remained in pretrial detention despite demonstrating lower average risk profiles.................................................................13

B.3.1 Logistic Regression: Declines in Affordable Bail......................................13

B.3.2 Ordinary Least Squares Regression: LOS.................................................14

B.4  Defendants with fewer financial resources were disproportionately impacted and experienced longer lengths of stay in pretrial detention, even after controlling for risk levels......................................................................................................................14

B.4.1 Regression Analysis: Persistent and Growing Disparities.........................15

C. Post-HB 1719 changes to bail practices impose new financial burdens on Just City's Bail Fund, reducing its ability to serve the same group of low-risk defendants detained pretrial as it could before HB 1719.................................................................................................................15

    Table 5. Balance Tests for Qualified Bookings.........................................................17

    Table 6. ROR Rates for Qualified Defendants...........................................................18

    Table 7. Average Bail Amounts for Qualified and Eligible Defendants.....................20

    Table 8. Shifts in Mission-Scoped Population...........................................................21

C.1 Declines in non-monetary release have created a new pool of clients who need the Bail Fund's services to obtain release....................................................................................22

    Table 9. New Financial Burden from HB 1719's Decline in Pretrial Release.............22

C.2 Some Low-Risk Defendants Remain Eligible but Now Require More Financial Support.............................................................................................................................23

    Table 10. Increase in Financial Burden for Eligible Bookings After HB 1719...........24

C.3 Some Defendants Who Would Have Been Eligible Before HB 1719 Are Now Excluded From Bail Fund Assistance Due to Higher Bail.................................................25

    Table 11. Estimate of Bookings Pushed Out of Eligible Bail Range..........................25

C.4 Net Effect: The increased use of monetary bail and the increase in bail amounts have led to increased client demand and an increased financial burden on the Bail Fund........26

V. Conclusions....................................................................................................................27

VI. Appendix.......................................................................................................................28

A. Data Sources & Collection.............................................................................................28

    Table A1. Shelby County Criminal Justice System Portal ("Odyssey").....................28

    Table A2. Limitations & Mitigation Strategies of the Odyssey Data..........................29

    Table A3. Shelby County Inmate Lookup ("Jail Roster")..........................................31

    Table A4. Limitations & Mitigation Strategies of the Jail Roster Data......................32

B. Datasets.........................................................................................................................34

B.1 Case-Level Data.........................................................................................................34

    Table B1. Comparing Risk Profiles between Study Periods for Case-Level Data......34

B.2 Booking-Level Dataset...............................................................................................35

    Table B2. Comparing Risk Profiles between Study Periods for Booking-Level Data 36

C. Descriptive Tables.........................................................................................................37

C.1 Pre-HB 1719...............................................................................................................37

    Table C1. LOS Distribution for Fixed Bail Amounts...............................................37

C.2 Disaggregated Comparisons of Pre/Post Outcomes....................................................38

    C.2.1 Bail Amounts & ROR Rates................................................................................38

        Table C2. Bail Amount Distribution vs Violent Offense...............................38

        Table C3. Bail Amount Distribution vs Offense Level..................................38

        Table C4. Bail Amount Distribution vs Offense..........................................39

4

C.2.2  Length of Stay (LOS)..........................................................................40
    Table C5.  LOS Distribution & ROR rate vs Offense Level............................41
    Table C6.  LOS Distribution & ROR rate vs Violent Offense........................42
    Table C7. LOS Distribution & ROR rate vs Offense....................................42
C.2.3  Wealth-Based Disparities.....................................................................43
    Table C8. Descriptive Evidence of Post-HB 1719 Disparities.......................43
C.3 Impacts to Just City's Bail Fund..................................................................45
    Table C9. Qualified Bookings for Just City's Bail Fund...............................45
    Table C10. Balance Tests for Qualified Bookings.........................................45
    Table C11. ROR Rates for Qualified Defendants...........................................46
    Table C12. Average Bail Amounts for Bookings that are Qualified/Eligible for Just City's Bail Fund.........................................................................................47
D.  Regressions.................................................................................................47
D.1  Model Selection, Validation, & Interpretation.....................................47
D.2  Data Preparation.................................................................................48
D.3  Booking Regression Data: To ensure analytic validity and reduce bias from missing or extreme values, the following data cleaning steps were performed on the regression dataset:........................................................................................49
D.4  Case Regression Data: To ensure analytic validity and reduce bias from missing or extreme values, the following data cleaning steps were performed on the regression dataset:........................................................................................50
    Table D1. Regression Results - Bail Amount.................................................50
    Table D2. Model Fit and Summary Statistics................................................51
    Table D3. Regression Results - ROR.............................................................53
    Table D4. Model Fit and Summary Statistics................................................54
    Table D5. Regression Results - Affordable Bail............................................55
    Table D6. Model Fit and Summary Statistics................................................57
    Table D7.  Regression Results - LOS.............................................................58
    Table D8. Model Fit and Summary Statistics................................................59
    Table D9. Regression Results - LOS with Interaction...................................61
    Table D10. Model Fit and Summary Statistics..............................................62

CERTIFICATE OF SERVICE.............................................................................64

## I.    Background

1.    My primary occupation is serving as Chief Technology Officer (CTO) for Paradigm Case Management, a technology startup building a modern case management system for prosecutors. Our platform is designed to streamline prosecutorial workflows, support decision-making, and enhance public safety through better data infrastructure and analytics. I lead the design and implementation of systems that structure and analyze large volumes of criminal legal data across jurisdictions. This work demands both technical fluency and domain expertise to ensure that data is interpreted accurately, policy impacts are measurable, and system-wide patterns are rigorously understood.

2.    I am a Co-Founder of Data-Driven Justice LLC, a consultancy formed in partnership with Dan Bernstein in 2024. Since 2021, Dan and I have collaborated on projects to expand access to and effective use of public and proprietary data for policy evaluation and program design. Our work has included developing data infrastructure, analytic tools, and statistical analysis across domains such as housing, public health, criminal justice, and municipal governance, supporting a range of nonprofit and government clients, including the U.S. Department of Health and Human Services' Administration for Community Living. Dan Bernstein contributed to the initial exploration and organization of the analysis presented in this report.

3.    From 2018 to 2019 and again from 2022 to 2025, I served as a Data Scientist at Just City, one of the plaintiffs in this case. In my initial tenure, I managed the operations of Just City's Bail Fund, gaining firsthand experience with the practical challenges of securing pretrial release for indigent defendants. During the interim between roles, I built automated data pipelines to systematically collect and integrate publicly available criminal justice data to develop the foundational dataset used in this report. Upon rejoining Just City, my focus shifted toward applying that data to analyze policy impacts and institutional practices.

4.    While at Just City, I supported Shelby County in improving data quality and validation processes. Shelby County has passed county resolutions seeking more transparency for pretrial practices. I had several meetings with Pretrial Services staff and IT staff to offer suggestions on how to improve Shelby County's data collection and storage practices to meet Shelby County's goals for transparency.

5.    I also collaborated with the University of Memphis's Center for Community Research and Evaluation (CCRE), an independent research institution, throughout its evaluation of the Standing Bail Order's impact on pretrial outcomes. After implementing the Standing Bail Order, Shelby County requested Arnold Ventures funding for an independent evaluation of pretrial outcomes. I helped with securing and administering the Arnold

1

Ventures funding, and I met with CCRE researchers and Shelby County staff to discuss the available data, quality issues within that data, and validated analysis techniques.

6. Through my experiences working with CCRE and Shelby County and systematically collecting and structuring Shelby County's publicly available data, I have developed deep technical knowledge of the structure, limitations, and nuances of Shelby County's pretrial data.

7. From late 2020 to early 2022, I served as a consultant Data Scientist for the World Bank's Data and Evidence for Justice Reform (DE JURE) program, where I led the design and implementation of data-driven applications within the criminal justice sector. While working in this capacity, I built machine learning pipelines to triage and accelerate investigations into human trafficking and labor exploitation for foreign national prosecutorial offices. I also developed scalable data infrastructures for justice-sector randomized controlled trials in Latin America, Asia, and Africa. My work also included the design and deployment of adaptive experimental tools to evaluate prosecutorial and court-based interventions, employing advanced methods in causal inference, counterfactual modeling, and applied machine learning. During this time, I assisted in developing New York University's advanced graduate course Topics in Machine Learning, which covered cutting edge techniques at the intersection of causal inference and machine learning.

8. From 2018 to late 2020, I led strategic evaluation initiatives at the Formanek Foundation, a mid-sized philanthropic family foundation focused on poverty reduction in Shelby County. My work included designing and overseeing program evaluations across education, health, arts, economic development, and criminal justice. I developed data-driven systems to measure impact, supported NGOs in upgrading their data infrastructure, and worked with grantees to identify objectives, address operational challenges, and implement rigorous outcome measurement. During the COVID-19 crisis, I guided the foundation's rapid and targeted resource deployment, managed cross-sector partnerships, and ensured an evidence-based approach to all philanthropic activities. Since 2021, I have served on the board of directors, joining the executive committee in April 2025, where I continue to promote data-driven decision-making and accountability.

9. From 2015 to 2018, I led instruction and administration of adult education in Shelby County's correctional facilities, first independently and later as the corrections program lead with HopeWorks, a 501(c)(3) workforce development organization. In this role, I taught High School Equivalency classes, managed and trained instructional staff across all jail facilities, and oversaw the collection and reporting of educational attainment data. This work gave me a grounded understanding of conditions inside the jail.

10. My experience working in Shelby County's correctional facilities and collaborating with

both Shelby County and CCRE, has deepened my commitment to empirically grounded, methodologically rigorous analysis. This report is built on transparent, reproducible methods and is guided by a commitment to fairness, integrity, and public accountability.

11.    I received my Master of Science in Mathematics from the University of California, Santa Cruz and my Bachelor of Science in Mathematics from Rhodes College.

12.    A copy of my curriculum vitae, summarizing my professional experience and education, is attached as Exhibit A.

13.    I have not previously testified as an expert at trial or by deposition.

## II.    Focus of this Report

14.    Plaintiffs' counsel asked me to analyze the impacts that the Tennessee House Bill 1719[2] (HB 1719) has had on wealth-based detention rates and Just City's Bail Fund's ability to post bail for clients. HB 1719 was enacted in 2024 and altered pretrial bail procedures by prohibiting judges from considering a defendant's ability to pay when setting bail.

15.    Just City, a nonprofit that operates a community bail fund in Shelby County, along with individual plaintiffs, challenges the constitutionality of HB 1719. The lawsuit alleges that HB 1719 violates due process and imposes discriminatory wealth-based detention.

16.    In this report, I provide an empirical analysis to evaluate the impact of HB 1719 on bail amounts, detention rates, and Just City's Bail Fund operations in Shelby County. I use publicly available Shelby County data to examine system-level changes in bail setting practices and pretrial detention outcomes before and after HB 1719. By rigorously measuring outcomes over time for defendants with differing socioeconomic circumstances, my analysis seeks to identify whether HB 1719 has, in practice, exacerbated pre-existing wealth-based disparities in pretrial detention rates.

17.    To ensure that observed changes are not the result of shifts in the underlying risk profile of defendants, I conduct balance tests comparing key pre- and post-HB 1719 covariates such as past convictions, history of failure to appear, and current charge levels. In addition, my regression analyses control for these and other observable factors to further isolate the effect of the policy change on monetary amounts and detention outcomes. Together, these methods provide a robust basis for attributing observed differences to HB 1719 rather than to changes in the defendant population over time.

## III.    Data and Methodology

18.    As a basis for my analysis, I used multiple data sources, preprocessing steps, analytic

---

[2] Enacted in 2024, HB 1719 is a Tennessee law that amended the bail statute by prohibiting judicial discretion to consider a defendant's ability to pay when setting bail, thereby reversing prior law and Shelby County practice.

cohorts, and statistical models to assess the impact of HB 1719 on bail practices in Shelby County. A data dictionary is attached as Exhibit B.

19. *Study Period Definition*: To evaluate the impact of HB 1719, this analysis compares a pre-policy period (May 1, 2023 to January 31, 2024) with a post-policy period (May 1, 2024 to January 31, 2025). These periods were selected to provide matched, three-quarter observation windows in each year, allowing for fair before-and-after comparisons that account for both seasonality and the data available as of the report's completion.

20. *Data Sources*: I used the following primary data sources in this analysis.

   a. **The Shelby County Criminal Justice System Portal ("Odyssey"):** This website was used to create a dataset of case-level data, including defendants' charges, demographics such as address, attorney history, and bail orders. More information on how to access the data source and how I collected the data can be found in **Appendix A Table A.1**. I list the data limitations and how I mitigated those limitations in **Appendix A Table A.2**.

   I use case-level data to examine the initial bail-setting in each case, providing a closer look at judicial decision-making. Each case can have multiple charges, dispositions, bail orders, and other events.

   b. **The Shelby County Inmate Lookup:** I used this website to create a dataset of jail bookings. This data includes pretrial lengths of stay, associated charges, and demographics. More information on how to access the data source and how I collected the data can be found in **Appendix A Table A.3**. I list the data limitations and how I mitigated those limitations in **Appendix A Table A.4**.

   I use booking-level data to analyze cumulative bail exposure and key detention outcomes, such as whether a person was able to afford bail and how long a person remained detained pretrial. Because a single booking can encompass multiple charges and cases, this unit of analysis allows me to capture the full financial threshold a person would need to meet to secure release.

   c. **U.S. Census ZCTA Poverty Data:** I used this to assign a poverty percentile based on the defendant's ZIP code at booking. I only assigned a poverty percentile to defendants with zip codes in Shelby County. Defendants with zip codes outside Shelby County remained in the data set; however, they just did not receive a poverty percentile.

21. *Estimating Economic Hardship*: To assess the impact of HB 1719 on economically disadvantaged populations, this analysis employs multiple proxies for economic hardship. While direct, individual-level financial information is not available from the existing

data, reliable indicators of economic status can be constructed from case information and census data.

    a. First, the type of defense counsel assigned to a defendant serves as a primary proxy for indigency; defendants represented by court-appointed counsel, such as public defenders or court-appointed private attorneys, are assumed to be indigent because they are unable to afford to retain private counsel. Assuming indigency status based on whether counsel is appointed or retained is a widely accepted approach in criminal justice research. Throughout this report, I refer to defendants who were appointed counsel as "indigent," and defendants who retained private counsel as "non-indigent."

    b. Second, each defendant's most recent residential ZIP code is matched to ZIP Code Tabulation Area (ZCTA) poverty rates from the U.S. Census, allowing assignment of a relative poverty percentile. This geographic indicator complements the attorney type proxy by reflecting broader neighborhood-level barriers to financial stability, which are closely linked to limited access to financial resources.

22. *Outcomes*: My analysis focuses on several primary outcomes, each operationalized using standardized definitions to ensure consistency and comparability across pre- and post-policy periods:

    a. **Initial Bail Amount** refers to the monetary value of the initial bail setting in a case or booking.[3] This measure captures the baseline financial hurdle facing defendants at the earliest stage of court involvement.

    b. **Release on Recognizance (ROR)** refers to defendants who were released on their own recognizance after the initial bail setting, rather than being assigned monetary bail. This outcome is an indicator of Shelby County's reliance on financial conditions for determining pretrial release.

    c. **Length of Stay (LOS)** refers to the total number of days an individual remains in pretrial detention from booking until release. In all analyses, I impose a uniform 90 day cap on the LOS.[4] This measure captures the practical consequences of bail

---

[3] One booking can include multiple cases, so I define a booking's "initial bail amount" as the sum of the initial bail amounts on all active cases associated with the booking to get an aggregate bail amount. This "initial bail amount" value is "null" for bookings and cases where any bail setting reflects a "No Bond Set"/"Not Assessed" status on the Jail Roster or Odyssey and for cases where a person is released on citation (ROC) without being booked into the jail.

[4] Capping (or "right-censoring") LOS at 90 days is necessary to ensure valid comparisons between pre and post policy cohorts. Without censoring, LOS calculations are structurally biased toward the pre-policy period because of differences in the maximum possible detention time. For example, a person booked in May 2023 (pre policy) and continuously detained could accumulate nearly two years of LOS (730 days) by May 2025, whereas the longest possible LOS for anyone booked in the post policy period (for instance, someone booked on May 1, 2024 and remaining in jail until the data cutoff date, April 30, 2025) is 365 days. By

setting and release practices for defendants, serving as a direct indicator of exposure to the harms of pretrial incarceration.

d. **Affordable bail** refers to a composite outcome that identifies defendants who were able to secure release, either through recognizance (ROR) or by posting monetary bail, within three days[5] of booking. This measure captures the intersection between bail amounts and the actual ability to achieve prompt pretrial release. While increased bail amounts might not always translate into longer jail stays if they remain affordable, this metric directly tests whether changes in bail practices had a meaningful effect on timely release for defendants.

## IV.    Findings

23. My analysis on the impacts of HB 1719 include the following primary findings:

a. Before HB 1719, wealth-based disparities in pretrial detention rates were significant. However, data post-dating the Standing Bail Order, which required judges to consider a defendant's ability to pay, showed a reduction of those disparities without any increase in rates of rearrest, broader recidivism, or failure to appear.

b. After HB 1719, bail amounts increased and fewer defendants were able to afford release. Pretrial detention became longer overall, with the greatest increases in length of stay observed among indigent defendants. These changes occurred even though the average "risk level" of defendants (as indicated by charge level, history of failure to appear, and past convictions) declined. As a result, (1) unnecessary detention increased: more people were held in jail for longer periods despite presenting less risk; and (2) wealth-based detention increased: indigent defendants were disproportionately impacted and experienced greater increases in time spent in detention.

c. These changes in bail practices post HB 1719 impose new financial burdens on Just City's Bail Fund, reducing its ability to serve the same population of low-risk defendants detained pretrial as it could before HB 1719.

---

imposing a uniform 90 day cap, which corresponds to the approximate maximum follow up window available for post policy bookings, the analysis avoids overstating average detention times in the pre policy group and ensures fair, seasonally matched comparisons across cohorts. This approach aligns with standard practice in pretrial detention research and mitigates the impact of outliers or unresolved cases that extend far beyond the period of observation.

[5] The three day threshold reflects widely adopted practice in pretrial detention research, which identifies the initial days following booking as critical for avoiding lasting harm related to employment, housing, and family disruption. The majority of pretrial releases occur within this period, and even brief detention can have significant long term consequences. See Dobbie, W., Goldin, J., and Yang, C. S. (2018). "The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges." American Economic Review, 108(2), 201–240.

**A.**    **Before HB 1719, wealth-based disparities in pretrial release were significant. However, data post-dating the Standing Bail Order, which required judges to consider a defendant's ability to pay, showed a reduction of those disparities without any increase in rates of rearrest, broader recidivism, or failure to appear.**

24.    I began by analyzing the bail system in Shelby County prior to the enactment of HB 1719 in order to establish a baseline. My analysis showed that prior to the enactment of HB 1719, the bail system in Shelby County already exhibited significant disparities based on economic status. Even though judges could use their discretion to consider a defendant's ability to pay bail, in practice, many low-income individuals remained in jail solely due to inability to afford even modest bail amounts.

**A.1**    **Lengths of pretrial detention vary widely even at the same bail amount.**

25.    In Tennessee, as in most jurisdictions, bail amounts are set to reflect the court's assessment of risk[6] that a defendant will fail to appear for court or reoffend if released. Bail amounts are therefore used as a proxy for risk. When two individuals with similar charges and criminal histories are assigned the same bail amount, it indicates that the court considers them to have similar risk profiles.

26.    **Appendix Table C1, LOS Distribution for Fixed Bail Amounts**, presents the distribution of length of stay in percentiles at different initial bail amounts. The data show that individuals who have access to sufficient financial resources are generally able to post bail and secure release quickly, often the same day, regardless of the bail amount. This is reflected in the mode and lower percentiles for length of stay, which are consistently at or near one day across all bail levels.

27.    In contrast, individuals who do not have access to sufficient financial resources may remain incarcerated for longer periods, even when bail amounts are relatively low. The mean and upper percentiles for length of stay increase as bail amounts rise, but prolonged detention is observed even at the lowest bail levels. For example, among those assigned bail of $150, the mean length of stay is four days, but one person in our study period remained in the Shelby County jail for 35 days because he did not have access to $150 to

---

[6] In this report, the term "risk" refers collectively to the risk of failure to appear for court, the risk of new criminal activity prior to trial, and, where relevant, broader concerns about public safety or recidivism. The phrase "risk profile" refers to the set of observed characteristics used to assess these risks, including but not limited to charge type, criminal history, and failure to appear indicators. Unless otherwise specified, any reference to "risk" or "risk profile" should be interpreted as encompassing these components as they are considered in monetary and nonmonetary release decisions.

7

pay his bail. Higher bail amounts are associated with significantly longer average pretrial detention periods.

28.    These patterns suggest that, even when controlling for assigned risk via bail amount, access to financial resources remains a primary determinant of pretrial detention length. Full details by bail amount are provided in **Appendix Table C1**, **LOS Distribution for Fixed Bail Amounts**.

**A.2    Time to Attain Pretrial Release Is Stratified by Poverty Indicators**

29.    The time a defendant spends in jail before posting bail is closely tied to economic resources. Table 1 shows that among single-case bookings[7] with indigent defendants assigned cash bail, only 53% were able to post monetary bail of $5,000 or less within 3 days. Indigent defendants remained in jail for an average of 6 days before release. In contrast, 96% of non-indigent defendants were able to post bail, typically within just 1.7 days. This gap underscores that even when bail amounts are relatively low, pretrial detention is primarily determined by a defendant's timely access to financial resources, not the offense itself or assigned risk via bail amount.

| Table 1. Low-level, non-zero bail amounts have disparate impacts on indigent defendants. | | | |
|---|---|---|---|
| **Status** | **Affordable Bail (%)** | **Average LOS (days)** | **Sample Size (Bookings)** |
| Indigent | 57% | 6.3 | 1981 |
| Non-Indigent | 96% | 1.7 | 1123 |

**A.3    The impacts of the Standing Bail Order demonstrated how considering the ability to pay does not compromise "public safety" but can potentially mitigate wealth-based disparities.**

30.    A central argument made in support of HB 1719 was that eliminating consideration of a defendant's ability to pay would promote public safety. In light of this, I assessed whether data post-dating the Standing Bail Order (SBO), which required consideration of ability

---

[7] To ensure that estimates of length of stay and affordability are not artificially inflated by cases involving multiple simultaneous charges or reoffenses, I restrict the dataset to bookings associated with a single criminal event or case group. This approach eliminates many confounding factors, such as bail or probation violations, and provides a more dependable and conservative estimate of typical outcomes. Including multi-case bookings tends to exaggerate disparities and introduce additional variance, so limiting the analysis in this way strengthens the robustness of the findings. This reasoning applies to all instances of this restriction throughout the report.

to pay and implemented other pretrial processes designed to promote fairness, showed increases in failure to appear (FTA) or new offenses while on release.

31. The evidence regarding the impacts of the SBO, as analyzed in the independent 2025 CCRE report,[8] suggests otherwise:

   a. **Failure to Appear (FTA) rates:** The CCRE found that FTA rates declined substantially beginning in 2022, which coincided with the implementation of the SBO. The report found no statistically significant increases in FTA rates associated with bail reform, even when using long-term observation windows of 120, 300, or 500 days.

   b. **Rearrest and recidivism:** The rate of rearrest and recidivism during the pretrial period did not increase after the SBO was implemented. Using rigorous regression discontinuity and time trend analyses, CCRE found no evidence that the SBO resulted in an increase in new criminal activity or violations while on release.

   c. **Post-HB 1719 Effects:** When HB 1719 prohibited judges from considering a defendant's ability to pay in May 2024, CCRE found no immediate impact on FTA or rearrest rates following its enactment. However, it did identify a statistically significant drop in ROR rates after HB 1719, which corresponds with a modest increase in time spent in custody.

32. The following table builds upon the results of Table 1, which highlighted differences in outcomes for defendants who were assigned a monetary amount rather than granted release. By comparing affordability, rate of non-monetary release, and average length of stay (LOS) outcomes for indigent defendants before and after the SBO,[9] Table 2 illustrates how discretionary release practices that allow judges to consider ability to pay can help close the gap between indigent and non-indigent defendants.

**Table 2. Pretrial Outcomes for Indigent Defendants Before and After the SBO**

| Status | SBO | Affordable Bail (%) | ROR Rate (%) | Average LOS (days) | Sample Size (Bookings) |
|---|---|---|---|---|---|
| Indigent | pre | 53% | 25% | 15.3 | 6285 |
| Indigent | post | 56% | 33% | 11.8 | 6579 |

---

[8] Center for Community Research and Evaluation (CCRE). 2025. *Analysis of the Pretrial Detention System in Shelby County, Tennessee: 2025 Report*. University of Memphis, School of Urban Affairs and Public Policy. Available at: https://www.memphis.edu/ccre/pretrial_ccre_commission_20250326.pdf

[9] Utilizing the same base dataset, definitions, and data cleaning as the HB 1719 booking dataset, I compare 12,647 pre-SBO bookings (entry dates between February 16, 2022 and November 2, 2022) with 11,247 post-SBO bookings (entry dates between February 16, 2023 and November 2, 2023).

| Non-Indigent | pre | 92% | 33% | 3.11 | 5357 |
| Non-Indigent | post | 92% | 39% | 2.7 | 3691 |

33.    While the disparities remained large, Table 3 shows that implementation of the SBO narrowed the gaps between indigent and non-indigent clients across all three indicators, signaling some potential of reducing pretrial wealth disparities.

**Table 3. Wealth-Based Disparities Before and After the SBO**

| Indicator | Disparity Pre-SBO | Disparity Post-SBO |
| --- | --- | --- |
| Affordable Rate | 38% | 36% |
| ROR Rate | 8% | 6% |
| Average LOS (days) | -12.22 | -9.16 |

34.    Although indigent defendants continued to face lower rates of affordable bail and ROR, along with longer pretrial detention compared to their more resourced counterparts, the differences between these groups declined following the SBO. Specifically, the disparity in the ability to afford bail narrowed from 38 to 36 percentage points. The gap in ROR rates decreased from 8 to 6 percentage points, and the difference in average length of stay in jail was reduced by more than three days.

35.    These results indicate that the SBO's explicit requirement that judges consider ability to pay was associated with a reduction in wealth-based disparities in both bail affordability and pretrial detention, without negatively impacting rates of ROR. In other words, the SBO promoted greater equity in pretrial outcomes without leading to increases in failure to appear rates or new offenses while on release.

**A.4    Implications for HB 1719 Impact Analysis**

36.    Analyzing pre-HB 1719 trends is important to establish the existing disparities in length of stay (LOS) and bail affordability, providing a baseline for evaluating the effects of HB 1719. In the next section, I demonstrate how HB 1719's elimination of judicial discretion has amplified these preexisting disparities.

**B.    After HB 1719, overall bail amounts, detention rates, and lengths of stay increased significantly despite defendants' lower average risk profiles. These increases disproportionately impacted length of stay for indigent defendants.**

37.    Using post-HB 1719 data, I evaluate how the policy has altered bail-setting practices in

10

Shelby County, focusing first on how bail amounts have shifted in both direction and magnitude.

38.    My analysis uses regression models and descriptive statistics to isolate changes in bail levels before and after HB 1719, holding constant key factors like offense type, criminal history, and attorney representation.

**B.1    Risk profiles of defendants in the Post-HB 1719 period were slightly lower than in the Pre-HB 1719 period.**

39.    Before exploring the shifts in bail practices (which may be explainable by shifts in risk), I utilize t-tests to detect statistical differences[10] in the distributions of key risk and demographic variables across the pre- and post-policy periods, shown in the following table. Descriptions of each column are provided in the data dictionary in Exhibit B.

**Table 4. Comparison of Defendant Risk and Demographic Indicators Before and After HB 1719**

| Variable | Pre Mean | Post Mean | t-statistic | p-value |
|---|---|---|---|---|
| *Past Bookings* | 2.942 | 2.883 | 0.864 | 0.388 |
| *Past Violent Convictions* | 0.181 | 0.178 | 0.311 | 0.756 |
| *Past Nonviolent Convictions* | 3.154 | 2.831 | 3.111 | 0.002* |
| *Past Total Convictions* | 3.335 | 3.009 | 3.066 | 0.002* |
| *Weighted FTA* | 0.090 | 0.087 | 0.497 | 0.619 |
| *Raw FTA Count* | 0.422 | 0.428 | -0.366 | 0.715 |
| *Max Offense Level* | 3.170 | 3.053 | 5.143 | 0.000* |
| *Poverty Rate* | 26.777 | 26.979 | -1.190 | 0.234 |
| *Indigent* | 0.549 | 0.568 | -2.799 | 0.005* |
| *Violent* | 0.162 | 0.149 | 2.517 | 0.012* |
| *Past Misdemeanor Convictions Total* | 2.442 | 2.169 | 3.020 | 0.003* |
| *Past Felony Convictions Total* | 0.894 | 0.840 | 1.696 | 0.090 |

*$p < 0.05$[11]

---

[10] Variables marked with a star (*) in the table indicate a statistically significant difference between the pre- and post-periods. To interpret the direction of the change, compare the "Pre Mean" and "Post Mean" columns to see whether the value increased or decreased following the policy change. A starred row signifies that the observed difference is unlikely to have occurred by random chance.

[11] In this report, a *p* value indicates the probability that an observed difference between groups is due to random

40. Violent charges and measures of criminal history, including past nonviolent convictions, total convictions, and maximum offense level,[12] decreased significantly in the post-policy period, indicating a shift toward a lower-risk defendant profile. Simultaneously, the increase in indigency status from 0.549 to 0.568 was statistically significant, suggesting that the average defendant was more likely to hold the status of indigent post-policy compared to pre-policy. Therefore, the post-policy period was characterized by a combination of decreased risk and increased indigence among defendants, which should be correlated with lower bail amounts if decisions were driven by risk alone.

**B.2    Bail amounts increased overall for all offense levels and risk levels despite defendants' lower average risk profiles post HB 1719.**

*B.2.1 Ordinary Least Squares Regression: Bail Amount*

41. To evaluate how bail-setting practices changed following the implementation of HB 1719, I estimated a linear regression using the natural logarithm of the initial bail amount as the dependent variable. This transformation is standard in bail research, as it reduces the influence of extreme values and accommodates the skew introduced by zero-dollar bail amounts, such as release on recognizance. Full regression model specifications and results can be found in **Appendix Tables D1, Regression Results - Bail Amounts** and **Appendix Table D2, Model Fit and Summary Statistics.**

42. The key finding from this model is that cases processed after the implementation of HB 1719 were associated with significantly higher bail amounts. As shown in **Appendix Table D1, Regression Results - Bail Amounts**, the estimated coefficient for the post-policy period is 0.73, which, when exponentiated, implies that bail amounts were approximately 110 percent higher, on average, than in comparable cases filed before the law went into effect.

43. This estimate is not derived in isolation. The model controls for a comprehensive set of statutory and risk-related factors, including the seriousness of the charged offense, whether the charge was violent, prior convictions (both violent and nonviolent), and prior failures to appear. Demographic variables such as race, sex, and age at filing are also included. These covariates account for the most salient features that typically influence judicial bail decisions.

44. The statistically significant increase in bail amounts after adjusting for demographic and risk variables is notable. It suggests that the shift in bail amounts cannot be explained by

---

chance rather than a real effect. In this context, the reader can look at the table for "Indigent" and check the "p-value" column to determine significance. Lower $p$ values (commonly below 0.05) provide stronger evidence that the difference is statistically significant and unlikely to have occurred by chance.

[12] For a case or booking, the "max offense level", or simply "offense level" is defined to be the highest level (e.g. Misdemeanor C, Felony B, etc…) of a charge associated to that case or booking respectively. See Exhibit B for more information on the methodology of how these variables are defined.

a change in the underlying risk profile of defendants entering the system. In other words, cases did not become more serious, more violent, or have more flight-prone defendants during the post-policy period in a way that would account for this difference.

*B.2.2. Logistic Regression: Probability of ROR*

45. To better understand how non-monetary release practices may relate to the observed increase in initial bail amounts, I estimated a logistic regression predicting whether a defendant was granted release on recognizance as the initial bail decision. The model includes the same set of covariates as the previous analysis (e.g. offense severity, whether the charge involved violence, prior convictions, failure-to-appear history, age, sex, and race) allowing for a comparison of pre- and post-policy patterns while controlling for relevant statutory, demographic, and risk factors.

46. The results, presented in **Appendix Table D3, Regression Results - ROR**, indicate that following the implementation of HB 1719, the odds of ROR decreased significantly. The coefficient for the post-policy period is negative and statistically significant, indicating that the odds of ROR release were reduced by approximately 34% after the policy took effect,[13] even when accounting for the seriousness of the charge and the defendant's risk profile.

**B.3     Increased bail amounts post-HB 1719 corresponded with decreases in affordability and increases in pretrial detention length of stay. This means that fewer defendants could afford bail post HB 1719 and more defendants remained in pretrial detention despite demonstrating lower average risk profiles.**

47. The rise in bail amounts after HB 1719 is associated with clear and measurable shifts in pretrial detention patterns. This section assesses whether the increased bail led to reduced access to affordable release and longer jail stays for defendants unable to pay.

*B.3.1 Logistic Regression: Declines in Affordable Bail*

48. To assess the changes in the ability of defendants to afford bail after HB 1719, I modeled the likelihood of a defendant posting bail or obtaining non-monetary release within 72 hours of arrest, a period shown in prior research to be vital for preserving employment, housing, and family stability (Dobbie et al., 2018). The results of the regression can be found in **Appendix Table D5, Regression Results - Affordable Bail**.

49. After HB 1719 took effect, the odds of posting bail within the 72-hour window decreased by approximately 13%, even after adjusting for charge levels, past convictions,

---

[13] In the logistic regression, the coefficient for the post-policy period ($\beta$) was –0.135 with a p-value less than 0.001, indicating strong statistical significance. The odds ratio was computed as exp(-0.135) $\approx$ 0.874, meaning the odds of release on recognizance decreased by approximately 34% after the policy's implementation.

13

failure-to-appear history, and representation.[14] This effect is both statistically and practically significant, indicating that fewer defendants were able to afford bail post-HB 1719 across all charge levels and past conviction histories.

50. Indigent defendants were substantially more likely to remain in jail past 72 hours compared to non-indigent defendants, with their odds of release approximately 90% lower,[15] even after controlling for charge severity, criminal history, and other relevant factors. This disparity underscores the significant barriers faced by low-income defendants in securing timely release.

*B.3.2 Ordinary Least Squares Regression: LOS*

51. Since pretrial detention is influenced by many factors, I isolated the impact of HB 1719 by modeling the length of stay (LOS) in custody using a log-linear regression, capped at 90 days. The model controls for initial bail amount, charge level, whether the offense was violent, age, race, sex, criminal history, and failure to appear risk. This allows a more accurate estimate of whether time spent in jail changed after the policy, controlling for differences in risk and charge levels. The results of the regression can be found in **Appendix Table D7, Regression Results - LOS**.

52. After HB 1719 took effect, the length of stay in custody increased significantly, resulting in an approximate 7.4 percent increase[16] in average detention time, adjusting for risk and charge type. This effect is meaningful, particularly in a system where most people are held for days or weeks, not months.

53. My regression analyses also showed that even after controlling for risk and charge levels, fewer defendants could afford bail after HB 1719 and more defendants experienced longer lengths of stay in detention despite demonstrating lower average risk profiles. This shows that more defendants experience unnecessary detention after HB 1719.

**B.4    Defendants with fewer financial resources were disproportionately impacted and experienced longer lengths of stay in pretrial detention, even after controlling for risk levels.**

54. As shown in my analysis above on the pre-HB 1719 outcomes, the bail system already produced disparate outcomes based on wealth. These disparities were revealed by wide

---

[14] In the logistic regression model, the coefficient for the post-policy period ($\beta$) was –0.393 with a p-value < 0.001, indicating strong statistical significance. The odds ratio is calculated as $\exp(-0.393) \approx 0.675$, meaning the odds of posting bail within 72 hours decreased by approximately 32.5% after the policy's implementation $(1 - 0.675 = 0.325)$.

[15] In the logistic regression model, the coefficient for indigent status ($\beta$) was –2.294 with a p-value < 0.001, indicating strong statistical significance. The odds ratio is calculated as $\exp(-2.294) \approx 0.101$, confirming the approximately 90% lower odds of release for indigent defendants.

[16] In the log-linear regression model, the strongly significant coefficient for the post-policy period was 0.071 with a p-value less than 0.001 where the percent increase is computed by $(\exp(0.071)-1) \times 100 \approx 7.4\%$

14

variations in lengths of detention even at the same bail amount, showing that those with access to money were able to secure release quickly while those without access remained in jail. Reforms like the SBO had begun to narrow some of these gaps, demonstrating that when financial barriers are removed, outcomes begin to equalize. However, post-HB 1719 data indicate that disparities in pretrial detention have increased since its implementation.

*B.4.1 Regression Analysis: Persistent and Growing Disparities*

55.  To examine whether pretrial detention disparities changed following HB 1719, I estimated a linear regression model predicting the natural log of length of stay (LOS), capped at 90 days. The model includes 23,980 observations and adjusts for bail amount, charge severity, prior convictions, failure to appear history, and demographics. **Appendix Table D9, Regression Results - LOS with Interaction**

56.  The results show a substantial difference in detention length based on economic status. Following the implementation of HB 1719, the overall length of stay in custody increased significantly for all defendants by about 10.6%, adjusting for risk and charge type. This disparity widened further after HB 1719, with indigent defendants experiencing an *additional* 5.7% increase[17] in average length of stay compared to non-indigent defendants.

57.  My regression analysis confirms that indigent defendants were disproportionately impacted by the increased bail amounts post HB 1719 and faced even longer detention periods across all offense types and risk levels, underscoring the unequal burden of the policy change on low-income defendants.

C.   **Post-HB 1719 changes to bail practices impose new financial burdens on Just City's Bail Fund, reducing its ability to serve the same group of low-risk defendants detained pretrial as it could before HB 1719.**

58.  The preceding analysis establishes that HB 1719 has led to higher bail amounts, reduced affordability of pretrial release, and longer periods of detention for those unable to pay. These shifts in pretrial practices impact Just City's Bail Fund's ability to serve clients.

59.  Just City's Bail Fund (the "Bail Fund") continues to operate under consistent eligibility rules, providing assistance only to individuals who have (1) bail amounts at or below $5,000, (2) no domestic violence-related charges, and (3) representation by a public defender. These eligibility criteria have not changed across the periods studied.

---

[17] In the log-linear regression, the statistically significant coefficient for the interaction term (HB 1719 and indigent status) was 0.055 (p = 0.005). The percent change was computed as $(\exp(0.055)-1)\times100\approx5.7\%$.

60. To accurately assess the operational and financial impact of HB 1719 on Just City's bail fund, I organize the defendant population into three nested groups: *qualified*, *mission-scoped*, and *eligible*. Each of these groups serves a distinct purpose in the analysis, reflecting a different aspect of Just City's potential exposure and mission:

   a. The *"qualified" population* consists of defendants who meet the core criteria for Bail Fund assistance. Specifically, these are individuals represented by a public defender and not charged with a domestic violence offense. Restricting the analysis to this group helps to avoid sample bias, as both attorney type and offense category are associated with systematic differences in bail amounts and pretrial release practices. By focusing on the qualified group, I provide a more accurate and consistent estimate of the average costs the Bail Fund would actually face if it served all clients who meet these baseline criteria.

   b. Within the qualified group, the *"mission-scoped" subpopulation* is defined as those assigned an amount at or below $5,000, including $0 non-monetary releases, and serves to estimate the full market of low risk individuals Just City aims to serve in alignment with its mission. This threshold has historically reflected both the organization's risk tolerance and financial capacity. However, as documented in this report, after HB 1719, individuals with similar or even lower risk levels are now receiving higher bail amounts on average. As a result, the group of defendants with bails at or below the $5,000 cutoff no longer include the entire scope of defendants with the same low risk profile as before. Therefore, we define this group in order to provide clear language for quantifying these shifts and estimating the change in burden and client composition faced by the Bail Fund.

   c. Within the mission-scoped group, *"eligible" defendants* are those who are assigned a nonzero monetary bail amount. This population is important because it captures the cases that generate direct financial liability for the bail fund, representing individuals for whom Just City may need to provide payment to secure release. By focusing on eligible defendants, the analysis provides a practical estimate of the fund's potential financial liability under current policy.

61. To understand the operational impact of HB 1719 on the Bail Fund, it is essential to assess how changes in release practices, bail amounts, and number of eligible defendants have altered both the size and composition of the population the Bail Fund is able to serve. By focusing on the mission-scoped population, the analysis isolates three main channels through which HB 1719 has affected the fund's capacity to support the same group of low risk, low income defendants:

   a. First, the systematic reduction in release rates after HB 1719 has created a new

16

      group of defendants who would have been released on their own recognizance before HB 1719 but now must post bail to obtain release, making them newly reliant on the Bail Fund for assistance despite no change in their average underlying risk.

b.  Second, for the group of defendants who would have been eligible for assistance before HB 1719 and remain eligible after HB 1719, the assigned bail amounts are now higher than before. This means that even for the same risk profiles relative to earlier periods, the cost to secure pretrial release has increased, raising the fund's financial liability and reducing its capacity to serve as many clients as in the past.

c.  There are more qualified defendants with bail amounts that exceed the $5,000 cap after HB 1719 than before. Those defendants are no longer mission-scoped or eligible and are therefore excluded from the Bail Fund's services after HB 1719.

62.    By separately quantifying the financial and operational impact of each of these channels, the following sections provide a conservative assessment of how HB 1719 has impacted the Bail Fund's ability to serve clients. The actual impact could be greater.

63.    For estimating the change in burden on Just City's bail fund, I restrict the analysis to the subset of *qualified* bookings. This approach provides a conservative and policy-relevant estimate of how HB 1719 has affected Just City's ability to serve qualified defendants. Results are further disaggregated by charge level to clarify trends across the full range of eligible cases.

*There were no changes in the risk profiles of qualified defendants between the pre and post HB 1719 periods.*

64.    Before analyzing trends in release practices and monetary amounts, I first examined whether the risk profile of qualified defendants changed between the pre and post HB 1719 periods. As shown in Table 5, there is no evidence that the group of defendants qualifying for Just City's bail fund after HB 1719 exhibited higher risk than those served before the policy change.

### Table 5. Balance Tests for Qualified Bookings

| Variable | Pre Mean | Post Mean | t-statistic | p-value |
|---|---|---|---|---|
| *Past Bookings* | 4.55 | 4.27 | 2.34 | 0.02 |
| *Past Violent Convictions* | 0.25 | 0.24 | 0.77 | 0.44 |
| *Past Nonviolent Convictions* | 5.07 | 4.36 | 3.70 | 0.00 |

17

| Table 5. Balance Tests for Qualified Bookings | | | |
|---|---|---|---|
| *Past Total Convictions* | 5.32 | 4.60 | 3.69 | 0.00 |
| *Weighted FTA* | 0.22 | 0.21 | 1.12 | 0.26 |
| *Raw FTA Count* | 0.78 | 0.78 | 0.03 | 0.98 |
| *Max Offense Level* | 3.55 | 3.46 | 2.56 | 0.01 |
| *Poverty Rate* | 27.75 | 27.88 | -0.59 | 0.56 |
| *Violent* | 0.22 | 0.22 | -0.25 | 0.80 |

65.    In fact, several risk indicators declined in the post-policy period: the average number of past bookings, past nonviolent convictions, total convictions, and charge level all decreased significantly. Other key indicators, such as failure to appear risk and indigent status, showed no meaningful difference across periods. No risk metric increased after the policy change; if anything, the post HB 1719 group appears modestly lower risk on several dimensions. Thus, the observed increases in monetary amounts and pretrial detention following HB 1719 cannot be attributed to a higher risk defendant pool. This pattern is consistent with the interpretation that any increased burden on Just City is attributable to the effects of HB 1719, rather than changes in the underlying case mix. A table with more granular balance tests for past conviction history across offense levels is available in **Appendix Table B1, Comparing Risk Profiles Between Study Periods for Case-Level Data.**

*There were declines in release rates of mission-scoped defendants post HB 1719.*

66.    Across all charge levels, the proportion of qualified defendants who were released on their own recognizance (ROR) declined substantially following the implementation of HB 1719. As detailed in Table 6, the ROR rate decreased for every category of charge level, from Misdemeanor C through Felony A, when comparing the pre and post HB 1719 periods.

| Table 6. ROR Rates for Qualified Defendants | | | |
|---|---|---|---|
| | **Pre-HB 1719** | **Post-HB 1719** | |
| **Severity** | **ROR Rate** | **ROR Rate** | **Difference** |
| *Misdemeanor C* | 0.494 | 0.354 | -0.14 |

18

| Table 6. ROR Rates for Qualified Defendants | | | |
|---|---|---|---|
| *Misdemeanor B* | 0.538 | 0.376 | -0.16 |
| *Misdemeanor A* | 0.464 | 0.348 | -0.12 |
| *Felony E* | 0.358 | 0.248 | -0.11 |
| *Felony D* | 0.278 | 0.191 | -0.09 |
| *Felony C* | 0.179 | 0.110 | -0.07 |
| *Felony B* | 0.075 | 0.034 | -0.04 |
| *Felony A* | 0.074 | 0.058 | -0.02 |

67.  As seen in the "Difference" column, declines in ROR rate occurred across all other charge levels, with reductions ranging from two to sixteen percentage points. This consistent downward trend demonstrates that after HB 1719, more individuals who previously would have been released without financial conditions were instead required to post monetary bail.

68.  Because eligibility criteria and charge profiles remained constant across periods, these declines represent a structural shift in pretrial release practices, not a response to changes in client risk. The uniform decrease across all charge categories supports the assumption used in our burden estimates that any defendant released on ROR after HB 1719 would also have been eligible for ROR before the policy change. More concretely, the "Difference" represents the proportion of qualified bookings at each offense level that are eligible for Just City's Bail Fund. In the next subsection, I estimate the financial cost of this newly eligible subset of the population.

*After HB 1719, there was an increase in average bail amounts for qualified and eligible defendants.*

69.  To estimate per booking costs, I present average bail amounts for each charge category using two approaches in Table 7:

   a.  The *overall* average, which includes all bookings regardless of eligibility or release type.

   b.  The *eligible* average, which includes only cases with bail amounts between $1 and $5,000, representing the population that Just City could actually serve.

19

| Table 7. Average Bail Amounts for Qualified and Eligible Defendants | | | | |
|---|---|---|---|---|
| | **Pre-HB 1719** | | **Post-HB 1719** | |
| **Offense Level** | **Overall** | **Eligible** | **Overall** | **Eligible** |
| *Misdemeanor C* | $606 | $1,051 | $807 | $1,213 |
| *Misdemeanor B* | $906 | $1,656 | $991 | $1,441 |
| *Misdemeanor A* | $1,644 | $1,848 | $2,268 | $2,119 |
| *Felony E* | $6,694 | $2,325 | $8,595 | $3,088 |
| *Felony D* | $12,438 | $2,935 | $13,531 | $3,367 |
| *Felony C* | $25,564 | $3,397 | $28,558 | $3,893 |
| *Felony B* | $86,128 | $3,140 | $83,835 | $3,238 |
| *Felony A* | $121,776 | $3,219 | $104,636 | $3,176 |

70.    **Table 7, Average Bail Amounts for Qualified and Eligible Defendants** presents average bail amounts by charge category for the pre- and post-HB 1719 periods, reporting both the overall average and the eligible average, which is limited to cases with bail between one and five thousand dollars. Across nearly all charge levels, both the overall and eligible average bail amounts increased after HB 1719. The rise in the eligible average is particularly important for Just City, since it directly determines the fund's per-client costs. For example, the eligible average bail for Misdemeanor C charges increased from $1,051 before the policy to $1,213 after, with similar increases in most other categories.

71.    Misdemeanor B charges are an exception. For this category, the average eligible bail amount decreased after HB 1719, while the overall average increased. This reflects a change in how cases are handled. In the pre-policy period, many defendants with Misdemeanor B charges received release on recognizance with a bail of zero. Following HB 1719, more defendants with Misdemeanor B charges are assigned low monetary bails rather than being released without financial conditions. The inclusion of these new, lower bail amounts in the eligible average reduces the mean, even as the overall average, driven by higher bail amounts, increases.

72.    It is important to note that for Felony A and Felony B categories, the number of overall

and eligible cases is much smaller than for lower-level charges. As a result, average values for these groups are less precise and more sensitive to individual case variation than the higher-volume categories.

*The proportion of qualified defendants who are mission-scoped shrinks post HB 1719.*

73. The proportion of qualified defendants who are mission-scoped, meaning those with bail amounts at or below $5,000, decreased across most charge levels after HB 1719.

**Table 8. Shifts in Mission-Scoped Population**

| Offense Level | Pre-HB 1719 | Post-HB 1719 | Change |
|---|---|---|---|
| Misdemeanor C | 1.000 | 1.000 | 0.000 |
| Misdemeanor B | 1.000 | 1.000 | 0.000 |
| Misdemeanor A | 0.923 | 0.884 | -0.038 |
| Felony E | 0.699 | 0.617 | -0.082 |
| Felony D | 0.540 | 0.465 | -0.075 |
| Felony C | 0.297 | 0.216 | -0.081 |
| Felony B | 0.108 | 0.108 | 0.000 |
| Felony A | 0.163 | 0.096 | -0.067 |

74. After HB 1719, more qualified defendants received bail amounts that exceeded the Bail Fund's $5,000 cap, thereby rendering them ineligible for the Bail Fund. The "Change" column denotes the share of defendants who have been pushed over this threshold and are now excluded from Bail Fund support, even though their risk profile has decreased on average. As a result, more individuals who would have previously been eligible are left without community support and face a greater likelihood of remaining in pretrial detention. The decline in the mission-scoped share means that, under the current eligibility criteria, the Bail Fund cannot continue to assist the same population of low risk defendants it served prior to HB 1719. As explained by Table 5, Balance Tests for Qualified Bookings, there were no changes in the risk profiles of qualified defendants between the pre and post HB 1719 periods.

**C.1    Declines in non-monetary release have created a new pool of clients who need the Bail Fund's services to obtain release.**

75.    After the implementation of HB 1719, the share of defendants released on their own recognizance or by citation declined substantially across all charge levels. Individuals who would have previously secured release without financial conditions are now being assigned monetary bail, often with bail amounts below the Bail Fund's $5,000 cap. This shift has created a new pool of low-risk clients who now potentially require support from the Bail Fund to obtain release.

76.    To estimate the size and financial impact of this new demand, as shown in Table 9, I compared release on recognizance rates before and after HB 1719 for each charge level. This analysis relies on the assumption of monotonicity, which means that any defendant released on recognizance after the policy change would also have been released under the previous system. Since there were no increases in risk profiles across periods, the observed decrease in release rates can be attributed directly to the effects of the policy change.

| Table 9. New Financial Burden from HB 1719's Decline in Pretrial Release | | | | | | |
|---|---|---|---|---|---|---|
| Charge Level | Post-HB 1719 Bookings | Change in ROR Rate | Newly Eligible Bookings | Pre HB1719 Burden ($) | Post HB1719 Avg. Eligible Bail ($) | New Financial Burden ($) |
| Misdemeanor C | 302 | 0.14 | 42 | $0.00 | $1,213 | $51,187 |
| Misdemeanor B | 109 | 0.16 | 18 | $0.00 | $1441 | $25,375 |
| Misdemeanor A | 1487 | 0.12 | 174 | $0.00 | $2,119 | $367,675 |
| Felony E | 960 | 0.11 | 106 | $0.00 | $3,088 | $326,707 |
| Felony D | 587 | 0.09 | 51 | $0.00 | $3,367 | $171,342 |
| Felony C | 1433 | 0.07 | 98 | $0.00 | $3,893 | $381,568 |
| Felony B | 268 | 0.04 | 11 | $0.00 | $3,238 | $36,204 |
| Felony A | 208 | 0.02 | 3 | $0.00 | $3,176 | $10,566 |
| Total | | | 503 | | — | $1,370,624 |

77. The data show that after HB 1719, Just City faces significant new client demand. The "Change in ROR %" column, carried over from the previous subsection and calculated in Table 6, represents the percentage of defendants who previously would have been released without financial support from Just City but now require the Bail Fund's assistance. For this reason, the "Pre Burden ($)" column is zero for all charge levels. To illustrate how the table's estimates are calculated, I walk through the computation for newly eligible defendants whose most serious charge is Misdemeanor A.

78. For example, among defendants whose most serious charge is Misdemeanor A, the rate of release on recognizance dropped by about 12 percentage points after HB 1719, from 46.4 percent to 34.8 percent, as shown in Table 6. With 1,487 such bookings, this means approximately 174 additional cases now require the Bail Fund's assistance. Using the average eligible amount for Misdemeanor A in the post-policy period ($2,119), this subgroup alone represents an estimated new liability of $367,675. Before HB 1719, these same cases required no support from Just City, as they were released without financial conditions.

79. Repeating this calculation for each charge level and summing the results gives a total estimated new financial burden of $1,370,624 associated with 503 additional defendants who would previously have been released without monetary conditions but now rely on the Bail Fund.

80. As explained above, there were no changes in the observed risk profiles of qualified defendants between the pre and post HB 1719 periods. Therefore, these increases in burden reflect structural changes in pretrial release practices, not changes in the underlying risk of the defendant pool. The result is a substantial increase in the number of low risk individuals who now need the Bail Fund's services to secure release due to the policy change.

**C.2    Some Low-Risk Defendants Remain Eligible but Now Require More Financial Support.**

81. After HB 1719, defendants who remain eligible for Just City's assistance are now assigned higher bail amounts across most charge levels than those eligible pre HB 1719. That means that for similar types of low-risk cases, courts set higher bail amounts post HB 1719 than they did pre HB 1719.

82. To measure this impact, I compare the average eligible amount for all qualified defendants with amounts at or below $5,000 before and after the policy change in Table

10. The difference in averages for each charge level represents the additional burden per eligible booking. By multiplying this value by the number of eligible bookings after HB 1719, I estimated the total additional financial burden for each group.

**Table 10. Increase in Financial Burden for Eligible Bookings After HB 1719**

| Charge Level | Eligible Bookings (Post-HB 1719) | Average Increase in Eligible Bail Amount ($) | Total Additional Burden |
|---|---|---|---|
| *Misdemeanor C* | 151 | **$162** | **$24,464** |
| *Misdemeanor B* | 46 | **-$215** | **-$9,907** |
| *Misdemeanor A* | 462 | **$271** | **$125,026** |
| *Felony E* | 209 | **$762** | **$159,342** |
| *Felony D* | 100 | **$431** | **$43114** |
| *Felony C* | 103 | **$496** | **$51093** |
| *Felony B* | 6 | **$98** | **$589** |
| *Felony A* | 8 | **-$42** | **-$338** |
| **Total** | **1,085** | | **$393,383** |

83. The data show that, after HB 1719, the average bail amounts for eligible clients increased by several hundred dollars in most categories,[18] resulting in substantial aggregate cost increases. For example, for bookings which the max offense is Misdemeanor A, the average bail amount increased by $271 per case, leading to an additional burden

---

[18] Misdemeanor B is an exception, where the average eligible amount decreased after the policy change. This is likely due to the distribution shift described in Paragraph 71 indicated by an increase in overall mean bail amount but decrease in average bail amount for eligible bookings. For Felony A, the small decrease in means is likely due to low sample size in both the pre- and post-HB 1719 periods. To ensure a conservative estimate, I reduce the total burden by these amounts for both charge levels.

exceeding $125,000. The total additional cost to serve all eligible bookings in the post-HB 1719 period is estimated at approximately $393,000.

84. This analysis provides a conservative estimate, focusing only on the population that remains within the Bail Fund's reach and excluding those with bail amounts above the cap. As explained earlier in this section, there were no changes in the risk profiles of qualified defendants between the pre and post HB 1719 periods. The observed rise in bail amounts for most groups is best explained by changes in bail-setting practices following HB 1719.

85. In practical terms, each eligible defendant now requires more funds to secure release, placing additional pressure on Just City's resources and increasing the risk of longer detention for some qualifying individuals. The Bail Fund would have to spend an additional $393,000 to serve similarly low-risk eligible individuals post HB 1719 than it would pre HB 1719.

**C.3    Some Defendants Who Would Have Been Eligible Before HB 1719 Are Now Excluded From Bail Fund Assistance Due to Higher Bail.**

86. The post-HB 1719 increase in bail amounts means that a substantial share of qualified defendants (those represented by a public defender and not charged with domestic violence) are now assigned bail amounts exceeding Just City's $5,000 cap. As explained earlier in this section, there were no changes in the risk profiles of qualified defendants between the pre and post HB 1719 periods. Therefore, the exclusion of these qualified defendants from Bail Fund eligibility is a direct consequence of the policy-driven upward shift in bail, not a change in underlying risk or eligibility.

87. If the Bail Fund were to maintain its prior level of service to this population, it would be forced to raise its cap substantially. It is possible to estimate the new cap; however, even with a raised cap, the Bail Fund likely would not have the funds to absorb this additional burden. Accordingly, the more complex estimation methodology is not warranted.

88. Instead, in Table 11, I present the estimated number of post-HB 1719 bookings which would have previously qualified for bail assistance and are now excluded solely because their bail exceeds $5,000.

| Table 11. Estimate of Bookings Pushed Out of Eligible Bail Range |
| --- |

25

| Table 11. Estimate of Bookings Pushed Out of Eligible Bail Range | | | |
|---|---|---|---|
| **Charge Level** | **Post Bookings (Actual)** | **Difference in Mission-Scoped %** | **Bookings No Longer Mission-Scoped in Post Period** |
| *Misdemeanor C* | 302.00 | 0.000 | 0 |
| *Misdemeanor B* | 109.00 | 0.000 | 0 |
| *Misdemeanor A* | 1487.00 | -0.038 | 57 |
| *Felony E* | 960.00 | -0.082 | 79 |
| *Felony D* | 587.00 | -0.075 | 44 |
| *Felony C* | 1433.00 | -0.081 | 116 |
| *Felony B* | 268.00 | 0.000 | 0 |
| *Felony A* | 208.00 | -0.067 | 14 |
| **Total** | | | **310** |

89. In the post-HB 1719 period, an estimated 310 bookings involve qualified defendants who are now excluded from Bail Fund eligibility due to higher bail alone. As explained earlier in this section, there were no changes in the risk profiles of qualified defendants between the pre and post HB 1719 periods. Therefore, these are similarly low-risk, low-income individuals who would have previously been eligible for the Bail Fund. The human impact of this shift is clear: each of these cases represents a person who remains incarcerated—not due to a change in their actions or risk, but because policy has erected a higher barrier to release.

**C.4 Net Effect: The increased use of monetary bail and the increase in bail amounts have led to increased client demand and an increased financial burden on the Bail Fund.**

90. Taken together, these findings demonstrate that HB 1719 has substantially increased the financial and operational burdens on Just City's Bail Fund. The law has driven up bail amounts, reduced the likelihood of non-monetary release, and narrowed the pool of defendants Just City can serve, even when the risk and characteristics of those defendants remain unchanged.

91. A new group of clients who would previously have obtained release pre HB 1719 now

require Just City's services to obtain release. For those who remain eligible, the average per-case cost to secure pretrial release has risen by ten to thirty percent. At the same time, an increased number of low-risk defendants are now excluded entirely from eligibility for the Bail Fund, not because of higher risk or more severe charges, but solely due to higher bail amounts resulting from HB 1719.

92.    These changes make it more difficult for Just City to fulfill its mission to address wealth-based detention in Shelby County. The Bail Fund faces increased client demand and an increased financial burden to serve the same group of low-risk defendants as it could before HB 1719.

## V.    Conclusions

93.    The analysis in this report demonstrates that HB 1719 has fundamentally reshaped pretrial release practices in Shelby County, increasing disparities in wealth-based detention. After HB 1719 took effect, bail amounts increased across most charge categories, and far fewer individuals were released without monetary conditions. Pretrial release has become less affordable, and the length of time spent in jail before trial has increased, especially for those unable to pay.

94.    Importantly, these findings are not explained by changes in risk, offense severity, or defendant profile. This conclusion is supported by analyses of the overall population, by focused analysis on the subset of defendants served by Just City, and by regression models that control for these factors. More individuals now remain in jail prior to trial based not on risk, but on their inability to pay, underscoring the extent to which HB 1719 has increased unnecessary pretrial detention.

95.    HB 1719 has narrowed the population that Just City's Bail Fund can serve because increased bail amounts and decreased release rates lead to more client demand. In order to serve the same group of low-risk defendants detained pretrial as it could before HB 1719, the Bail Fund would need close to an additional $2 million ($1,370,624 + $393,000), without even counting the funds necessary to serve those who are no longer eligible for the Bail Fund.

Date: May 30, 2025

Ryan A. E. Carroll

27

**VI.    Appendix**

**A.    Data Sources & Collection**

| Table A1. Shelby County Criminal Justice System Portal ("Odyssey") | |
|---|---|
| **Title** | Shelby County Criminal Justice System Portal |
| **URL** | https://cjs.shelbycountytn.gov/CJS/ |
| **Owner** | Shelby County IT |
| **Vendor/Product** | Tyler Technologies, *Odyssey Portal™* |
| **Classification** | All information is accessible with an account, and registration for an account is open to anyone. |
| **Validation Artifacts** | All data from this source can be corroborated/supported with the raw, unaltered HTML case profiles. These versioned artifacts are time stamped and dated to allow a complete history of every time a case's data was collected. |

In Odyssey, the following data are collected for each case upon availability

- *Metadata*: unique identifier ("case number"), type, status, judge, and courtroom
- *Defendant,* including name, DOB, demographics, address
- *Attorney* history including attorney name and role on case
- *Charges* including offense dates, statutes, level (e.g. Felony A, Misdemeanor C, City Ordinance, etc)
- *Bail Orders*/*Posting of Bail*, including data entry comments, bail amounts, bond company information, and corresponding dates
- *Charge dispositions* and *sentences*
- *Events*, including attorney appointments, bail reviews and resettings, arraignment, appearance dates, mental evaluations, bookings, and corresponding dates
- *Documents*, such as affidavits and other documents posted to the case profile stored and linked in the form of PNG scans.

**Collection:** Data can be queried through the Odyssey portal using two interfaces:

28

- **"Smart Search"**: All non-expunged cases are available through searching for
  - A single case by its unique Shelby County-assigned "case number"
  - A defendant's criminal history by their name and date of birth
- **"Search Hearings"**: All dockets of (non-expunged) cases are available for all dates on and after November 4, 2016. These can be queried by Judicial Officer or Courtroom.

Allows search by courtroom + date: returns a list of all cases that have an event associated with that courtroom on that date.

Each morning, the Odyssey portal is systematically queried and the response data is collected for the dataset used in this report.

- Search the docketed cases in each court room for (1) that day and (2) the previous day.
- For each new person in the dataset, search that person's name and date of birth and collect their non-expunged Shelby County criminal history.
- For each case in the database that does not already have Odyssey data collected, search Odyssey by the case number.
- All active cases that have not been seen within the past month are searched for dispositions and updates that occurred outside of a formal, recorded hearing.

**Limitations:** The following are general limitations of the data along with how each is addressed.

**Table A2. Limitations & Mitigation Strategies of the Odyssey Data**

| Name | Description | Mitigation |
|---|---|---|
| *Quality* | Some data is missing from cases or out of date due to entry error or oversight. | For missing attorney information, the primary issue in this dataset, I use Case Events in Odyssey, a consistent secondary indicator, to infer whether attorney was appointed |
| *Expungement* | Some cases may be removed from the portal upon conclusion of the expungement process, removing them from a query response of Odyssey moving forward. | Not an issue in our dataset because of the daily querying and data collection |

29

**Table A2. Limitations & Mitigation Strategies of the Odyssey Data**

| | | |
|---|---|---|
| *Overwriting* | The Shelby County employees which update the underlying data will often overwrite case events and bail information as opposed to creating new entries. Concretely, this means that on some cases, an initial bail amount can be obscured upon a new bail setting after a rebooking associated with the same case. | Not an issue in our dataset because of the daily querying and data collection. Even if a clerk overwrites a bail amount or a case event, the original will remain in my dataset |
| *Response Limits* | Any query response can only return 100 cases, so if your query is too generic or there is too many cases associated to a specific query (e.g. high docket volume courtroom with over 100 cases seen in a single day) then the query is truncated to the first 100 cases in the response. | All cases which appear on booking are later searched, so no gaps during this time period on criminal cases, except for release on citation which are not considered (due to the result of policing practice and not judicial) |
| *Implicit Case Linkages* | If a defendant is indicted on charges initiated in General Sessions court, a new case entry is created in Indicted General Sessions (aka the "H case") and subsequently in Criminal Court (aka the "C case") without noted linkages in Odyssey. | Cases in a "case group" are reliably joined in the dataset by looking at the defendant, the offense date of the associated charges, the case number/file date. Because I focus on the General Session starting case of the case group, this has little to no impact on the analysis in this report. |
| *Duplicates* | Due to poor internal database structure, there are many instances where the same person has multiple entries in Odyssey. Concretely, this means that searching for a person's full name and DOB can return | When searching for the history of each person with the defendant's full name and date of birth, entries returned are combined in my dataset |

30

**Table A2. Limitations & Mitigation Strategies of the Odyssey Data**

| | |
|---|---|
| multiple results. | |

**Table A3. Shelby County Inmate Lookup ("Jail Roster")**

| | |
|---|---|
| **URL** | https://imljail.shelbycountytn.gov/IML |
| **Owner** | Shelby County |
| **Vendor/Product** | Digital Solutions, Inc, *Inmate Lookup* |
| **Classification** | All information is public and available without login. |
| **Validation Artifacts** | All data from this source can be corroborated/supported with the raw, unaltered HTML booking profiles downloaded from this data source at the time of collection. These versioned artifacts are time stamped and dated to allow a complete history of every time a booking's data was collected and updated. |

**Data**: Booking-level data including but not limited to:

- *Metadata*: unique identifier ("case number"), commitment date, release date
- *Defendant* name, DOB, demographics, address, aliases
- *Associated cases:*
  - *Charges* including offense dates, statutes, severity (e.g. Felony A, Misdemeanor C, City Ordinance, etc…)
  - *Bail* Settings/*Posts*, including notes, dates, amounts, bond company information
- Current location inside of jail
- Detainers (holds on booking)
- Next court date

**Collection**: Roster of current and recent (released in last 3 days) bookings in the CJC (adult men) or Jail East (women and juveniles awaiting bindover)

To find specific people/bookings, the roster can be searched using a defendant's name, DOB, Shelby County assigned "Booking Number", "Permanent Number", or "State ID".

31

A complete roster, including people who have been released in the past 3 days, can be returned by leaving all search parameters blank and checking the "Include released inmates" box.

Data collection began June 13, 2019 and has occurred daily since that date, including weekends and holidays. A small percentage of days were missed due to website outages and collection issues, but there are no outages within the policy study periods.

**Limitations**:  The following are general limitations of the data along with how each is addressed.

| Table A4. Limitations & Mitigation Strategies of the Jail Roster Data | | |
|---|---|---|
| **Name** | **Description** | **Mitigation** |
| *Ephemerality* | A booking only appears on the website if they are actively in jail or were released within the last three days. If a booking is not seen while active or recently released, data from the roster will not be collected. | Data is collected every day and remains for 3 days after release with an explicit release date. This ensures that all bookings are captured by the data collection methods outlined above. |
| *Imprecise Bail Amounts* | Sometimes bail amounts are inflated (e.g. if someone posts bail comes back and another bail is set, then it displays an inflated number which is not indicative of the bail set. | We "correct" the bail amount by replacing the inflated bail amount with the correct one (aligning with bond setting date and case number). |
| *Bookings without Data* | There are 8,088 (2.6%) of bookings between June 13, 2019 and April 30, 2025 dates that do not have any case information at all. There are no bonds, associated case numbers, or indications for why they are being held. | These are dropped, but I am concerned by the lack of insight as to why they are in jail if there is no public record as to why. Assuming agreement to CJI data handling compliance, a list of relevant bookings can be provided upon request. |

## B.    Datasets

### B.1    Case-Level Data

**Policy Evaluation Filters:** The policy-relevant 27,241 cases are the subset (out of 1,451,271 distinct Odyssey cases in my data) resulting from the following filters:

a.  The file date falls within one of the two study periods.

b.  At least one associated offense classified as criminal[19] in nature: This eliminates traffic charges like speeding or other city ordinances that are not relevant to the policy being evaluated.

c.  Is created in General Sessions court: Because many General Sessions cases either resolve at that level or proceed to Criminal Court through indictment, I treat the initial bail set in General Sessions as the analytically relevant point, even when cases are later bound over to higher courts[20]. This allows us to assess how initial judicial discretion in lower court settings has changed before and after HB 1719.

d.  Not initially a release on citation: Because "release on citation" is related to policing practices and not judicial discretion, we drop "Misdemeanor Citations" in which the defendant was not initially arrested for the criminal incident.

**Table B1. Comparing Risk Profiles between Study Periods for Case-Level Data**

| Variable | Pre Mean | Post Mean | t-statistic | p-value |
|---|---|---|---|---|
| *Past Violent Convictions* | 0.221 | 0.227 | -0.625 | 0.5321 |
| *Past Nonviolent Convictions* | 4.154 | 3.713 | 4.198 | 0 |
| *Total Past Convictions* | 4.374 | 3.939 | 4.048 | 0.0001* |
| *Weighted FTA* | 0.178 | 0.175 | 0.595 | 0.5517 |
| *Raw FTA Count* | 1.737 | 1.681 | 1.589 | 0.1122 |
| *Max Offense Level* | 2.984 | 2.954 | 1.591 | 0.1117 |

---

[19] We define an offense as "criminal" if it corresponds with Title 39 Criminal Offenses of the Tennessee Code or Driving Under the Influence charge from Title 55.

[20] In Shelby County, when a criminal matter is heard in General Sessions Court and the judge finds probable cause, the case is typically "bound over" to the Grand Jury — a process also referred to as a case being "held to state" — unless the defendant waives that step. This creates a second, distinct case number, usually starting with "H" and referred to colloquially as the "H case". If the Grand Jury returns a true bill (i.e., an indictment), a third case is then initiated in Criminal Court under yet another case number, beginning with "C" and analogously called the "C case".  I refer to this sequence of case numbers — each corresponding to the same underlying criminal incident as it moves through different stages of adjudication — as a "case group."

34

|  | | | | |
|---|---|---|---|---|
| Poverty Rate | 27.023 | 27.053 | -0.221 | 0.8254 |
| Indigent | 0.589 | 0.603 | -2.437 | 0.0148* |
| Violent | 0.141 | 0.140 | 0.254 | 0.7997 |
| Total Past Misdemeanor Convictions | 3.238 | 2.878 | 3.922 | 0.0001* |
| Total Past Felony Convictions | 1.136 | 1.062 | 2.431 | 0.0151* |

\* $p < 0.05$

### B.2    Booking-Level Dataset

**Size:** Out of in my raw booking data, the base booking-level dataset used in this report contains 24,288 bookings (11,644 in the pre-HB 1719 period and 12,644 post).

**Policy Evaluation Filters**: The 27,241 cases that are policy relevant are the subset of the 308,919 bookings in the raw bookings table resulting from the following filters:

- The date of arrest falls within the designated study windows.

- It was the result of a new offense and not *solely* for technical violations of probation (VOP), failures to appear (FTA), or administrative holds.

- The max_offense_level on the booking is a specified level of misdemeanor (A, B, or C) or felony (M, A, B, C, D, E) which excludes bookings that were for a city ordinance, civil petition, etc…

- The booking profile is not blank, as described above where there are 8,088 (2.6%) of bookings that have no information on why the person is being held.

- The defendant is not detained for a fugitive from justice hold, inferred by "Fugitive from Justice" charge on an associated case which is a common reason for LOS outliers.

- A 'No Bond Set' bail setting reflects the absence of a recorded bail amount for the associated case during the booking interval.

**Subsets:**

- **Single-Case Bookings**: In some situations, I check the robustness of descriptives and regressions by removing some of the variance and outliers that come with a person being booked on a reoffense while out on bail. To filter out these qualitatively, as opposed to statistically, we restrict the booking dataset to bookings associated to a single criminal event or case group, which eliminates many confounding factors, such as bail or probation violations.

**Comparing Risk Profiles between Study Periods**:

35

**Table B2. Comparing Risk Profiles between Study Periods for Booking-Level Data**

| Variable | Pre Mean | Post Mean | t-statistic | p-value |
|---|---|---|---|---|
| *Past Bookings* | 2.942 | 2.883 | 0.864 | 0.388 |
| *Past Violent Convictions* | 0.181 | 0.178 | 0.311 | 0.756 |
| *Past Nonviolent Convictions* | 3.154 | 2.831 | 3.111 | 0.002* |
| *Past Convictions Total* | 3.335 | 3.009 | 3.066 | 0.002* |
| *Fta Exp Decay* | 0.090 | 0.087 | 0.497 | 0.619 |
| *Fta Raw Count* | 0.422 | 0.428 | -0.366 | 0.715 |
| *Max Offense Level Ord* | 3.170 | 3.053 | 5.143 | 0.000* |
| *Indigent* | 0.549 | 0.568 | -2.799 | 0.005* |
| *Violent* | 0.162 | 0.149 | 2.517 | 0.012* |
| *Past Misdemeanor C Convictions* | 0.528 | 0.421 | 2.853 | 0.004* |
| *Past Misdemeanor B Convictions* | 0.198 | 0.168 | 2.833 | 0.005* |
| *Past Misdemeanor A Convictions* | 1.516 | 1.406 | 2.040 | 0.041* |
| *Past Felony E Convictions* | 0.347 | 0.330 | 1.026 | 0.305 |
| *Past Felony D Convictions* | 0.173 | 0.156 | 1.800 | 0.072 |
| *Past Felony C Convictions* | 0.271 | 0.254 | 1.327 | 0.185 |
| *Past Felony B Convictions* | 0.078 | 0.076 | 0.253 | 0.801 |
| *Past Felony A Convictions* | 0.007 | 0.009 | -0.584 | 0.559 |
| *Past Felony M Convictions* | 0.000 | 0.000 | 0.647 | 0.517 |
| *Past Misdemeanor Convictions Total* | 2.442 | 2.169 | 3.020 | 0.003* |
| *Past Felony Convictions Total* | 0.894 | 0.840 | 1.696 | 0.090 |

* $p < 0.05$

**Linking Jail Roster Data with Odyssey Data**: Bookings are linked to Odyssey through the associated Shelby County-assigned case numbers which are consistent across both sources. Some booking columns depend on Odyssey's more granular case data. The methodology for how these are determined are described in the Exhibit B.

36

## C.    Descriptive Tables

## C.1    Pre-HB 1719

**Table C1. LOS Distribution for Fixed Bail Amounts**

| Initial Bail ($) | Mean | Min | 25% | 50% | 75% | 95% | Mode | Count |
|---|---|---|---|---|---|---|---|---|
| | | | | **Percentiles** | | | | |
| 0 | 1 | 0 | 1 | 1 | 1 | 2 | 1 | 3486 |
| 150 | 4 | 1 | 1 | 2 | 3 | 12 | 1 | 23 |
| 250 | 3 | 0 | 1 | 1 | 2 | 14 | 1 | 127 |
| 500 | 5 | 0 | 1 | 2 | 3 | 13 | 1 | 369 |
| 1000 | 4 | 0 | 1 | 1 | 2 | 9 | 1 | 523 |
| 1500 | 4 | 0 | 1 | 2 | 2 | 16 | 1 | 328 |
| 2000 | 5 | 0 | 1 | 2 | 3 | 17 | 1 | 169 |
| 2500 | 5 | 0 | 1 | 2 | 3 | 16 | 1 | 379 |
| 5000 | 7 | 0 | 1 | 2 | 4 | 22 | 1 | 618 |
| 7500 | 5 | 0 | 1 | 2 | 4 | 20 | 1 | 256 |
| 10000 | 5 | 0 | 1 | 2 | 4 | 22 | 1 | 486 |
| 15000 | 8 | 0 | 1 | 2 | 5 | 27 | 1 | 279 |
| 20000 | 12 | 0 | 1 | 2 | 5 | 60 | 1 | 209 |
| 25000 | 7 | 0 | 1 | 2 | 4 | 23 | 1 | 263 |
| 30000 | 11 | 0 | 1 | 2 | 7 | 24 | 1 | 141 |
| 35000 | 24 | 0 | 1 | 3 | 16 | 85 | 1 | 68 |
| 40000 | 10 | 0 | 2 | 3 | 7 | 31 | 1 | 100 |
| 50000 | 23 | 0 | 1 | 3 | 9 | 111 | 1 | 211 |
| 60000 | 42 | 0 | 2 | 5 | 19 | 264 | 2 | 49 |
| 75000 | 27 | 0 | 2 | 6 | 23 | 134 | 1 | 145 |
| 100000 | 32 | 1 | 4 | 8 | 24 | 136 | 4 | 130 |
| 125000 | 59 | 3 | 5 | 9 | 39 | 351 | 4 | 20 |
| 150000 | 55 | 2 | 6 | 24 | 62 | 210 | 3 | 73 |
| 200000 | 83 | 2 | 6 | 17 | 68 | 415 | 3 | 38 |
| 250000 | 62 | 1 | 8 | 23 | 46 | 354 | 23 | 25 |
| 500000 | 86 | 3 | 9 | 24 | 70 | 307 | 3 | 26 |
| 1000000 | 134 | 21 | 26 | 30 | 190 | 318 | 21 | 3 |

## C.2 Disaggregated Comparisons of Pre/Post Outcomes

### C.2.1 Bail Amounts & ROR Rates

*Violent vs. Nonviolent Offenses*

The table below presents changes in the mean, median, and interquartile range (i.e., upper and lower quartiles) of bail amounts before and after HB 1719, disaggregated by violent and nonviolent offenses. Across metrics, bail amount increased for both violent and non-violent crimes, as indicated by increases in the average, median, and interquartile range of bail post-HB 1719 implementation. The increase in bail amount across metrics for non-violent crime is most notable, given that the primary justification for bail is often framed around the concern for public safety, which is less at risk from non-violent offenses.

**Table C2. Bail Amount Distribution vs Violent Offense**

| Violent | HB 1719 | Mean | Median | q25 | q75 | Count |
|---------|---------|---------|--------|-------|-------|-------|
| False | Pre | 6901.4 | 1000 | 0 | 5000 | 11271 |
| False | Post | 9687.2 | 2500 | 0 | 7500 | 11667 |
| True | Pre | 58082.8 | 25000 | 7500 | 75000 | 2031 |
| True | Post | 63355.9 | 25000 | 10000 | 75000 | 2075 |

*By Offense Level*

The table below shows changes in the mean, median, and interquartile range of bail amounts before and after HB 1719, disaggregated by the maximum offense level on each case. Across all offense levels, bail amounts increased following the implementation of HB 1719. Notably, bail amounts for Misdemeanor C and D-level felonies increased across quartiles, even though these typically involve nonviolent or technical offenses.

**Table C3. Bail Amount Distribution vs Offense Level**

| Offense Level | HB 1719 | Mean | Median | q25 | q75 | Count |
|---------------|---------|---------|--------|-----|------|-------|
| Misdemeanor C | Pre | 380.55 | 100 | 0 | 500 | 555 |
| Misdemeanor C | Post | 480.93 | 250 | 0 | 500 | 671 |
| Misdemeanor B | Pre | 1066.38 | 500 | 0 | 1500 | 235 |
| Misdemeanor B | Post | 1382.85 | 500 | 0 | 1500 | 277 |

38

| | | | | | | |
|---|---|---|---|---|---|---|
| *Misdemeanor A* | *Pre* | 1913.21 | 500 | 0 | 2500 | 5994 |
| *Misdemeanor A* | *Post* | 2794.98 | 1000 | 0 | 3500 | 6291 |
| *Felony E* | *Pre* | 7640.00 | 2500 | 0 | 8500 | 1670 |
| *Felony E* | *Post* | 10762.59 | 5000 | 1500 | 15000 | 1763 |
| *Felony D* | *Pre* | 9902.34 | 5000 | 0 | 12500 | 1311 |
| *Felony D* | *Post* | 14214.27 | 7500 | 2500 | 20000 | 1202 |
| *Felony C* | *Pre* | 23276.88 | 12000 | 5000 | 33750 | 2646 |
| *Felony C* | *Post* | 27343.29 | 15000 | 7500 | 40000 | 2534 |
| *Felony B* | *Pre* | 72113.95 | 75000 | 20000 | 100000 | 545 |
| *Felony B* | *Post* | 87395.12 | 75000 | 25000 | 125000 | 557 |
| *Felony A* | *Pre* | 125761.83 | 75000 | 20000 | 175000 | 317 |
| *Felony A* | *Post* | 138749.41 | 75000 | 20000 | 200000 | 425 |
| *Felony M* | *Pre* | 597310.34 | 500000 | 250000 | 750000 | 29 |
| *Felony M* | *Post* | 599999.95 | 550000 | 250000 | 1000000 | 22 |

*By Offense*

Bail amounts for charges commonly associated with economic marginalization—including theft, trespassing, and low-level drug possession—also increased across metrics. These types of offenses often result from or are exacerbated by poverty[21], and higher bail on such charges could increase the likelihood that low-risk indigent defendants are detained pretrial due to inability to afford low-level bail amounts.

**Table C4. Bail Amount Distribution vs Offense**

| Max Offense | HB 1719 | Mean | Median | q25 | q75 | Count | ROR Rate |
|---|---|---|---|---|---|---|---|
| *Criminal Trespass* | pre | 406.5 | 100.0 | 0.0 | 500.0 | 416.0 | 0.3 |
| *Criminal Trespass* | post | 513.7 | 250.0 | 0.0 | 500.0 | 463.0 | 0.2 |

---

[21]Sciandra, M., Sanbonmatsu, L., Duncan, G. J., Gennetian, L. A., Katz, L. F., Kessler, R. C., Kling, J. R., & Ludwig, J. (2013). Long-term effects of the Moving to Opportunity residential mobility experiment on crime and delinquency. Journal of experimental criminology, 9(4), 10.1007/s11292-013-9189-9. https://doi.org/10.1007/s11292-013-9189-9

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Poss Of Cont Substance Marijuana* | pre | 977.4 | 0.0 | 0.0 | 1000.0 | 54.0 | 0.2 |
| *Poss Of Cont Substance Marijuana* | post | 1480.6 | 500.0 | 0.0 | 1500.0 | 90.0 | 0.2 |
| *Theft Of Merch 1000 - 2500* | pre | 4639.0 | 2500.0 | 250.0 | 5000.0 | 127.0 | 0.2 |
| *Theft Of Merch 1000 - 2500* | post | 12000.0 | 6000.0 | 2500.0 | 19000.0 | 91.0 | 0.1 |
| *Theft Of Merch Less Than 1000* | pre | 1869.7 | 1000.0 | 200.0 | 2500.0 | 1047.0 | 0.1 |
| *Theft Of Merch Less Than 1000* | post | 3031.7 | 1500.0 | 500.0 | 4250.0 | 1031.0 | 0.1 |
| *Theft Of Property 1000 - 2500* | pre | 4325.9 | 1500.0 | 0.0 | 5000.0 | 264.0 | 0.4 |
| *Theft Of Property 1000 - 2500* | post | 6715.0 | 3000.0 | 0.0 | 7875.0 | 214.0 | 0.3 |
| *Theft Of Property 1000 Or Less* | pre | 1216.4 | 500.0 | 0.0 | 1500.0 | 479.0 | 0.2 |
| *Theft Of Property 1000 Or Less* | post | 2253.3 | 1000.0 | 200.0 | 2500.0 | 368.0 | 0.1 |
| *Theft Of Services Less Than 1000* | pre | 768.0 | 500.0 | 100.0 | 1000.0 | 25.0 | 0.2 |
| *Theft Of Services Less Than 1000* | post | 3173.1 | 500.0 | 500.0 | 5000.0 | 13.0 | 0.1 |

## C.2.2  Length of Stay (LOS)

To understand whether this increase varied by legal exposure, I disaggregated the LOS distribution by charge level. Serious charges are associated with longer stays, as expected. Offense severity, prior convictions, and failure to appear history were all strong and statistically significant predictors of detention.

**Table C5.  LOS Distribution & ROR rate vs Offense Level**

| Max Offense Level | HB 1719 | Mean | Median | q25 | q75 | Count | ROR Rate |
|---|---|---|---|---|---|---|---|
| *Misdemeanor C* | *Pre* | 3.2 | 1.0 | 1.0 | 2.0 | 461.0 | 0.6 |
| *Misdemeanor C* | *Post* | 4.1 | 1.0 | 1.0 | 3.0 | 584.0 | 0.4 |
| *Misdemeanor B* | *Pre* | 3.6 | 1.0 | 1.0 | 1.0 | 222.0 | 0.6 |
| *Misdemeanor B* | *Post* | 4.1 | 1.0 | 1.0 | 2.0 | 249.0 | 0.4 |
| *Misdemeanor A* | *Pre* | 3.4 | 1.0 | 1.0 | 2.0 | 4528.0 | 0.5 |
| *Misdemeanor A* | *Post* | 4.0 | 1.0 | 1.0 | 3.0 | 5344.0 | 0.4 |
| *Felony  E* | *Pre* | 6.0 | 1.0 | 1.0 | 3.0 | 1688.0 | 0.4 |
| *Felony  E* | *Post* | 6.7 | 2.0 | 1.0 | 4.0 | 1824.0 | 0.3 |
| *Felony  D* | *Pre* | 9.2 | 2.0 | 1.0 | 5.0 | 1177.0 | 0.4 |
| *Felony  D* | *Post* | 12.1 | 2.0 | 1.0 | 7.0 | 1163.0 | 0.3 |
| *Felony  C* | *Pre* | 10.9 | 2.0 | 1.0 | 8.0 | 2555.0 | 0.2 |
| *Felony  C* | *Post* | 11.6 | 3.0 | 1.0 | 13.0 | 2549.0 | 0.2 |
| *Felony  B* | *Pre* | 26.4 | 8.0 | 2.0 | 41.0 | 633.0 | 0.2 |
| *Felony  B* | *Post* | 19.9 | 6.0 | 2.0 | 27.0 | 541.0 | 0.1 |
| *Felony  A* | *Pre* | 30.1 | 11.0 | 3.0 | 58.5 | 371.0 | 0.2 |
| *Felony  A* | *Post* | 24.1 | 9.0 | 3.0 | 34.8 | 386.0 | 0.2 |
| *Felony  M* | *Pre* | 45.6 | 21.0 | 16.0 | 90.0 | 9.0 | 0.2 |
| *Felony  M* | *Post* | 38.8 | 35.5 | 13.5 | 60.8 | 4.0 | 0.3 |

**Table C6.  LOS Distribution & ROR rate vs Violent Offense**

| Violent | HB 1719 | Mean | Median | q25 | q75 | Count | ROR Rate |
|---------|---------|------|--------|-----|-----|-------|----------|
| *False* | *Pre* | 6.3 | 1.0 | 1.0 | 3.0 | 9594.0 | 0.5 |
| *False* | *Post* | 6.8 | 2.0 | 1.0 | 4.0 | 10620.0 | 0.4 |
| *True* | *Pre* | 16.9 | 3.0 | 1.0 | 18.0 | 2050.0 | 0.2 |
| *True* | *Post* | 14.0 | 3.0 | 2.0 | 17.0 | 2024.0 | 0.1 |

These increases are particularly pronounced among individuals facing low-level charges, suggesting a heightened detention risk for individuals who previously may have been eligible for release or able to post bail more easily.

**Table C7. LOS Distribution & ROR rate vs Offense**

| Max Offense | HB 1719 | Mean | Median | q25 | q75 | Count | ROR Rate |
|-------------|---------|------|--------|-----|-----|-------|----------|
| *Criminal Trespass* | *Pre* | 3.37 | 1.00 | 1.00 | 2.00 | 289.00 | 0.54 |
| *Criminal Trespass* | *Post* | 5.13 | 2.00 | 1.00 | 3.00 | 333.00 | 0.33 |
| *Poss Of Cont Substance Marijuana* | *Pre* | 1.29 | 1.00 | 1.00 | 2.00 | 38.00 | 0.66 |
| *Poss Of Cont Substance Marijuana* | *Post* | 1.79 | 1.00 | 1.00 | 2.00 | 56.00 | 0.38 |
| *Theft Of Merch 1000 - 2500* | *Pre* | 7.03 | 1.00 | 1.00 | 3.00 | 59.00 | 0.47 |
| *Theft Of Merch 1000 - 2500* | *Post* | 9.92 | 2.00 | 1.00 | 8.00 | 62.00 | 0.26 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Theft Of Merch Less Than 1000* | *Pre* | 4.82 | 1.00 | 1.00 | 3.00 | 350.00 | 0.41 |
| *Theft Of Merch Less Than 1000* | *Post* | 5.07 | 2.00 | 1.00 | 5.00 | 515.00 | 0.28 |
| *Theft Of Property 1000 - 2500* | *Pre* | 5.56 | 1.00 | 1.00 | 2.00 | 235.00 | 0.56 |
| *Theft Of Property 1000 - 2500* | *Post* | 5.95 | 2.00 | 1.00 | 4.00 | 189.00 | 0.39 |
| *Theft Of Property 1000 Or Less* | *Pre* | 2.53 | 1.00 | 1.00 | 2.00 | 218.00 | 0.61 |
| *Theft Of Property 1000 Or Less* | *Post* | 3.54 | 1.00 | 1.00 | 3.00 | 206.00 | 0.46 |

### C.2.3    Wealth-Based Disparities

[*Descriptive Evidence of Post-HB 1719 Disparities*] Post-HB 1719 outcomes reveal that indigent defendants are less likely to post bail, even for modest amounts, and are more likely to remain detained pretrial, even when charged with the same charge types, levels, and offenses.

**Table C8. Descriptive Evidence of Post-HB 1719 Disparities**

| Offense Level | Indigent | Pre/ Post HB 1719 | Avg LOS | Bail Affordabil ity Rate | ROR Rate | Post Bail | Bookings |
|---|---|---|---|---|---|---|---|
| *Misdemeanor C* | True | Pre | 4.419 | 0.558 | 0.535 | 0.070 | 258 |
| *Misdemeanor C* | True | Post | 5.388 | 0.466 | 0.373 | 0.149 | 322 |
| *Misdemeanor C* | False | Pre | 1.127 | 0.964 | 0.691 | 0.273 | 55 |
| *Misdemeanor C* | False | Post | 1.395 | 0.975 | 0.630 | 0.346 | 81 |

43

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Misdemeanor B* | True | Pre | 5.385 | 0.670 | 0.587 | 0.138 | 109 |
| *Misdemeanor B* | True | Post | 6.856 | 0.541 | 0.414 | 0.216 | 111 |
| *Misdemeanor B* | False | Pre | 0.984 | 0.984 | 0.603 | 0.381 | 63 |
| *Misdemeanor B* | False | Post | 1.243 | 0.959 | 0.500 | 0.500 | 74 |
| *Misdemeanor A* | True | Pre | 3.948 | 0.757 | 0.578 | 0.275 | 2287 |
| *Misdemeanor A* | True | Post | 5.040 | 0.689 | 0.455 | 0.359 | 2771 |
| *Misdemeanor A* | False | Pre | 1.172 | 0.980 | 0.539 | 0.451 | 1380 |
| *Misdemeanor A* | False | Post | 1.276 | 0.962 | 0.466 | 0.512 | 1513 |
| *Felony E* | True | Pre | 6.971 | 0.631 | 0.482 | 0.341 | 765 |
| *Felony E* | True | Post | 7.317 | 0.575 | 0.384 | 0.419 | 804 |
| *Felony E* | False | Pre | 1.564 | 0.963 | 0.432 | 0.556 | 516 |
| *Felony E* | False | Post | 1.913 | 0.945 | 0.328 | 0.660 | 577 |
| *Felony D* | True | Pre | 9.179 | 0.581 | 0.411 | 0.409 | 496 |
| *Felony D* | True | Post | 13.595 | 0.493 | 0.322 | 0.489 | 513 |
| *Felony D* | False | Pre | 1.775 | 0.952 | 0.412 | 0.586 | 374 |
| *Felony D* | False | Post | 2.575 | 0.920 | 0.319 | 0.674 | 386 |
| *Felony C* | True | Pre | 11.244 | 0.522 | 0.305 | 0.520 | 1102 |
| *Felony C* | True | Post | 12.453 | 0.458 | 0.211 | 0.536 | 1257 |
| *Felony C* | False | Pre | 2.462 | 0.907 | 0.183 | 0.796 | 840 |
| *Felony C* | False | Post | 3.039 | 0.907 | 0.125 | 0.854 | 719 |
| *Felony B* | True | Pre | 26.265 | 0.273 | 0.186 | 0.508 | 264 |
| *Felony B* | True | Post | 21.197 | 0.272 | 0.174 | 0.493 | 213 |
| *Felony B* | False | Pre | 6.790 | 0.760 | 0.168 | 0.814 | 167 |
| *Felony B* | False | Post | 6.389 | 0.688 | 0.083 | 0.847 | 157 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Felony A* | True | Pre | 32.425 | 0.250 | 0.181 | 0.475 | 160 |
| *Felony A* | True | Post | 27.162 | 0.157 | 0.218 | 0.371 | 197 |
| *Felony A* | False | Pre | 15.198 | 0.519 | 0.094 | 0.811 | 106 |
| *Felony A* | False | Post | 11.290 | 0.598 | 0.065 | 0.888 | 107 |

## C.3 Impacts to Just City's Bail Fund

The table below shows the number of qualified bookings by charge severity before and after HB 1719.

| Table C9. Qualified Bookings for Just City's Bail Fund | | |
|---|---|---|
| **Severity** | **Pre-HB 1719** | **Post-HB 1719** |
| *Misdemeanor C* | 253 | 302 |
| *Misdemeanor B* | 106 | 109 |
| *Misdemeanor A* | 1320 | 1487 |
| *Felony E* | 860 | 960 |
| *Felony D* | 609 | 587 |
| *Felony C* | 1321 | 1433 |
| *Felony B* | 332 | 268 |
| *Felony A* | 190 | 208 |

| Table C10. Balance Tests for Qualified Bookings | | | | |
|---|---|---|---|---|
| **Variable** | **Pre Mean** | **Post Mean** | **t-statistic** | **p-value** |
| Past Bookings | 4.55 | 4.27 | 2.34 | 0.02 |
| Past Violent Convictions | 0.25 | 0.24 | 0.77 | 0.44 |
| Past Nonviolent Convictions | 5.07 | 4.36 | 3.70 | 0.00 |
| Total Past Convictions | 5.32 | 4.60 | 3.69 | 0.00 |
| Weighted FTA | 0.22 | 0.21 | 1.12 | 0.26 |
| Raw FTA Count | 0.78 | 0.78 | 0.03 | 0.98 |
| Max Offense Level | 3.55 | 3.46 | 2.56 | 0.01 |

**Table C10. Balance Tests for Qualified Bookings**

| | | | | |
|---|---|---|---|---|
| Indigent | 1.00 | 1.00 | | |
| *Violent* | 0.22 | 0.22 | -0.25 | 0.80 |
| *Past Misdemeanor C Convictions* | 0.88 | 0.67 | 2.98 | 0.00 |
| *Past Misdemeanor B Convictions* | 0.34 | 0.27 | 3.15 | 0.00 |
| *Past Misdemeanor D Convictions* | 2.51 | 2.27 | 2.28 | 0.02 |
| *Past Felony E Convictions* | 0.54 | 0.46 | 2.84 | 0.00 |
| *Past Felony D Convictions* | 0.28 | 0.22 | 3.87 | 0.00 |
| *Past Felony C Convictions* | 0.38 | 0.33 | 2.28 | 0.02 |
| *Past Felony B Convictions* | 0.10 | 0.11 | -0.57 | 0.57 |
| *Past Felony A Convictions* | 0.01 | 0.01 | -0.88 | 0.38 |
| *Past Felony M Convictions* | 0.00 | 0.00 | 1.73 | 0.08 |
| *Total Past Misdemeanor Convictions* | 3.99 | 3.45 | 3.15 | 0.00 |
| *Total Past Felony Convictions* | 1.34 | 1.15 | 3.51 | 0.00 |

**Table C11. ROR Rates for Qualified Defendants**

| | Pre-HB 1719 | Post-HB 1719 | |
|---|---|---|---|
| **Severity** | **ROR Rate** | **ROR Rate** | **Difference** |
| *Misdemeanor  C* | 0.494 | 0.354 | 0.14 |
| *Misdemeanor  B* | 0.538 | 0.376 | 0.16 |
| *Misdemeanor  A* | 0.464 | 0.348 | 0.12 |
| *Felony  E* | 0.358 | 0.248 | 0.11 |
| *Felony  D* | 0.278 | 0.191 | 0.09 |
| *Felony  C* | 0.179 | 0.110 | 0.07 |
| *Felony  B* | 0.075 | 0.034 | 0.04 |

46

**Table C11. ROR Rates for Qualified Defendants**

| | | | |
|---|---|---|---|
| *Felony  A* | 0.074 | 0.058 | 0.02 |

**Table C12. Average Bail Amounts for Bookings that are Qualified/Eligible for Just City's Bail Fund**

| | Pre-HB 1719 | | Post-HB 1719 | |
|---|---|---|---|---|
| **Severity** | **Overall** | **Eligible** | **Overall** | **Eligible** |
| *Misdemeanor  C* | 606.32 | 1050.68 | 807.12 | 1212.69 |
| *Misdemeanor  B* | 906.13 | 1656.03 | 991.28 | 1440.67 |
| *Misdemeanor  A* | 1644.19 | 1847.89 | 2267.78 | 2118.51 |
| *Felony  E* | 6694.26 | 2325.16 | 8595.36 | 3087.56 |
| *Felony  D* | 12438.10 | 2935.44 | 13530.58 | 3366.58 |
| *Felony  C* | 25563.57 | 3397.14 | 28558.37 | 3893.19 |
| *Felony  B* | 86127.56 | 3140.00 | 83834.70 | 3238.10 |
| *Felony  A* | 121775.79 | 3218.75 | 104636.06 | 3176.47 |

## D.    Regressions

### D.1    Model Selection, Validation, & Interpretation

All regression models in this report are specified and validated according to best practices in the applied policy and econometric literature. The following principles and steps are applied consistently across analyses:

**Covariate Selection:** Covariates (such as age, race, sex, charge severity, criminal history, failure-to-appear risk, attorney type, and ZIP code poverty) are included based on their established importance in predicting pretrial outcomes, as supported by prior research (Dobbie et al., 2018; Heaton et al., 2017; Stevenson, 2018; Leslie & Pope, 2017).

47

**Model Choice:**

- **Logistic regression** is used for binary (dichotomous) outcomes (e.g., whether bail was affordable or a defendant was released on ROR).
- **Ordinary Least Squares (OLS)** is used for continuous outcomes (e.g., bail amount, length of stay). All models employ robust (Huber-White) standard errors to address potential heteroskedasticity (White, 1980)**.**

**Variable Construction:** Multiple operationalizations of criminal history and risk are considered, including exponentially weighted FTA counts, raw and binned prior convictions, and categorical indicators for offense severity. Final model selection is guided by predictive value, parsimony, and precedent in the literature.

**Diagnostics and Model Validation:** Each regression is accompanied by a standard battery of diagnostic tests:

- **Multicollinearity:** Assessed via Variance Inflation Factor (VIF); predictors with $VIF > 5$ are flagged for review.
- **Influential Observations:** Assessed via Cook's Distance and leverage; influential points are documented but generally retained given the policy relevance of rare but important cases.
- **Residual Analysis:** Normality (Jarque-Bera), heteroskedasticity (Breusch-Pagan), and autocorrelation (Ljung-Box) are evaluated for OLS models; calibration (Hosmer-Lemeshow) and discrimination (ROC AUC) for logistic models.
- **Model Specification:** The RESET test is used to screen for omitted nonlinearities or mis-specification in OLS models.
- **Robustness Checks:** Core results are replicated after excluding the top and bottom 1% of outcome variable values and, where feasible, using alternate codings of key variables.
- **Model Calibration and Fit:** For logistic regression, Hosmer-Lemeshow goodness-of-fit and AUC (area under ROC curve) are reported; for OLS, R-squared and information criteria (AIC, BIC) are documented.

## D.2    Data Preparation

We have "regression datasets" corresponding to data level. To ensure analytic validity and reduce bias from missing or extreme values, the following data cleaning methods were performed on the regression dataset. The impact of each transformation is logged in the subsequent sections.

- **Dropping Missing Values**: Observations with missing values in key variables (e.g., attorney type, sex) were excluded. This ensures that regression models are fit only on

cases with complete data for all covariates of interest, which avoids introducing bias from imputation or listwise deletion during model fitting.

- **Dropping Underutilized Categories:** Observations with categorical values that appear infrequently (e.g., certain race categories with insufficient sample size) were excluded from regression analyses to ensure stable estimation and prevent high-leverage influence from sparse groups.
- **Winsorization**: Continuous covariates exhibiting extreme values were winsorized at the 1st and 99th percentiles. Winsorization caps extreme values by replacing those outside specified percentile bounds with the nearest values at those thresholds. This method retains all data points while reducing the disproportionate influence of outliers, thereby improving robustness and interpretability of regression estimates. Winsorization is preferred over trimming when sample sizes are moderate and the goal is to minimize leverage from outliers without discarding data.
- **Log Transformations**: Variables exhibiting strong positive skewness (e.g., count variables, monetary amounts) were log-transformed prior to analysis. Log transformation reduces skewness, brings extreme values closer to the mean, and helps to meet regression assumptions of normality and homoscedasticity. This is particularly useful when variables span several orders of magnitude or when multiplicative rather than additive relationships are plausible.
- **Normalization**: Where appropriate, variables were normalized, or standardized, to mean zero and unit variance to facilitate interpretability and comparability of regression coefficients, especially in models that combine predictors with differing units and scales.

**D.3    Booking Regression Data:** To ensure analytic validity and reduce bias from missing or extreme values, the following data cleaning steps were performed on the regression dataset:

1. **Handling Missing Values and Underutilized Categories**
   - Dropped 2,092 records with missing values for *attorney_type* (required for assessing indigence and counsel effects).
   - Dropped 10 records with missing *person_sex*.
   - Excluded 43 records with *person_race* categorized as "ASIAN" or "OTHER" to ensure sufficient sample size in each group.
   - Drop FELONY_M bookings due to low number
2. **Winsorization of Continuous Covariates**
   - *age_at_booking:* Min shifted from –2.102 to –1.304, max from 7.233 to 2.765 (standardized units).
   - *fta_exp_decay:* Max shifted from 5.033 to 1.823.
   - *past_violent_convictions*: Max shifted from 22 to 3.
   - *past_nonviolent_convictions:* Max shifted from 142 to 36.

3. **Log Transformation of Skewed Variables**
   - *past_violent_convictions*: Skewness reduced from 3.75 to 3.08.
   - *past_nonviolent_convictions*: Skewness reduced from 3.23 to 1.11.
   - *fta_exp_decay*: Skewness reduced from 3.36 to 2.81.
   - *censored_los*: Skewness reduced from 4.35 to 1.45.
   - *initial_bail_amount:* Skewness reduced dramatically from 141 to –0.66.

**D.4  Case Regression Data:** To ensure analytic validity and reduce bias from missing or extreme values, the following data cleaning steps were performed on the regression dataset:

1. **Handling Missing Values and Underutilized Categories**
   - Dropped 2,529 records with missing values for *initial_bail_amount* .
   - Dropped 281 records with missing *person_sex*.
     Excluded 47 records with *person_race* categorized as "ASIAN" or "OTHER" to ensure sufficient sample size in each group.
2. **Winsorization of Continuous Covariates**
   - *age_at_filing*: Min shifted from –2 to –1, max from 7 to 2 (standardized units).
   - *fta_exp_decay:* Max shifted from 6.046 to 2.164.
   - *initial_bail_amount*: Max shifted from 750,000 to 200,000.
3. **Log Transformation of Skewed Variables**
   - *past_violent_convictions*: Skewness reduced from 8.24 to 3.12.
   - *past_nonviolent_convictions*: Skewness reduced from 5.00 to 1.00.
   - *fta_exp_decay*: Skewness reduced from 2.87 to 2.28.
   - *initial_bail_amount*: Skewness reduced from 3.79 to –0.75.

**Linear Regression: Bail Amount**

**Purpose:** To estimate the effect of HB 1719 and key defendant characteristics on initial bail amount set at the court case level.

**Outcome:** The dependent variable is the (log-transformed) initial bail amount set for each criminal court case.

**Dataset:** Analyses were performed at the court case level, with each observation corresponding to a unique case filed during the study window. See Appendix A for sample and cleaning details.

**Table D1. Regression Results - Bail Amount**

| Variable | Coefficient | Std. Error | t/z-stat | p-value | CI Lower | CI Upper |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| *Intercept* | 0.3665 | 0.0838 | 4.3711 | 0.0000* | 0.2021 | 0.5308 |
| *Post-HB 1719* | 0.7279 | 0.0391 | 18.6383 | 0.0000* | 0.6513 | 0.8044 |
| *Indigent* | 0.8414 | 0.0448 | 18.7948 | 0.0000* | 0.7537 | 0.9292 |
| *Black* | 0.0905 | 0.0648 | 1.3980 | 0.1621 | -0.0364 | 0.2175 |
| *Hispanic* | -0.1871 | 0.1154 | -1.6203 | 0.1052 | -0.4133 | 0.0392 |
| *Male* | 1.1542 | 0.0491 | 23.4941 | 0.0000* | 1.0580 | 1.2505 |
| *Age at Filing* | 0.2208 | 0.0432 | 5.1163 | 0.0000* | 0.1362 | 0.3054 |
| *Age$^2$ at Filing* | -0.2399 | 0.0271 | -8.8583 | 0.0000* | -0.2930 | -0.1868 |
| *Max Offense Level* | 1.1400 | 0.0113 | 100.7415 | 0.0000* | 1.1178 | 1.1622 |
| *Weighted FTA* | 1.4550 | 0.0636 | 22.8893 | 0.0000* | 1.3304 | 1.5796 |
| *Past Violent Convictions* | 0.5892 | 0.0436 | 13.5261 | 0.0000* | 0.5038 | 0.6746 |
| *Past Nonviolent Convictions* | 0.7216 | 0.0195 | 37.0394 | 0.0000* | 0.6834 | 0.7598 |

\* $p < 0.05$

**Interpretation:** The regression results provide clear and statistically robust evidence that bail amounts increased following the enactment of HB 1719, controlling for other factors. The coefficient for the post-HB 1719 period is 0.74 (SE = 0.04, $p < 0.001$), which is both statistically significant and substantial in magnitude. This coefficient can be interpreted as the expected difference in the (log-transformed) initial bail amount assigned after HB 1719 took effect, relative to the pre-HB 1719 period, holding all other covariates constant. In exponentiated terms, this suggests an increase in assigned bail amounts of approximately 110% (exp(0.74) ≈ 2.10), other things equal.

All other major covariates (e.g. offense severity, violent charge status, prior convictions, and failure-to-appear risk) have expected signs and are statistically significant. Male defendants and those with higher-risk or more severe charges are assigned higher bail amounts, consistent with established literature and policy expectations. The quadratic term for age is negative and significant, indicating a nonlinear or concave relationship with bail amount.

**Table D2. Model Fit and Summary Statistics**

| Model Statistic | Value |
|---|---|

51

| | |
|---|---|
| *AIC* | 137497.3157 |
| *BIC* | 137595.6071 |
| *Log-Likelihood* | -68736.65783 |
| *No. Observations* | 26661 |
| *DF Model* | 11 |
| *DF Residuals* | 26649 |
| *R-squared* | 0.351624833 |
| *Adj. R-squared* | 0.3513572009 |
| *F-statistic* | 1664.054913 |
| *Prob (F-statistic)* | 0 |

**Model Robustness and Validation**

To validate the robustness of the estimated effects, we conducted standard diagnostic checks:

- **Multicollinearity:** All variance inflation factors (VIFs) were below 5, indicating no concerning multicollinearity among covariates.
- **Influential and High-Leverage Observations:** Leverage and Cook's distance metrics were examined. No observations exceeded conventional cutoffs (Cook's D > 4/n, leverage > 2k/n), suggesting no undue influence on the results.
- **Residual Diagnostics:** Plots of residuals against fitted values and normal Q-Q plots confirmed approximate normality and homoscedasticity of residuals.
- **Model Fit:** The $R^2$ and adjusted $R^2$ values (0.36) indicate that the model explains a substantial proportion of the variance in log-transformed bail amounts.

These diagnostics support the robustness of our regression results and the substantive interpretation that HB 1719 significantly increased initial bail amounts.

**Logistic Regression: ROR**

**Purpose:** To evaluate whether HB 1719 was associated with a change in the likelihood of being released on recognizance (ROR), controlling for key defendant characteristics.

**Outcome:** The dependent variable is ror, an indicator for whether the defendant was released on recognizance (1 = ROR, 0 = otherwise).

**Dataset:** Analyses were conducted at the court case level. Each observation corresponds to a unique criminal case filed during the study period (N = 26,661). See data cleaning log for treatment of missing values and transformations.

### Table D3. Regression Results - ROR

| Variable | Coefficient | Std. Error | t/z-stat | p-value | CI Lower | CI Upper |
|---|---|---|---|---|---|---|
| *Intercept* | 1.7047 | 0.0686 | 24.8344 | 0.0000* | 1.5701 | 1.8392 |
| *Post- HB 1719* | -0.4080 | 0.0325 | -12.5387 | 0.0000* | -0.4718 | -0.3442 |
| *Indigent* | -0.5100 | 0.0331 | -15.4233 | 0.0000* | -0.5748 | -0.4452 |
| *Black* | 0.0679 | 0.0536 | 1.2664 | 0.2054 | -0.0372 | 0.1730 |
| *Hispanic* | 0.1257 | 0.0800 | 1.5722 | 0.1159 | -0.0310 | 0.2825 |
| *Male* | -0.5895 | 0.0349 | -16.8770 | 0.0000* | -0.6579 | -0.5210 |
| *Age at Filing* | -0.1541 | 0.0292 | -5.2712 | 0.0000* | -0.2114 | -0.0968 |
| *$Age^2$ at Filing* | 0.1670 | 0.0208 | 8.0461 | 0.0000* | 0.1263 | 0.2077 |
| *Max Offense Level* | -0.5026 | 0.0118 | -42.6463 | 0.0000* | -0.5257 | -0.4795 |
| *Weighted FTA* | -2.0196 | 0.1108 | -18.2252 | 0.0000* | -2.2367 | -1.8024 |
| *Past Violent Convictions* | -0.8728 | 0.0971 | -8.9840 | 0.0000* | -1.0632 | -0.6824 |
| *Past Nonviolent Convictions* | -0.7292 | 0.0251 | -29.0833 | 0.0000* | -0.7783 | -0.6800 |

*\* p < 0.05*

**Interpretation:** Controlling for relevant factors, the results indicate that the odds of being released on recognizance (ROR) decreased following the enactment of HB 1719. The coefficient for the post-HB 1719 period is -0.408 (SE = 0.033, p < 0.001), which is statistically significant and suggests a meaningful decline in the likelihood of ROR. In terms of odds ratios, this corresponds to an approximate 33% decrease in the odds of release on recognizance (ROR) following HB 1719 (exp(-0.408) ≈ 0.665), holding other factors constant.

Other covariates generally show expected relationships; indigent and male defendants are less likely to be RORed, and risk factors (prior convictions, FTA risk, and more serious offenses)

significantly decrease the odds of ROR. A quadratic relationship for age suggests that ROR likelihood varies nonlinearly across the age spectrum.

**Table D4. Model Fit and Summary Statistics**

| Model Statistic | Value |
|---|---|
| *AIC* | 23046.30785 |
| *BIC* | 23144.59933 |
| *Log-Likelihood* | -11511.15392 |
| *Null Log-Likelihood* | -14755.83981 |
| *LR statistic* | 6489.371776 |
| *LR p-value* | 0 |
| *Pseudo R-squared* | 0.2198916449 |
| *No. Observations* | 26661 |
| *DF Model* | 11 |
| *DF Residuals* | 26649 |
| *Converged* | TRUE |

**Model Robustness and Diagnostics**

- **Multicollinearity:** All predictors were assessed for multicollinearity using variance inflation factors (VIFs), none of which exceeded 5, suggesting no issues of concern.
- **Influential Observations:** Leverage and Cook's distance were evaluated. A total of 251 high-leverage points were identified, which is expected in large policy data. None of these had a disproportionate effect on the key results.
- **Residual Diagnostics:**
  - **Jarque-Bera test** for residual normality showed $p < 0.05$, indicating residuals are not perfectly normal (common in binary models).
  - **Breusch-Pagan test** for heteroscedasticity showed $p < 0.05$, indicating heteroscedasticity; this is addressed with robust (HC3) standard errors.
  - **Ljung-Box test** for autocorrelation was not flagged as significant, suggesting no autocorrelation concerns.

54

- **Model Specification:** RESET test suggests possible model misspecification ($p < 0.05$), though the primary HB 1719 result is robust to this.
- **Calibration:** Hosmer-Lemeshow test was not flagged as significant ($p > 0.05$), indicating no evidence of poor calibration.
- **Model Fit:** $R^2$ and adjusted $R^2$ are not applicable here due to the binary outcome; instead, Pseudo $R^2$ of 0.22 suggests that the model explains a moderate proportion of variation in ROR outcomes.

**Summary of Robustness Implications:** While some mild heteroscedasticity and potential model misspecification were detected, the primary finding—that HB 1719 was associated with a significant decrease in the odds of being RORed—remains robust. Use of robust (HC3) standard errors mitigates heteroscedasticity concerns. Overall, these diagnostics support the reliability of the conclusion that HB 1719 substantially reduced the likelihood of ROR.

---

**Logistic Regression: Affordable Bail**

**Purpose:** To evaluate whether HB 1719 was associated with a change in the likelihood that defendants could afford the initial bail amount set in their criminal cases, controlling for key defendant characteristics.

**Outcome:** The dependent variable is *affordable_bail,* a binary indicator for whether the defendant's bail amount was considered affordable (1 = affordable, 0 = not affordable).

**Dataset:** Analyses were conducted at the court case level. Each observation corresponds to a unique criminal case filed during the study period (N = 21,106). See the data cleaning log for treatment of missing values and variable transformAfter HB 1719 took effect, the odds of posting bail within the 72-hour window decreased by approximately 13%, even after adjusting for charge levels, past convictions, failure-to-appear history, and representation. This effect is both statistically and practically significant, indicating that fewer indigent and non-indigent defendants were able to afford bail post-HB 1719 across all charge levels and past conviction histories.ations.

**Model Summary:**

Table D5. Regression Results - Affordable Bail

| Variable | Coefficient | Std. Error | t/z-stat | p-value | CI Lower | CI Upper |
|---|---|---|---|---|---|---|
| *Intercept* | 6.779 | 0.131 | 51.671 | 0.000* | 6.522 | 7.036 |
| *Post-HB 1719* | -0.135 | 0.040 | -3.367 | 0.001* | -0.214 | -0.057 |

55

| | | | | | | |
|---|---|---|---|---|---|---|
| *Indigent* | -2.294 | 0.050 | -45.904 | 0.000* | -2.392 | -2.196 |
| *Black* | 0.585 | 0.067 | 8.770 | 0.000* | 0.455 | 0.716 |
| *Hispanic* | -0.106 | 0.108 | -0.978 | 0.328 | -0.317 | 0.106 |
| *Male* | -0.427 | 0.050 | -8.521 | 0.000* | -0.525 | -0.329 |
| *Age at Filing* | -0.488 | 0.013 | -38.122 | 0.000* | -0.513 | -0.463 |
| *$Age^2$ at Filing* | -0.025 | 0.031 | -0.802 | 0.422 | -0.086 | 0.036 |
| *Max Offense Level* | -0.025 | 0.019 | -1.335 | 0.182 | -0.062 | 0.012 |
| *Weighted FTA* | 0.014 | 0.015 | 0.939 | 0.348 | -0.015 | 0.044 |
| *Past Violent Convictions* | -1.898 | 0.093 | -20.358 | 0.000* | -2.081 | -1.715 |
| *Past Nonviolent Convictions* | -0.054 | 0.063 | -0.862 | 0.389 | -0.178 | 0.069 |

*\* p < 0.05*

**Interpreting Coefficients:** In logistic regression, coefficients represent changes in log odds of an outcome per unit change in the predictor variable. For lay readers, this means that a negative coefficient, like –0.135 for "Post-HB 1719," indicates that the odds of defendants being able to afford bail decreased after the law was enacted. More precisely, I calculate the odds ratio (OR) by exponentiating the coefficient:

$$Odds\ Ratio\ (OR)\ =\ exp(-\ 0.135) \approx 0.874$$

This means that the odds of affordable bail post-HB 1719 are about 87.4% of the odds prior to the law's implementation. In other words, the odds of affording bail decreased by approximately 13% (100% − 87.4%), controlling for other factors like indigency, race, gender, and criminal history. This approach to interpretation is standard practice in translating logistic regression results.

**Interpretation:** Controlling for relevant factors, the results indicate that the likelihood of defendants being able to afford their bail amount decreased after the enactment of HB 1719. The coefficient for the post-HB 1719 period is -0.135 *(SE = 0.040, p = 0.001)*, which is statistically significant and negative in direction. In odds-ratio terms, this translates to an approximate 13% decrease in the odds of affordable bail post-HB 1719 *(exp(-0.135) ≈ 0.874)*, holding other factors constant.

56

Other covariates show expected and important relationships; indigent defendants and male defendants are significantly less likely to afford bail, while Black defendants have a higher probability of affordable bail when controlling for other factors. The initial bail amount is a strong negative predictor, as expected.

**Table D6. Model Fit and Summary Statistics**

| Model Statistic | Value |
|---|---|
| *AIC* | 15821.7 |
| *BIC* | 15925.1 |
| *Log-Likelihood* | -7897.8 |
| *Null Log-Likelihood* | -13130.2 |
| *LR statistic* | 10464.6 |
| *LR p-value* | 0.0 |
| *Pseudo R-squared* | 0.4 |
| *No. Observations* | 21106.0 |
| *DF Model* | 12.0 |
| *DF Residuals* | 21093.0 |
| *Converged* | TRUE |

**Model Robustness and Diagnostics**

- **Multicollinearity:** All predictors were assessed for multicollinearity using variance inflation factors (VIFs), none of which exceeded 5, suggesting no issues of concern.
- **Influential Observations:** Leverage and Cook's distance were examined. A total of approximately 200 high-leverage points were identified, which is expected in policy data. These do not unduly influence the primary result.
- **Residual Diagnostics:** No major issues were detected in residual normality, heteroscedasticity, or autocorrelation.
- **Model Specification:** RESET test did not indicate any misspecification concerns.
- **Hosmer-Lemeshow test:** was not significant ($p > 0.05$), suggesting no significant calibration issues.

57

- **Model Fit:** a Pseudo R² of 0.398 suggests the model explains a substantial proportion of the variation in affordable bail outcomes.

**Summary:** The diagnostic checks support the robustness of the primary result: HB 1719 was associated with a significant decrease in the likelihood of affordable bail for defendants. No major diagnostic concerns were identified, and robust (HC3) standard errors were used throughout. Overall, these findings confirm the reliability of the conclusion that HB 1719 made it harder for defendants to afford their bail.

**Linear Regression: LOS**

**Purpose:** To assess whether HB 1719 was associated with an increase in the length of stay (LOS) in jail, controlling for key defendant and case characteristics.

**Outcome:** The dependent variable is *censored_los*, the (log-transformed) length of stay in jail, right censored at 90 days..

**Dataset:** Analyses were conducted at the court case level. Each observation corresponds to a unique criminal case filed during the study period *(N = 21,106)*. See the data cleaning log for treatment of missing values and variable transformations.

**Table D7.  Regression Results - LOS**

| Variable | Coefficient | Std. Error | t/z-stat | p-value | CI Lower | CI Upper |
|---|---|---|---|---|---|---|
| *Intercept* | -0.138 | 0.021 | -6.590 | 0.000* | -0.179 | -0.097 |
| *Post-HB 1719* | 0.071 | 0.010 | 7.115 | 0.000* | 0.051 | 0.090 |
| *Indigent* | 0.502 | 0.010 | 51.424 | 0.000* | 0.483 | 0.521 |
| *Black* | -0.130 | 0.016 | -8.001 | 0.000* | -0.162 | -0.098 |
| *Hispanic* | 0.067 | 0.025 | 2.675 | 0.007* | 0.018 | 0.117 |
| *Male* | 0.215 | 0.011 | 19.622 | 0.000* | 0.193 | 0.236 |
| *Initial Bail Amount* | 0.078 | 0.001 | 66.193 | 0.000* | 0.076 | 0.080 |

| | | | | | | |
|---|---|---|---|---|---|---|
| *Age at Booking* | -0.034 | 0.007 | -4.856 | 0.000* | -0.048 | -0.021 |
| $Age^2$ *at booking* | 0.006 | 0.004 | 1.298 | 0.194 | -0.003 | 0.015 |
| *Max Offense Level* | 0.119 | 0.004 | 31.913 | 0.000* | 0.112 | 0.126 |
| *Weighted FTA* | 0.522 | 0.028 | 18.374 | 0.000* | 0.466 | 0.578 |
| *Past Violent Convictions* | 0.073 | 0.021 | 3.402 | 0.001* | 0.031 | 0.115 |
| *Past Nonviolent Convictions* | 0.089 | 0.007 | 12.363 | 0.000* | 0.075 | 0.103 |

*\* p < 0.05*

**Interpretation:** Controlling for relevant factors, the regression results provide clear evidence that the length of stay (LOS) in jail increased following the enactment of HB 1719. The coefficient for the post-HB 1719 period is 0.071 *(SE = 0.010, p < 0.001)*, which is statistically significant and positive in magnitude. This suggests that defendants experienced a 7% increase in log-transformed length of stay post-HB 1719, controlling for other covariates.

Other covariates have expected relationships: indigent status, male gender, higher initial bail amounts, more serious charges, and prior convictions are associated with longer LOS. Black defendants, on the other hand, have a statistically significant shorter LOS compared to White defendants when controlling for other factors.

### Table D8. Model Fit and Summary Statistics

| Model Statistic | Value |
|---|---|
| *AIC* | 45758.03803 |
| *BIC* | 45861.4831 |
| *Log-Likelihood* | -22866.01902 |
| *No. Observations* | 21106 |
| *DF Model* | 12 |
| *DF Residuals* | 21093 |

| | |
|---|---|
| *R-squared* | 0.4275708921 |
| *Adj. R-squared* | 0.427245232 |
| *F-statistic* | 1137.969944 |
| *Prob (F-statistic)* | 0 |

**Model Robustness and Diagnostics**

- **Multicollinearity:** Variance inflation factors (VIF) were examined for all predictors. No predictors had VIF > 5, indicating no concerning multicollinearity.
- **Influential Observations:** Leverage and Cook's distance were examined. A total of approximately 150 high-leverage points were identified, which is expected in policy datasets. These do not unduly influence the primary result.
- **Residual Diagnostics:**
    - Jarque-Bera test for residual normality showed $p < 0.05$, indicating residuals are not perfectly normal.
    - Breusch-Pagan test for heteroscedasticity showed $p < 0.05$, indicating heteroscedasticity. This is acceptable here because robust (HC3) standard errors were used.
    - Ljung-Box test for autocorrelation showed $p < 0.05$, indicating some autocorrelation in residuals.
- **Model Specification:** RESET test suggested potential model misspecification ($p < 0.05$), though the main result (the effect of HB 1719) remains robust.
- **Calibration:** Hosmer-Lemeshow test was not applicable for this continuous outcome.
- **Model Fit:** The $R^2$ of 0.428 suggests the model explains a substantial portion of the variation in length of stay.

**Summary:** Although some mild heteroscedasticity, autocorrelation, and residual normality issues were detected, the main result that HB 1719 was associated with a significant increase in length of stay in jail remains robust. Robust (HC3) standard errors mitigate heteroscedasticity concerns. Overall, these diagnostics confirm the reliability of the substantive conclusion that HB 1719 led to longer stays in jail.

**OLS Regression: LOS with Interaction**

**Purpose:** To assess whether, controlling for bail amounts and other relevant factors, defendants identified as indigent—struggling with poverty and typically represented by public defenders—remained in jail longer, and whether HB 1719 further exacerbated this relationship

**Outcome:** The dependent variable is *censored_los,* the log-transformed length of stay in jail.

**Dataset:** Analyses were conducted at the court case level. Each observation corresponds to a unique criminal case filed during the study period *(N = 21,106)*. See the data cleaning log for treatment of missing values and variable transformations.

### Table D9. Regression Results - LOS with Interaction

| Variable | Coefficient | Std. Error | t/z-stat | p-value | CI Lower | CI Upper |
|---|---|---|---|---|---|---|
| Intercept | -0.051 | 0.023 | -2.171 | 0.030 | -0.097 | -0.005 |
| Post-HB1719 | 0.101 | 0.013 | 7.617 | 0.000* | 0.075 | 0.127 |
| Indigent | 0.506 | 0.015 | 34.392 | 0.000* | 0.477 | 0.535 |
| Black | -0.135 | 0.018 | -7.667 | 0.000* | -0.169 | -0.100 |
| Hispanic | 0.062 | 0.027 | 2.275 | 0.023* | 0.009 | 0.116 |
| Male | 0.315 | 0.011 | 27.536 | 0.000* | 0.293 | 0.338 |
| Violent | 0.205 | 0.021 | 9.890 | 0.000* | 0.165 | 0.246 |
| HB1719*Indigent | 0.055 | 0.020 | 2.798 | 0.005* | 0.017 | 0.094 |
| Age at Booking | -0.018 | 0.008 | -2.387 | 0.017* | -0.033 | -0.003 |
| $Age^2$ at booking | -0.011 | 0.005 | -2.237 | 0.025* | -0.020 | -0.001 |
| Max Offense Level | 0.190 | 0.005 | 40.887 | 0.000* | 0.181 | 0.199 |
| Past Violent Convictions | 0.127 | 0.022 | 5.656 | 0.000* | 0.083 | 0.170 |
| Past Nonviolent Convictions | 0.156 | 0.008 | 20.770 | 0.000* | 0.141 | 0.171 |
| Weighted FTA | 0.660 | 0.030 | 21.843 | 0.000* | 0.601 | 0.720 |

* $p < 0.05$

**Interpretation:** Controlling for bail amounts, charges, and other relevant factors, the analysis shows that indigent defendants stay in jail longer. Specifically:

61

- Indigent defendants have an average 51% higher log-LOS compared to non-indigent defendants (*coefficient = 0.506, p < 0.001*).
- Post-HB1719, the indigent penalty further increased by 0.055 (*p = 0.005*).
- Translating the interaction term into a real-world effect: post-HB 1719, the *additional* LOS increase for indigent defendants is about 5.7% *(exp(0.055) ≈ 1.057)*, controlling for all other variables.
- The primary HB 1719 coefficient *(0.101)* and the indigent main effect *(0.506)* are also significant, confirming an overall increase in LOS for indigent defendants, and a greater gap post-reform.

Other covariates show expected and significant effects: male defendants, those with more severe charges, or more prior convictions have longer stays. Black defendants show a shorter LOS compared to White defendants.

**Table D10. Model Fit and Summary Statistics**

| Model Statistic | Value |
|---|---|
| AIC | 48317.56457 |
| BIC | 48428.96694 |
| Log-Likelihood | -24144.78228 |
| No. Observations | 21106 |
| DF Model | 13 |
| DF Residuals | 21092 |
| R-squared | 0.3538289645 |
| Adj. R-squared | 0.3534306986 |
| F-statistic | 762.9912385 |
| Prob (F-statistic) | 0 |

62

**Model Robustness and Diagnostics**

- **Multicollinearity:** Variance inflation factors (VIF) were examined for all predictors. No predictors had VIF > 5, indicating no concerning multicollinearity.
- **Influential Observations:** A total of ~100 high-leverage observations were identified (common in large datasets), but none unduly influenced the main results.
- **Residual Diagnostics:**
  - **Jarque-Bera test** for residual normality showed $p < 0.05$, indicating residuals are not normally distributed (common with log-transformed outcomes).
  - **Breusch-Pagan test** for heteroscedasticity showed $p < 0.05$, indicating heteroscedasticity; robust (HC3) standard errors address this.
    **Ljung-Box test** for autocorrelation showed $p < 0.05$, indicating some autocorrelation.
- **Model Specification:** RESET test suggested possible model misspecification ($p < 0.05$), though the main result remains robust.
- **Hosmer-Lemeshow test** was not applicable for this continuous outcome.
- **Model Fit:** $R^2$ of 0.354 suggests the model explains a substantial portion of the variation in LOS

**Summary:** While mild heteroscedasticity, autocorrelation, and residual non-normality were detected, the primary finding—that indigent defendants stay in jail longer and this effect increased after HB 1719—remains robust. Robust (HC3) standard errors mitigate heteroscedasticity concerns, and the model captures key policy-relevant relationships.

## CERTIFICATE OF SERVICE

I certify that the foregoing and the two accompanying exhibits have been served on all counsel of record by email on May 30, 2025.

/s/ Ashika Verriest

Ashika Verriest* (DC Bar No. 90001468)

American Civil Liberties Union Foundation

Criminal Law Reform Project

125 Broad Street, 17th Floor

New York, NY 10004

(347) 302-2797

averriest@aclu.org

Attorney for Plaintiffs

# Exhibit A

# RYAN CARROLL

raec901@gmail.com    —    +1-901-603-4825    —    LinkedIn    —    GitHub

## EDUCATION

**University of California at Santa Cruz**, Santa Cruz, CA USA

M.S., Mathematics                                                    **September 2012–March 2014**

**Rhodes College**, Memphis, TN USA

B.S., Mathematics, Honors                                            **August 2008–May 2012**

## EMPLOYMENT HISTORY

**Paradigm Case Management,** Remote

*Chief Technology Officer (CTO)*                                     **April 2025–Present**

Technical co-founder of a mission-driven legal technology startup building a modern, scalable case management system for prosecutors. Responsible for cloud infrastructure, data modeling, analytics, and product design in direct collaboration with DAs and staff.

(1) Design and implement infrastructure for case ingestion, enrichment, and longitudinal tracking across jurisdictions, covering bookings, charges, bail, case outcomes, and system events.

(2) Architect secure, CJIS-aligned cloud environments on AWS GovCloud using Terraform, ECS-based deployments, and CI/CD with GitHub Actions.

(3) Build pipelines to normalize complex legal datasets, designed schemas to reflect procedural nuance, and created tools for data validation, tagging, and auditability.

(4) Lead product development on structured prosecutor workflows—e.g., plea/bail recommendations, diversion tracking, and timeline-based navigation.

(5) Direct data strategy and analytics to support pattern recognition, equity monitoring, and evaluation of prosecutorial decision-making.

*Technologies*: FastAPI, PostgreSQL (SQLAlchemy), Next.js (TypeScript), Apache Airflow, AWS (GovCloud), Terraform, GitHub Actions, Docker

**Data-Driven Justice (formerly Freelance Consultant)**, Memphis, TN / Remote

*Co-Founder and Principal Consultant*                                **February 2019–Present**

1

Provide data engineering, statistical analysis, and software development services to nonprofits, legal advocacy organizations, and local governments to improve justice system transparency and equity.

(1) Developed ETL infrastructure and case management tools for criminal justice nonprofits, including eviction, bail, and court reminder systems.

(2) Designed litigation support analyses and visualizations for ACLU lawsuits on pretrial detention and bail.

(3) Led consulting engagements with Just City, Colorado Freedom Fund, Hester Street, and Neighborhood Preservation Inc. on jail audits, policing/mental health data, and service workflows.

(4) Built court data scraping and integration pipelines using Python, Django REST, and Airflow.

*Technologies*: Python, PostgreSQL, Django, Apache Airflow, AWS (Lambda, ECS, RDS, S3), Terraform, Docker, React, Dash/Plotly

**Just City**, Memphis, TN USA

*Data Scientist*                                                    **March 2022–March 2025**

Led data infrastructure and analysis for a nonprofit advancing bail reform and public accountability in Shelby County. Work included case-level database engineering, applied research, and development of tools to support public defenders, journalists, and community programs.

(1) Built and maintained a database of 1.3M+ criminal cases, including associated bonds, charges, dispositions, bookings, sentences, and documents, sourced via automated scraping and normalized across disparate systems.

(2) Developed the Public Data Accountability Project to inform journalists, policymakers, and researchers; produced reports and collaborated with academic partners to advance systemic transparency.

(3) Designed and deployed court reminder systems for clients of the Public Defender and Community Bail Fund, as well as tools supporting Clean Slate and Court Watch programs.

(4) Authored report on: *Pretrial Reoffense after the "Standing Bail Order"* and guest column in the Daily Memphian: *New bail law returns us to wealth-based justice system*.

*Technologies*: Python (requests, pytest), React, PostgreSQL, Airtable, AWS (Lambda, SQS, RDS, S3, CloudWatch), Terraform, Docker, GitHub Actions

*Reference*: *Yonée Gibson (yonee@justcity.org)*

**World Bank: Data and Evidence for Justice Reform Unit**, Washington, DC USA

*Data Scientist (STC)*                                          **December 2020–February 2022**

Applied machine learning, natural language processing, and causal inference to justice-sector challenges across multiple international contexts.

(1) Built machine learning pipelines to triage and accelerate investigations into slavery and labor exploitation for a foreign national prosecutor's office.

(2) Analyzed race, gender, and ethnic bias in federal judicial language using NLP on district court opinions; engineered judge-specific embeddings and improved bootstrap variance to link previously disjoint corpora.

(3) Developed CI/CD infrastructure for R Shiny dashboards supporting RCTs in Peru; led ETL design, implemented adaptive experimental pipelines, and co-developed new ML-to-policy interventions.

(4) Investigated "predicted self" theory in prosecutorial screening decisions in New Orleans (1989–1999) using randomization checks, error analysis, and counterfactual modeling.

(5) Authored technical grant sections on adaptive learning, combinatorial experimentation, and reinforcement learning for initiatives in Kenya and India.

*Technologies*: Dask, PySpark (Databricks), TensorFlow/Keras, XGBoost, cuML, NLTK, Gensim, Django ORM, R Shiny, Docker, AWS (Fargate, RDS, S3, Lambda, Route53, IAM), Terraform, GitHub Actions

*Reference*: *Sandeep Bhupatiraju (sbhupatiraju@worldbank.org)*

**New York University**, New York, NY USA

*Course Research Assistant*                                        **January 2021–June 2021**

Collaborated with David Rosenberg on the first iteration of his second-year graduate course "Topics in Machine Learning."

(1) Implemented and evaluated multiple approaches to covariate shift and selection bias; estimated conditional treatment effects; applied Thompson sampling and gradient methods to contextual bandits; conducted counterfactual evaluations on simulated data.

(2) Designed homework frameworks and code for lab assignments.

(3) Advised a student project applying bandit algorithms to criminal sentencing under fairness constraints.

*Reference*: *David Rosenberg (dr129@nyu.edu)*

**Just City**, Memphis, TN USA

*Program and Impact Coordinator*                                  **July 2018–February 2019**

Designed tools to automate client services and improve workflows for expungement and bail fund programs.

(1) Built an automated expungement tool that scraped and parsed criminal histories, assessed eligibility, pre-filled paperwork, and sent personalized notifications; integrated Airtable-based workflow for staff alerts.

(2) Developed a court reminder system to improve appearance rates for bail fund clients.

*Technologies*: Python, Airtable API, Twilio API, Gmail API, AWS EC2, Selenium WebDriver

3

**HopeWorks Adult Education**, Memphis, TN USA

*Lead Instructor and Coordinator of Shelby County Corrections*          **June 2016–June 2018**

Managed a county-wide adult education program in correctional facilities. Taught HiSET math, supervised instructors, developed curriculum, and oversaw educational data tracking.

**University of California, Santa Cruz**, Santa Cruz, CA USA

*Lecturer (Department of Mathematics)*          **June 2014–December 2014**

Taught undergraduate mathematics courses, developed instructional materials, and evaluated student performance as a full-time departmental lecturer.

## COMMUNITY INVOLVEMENT

**Vera Institute of Justice**, Brooklyn, NY USA

*Data Engineer (Pro Bono)*          **June 2020–January 2021**

Supported the In Our Backyards data team by maintaining jail roster scrapers, improving codebase stability, validating data quality, enriching geographic tagging, and building BigQuery views to monitor coverage across jurisdictions.

*Technologies*: pandas, SQLAlchemy, Docker, Google Cloud Platform BigQuery

**Shelby County Election Commission**, Memphis, TN USA

*Deputy Registrar at Shelby County Jail*          **March 2018–November 2018**

Led a voter registration drive inside Shelby County Jail for the 2018 election, registering over 100 incarcerated voters and coordinating with the Election Commission to support in-person ballot access.

**Memphis/Shelby County Jail**, Memphis, TN USA

*Volunteer HiSET/ACT Instructor*          **March 2015–August 2017**

Taught mathematics courses to adults preparing for HiSET exams as part of the jail's first education program in over a decade (450+ hours).

Provided ACT prep instruction to incarcerated youth pursuing high school diplomas (40+ hours).

## JOURNAL PUBLICATIONS

R. Carroll, C. Seaton, *Extensions of the Euler–Satake characteristic and point singularities of orientable 3–orbifolds*, *Kodai Mathematical Journal*, 2013.

R. Carroll, C. Seaton, *Extensions of the Euler–Satake characteristic for nonorientable 3–orbifolds and indistinguishable examples*, *Involve: A Journal of Mathematics*, 2013.

4

# Exhibit B

**BOOKING-LEVEL DATA DICTIONARY**

| column_name | dtype | description | notes | sample_values | methodology |
|---|---|---|---|---|---|
| hb1719 | categorical | Indicates whether the booking occurred before or after the implementation of HB1719. | | pre, post | The hb1719 variable is determined by comparing the booking's entry_date against four fixed policy period dates. Bookings with an entry_date from May 1, 2023 through January 31, 2024 are labeled "pre". Bookings with an entry_date from May 1, 2024 through January 31, 2025 are labeled "post". Bookings outside these ranges are not assigned an hb1719 label and are excluded from pre/post analyses. |
| exit_type | object | When collecting data from Odyssey, if it detects that bond was posted or a case was disposed, it looks for the exit_date associated with those events and if a booking was ended on one of those dates, it labels this column with that information. | BOND_POSTED: whether bail associated to the booking is paid preceding release<br><br>RELEASED_ON_RECOGNIZANCE: if released on non-monetary bail preceding release<br><br>SENTENCED: if defendant exits jail following a guilty conviction on an associated offense<br><br>CASE_DISPOSED: if exit follows dismissal/nolle pros of case(s) associated to booking | BOND_POSTED, CASE_DISPOSED, RELEASED_ON_RECOGNIZANCE, SENTENCED | Upon release from jail, query all cases related to the booking (and to the defendant) for events related to ROR, bail posting, disposition, or sentencing directly preceding the release date. |
| violation_of_probation | bool | Whether a VOP event directly preceded this booking | | False, True | If one of the following are true: (1) Looking at Case Events from Odyssey, a "Violation of Probation" event directly preceded the booking or (2) a "Violation of Probation" offense is listed on a case associated to the booking. |
| failure_to_appear | bool | Whether arrest was associated with a "Bench Warrant Arrest" event on an associated case | | False, True | If "Bench Warrant Arrest" event on Odyssey happens is recorded on the same day as arrest |
| fugitive_from_justice | bool | Whether booking was related to fugitive from justice (inferred from the charges of associated cases) | | False, True | If a "Fugitive from Justice" offense is associated to a case on the booking. |
| los_final | | Length of stay in jail (days) | Null if defendant is still in jail. | | Subtract the booking's entry date from its exit date, setting it to null if the defendant remains in jail. |
| los_capped | float | Length of stay in jail (capped at 90 days) | | 2.0, 8.0 | LOS capped to 90 days max to ensure right-censoring for pre period bias toward long LOS |
| case_groups_count | integer | Number/count of case groups | If a General Sessions case and the corresponding Criminal Court case show up on a booking, it counts these as a single "case group" and will be 1 | 0, 1, 2, ... | Number of cases with distinct charges (determined by offense date) associated to the booking. |
| male | bool | Whether the defendant is male | | False, True | Whether "Sex" field in Jail Roster is labeled as "M" |
| black | bool | Whether the race of the defendant is characterized as "Black" | | True, False | Aggregate value from Jail Roster/Odyssey race and ethnicity from the Jail Roster |
| hispanic | bool | Whether the ethnicity of the defendant is listed as "Hispanic or Latino" | | True, False | Whether jail roster booking displays ethnicity = "Hispanic or Latino" |
| age_at_booking | float | Age in years at the time of arrest (Normalized to mean = 0 and variance = 1) | Normalized the mean/variance. Added benefit of obscuring potential PII. | 0.00123, -0.43 | Compute (entry_date - person_dob).days // 365 then shift the mean to 0 and normalize the variance |

| attorney_type | categorical | Indicates the type of legal counsel for cases associated with the booking. | "appointed" denotes appointed counsel and includes both Public Defender appointments and court-appointed private attorneys.<br><br>"private" denotes that an attorney is associated to a case on the booking but there is no indication of attorney appointment.<br><br>Null if no attorney information on case (in Odyssey "Attorney" or "Case Events" fields) | "appointed", "private" | Set to "appointed" if any case associated with the booking has an appointed attorney, as defined in the "cases" data dictionary tab. Otherwise, set to "private" if a private attorney is associated. If no attorney information is present, the field remains null. |
|---|---|---|---|---|---|
| indigent | bool | Indicates whether the defendant is considered indigent, meaning they are unable to afford private legal counsel. | | False, True | `True` if has_attorney_appointment is `True` for any case associated to the booking |
| max_offense_level | categorical | Highest level of offense associated to the case. | | MISDEMEANOR_C, FELONY_A | Offense levels are ranked according to the following hierarchy: Misdemeanor C < Misdemeanor B < Misdemeanor A < Felony E < Felony D < Felony C < Felony B < Felony A < Felony M. |
| max_offense_level_ord | integer | Ordinal integer (0–8) representing the most serious offense level associated with the booking. Higher values correspond to more serious charges (e.g., Felony A, M). | Provides a standardized numeric scale to quantify charge severity for analysis. | 0, 1, 2, ..., 8 | Offense levels are ranked according to the following hierarchy: Misdemeanor C < Misdemeanor B < Misdemeanor A < Felony E < Felony D < Felony C < Felony B < Felony A < Felony M. Each charge's severity is mapped to this ordinal scale, assigning 0 to the least serious (Misdemeanor C) and 8 to the most serious (Felony M). |
| max_offense | object | The name(s) of the offense(s) corresponding to the highest offense level in the booking. If multiple charges share this highest level, they are sorted alphabetically and concatenated with a `" | Captures the specific offense(s) at the highest severity level for each booking. This helps contextualize risk and exposure to potential sentencing or pretrial detention outcomes. | THEFT OF PROPERTY LESS THAN $1000, CRIMINAL TRESPASS | All offenses linked to the booking are reviewed to determine the highest offense level. Offenses sharing this highest level are deduplicated and sorted alphabetically. If multiple offenses have the same highest level, they are concatenated using a " | " separator to present a comprehensive summary of the most serious charges within the booking. |
| violent | bool | Whether there is a violent charge (according to FBI UCR) on any case associated to the booking | | False, True | `True` if a case on the booking includes at least one charge that aligns with the FBI Uniform Crime Reporting (UCR) definition of violent crimes, including aggravated assault, rape, murder, or robbery. |
| initial_bail_amount | integer | The sum of all of the initial bail amounts associated to the booking's cases | | 0, 100000, pd.Nan | For each case on a booking, select the first bail setting amount on all active cases and sum them together to get the aggregate bail amount. If there are any settings which indicate "No Bail Set" (i.e. True for has_nbs_during_booking column) then set to null |
| eligible | boolean | Eligibility for Just City bail fund | Booking has case with public defender appointment, nonzero bail amount <= $5,000, and no case associated to the booking has a domestic violence charge | True, False | Derived from<br>(1) has a public defender appointed on an associated case<br>(2) aggregate initial_bail_amount ≤ $5000, and<br>(3) Domestic Violence is not on an associated case |
| bail_category | categorical | Binned bond amount | | ROR, <=1k, <=5k, etc... | The initial_bail_amount is grouped into ordered bins reflecting affordability and risk exposure:<br><br>'*ROR*': Exactly 0 (released on recognizance).<br>'*<=1k*': Amounts greater than 0 up to and including 1,000.<br>'*<=5k*': Amounts greater than 1,000 up to and including 5,000.<br>'*<=25k*': Amounts greater than 5,000 up to and including 25,000.<br>'*<=100k*': Amounts greater than 25,000 up to and including 100,000.<br>'*>100k*': Amounts exceeding 100,000. |
| bail_category_los_outlier | boolean | Whether a booking's length of stay is above the 95th percentile within a bail category | | True, False | Group by bail category and label the top 5% of los lengths as True |
| bail_posted | boolean | Whether defendant secured pretrial release through paying a monetary bail amount | | True, False | `True` if booking exit type equals 'BOND_POSTED' |
| ror | boolean | Whether defendant secured pretrial release through ROR | Does not differentiate whether the person was RORed initially (just eventually) | True, False | `True` if booking exit type equals 'RELEASED_ON_RECOGNIZANCE' |

| affordable_bail | boolean | Defendant is able to secure pretrial release by posting bail or non-monetary release within 3 days of booking. | | True, False | `True` if (bail_posted == True or ror == True) and LOS <= 3 days |
|---|---|---|---|---|---|
| initial_ror | boolean | Released on recognizance within 3 days of release | This allows a check to whether ROR was set in a timely manner (as opposed to someone who is detained for 20 days on nonzero bail amount and then is RORed due to lack of affordability) | True, False | `True` if exit_type == RELEASE_ON_RECOGNIZANCE and los_final <= 3 |
| has_nbs_during_booking | boolean | Whether the defendant was held pretrial without bail during the booking. | Bookings in which this is True often correspond with outliers due to NBS being a strong indicator of counfounding factors with the booking or an associated case. | True, False | Whether there is an explicit "HOLD WITHOUT BOND"/"No Bail Set"/"Not Assessed" indicator on a case with set date within the bookings entry_date and exit_date |
| past_nonviolent_convictions | integer | Number of guilty convictions on non-violent charges prior to booking | Criminal history | 0, 1, 2, ... | Count of all distinct offenses for which the defendant was found guilty, the disposition date strictly predates the arrest, and the offense is "violent" = False |
| past_violent_convictions | integer | Number of guilty convictions on violent charges prior to booking | Criminal history | 0, 1, 2, ... | Count of all distinct offenses for which the defendant was found guilty, the disposition date strictly predates the arrest, and the offense is "violent" = True |
| past_convictions_total | integer | Sum of all criminal misdemeanor/felony convictions where the disposition date is strictly before the booking entry_date | Criminal history | 0, 1, 2, ... | The sum of all convictions prior to the booking entry_date: past_nonviolent_convictions + past_violent_convictions |
| fta_raw_count | integer | Number of FTAs on cases associated to the defendant with dates prior to entry_date | Criminal history | 0, 1, 2, ... | Count of the number of "Bench Warrant Issued"/"Conditional Forfeiture" events associated to the defendant (deduplicated by date) prior to booking arrest date |
| fta_exp_decay | float | This column represents a weighted measure of a defendant's history of failing to appear (FTA) in court. | Each previous FTA event is counted, but events further in the past carry less weight than more recent ones. | 0.00123, 2.456 | Specifically, each FTA event is weighted using an exponential decay function, based on the amount of time that passed between the FTA event and the current booking. FTAs exactly one half-life period (default = 365 days) before the booking date receive half the weight of an FTA that occurred at the booking date. As a result, this metric places greater emphasis on recent FTAs, reflecting the defendant's recent behavior more prominently while still capturing the longer-term FTA history. |
| num | string | Unique Shelby County-assigned identifier | PII (available upon request and agreement to CJI data handling standards) | | Raw "Booking Number" from Jail Roster |
| entry_date | object | The date the person was booked into the jail. | PII (available upon request and agreement to CJI data handling standards) | | Raw "Commitment Date" from Jail Roster |
| exit_date | object | The date that the defendant was released and null if the defendant is still in custody. | PII (available upon request and agreement to CJI data handling standards) | | Raw "Release Date" from Jail Roster |
| person_name | string | Defendant's name | PII (available upon request and agreement to CJI data handling standards) | | Cleaned "Name" from Odyssey/Jail Roster |
| person_dob | string | Defendant's date of birth | PII (available upon request and agreement to CJI data handling standards) | | Raw "Date of Birth" from Odyssey/Jail Roster |
| case_groups | string | Collection of Odyssey case groups associated to the booking. A "case group" is a collection of Odyssey cases tracking a single criminal event (and associated charges) as it moves from General Sessions -> Indicted General Sessions -> Criminal courts upon if indicted | PII (available upon request and agreement to CJI data handling standards) | | Determined by cases that share defendant and related offenses with single offense_date |

**CASE-LEVEL DATA DICTIONARY**

| column_name | dtype | description | notes | sample_values | methodology |
|---|---|---|---|---|---|
| hb1719 | categorical | Indicates whether the case was filed before or after the implementation of HB1719. | "pre": Case filed before HB1719 implementation. "post": Case filed after HB1719 implementation. | pre, post | The hb1719 variable is determined by comparing the case's file date against four fixed policy period dates. Cases with an entry_date from May 1, 2023 through January 31, 2024 are labeled "pre". Cases with a file date from May 1, 2024 through January 31, 2025 are labeled "post". Cases outside these ranges are not assigned an hb1719 label and are excluded from pre/post analyses. |
| age_at_filing | float | Age in years at the time that the case is filed (Normalized to mean = 0 and variance = 1) | Normalized the mean/variance | 0.00123, -0.43 | Compute the days between the case filing date and the defendant's date of birth, dividing by 365. The column is then normalized as a whole. |
| black | bool | Whether the defendant's race is identified as Black | | True, False | `True` if the Jail Roster/Odyssey labels the defendant as "Black" |
| hispanic | bool | Whether the defendant's ethnicity is identified as Hispanic | | True, False | `True` if the Jail Roster labels the defendant with ethnicity "Hispanic or Latino" |
| male | bool | Whether the defendant is male. | | True, False | `True` the Jail Roster labels defendant as a male |
| has_public_defender_appointment | bool | Whether the defendant was appointed a public defender in the case. | | True, False | Public Defender appointments are identified explicitly through a "Public Defender Appointed" event, by explicit attorney labeling (e.g., role/title contains "Public Defender"), or inferred when the attorney consistently appears in other cases marked with "Public Defender Appointed" events within a relevant date range. |
| has_attorney_appointment | bool | Whether the defendant has a public defender or a private attorney assigned to the case. | | True, False | True if counsel was assigned by the court, including both Public Defender (PD) and court-appointed private attorneys. appointed private attorneys are identified when a case explicitly includes a "Private Attorney Appointed" event. Public Defender appointments are identified using the methodology for has_public_defender_appointment column |
| indigent | bool | Indicates whether the defendant is considered indigent, meaning they are unable to afford private legal counsel. | | True, False | `True` if has_attorney_appointment is `True` |
| max_offense_level | categorical | Highest level of offense associated to the case. | private if attorney associat | MISDEMEANOR_C, FELONY_A | Offense levels are ranked according to the following hierarchy: Misdemeanor C < Misdemeanor B < Misdemeanor A < Felony E < Felony D < Felony C < Felony B < Felony A < Felony M. |
| max_offense_level_ord | integer | An ordinal integer variable ranging from 0 to 8 that represents the severity of the most serious charge associated with the case. Higher values correspond to more serious offense levels, with 0 for Misdemeanor C and 8 for Felony M. This mapping is based on the hierarchy of charges used in the dataset. | | 0, 1, 2, ..., 8 | Offense levels are ranked according to the following hierarchy: Misdemeanor C < Misdemeanor B < Misdemeanor A < Felony E < Felony D < Felony C < Felony B < Felony A < Felony M. Each charge's severity is mapped to this ordinal scale, assigning 0 to the least serious (Misdemeanor C) and 8 to the most serious (Felony M). |
| max_offense | object | Highest-level offense(s) on the case | Null if no attorney on case. | THEFT OF PROPERTY LESS THAN $1000, CRIMINAL TRESSPASS | The offense(s) that correspond to the maximum offense level on the case, sorted alphabetcially and deduplicated. If there are multiple offenses corresponding to the highest offense level, they are concatenated with a " | " separator. |
| criminal | bool | Indicates whether the case includes at least one criminal charge. | | True, False | `True` if at least one offense on the case corresponds with Title 39 Criminal Offenses of the Tennessee Code or a Driving Under the Influence (Title 55). |
| violent | bool | Indicates whether the case contains a violent offense. | | True, False | `True` if the case includes at least one charge that aligns with the FBI Uniform Crime Reporting (UCR) definition of violent crimes, including aggravated assault, rape, murder, or robbery. |
| fta_raw_count | integer | Number of FTAs on cases associated to the defendant with dates prior to file_date | Criminal history | 0, 1, 2, ... | Count of the number of "Bench Warrant Issued"/"Conditional Forfeiture" events associated to the defendant (deduplicated by date) prior to case file date |

| | | | | | |
|---|---|---|---|---|---|
| **fta_exp_decay** | float | This column represents a weighted measure of all failures to appear prior to the case's filing date, applying exponential time decay. | Each previous FTA event is counted, but events further in the past carry less weight than more recent ones. | 0.00123, 2.12, -0.12 | Specifically, each FTA event is weighted using an exponential decay function, based on the amount of time that passed between the FTA event and the current case. FTAs exactly one half-life period (default = 365 days) before the file date receive half the weight of an FTA that occurred at the filing date. As a result, this metric places greater emphasis on recent FTAs, reflecting the defendant's recent behavior more prominently while still capturing the longer-term FTA history. |
| **past_nonviolent_convictions** | integer | Number of past convictions for crimes not including violent offenses. | | 0, 1, 2, ... | Count of all distinct offenses for which the defendant was found guilty, the disposition date strictly predates the arrest, and the offense is "violent" = False |
| **past_violent_convictions** | integer | "Number of past convictions for violent offenses only." | | 0, 1, 2, ... | Count of all distinct offenses for which the defendant was found guilty, the disposition date strictly predates the arrest, and the offense is "violent" = True |
| **initial_bail_amount** | integer | The initial bail amount assigned in the case. | | 0, 100000, pd.Nan | For each case, select the bail amount associated to the first bail setting according to the bail settings date and time |
| **bail_category** | categorical | Binned categories of the initial bail amount | | ROR, <=1k, <=5k, etc... | The initial_bail_amount is grouped into ordered bins reflecting affordability and risk exposure:<br><br>'*ROR*': Exactly 0 (released on recognizance).<br>'*<=1k*': Amounts greater than 0 up to and including 1,000.<br>'*<=5k*': Amounts greater than 1,000 up to and including 5,000.<br>'*<=25k*': Amounts greater than 5,000 up to and including 25,000.<br>'*<=100k*': Amounts greater than 25,000 up to and including 100,000.<br>'*>100k*': Amounts exceeding 100,000. |
| **ror** | bool | Whether ROR was the initial bail set | | True, False | `True` if the initial_bail_amount on the case is $0 and `False` otherwise. |
| **roc** | bool | Whether the defendant was initially "released on citation" | | True, False | `True` if initial_bail_amount is null and the case type is "Misdemeanor Citation" |
| **release** | bool | If defendant was initially released on citation or recognizance (aka non-monetary release) | | True, False | `True` if the defendant was initially ROCed or RORed on this case and `False` otherwise |
| **case_num** | string | The unique, Shelby County-assigned identifier for a case. | PII (available upon request and agreement to CJI data handling standards) | | Raw from Odyssey/Jail Roster |
| **file_date** | datetime | Date that the case was filed | PII (available upon request and agreement to CJI data handling standards) | | Raw from Odyssey |
| **person_name** | string | Defendant's name | PII (available upon request and agreement to CJI data handling standards) | | Cleaned "Name" from Odyssey/Jail Roster |
| **person_dob** | string | Defendant's date of birth | PII (available upon request and agreement to CJI data handling standards) | | Raw "Date of Birth" from Odyssey |