**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JUST CITY, INC., and class representatives DEANGELO TOWNS and MARSHAWN BARNES, on behalf of themselves and all others similarly situated, | ) | |
| Plaintiffs, | ) | No. 2:24-cv-02540-TLP-tmp |
| v. | ) | |
| SHERIFF FLOYD BONNER, JR., et al., | ) | |
| Defendants, | ) | |
| and | ) | |
| STATE OF TENNESSEE, | ) | |
| Intervenor. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

This case is about whether HB 1719, a statutory amendment to Tennessee's bail-setting law, violates the Fourteenth Amendment of the United States Constitution. Plaintiffs argue that it does and now move for summary judgment. (ECF No. 119.) The State and Defendants oppose the Motion. (ECF Nos. 126, 129.) Plaintiffs replied. (ECF No. 134.) For the reasons below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** summary judgment in Defendants' favor.

## BACKGROUND

Defendants facing criminal charges in Tennessee are entitled to bail unless they stand accused of a capital offense. Tenn. Const. art. I § 15. Tennessee Code Annotated section 40-11-

118 is the State's monetary bail-setting statute. It requires judicial officers to set a defendant's bail "as low as the court determines is necessary to reasonably ensure the safety of the community and the appearance of the defendant as required." Tenn. Code Ann. § 40-11-118(a)(2). Judicial officers consider nine statutory factors when setting a bail amount that is "as low as . . . necessary" to accomplish these two goals. *Id.* § 40-11-118(b). In 2024, Tennessee's General Assembly enacted HB 1719 which amended one of those factors. *See* 2024 Tenn. Pub. Acts, ch. 869, § 1 (amending Tenn. Code Ann. § 40-11-118(b)(2)). The amendment specifies that judicial officers setting bail must consider a defendant's "employment status and history and financial condition; provided, that, the defendant's ability to pay shall not be considered." Tenn. Code Ann. § 40-11-118(b)(2).

Plaintiffs claim that HB 1719 violates the Fourteenth Amendment in three ways. (ECF No. 75.) They assert that it is void for vagueness; that it results in fundamentally unfair bail proceedings; and that it causes discriminatory wealth-based detention. (ECF No. 75 at PageID 755–56.) Plaintiffs seek declaratory relief. (*Id.* at PageID 756.) *See* 28 U.S.C. § 2201. And they ask the Court to permanently enjoin the Shelby County Sheriff from "enforcing secured bail orders that are issued without a determination of ability to pay against arrestees who are unable to pay for release." (*See* ECF No. 75 at PageID 757.) Plaintiffs now move for summary judgment on all three of these claims. (ECF No. 119.) Defendants and the State oppose the Motion. (ECF Nos. 125, 129.)

Now for more background. The Court first provides an overview of Tennessee's bail-setting statutes. It then recounts the facts underlying this dispute. And finally, the Court discusses this case's procedural history before addressing the parties' arguments.

## I. Tennessee's Bail Statutes

Tennessee's Constitution provides that all defendants[1] charged with non-capital offenses "shall be bailable by sufficient sureties." Tenn. Const. art. I § 15. And Tennessee law sets out the process for judicial officers[2] to follow when determining the terms for a defendant's pretrial release. *See* Tenn. Code Ann. §§ 40-11-104 to -118. (*See* ECF No. 125 at PageID 1740–41.)

Tennessee courts have three main options for pretrial release. Judicial officers may release a defendant on their own recognizance, on an unsecured appearance bond, or on "conditions of release" that "may include the deposit of bail." Tenn. Code Ann. § 40-11-115(a)(1); *see id.* § 40-11-104(a). When deciding which release option applies to a defendant, the judicial officer must first consider community safety. *Id.* at § 40-11-115(a)(2). They must next consider "any results of a validated pretrial risk assessment" as well as the "defendant's financial resources." *Id.* § 40-11-115(b). The judicial officer may also consider other things, such as employment status, criminal record, the nature of the offense, and "[a]ny other factors indicating the defendant's ties to the community or bearing on the defendant's risk of willful failure to appear." *Id.*

When a judicial officer decides that release is warranted, that officer must "impose the least restrictive conditions" to ensure community safety and the defendant's reappearance. *Id.* That said, monetary bail is required if the judicial officer finds that "release on recognizance or with conditions will not reasonably ensure" that these two goals are met. *Id.* at § 40-11-117. Once the judicial officer determines that monetary bail is required, the amount of that bail must

[1] The term "defendant" as used in this Order is interchangeable with "detainee" and "arrestee."
[2] The term "judicial officers" as used in this Order refers to any individual who has authority to set bail, including magistrates, General Sessions judges, and judicial commissioners. *See* Tenn. Code Ann. § 40-11-105

be "as low as the court determines is necessary to," again, "reasonably ensure the safety of the community and the appearance of the defendant." *Id.* at § 40-11-118(a)(2).

As amended by HB 1719, nine statutory factors guide the judicial officer's calculation:

(1) The defendant's length of residence in the community;
(2) *The defendant's employment status and history and financial condition; provided, that, the defendant's ability to pay shall not be considered*;
(3) The defendant's family ties and relationships;
(4) The defendant's reputation, character and mental condition;
(5) The defendant's prior criminal record, record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;
(6) The nature of the offense and the apparent probability of conviction and the likely sentence;
(7) The defendant's prior criminal record and the likelihood that because of that record the defendant will pose a risk of danger to the community;
(8) The identity of responsible members of the community who will vouch for the defendant's reliability; however, no member of the community may vouch for more than two (2) defendants at any time while charges are still pending or a forfeiture is outstanding; and
(9) Any other factors indicating the defendant's ties to the community or bearing on the risk of the defendant's willful failure to appear, including, but not limited to, whether the defendant is lawfully present in this state.

*Id.* at § 40-11-118(b) (emphasis added). After the judicial officer sets bail, a defendant has the "right to petition the judge of the circuit or criminal court if the defendant feels that the bail set is excessive." *Id.* at § 40-11-105(a)(1). And a defendant can appeal that court's decision to the State's higher courts. *Id.* at § 40-11-144.

## II. Factual Background

The facts below are long but largely undisputed.[3] And so the Court recites them in full.

[3] The Court takes these facts from Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts (ECF No. 126-1) and Plaintiffs' Responses to Defendants' Additional Material Facts (ECF No. 134-1).

### A. Shelby County's Current Bail Setting Procedure

Judicial commissioners in Shelby County are typically the first officials to address a defendant's pretrial release. (*See* ECF No. 134-1 at PageID 1937.) They follow the statutory process described above when doing so. (*Id.* at PageID 1939.) If a judicial commissioner determines that bail is "appropriate," they complete a "detailed" five-page release screening form that includes the findings of fact on which they relied for their bail determination. (*Id.* at PageID 1937.) Although judicial commissioners used to consider an arrestee's ability to pay when setting a bail amount, the commissioners stopped doing so after HB 1719 was enacted. (*Id.* at PageID 1939.) But they still "consider a detainee's financial condition, including such factors as the detainee's employment history and whether the detainee receives public assistance, when setting bail." (*Id.* at PageID 1940.)

If an arrestee has not posted bond by their arraignment, they receive a "bail hearing" in which the District Attorney General bears the burden to show why the arrestee should be detained on bond. (*Id.* at PageID 1938–39; *see* ECF No. 119-8 at PageID 1448.) A Shelby County Criminal Court judge typically presides over such a bail hearing. (ECF No. 134-1 at PageID 1938.) Arrestees are appointed counsel if the court finds them indigent. (ECF No. 126-1 at PageID 1823.) And the arrestee, their counsel, the District Attorney, and Pretrial Services are present at the bail hearing. (*Id.*) And at the hearing, the arrestee can testify and produce their own witnesses. (ECF No. 134-1 at PageID 1938.)

### B. The Standing Bail Order

This case is about HB 1719's impact on Shelby County's bail-setting procedures. But much of the record discusses the County's Standing Bail Order ("SBO") that was in place *before* the General Assembly enacted HB 1719. Shelby County implemented the SBO in 2023 after

many entities, including Shelby County, the General Sessions Criminal Court Divisions, the Sheriff's office, and advocacy groups including Plaintiff Just City, Inc., negotiated its terms.[4] (ECF No. 126-1 at PageID 1820.)

The record is somewhat unclear on this point, but it seems the SBO is still in effect.[5] (*See* ECF No. 119-1 at PageID 1224.) Under the SBO, once an arrestee was booked into the Shelby County Jail, a pretrial services employee interviewed them and gathered information on their background. (ECF No. 126-1 at PageID 1820.)) That employee asked questions about the arrestee's income, assets, and expenses. (ECF No. 126-1 at PageID 1821.) It then entered this information into an "affordable bail calculator"—a tool created by the Vera Institute—that calculates the amount of bail the arrestee can afford. (*Id.*) The interview took seven to twelve minutes, and using the affordable bail calculator took another three to four minutes. (*Id.*) Put simply, the SBO required judicial officers to consider and enter findings on the amount of bail a person can afford. (*Id.* at PageID 1820.) That said, under the SBO, judicial officers could also set "unaffordable bail" if no other combination of release conditions would reasonably ensure public safety and court appearance. (*Id.* at PageID 1820.)

Shelby County worked with pretrial consultant Spurgeon Kennedy to implement the SBO. (*Id.* at PageID 1827.) And Kennedy prepared an expert report for Plaintiffs in this case. (*Id.*) In Kennedy's experience, courts consider arrestees' ability to pay with little to no fiscal or

---

[4] Even before HB 1719, judicial officers in Shelby County did not consider the amount of bail an arrestee could afford. (ECF No. 126-1 at PageID 1819.) It is undisputed that this practice led to the widespread detention of people "who simply cannot afford even a minimum bond" even though this system was "not necessary to ensure future court appearances or to protect public safety." (*Id.*) Shelby County implemented the SBO to require judicial officers to consider an arrestee's ability to pay bail. (*Id.*)

[5] The record refers to the SBO in the present tense. But because judicial officers no longer use the bail calculator (*see* ECF No. 122-1 at PageID 1824), the Court refers to the SBO process in the past tense.

administrative burden. (*Id.*) When facilitating discussions between Shelby County and the advocacy groups, Kennedy did not hear any concerns or complaints from judges, Pretrial Services employees, or court staff that administering the calculator would lead to problems. (*Id.*) Shelby County spent $3.5 million implementing the SBO. (*Id.* at PageID 1826.)

The SBO did not lead to increased public safety risks or failures to appear in court. (*Id.* at PageID 1828.) Indeed, the Center for Community Research and Evaluation ("CCRE") at the University of Memphis found that the Standing Bail Order did not result in increases in rearrest rates, broader recidivism, or failures to appear. (*Id.*) Commissioner Marshall—who provided a Rule 30(b)(6) deposition in this case—affirmed the CCRE's report conclusions. (*Id.* ("Bottom line is [rearrests] didn't change very much one way or the other[.]").)

### C. HB 1719's Impact on the Standing Bail Order

In sum, before HB 1719 judicial officers entered findings about the arrestee's ability to pay during bail hearings. (*Id.* at PageID 1824.) Pretrial Services often provided information about an arrestee's ability to pay in response to questions from the judicial officers. (*Id.*) Defense counsel also presented arguments that their clients could not afford to pay bail. (*Id.*) Judicial officers referenced the arrestee's ability to pay about 30% of the time when setting bail and entered findings on the arrestee's ability to pay in the bail hearing order form they completed. (*Id.*)

But after HB 1719, in Shelby County "judicial officers no longer inquire into the arrestee's affordable bail amount, income (other than employment status), benefits, expenses, or finances during bail hearings." (*Id.*) Pretrial Services does not bring up the arrestee's ability to

afford bail.[6] (*Id.*) And Defense counsel does not make arguments that their clients cannot afford bail as often as they did before. (*Id.*) Judicial officers no longer enter findings about the arrestee's ability to pay bail either on the record or when completing the bail hearing order form. (*Id.*) 1823.) When judicial officers require bail, those arrestees who can afford to pay bail are released, and those who cannot afford to pay bail remain detained. (*Id.* at PageID 1823.)

The General Sessions judges made the decision to stop using the affordable bail calculator solely to comply with HB 1719. (*Id.* at PageID 1825.) In fact, the judges held a meeting and instructed the judicial commissioners to stop taking information from Pretrial Services about the affordable bail calculator and to change the forms to remove "any discussion about affordable and unaffordable" bail amounts. (*Id*. ("Please do not include affordable bail information, numbers, or Vera calculator information. Gov. Lee signed law prohibiting us from considering it effective immediately").) The judicial commissioners followed these instructions. (*Id*.)

**D. HB 1719's Impact Generally**

The judicial officers ordered that Plaintiffs Towns and Barnes be released upon payment of secured bail. (*Id.* PageID 1831.) Both Plaintiffs assert they could not afford their bail amounts. (*Id.*) They were each subject to an initial screening after being arrested where the judicial officers did not ask or enter findings about their ability to pay. (*Id.*) The judicial officers instead set their bails at amounts exceeding what they could afford. (*Id.*) Towns and Barnes were then scheduled for a bail hearing. (*Id.*) The judicial officers again did not ask or enter

---

[6] Pretrial services still uses the affordable bail calculator to determine an arrestee's affordable bail amount and stores that data in a defendant's pretrial file. (*Id.* at PageID 1822.) But in response to HB 1719, they no longer provide the amount produced by the calculator to judicial officers. (*Id.*)

findings about their ability to pay and maintained their bails at the same unaffordable amounts. (*Id.*) So they remained in jail. (*Id.*)

Plaintiffs' expert, Ryan Carroll, analyzed HB 1719's impact using publicly available Shelby County data. (*Id.*) He examined whether any changes to bail amounts post-HB 1719 could be explained by the nature of the charges, arrestees' criminal histories, or past failures to appear. (*Id.*) He found that violent charges, maximum charge levels, and past convictions plunged after HB 1719. (*Id.*) And failures to appear decreased, though not significantly. (*Id.*) According to Carroll, this means that if judicial officers were setting bail solely based on "risk level"—as measured by charge levels, criminal histories, and past failures to appear-bail amounts should have decreased after HB 1719 because risk levels would have decreased. (*Id.*) Instead, bail amounts have climbed after HB 1719 and fewer arrestees can afford to make bail across all charge levels, criminal histories, and failure-to-appear histories. (*Id.*) As a result, more people are detained pretrial and for longer periods of time than before HB 1719. (*Id.*) The number of indigent arrestees after HB 1719 also increased. (*Id.*) Indigent defendants who could not afford to pay bail remained in jail for longer periods than before HB 1719 across all charge levels, prior convictions, and failure-to-appear histories. (*Id.*) Shelby County has issued no policy or training on how to apply HB 1719 or what its terms mean. (*Id.* at PageID 1830.)

At bottom, it is undisputed that "HB 1719 [] led to more wealth-based detention because indigent defendants were particularly unlikely to be able to afford bail and, as a result, remained in jail for much longer than their non-indigent counterparts not because of their risk level, but because of their inability to pay." (*Id.* at PageID 1833.) Further, Shelby County's representative Llana Greer testified that since HB 1719, bail amounts have increased and pretrial release has decreased. (*Id.*) She stated that there was no explanation for the change other than passage of

the new law. (*Id.*) According to Kennedy, individuals who are detained under the new law are not only subject to jail conditions, they also experience a higher risk of unemployment and higher rates of unfair convictions, sentencing disparities, and reoffending. (*Id.* at PageID 1834.)

## III. Procedural History

In July 2024, Just City, Inc. ("Just City") sued Sheriff Floyd Bonner, Jr. as well as Judge Lee Wilson[7] and the Shelby County judicial commissioners ("Judicial Defendants") under 42 U.S.C. § 1983 to prevent them from enforcing HB 1719. (ECF No. 1.) Just City also moved for a preliminary injunction and expedited declaratory relief. (ECF No. 2.) The State of Tennessee ("the State") then intervened "for the limited purpose of defending the constitutionality of the 2024 amendment to Tenn. Code Ann. § 40-11-118(b)(2)." (ECF No. 40 at PageID 366; ECF No. 43.) Defendants and the State separately moved to dismiss. (ECF Nos. 44, 52.) The Court denied all these motions. (ECF No. 64.)

Just City amended its Complaint in March 2025 and added Plaintiffs Towns and Barnes as proposed class representatives. (ECF No. 77.) Towns and Barnes are individuals who were detained in the Shelby County Jail under bail orders that they could not afford to pay. (*Id.* at PageID 1831; ECF Nos, 119-15, 119-16.) After reviewing the parties' arguments, which included initial briefing, oral argument, and post-argument briefing, the Court certified a class of:

> All people in the custody of the Shelby County Sheriff who are detained under bail orders issued by Shelby County judges pursuant to Tenn. Code Ann. § 40-11-118(b), as amended by HB 1719, without consideration of their ability to pay.

(*See* ECF No. 113 at PageID 1187.)

---

[7] Just City originally sued Bill Anderson as the Presiding Shelby County General Session Criminal Court Judge, but, because the suit brings only official-capacity claims, it later substituted Anderson for Lee Wilson under Federal Rule of Civil Procedure 25(d).

Plaintiffs now move for summary judgment.[8] (ECF No. 119.) The State and Defendants responded in opposition (ECF Nos. 125, 129), and Plaintiffs replied (ECF No. 134). And in May 2026, the Court heard oral argument on Plaintiffs' Motion. (ECF No. 140.) The Court now outlines the summary judgment standard before turning to the parties' arguments.

## LEGAL STANDARD

Under Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes all reasonable inferences in the nonmoving party's favor. *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). It does not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court only determines "whether there is a genuine issue for trial." *Id.* The parties have agreed that the Court may grant summary judgment in either party's favor based on the briefing and record here. (ECF No. 133.) *See* Fed. R. Civ. P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may [] grant summary judgment for a nonmovant[.]").

---

[8] Defendants did not timely move for summary judgment. In fact, Defendants waited until ten days after the dispositive motion deadline to file their summary judgment briefing. (ECF No. 122-2.) And along with the untimely Motion, Defendants moved to extend their deadline and asked the Court to accept their Motion for Summary Judgment as timely filed. (ECF No. 122.) Plaintiffs opposed the extension. (ECF No. 123.) So the Court held an in-person status conference in March 2026 to discuss the matter. (ECF No. 131.) At the hearing, the Court denied Defendants' Motion after finding that they failed to show excusable neglect. (ECF No. 133.) The Court's ruling means that Plaintiffs' Motion for Summary Judgment is the only dispositive motion for it to consider here. But at Plaintiffs' counsel's request, the parties agreed that the Court can rule on Plaintiffs' Summary Judgment Motion in either parties' favor. (*See id.*)

**ANALYSIS**

Plaintiffs argue that the record supports granting judgment in their favor as a matter of law on all their claims. Again, those claims are that under the Fourteenth Amendment, HB 1719 is unconstitutionally vague; it violates procedural due process by preventing arrestees from receiving a meaningful opportunity to be heard; and it violates equal protection by causing wealth-based detention. (*See* ECF No. 119-1 at PageID 1214.) Defendants and the State disagree on the merits. But Defendants also raise a few jurisdiction-related issues. (*See* ECF No. 129-1.) So before turning to the merits, the Court begins with these threshold matters.

## I. Threshold Issues

Defendants challenge Just City's standing and argue that the Judicial Defendants are not proper parties here.

### A. Standing

Article III of the United States Constitution provides federal courts with "judicial power." U.S. Const. art. III, § 1. But this "grant of authority does not allow courts to . . . preemptively screening all new laws passed by democratically elected legislators." *Tennessee Conf. of the NAACP v. Lee*, 139 F.4th 557, 562 (6th Cir. 2025) (citation omitted). Rather, the Constitution limits a federal court's jurisdiction to only "Cases" and "Controversies." U.S. Const. art. III, § 2. To ensure compliance with this requirement, courts have developed the standing doctrine to limit who can sue to enforce a right. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 379 (2024) (citation omitted).

Three well-known elements govern standing analysis. A plaintiff must show "(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be

caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA*, 602 U.S. at 380 (citation omitted).

An injury in fact must be "concrete" and "particularized." *Id.* at 381 (citation omitted). It must be more than an ideological offense or harm, no matter how deeply held the plaintiff's belief or conviction. *Id.* ("Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action."). To show causation, a plaintiff must show that the defendant's conduct caused, or likely will cause, the plaintiff's injury. *Id.* The final element, redressability, asks whether a court can order relief that would resolve the plaintiff's injury. *See id.* at 380. This often overlaps with causation because if a defendant caused an injury, "enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 380–81.

Defendants do not argue that Barnes, Townes, or the Certified Class lacks standing. And that is likely for good reason. It takes little, if any, discussion to see why these Plaintiffs—who have been detained under the very statute they challenge—satisfy the three elements that form the "irreducible constitutional minimum" for Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted); *cf. Kitchen v. Whitmer*, 106 F.4th 525, 534–35 (6th Cir. 2024) ("Kitchen suffered an injury (being kept in prison without parole) that is traceable to Defendants (who oversee enforcement of Michigan's parole statute) and is redressable by a ruling ordering a parole hearing[.]").

In multi-plaintiff cases like this one, if a single plaintiff has standing, courts typically need not consider the other plaintiffs' standing. *See Knight v. Montgomery Cnty., Tennessee*, 592 F. Supp. 3d 651, 671 (M.D. Tenn. 2022) ("When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. Thus, in a multiple-

plaintiff case, a court need not consider the standing of other plaintiffs once one plaintiff is determined to have standing." (citation omitted)). So perhaps the Court "need not consider the standing issue as to [Just City]" because the individual Plaintiffs already have standing. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (citations omitted); *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020) ("But because 'we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own[,] . . . we need not consider whether the other individual . . . [has] standing to maintain the suit." (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)).

But because Plaintiffs did not argue this point, the Court will now address whether Just City has standing to challenge HB 1719.

### 1. Just City's Standing

An organization "may have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). For organizational standing, the plaintiff organization must show the same three standing elements that individual plaintiffs must meet. *Id.* at 393–94. And when, as here, an organization challenges a law that does not directly regulate the organization's conduct, standing is "substantially more difficult to establish." *Id.* at 382 (citation omitted). "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.* (citations omitted).

Defendants argue that Just City fails to show injury, causation, and redressability.[9] (ECF No. 129-1 at PageID 1881.) Plaintiffs counter that Just City "has organizational standing because HB 1719 has 'directly affected and interfered with [its] core business activities." (ECF No. 134 at PageID 1916.) The Court agrees with Plaintiffs for the reasons below.

Plaintiffs' argument is based on the "diversion-of-resources theory of standing." *NAACAP*, 139 F.4th at 563. This theory finds that an organization can sometimes establish standing if it diverts its resources in response to government action. But as this Court explained in its Order Denying Preliminary Injunction and Motions to Dismiss (ECF No. 64), the Supreme Court recently questioned the viability of this approach. *See FDA*, 602 U.S. at 396 ("*Havens* [the foundational diversion-of-resources theory opinion] was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context."). And the Sixth Circuit in *NAACP v. Lee* later echoed the Supreme Court's hesitancy. *See* 139 F.4th at 563 ("As we have since recognized, though, the Supreme Court in *Alliance for Hippocratic Medicine* disavowed our diversion-of-resources theory."). In short, whether an organization can establish standing on a diversion-of-resources theory is uncertain.

Despite this growing doubt, the Sixth Circuit court still stated "that organizations can *sometimes* have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms." *Id.* at 565 (emphasis added) (citing *FDA*, 602 U.S. at 383–85). Yet it cannot "spend [its] way into standing" merely by "voluntarily using resources to counter government action." *Id.* (quoting *FDA*, 602 U.S. at 394). The record must instead show an organization's specific injuries, such as "actual costs incurred," "what it had

[9] Defendants also argue that Just City lacks third-party standing. (ECF No. 129-1 at PageID 1881.) Because the Court finds that Just City has organizational standing, it need not address this argument.

done to assist [its clientele]," and "when it had undertaken those efforts." *Id.* at 567. The bottom line is that organizations must show that the challenged law "interfered with [its] core business activities" beyond merely interfering with its advocacy. *See id.* at 564–65 ("Likewise, HOME in *Havens* suffered [] harms to its 'core business activities' . . apart from its efforts to oppose Havens's discrimination." (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982))).

The Court noted all this at the motion-to-dismiss stage as mentioned above. (ECF No. 64 at PageID 677–84, 699–700.) There, it found that Just City seems to fall somewhere between trying to "spend its way into standing" by voluntarily posting bail for qualified detainees—which is not enough to establish standing—and having HB 1719 genuinely impairing Just City's ability to perform its core business activity of posting bail for indigent detainees—which could be enough to establish standing. (*Id.* at PageID 681.) The Court concluded that Just City's pleadings were enough to withstand dismissal. (*See id.* at 700.) But it warned that Just City needed to develop more of a record through discovery to prove "increased bail amounts, potential future harm, individual detainees Just City intends to assist, and similar facts [that] may be relevant to deciding the issue of standing at summary judgment." (*Id.*)

With discovery now complete, Defendants argue that the record does not support Just City's standing. (ECF No. 129-1 at PageID 1882.) Plaintiffs push back: "The undisputed record shows that Just City suffered a concrete and particularized injury because HB 1719 directly increases client demand and the costs for Just City's bail fund to serve the same pool of clients as before." (ECF No. 134 at PageID 1916–17.) Just City "does not assert standing based on voluntarily using resources to oppose or respond to HB 1719; rather, it asserts standing because it is forced to incur costs to maintain the bail fund it has operated since 2017—long before HB 1719 passed." (*Id.* at PageID 1917.) And Plaintiffs contend that an injunction prohibiting HB

1719's enforcement "would result in judicial officers considering ability to pay, which would lower bail amounts and redress Just City's injury." (*Id.*) Even with the uncertainty about the "diversion-of-resources theory," Plaintiffs' arguments here are persuasive.

The undisputed facts here show why Just City has met its "difficult" organizational standing burden. Just City's "core mission" is operating a charitable bail fund to "fight discrimination based on race, ethnicity, and income in Shelby County criminal proceedings." (ECF No. 126-1 at PageID 1834.) The fund's purpose is to post bail for as many indigent arrestees who cannot afford to pay their bail amount "as possible." (*Id.*) Just City has operated this bail fund since 2017 and has paid "more than $4,500,000 in cash bail for more than 2,000 people." (*Id.*) So long as Just City has available funds, it will pay the full bail amount for qualifying indigent arrestees that the Shelby County Public Defender's office refers to it. (*Id.*)

What is more, Defendants do not dispute that HB 1719 has resulted in "[h]igher bail amounts and fewer release orders" than before Tennessee enacted the new law. (*Id.* at PageID 1835.) This increase has caused Just City's costs "of serving similarly situated clients" to surge and "inhibit[ed] its ability to serve as many indigent clients as possible." (*Id.*) Defendants also do not dispute that since the passage of HB 1719, Just City is spending more money posting bail and serves more clients than before. (*Id.* at PageID 1836 (citing data).) To meet this larger demand, "Just City conducted more fundraising and adjusted its policies to ensure it maintains the necessary funds for its bail fund to operate in light of increased costs after HB 1719." (*Id.*) And it set a weekly limit on the amount of cash bail it can post and lowered the maximum bail amount cap from $5,000.00 to $4,000.00 and then to $3,000 so it could serve more arrestees with low bail amounts. (*Id.*)

Considering the record here, Just City is not merely an "issue-advocacy organization" trying to "establish standing based on the intensity of [its] interest' or because of strong opposition" to HB 1719. *See FDA*, 602 U.S. at 393–95. Nor is it trying to "spend [its] way into standing' by voluntarily using resources to counter" HB 1719. *See NAACP*, 139 F.4th at 565. To the contrary, the Court finds that the passage of HB 1719 has caused Just City to "increase the costs of [its] preexisting" bail-fund efforts, *id.* at 566, which means the law "directly affected and interfered with [its] core business activities." *FDA*, 602 U.S. at 395. The record shows Just City suffers an injury-in-fact through economic harm associated with increased bail amounts and an increased client base. It shows a connection between HB 1719 and that harm. And it shows redressability if the Court were to enjoin Sheriff Bonner from enforcing the statute. Just City has therefore established organizational standing.

The Court acknowledges that recent precedent—and the uncertainty of applying it—casts doubt on Just City's standing. Yet even if the Court reads this shifting landscape incorrectly here, nobody disputes that the other Plaintiffs have standing. And as mentioned above, that is enough "to satisfy Article III's case-or-controversy requirement." *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("The complaint named numerous other plaintiffs as well. The District Court concluded that each plaintiff had standing to bring this suit. The Court of Appeals for the Third Circuit agreed with the District Court that FAIR had associational standing to bring this suit on behalf of its members. The Court of Appeals did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. Because we also agree that FAIR has standing, we similarly limit our discussion to FAIR." (citations omitted)).)

**B. Whether the Judicial Defendants Are Proper Parties**

The Judicial Defendants—Judge Wilson and the Judicial Commissioners—argue that Plaintiffs cannot "maintain a case" against them because they are not adverse to Plaintiffs' legal interests. (ECF No. 129-1 at PageID 1876). Plaintiffs disagree, arguing that because this lawsuit challenges "statutes related to the judicial process," these parties are "sufficiently adverse." (ECF No. 134 at PageID 1918, 1920.) For the reasons below, the Court finds that the Judicial Defendants are not proper parties here.

Judges are often immune from lawsuits challenging their judicial acts. *McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991 (6th Cir. 2019) (citation omitted). But § 1983 permits "litigants, in some circumstances, [to] obtain declaratory relief against judicial officers acting in their official capacity." *Lindke v. Tomlinson*, 31 F.4th 487, 490 (6th Cir. 2022). A lawsuit seeking declaratory relief against a judge must satisfy Article III's case-or-controversy requirement. *Cooper v. Rapp*, 702 F. App'x 328, 333 (6th Cir. 2017).

The defendant judge's role in the proceedings being challenged determines whether a live controversy is present. No case or controversy exists "between a state-court judge who has acted in an adjudicatory capacity under a state statue and a litigant who is attacking the constitutionality of that statute." *Lindke*, 31 F.4th at 492–93. But it does exist "[w]here a suit challenges 'statutes related to the judicial process or statutes previously enforced by the particular judge against the plaintiff.'" *Id.* at 493 (quoting *Georgevich v. Strauss*, 772 F.2d 1078, 1088 (3d Cir. 1985)). So "whether the judge is acting, under the statute at issue, in an adjudicatory capacity or as an enforcement or administrator" makes all the difference here. *Id.* at 491. The parties disagree about the meaning of—*Lindke* and *Georgevich*—which helps illustrate this distinction.

Start with the scenario in *Lindke*. A state court judge in that case found that the plaintiff had violated a personal protection order ("PPO"). 31 F.4th at 489. Rather than appealing that judge's ruling in the state system, the plaintiff sued the state judge in federal court "seeking to enjoin enforcement of [the state's] domestic PPO statute." *Id.* The federal district court dismissed the case for lack of subject-matter jurisdiction. *Id.* And the Sixth Circuit affirmed after finding that the state judge's role in the proceedings was only "adjudicative." *See id.* at 493.

The *Lindke* court reasoned that the judge did not "initiate the underlying action;" rather, he only "evaluate[d] the petitioner's request for a PPO." *Id.* (citations omitted). This evaluation rested on "purely adjudicative grounds," as the "PPO statute merely direct[ed] the adjudicating judge to make certain findings and issue a PPO if necessary." *Id.* So under the challenged statute, "judges act 'as they would in any other case based upon a [state] statute: they sit as adjudicators, finding facts and determining law in a neutral and impartial judicial fashion.'" *Id.* (citations omitted). *Lindke* went on to "hold that a federal court lacks subject-matter jurisdiction over a challenge to a state statute brought under § 1983 against a state-court judge when, in the underlying action, the judge merely acted in an adjudicatory capacity to construe and apply the statute." *Id.* at 496. Importantly, the judge was not responsible for the PPO's enforcement after entering it. *Id.* at 493. This rendered the "PPO statute distinct from the *rare* case, such as *Georgevich*, in which a judge is an 'enforcer' of a particular statute." *Id.* (emphasis added).

Contrast *Lindke* with the judge's enforcement role in *Georgevich*. In that case, the *Georgevich* court held "[w]here a suit challenges 'statutes related to the judicial process or statutes previously enforced by the particular judge against the plaintiff,' judges are proper parties." *Georgevich*, 772 F.2d 1088 (quoting *In re Justices*, 695 F.2d at 23).

In *Georgevich*, a class of state inmates brought an equal protection claim challenging state parole procedures. *Id.* at 1081. One of the statutes governing those procedures authorized a state parole board to parole prisoners who had received sentences for two years or more. *Id.* at 1083. And another statute authorized "sentencing judges" to parole prisoners who they sentenced to serve less than two years. *Id.* at 1083. The defendant judges argued that they were improper parties. *See id.* at 1087. But the Third Circuit rejected their argument, finding that it was "not a case in which judges [were] sued in their judicial capacity as neutral adjudicators of disputes." *Id.* at 1087 (citing *In re Justices*, 695 F.2d at 21–25). "Rather, the judges are sued as enforcers of the statutes, in other words as administrators of the parole power." *Id.* The Third Circuit later explained this ruling, stating that a state judge may be sued "if they have enough latitude under the statute and policies that they become enforcers like the judge defendants in *Georgevich*." *Allen v. DeBello*, 861 F.3d 433, 441 (3d Cir. 2017).

The Judicial Defendants compare this case to *Lindke*. According to them, *Lindke* is "dispositive" because like the judge there, they "merely acted in an adjudicatory capacity to apply the statute being challenged." (ECF No. 129-1 at PageID 1879.) Plaintiffs argue they "challenge a law that governs the process utilized by judges when setting bail, like the plaintiffs' challenge to a law governing parole procedures in *Georgevich*." (ECF No. 134 at PageID 1920.)

Plaintiffs make a fair point. It is true that parole procedures and bail-setting share a common thread because each deals with a defendant's release. But the Judicial Defendants here are in a different position than the sentencing judges in *Georgevich*. They are not applying or enforcing a statute against prisoners that they themselves sentenced. Nor are they responsible for the statute's enforcement after entering their bail determination. Rather, the Judicial Defendants

here only evaluate an arrestee and make certain findings under statutory guidelines. That process is nearly identical to the judges' responsibilities under the PPO statute in *Lindke*.

The Court finds that this is not a "rare" case like *Georgevich*. Because the Judicial Defendants are "bound to decide the issues before [them] according to the law," they are "not amendable to a suit for declaratory relief under § 1983." *Cooper*, 702 F. App'x at 333; *see also Harris v. Sec'y of State for Tennessee,* No. 23-5833, 2024 WL 4225713, at *3 (6th Cir. May 29, 2024), *cert. denied sub nom. Harris v. Hargett*, 145 S. Ct. 594, 220 L. Ed. 2d 231 (2024) ("Harris challenged judicial acts within the scope of Judge Williams's official duties and jurisdictional authority as an administrative law judge. Thus, Harris has failed to show that Judge Williams acted in a non-judicial capacity[.]" (citations omitted)). And so the Court lacks subject matter jurisdiction over Plaintiffs' claims against them. *See Lindke*, 31 F.4th at 495. The Court therefore **DISMISSES** the Judicial Defendants from this action. But Sheriff Bonner remains a proper party, and so the case may proceed to the merits against him.[10]

[10] Sheriff Bonner also argues that he is not a proper party. (ECF No. 129-1 at PageID 1895.) He relies on *McNeil v. Community Probation Services*, a case in which the Sixth Circuit affirmed a district court enjoining a sheriff from enforcing bail requirements "established by state law and set by a local judge." 945 F.3d at 993. Sheriff Bonner acknowledges that *McNeil* "seems" to support Plaintiffs' claims against him. (ECF No. 129-1 at PageID 1897.) In fact, *McNeil* stated "[t]he short answer is that the plaintiffs can sue the sheriff (when he enforced thebail amount), and it makes no difference whether he acts for the State or the county." 945 F.3d at 994. But Bonner tries to distinguish this case from *McNeil* because, unlike here, the sheriff in *McNeil* conceded "that the bail orders he was enforcing were unconstitutional." (*Id.*) And so, according to Sheriff Bonner, because he contests Plaintiffs' allegations that the bail orders are unconstitutional, there is no "constitutional harm" that this Court could enjoin him from "perpetuating." (*Id.* at PageID 1898.) This argument is unavailing. *McNeil* makes no exception for a sheriff who challenges a lawsuit on the merits.

## II. Merits

Plaintiffs claim that HB 1719 violates the Fourteenth Amendment for three reasons: it is void for vagueness, it violates both procedural due process, and it violates equal protection guarantees. (*See* ECF No. 119 at PageID 1205.) Defendants argue that the claims fail on the merits. (*See* ECF No. 129.) The State asks the Court to "uphold the constitutionality of the Tenn. Code Ann. § 40-11-118(b)(2)" because the "Constitution does not require consideration of a defendant's ability to pay the amount of bail set." (ECF No. 125 at PageID 1740.) The Court addresses each claim below.

### A. Void for Vagueness Claim

Due process protects against vague laws. *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999) (citations omitted). A law is unconstitutionally vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, (2000) (citation omitted); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (citations omitted).

Plaintiffs argue that HB 1719 is vague because it requires judicial officers setting bail to consider an arrestee's "financial condition" but then prohibits them from considering that same arrestee's "ability to pay." (ECF No. 119-1 at PageID 1214.) They assert that this statutory language is "fundamentally irrational and impossible to apply consistently." (*Id.* at PageID 1232.) The State responds first that the vagueness doctrine does not apply to HB 1719. (ECF No. 125 at PageID 1764–65.) And even if the doctrine does apply, the State and Defendants both argue that the law is definite enough to pass constitutional scrutiny. (*See id.* at PageID 1767–68;

ECF No. 129-1 at PageID 1899.) For the reasons below, the Court finds that HB 1719 is not unconstitutionally vague.

**1. Whether the Vagueness Applies**

Whether the void-for-vagueness doctrine applies here is a close question. The State argues that the doctrine is inapplicable because HB 1719 "only guides judicial decision-making." (ECF No. 125 at PageID 1765.) It relies on *Beckles v. United States* and *United States v. Watkins* for the proposition that "Supreme Court precedent forecloses vagueness challenges to statutes like [HB 1719] that neither define crimes, impose penalties, nor regulate speech." (*Id.*) Plaintiffs distinguish *Beckles* and claim that the State "drastically overreads" its impact. (ECF No. 134 at PageID 1921.) The Court briefly considers these arguments below but, in the end, chooses to address this claim on the merits.

In *Beckles*, the Supreme Court considered whether the residual clause[11] in the Federal Sentencing Guidelines could be "subject to vagueness challenges." 580 U.S. 256, 259 (2017). It explained that the Court had previously invalidated criminal laws that fit in two main categories: those that define criminal offenses and those that fix permissible sentences. *Id.* at 262. Because the Guidelines "merely guide[d] the district courts' discretion in choosing an appropriate sentence within the statutory (sentencing) range," the Guidelines fit into neither category. *See id.* at 263. The Court further reasoned that these "advisory" Guidelines did not reach the vagueness doctrine's two due process concerns—providing a defendant with notice and preventing arbitrary enforcement. *Id.* at 265.

[11] The residual clause has since been removed from the Federal Sentencing Guidelines.

Notice of the maximum sentence was not at issue because a defendant would have already been aware of the applicable statutory sentencing range "which establishe[d] the permissible bounds of the court's [] discretion." *Id.* at 266. A defendant receives notice of the maximum sentence when he receives a copy of the indictment and when he makes an initial appearance in federal court. And because the Guidelines only "advise[d] sentencing courts how to exercise their discretion," arbitrary enforcement concerns were unwarranted. As a result, the *Beckles* Court held that the Guidelines were "not subject to a vagueness challenge under the Due Process Clause." *Id.* at 263.

In *Watkins*, the Second Circuit, relying on *Beckles*, held that the federal Bail Reform Act's (BRA) residual clause was likewise "not amendable to a due process challenge." 940 F.3d 152, 161 (2019). Under the BRA, federal courts could detain certain arrestees pretrial. The residual clause at issue entitled the Government to a pretrial detention hearing in some cases. *Id.* at 158 (discussing 18 U.S.C. § 3142(f)(1)). Or as the Second Circuit described it, the law "merely perform[ed] a gate-keeping function by narrowing the types of offenses that render an arrestee eligible for a detention hearing.'" *Id.* at 160.

The *Watkins* court found that, like the Sentencing Guidelines in *Beckles*, the BRA did not define criminal offenses or impose mandatory penalties. *Id.* at 161. And because pretrial detention is not considered to be a "punishment," *id.* (citing *United States v. Salerno*, 481 U.S. 739, 747 (1987)), the BRA did not trigger notice concerns. *Id.* ("Moreover, as a practical matter, we cannot imagine that an individual conforms his conduct in order to avoid pretrial detention rather than, say, post-conviction incarceration."). It also did not invite arbitrary enforcement because the BRA "merely empower[ed] the court to hold a hearing that is itself guided by [] statutory requirements." *Id.*

The reasoning in *Beckles* and *Watkins* fits neatly here according to the State. Based on those cases, "[n]otice concerns simply do not translate to bail." (ECF No. 125 at PageID 1767.) And HB 1719 does not invite arbitrary enforcement because "[l]ike sentencing guidelines, Tennessee's bail laws do not regulate the public and are not 'enforced' against any defendant; they instead provide guidance to magistrates in the exercise of their discretion." (*Id.*) Plaintiffs counter that unlike the advisory Guidelines in *Beckles*, HB 1719 is mandatory in that judges "shall not" consider an arrestee's ability to pay. (ECF No. 134 at PageID 1922.)

In the end, the Court finds Plaintiffs' position more persuasive that neither case definitively bars the application of the vagueness doctrine here. On the one hand, HB 1719 provides less discretion to judicial officers than the advisory Guidelines in *Beckles*; indeed, it includes mandatory language removing a category of information (ability to pay) from the court's consideration. In other words, it arguably removes at least some discretion. On the other hand, like *Watkins*, the vagueness doctrine's notice concerns are arguably not present here because "non-punitive pretrial detention does not trigger the same constitutional concerns as the indisputably punitive post-conviction sentence." 940 F.3d at 161. *Cf. United States v. Haley*, No. 23-20191, 2024 WL 4906517, at *5 (W.D. Tenn. Nov. 27, 2024), *aff'd*, No. 24-6078, 2025 WL 674224 (6th Cir. Feb. 27, 2025) (finding that *Beckles* and *Watkins* "clearly stand for the proposition that void-for-vagueness concerns are triggered only when the context in which the [law] is applied fairly raises due process concerns").

To be sure, this is a close call. *See id.* ("Whether those concerns are triggered . . . is a question better left to the wisdom of higher courts."). But given these competing tensions and the lack of clear-cut guidance from the Sixth Circuit, the Court declines the State's invitation to avoid reaching the merits of Plaintiffs' vagueness claim.

**2. Legal Standards**

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). Relevant here, courts apply a "more stringent test" to laws that interfere with constitutional rights. *Ass'n of Cleveland Fire Fighters*, 502 F.3d at 551 (citation omitted). And a "less stringent test" applies to laws that "concern[] civil rather than criminal penalties." *Id.* "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests.*, 455 U.S. at 499.

Plaintiffs ask the Court to apply a more stringent test to HB 1719 because it "threatens to inhibit an arrestee's rights to pretrial liberty, against wealth-based detention, against excessive bail, and to bail under the Tennessee constitution."[12] (ECF No. 119-1 at PageID 1232.) But for reasons explained later in this Order, HB 1719 does not inhibit these rights to the degree that Plaintiffs allege. *See Ass'n of Cleveland Fire Fighters*, 502 F.3d 551 (applying a "less stringent review" because the Supreme Court had not recognized the right at issue). Nor does it impose civil or criminal penalties, as Plaintiffs have implied elsewhere in their briefing. (*See* ECF No. 134 at PageID 1925.) It follows that even if a "more stringent" standard applies, it "is somewhat relaxed" here. *NetChoice, LLC v. Yost*, 180 F.4th 268, 294 (6th Cir. 2026) (recognizing that the

---

[12] Plaintiffs also state for the first time that HB 1719 "interferes with an arrestee's First Amendment right to petition the court for release on a lower, affordable bail amount." (ECF No. 119-1 at PageID 1232.) This allegation is a stretch at best—the law regulates judicial discretion, not an arrestee's speech. And it does not interfere with an arrestee's right to petition because the undisputed facts show that defense lawyers in Shelby County still sometimes argue that their clients cannot afford bail. (ECF No. 126-1 at PageID 1824 ("Defense counsel do not make arguments that their clients cannot afford bail as often as they did before.").)

"stricter" standard applied to a vagueness challenge; "[h]owever, given that the Act provides for only civil penalties and not criminal punishment, the standard is somewhat relaxed").

The above test is not the only legal standard to keep in mind. Plaintiffs base their vagueness challenge not on how HB 1719 has been applied to specific arrestees, rather they claim that the law is facially invalid.[13] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. Meaning, a facial challenge can succeed "only if the [challenged] enactment is impermissibly vague in *all* of its applications."[14] *Rendon v. Transportation Sec. Admin.*, 424 F.3d 475, 480 (6th Cir. 2005) (internal quotation marks and citation omitted). The Supreme Court "has therefore made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024),

Plaintiffs' have yet another hurdle to clear: "federal courts must construe challenged state statutes, whenever possible, so as 'to avoid constitutional difficulty.'" *Green Party of Tennessee v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012) (quoting *Davet v. City of Cleveland*, 456 F.3d 549, 554 (6th Cir. 2006) and "[h]eeding that obligation" in a facial void-for-vagueness challenge); *see Just City Inc. v. Bonner*, 758 F. Supp. 3d 785, 814 (W.D. Tenn. 2024) ("And the canon of constitutional avoidance, which recognizes a court's duty to interpret statutes in a way that avoids

[13] Counsel for Plaintiffs stated at the summary judgment hearing that they are bringing a facial void-for-vagueness claim. (ECF No. 140; *see also* ECF No. 119-1 at PageID 1232–33.) Defendants also ask the Court to view Plaintiffs' claim as a facial challenge. (See ECF No. 129-1 at PageID 1888.)

[14] Sixth Circuit authority suggests that Plaintiffs may be unable to mount a facial challenge here. *See, e.g. 600 Marshall Ent. Concepts, LLC v. City of Memphis*, 705 F.3d 576, 587 n.7 (6th Cir. 2013) ("[V]agueness claims not involving First Amendment freedoms [or criminal sanctions] must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity.") (quoting *Belle Maer Harbor*, 170 F.3d 553, 557)). But the Court finds that Plaintiffs "chose to litigate th[is] case[] as [a] facial challenge[], and that decision comes at a cost." Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024).

constitutional questions, would favor interpreting 'financial condition' and 'ability to pay' in a way that does not violate the Fourteenth Amendment if possible." (citing *Bevan & Assocs. LPA v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019)). With these standards in mind, the Court now considers whether HB 1719 is vague.

**3. Vagueness**

As mentioned above, a law can be vague in two ways. The first is if the law fails to "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732. The second is "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (citation omitted).

Plaintiffs contend that HB 1719 is void because it is vague both ways. They argue that the law fails to put arrestees on notice of the kinds of evidence they can introduce at bail hearings. (ECF No. 134 at PageID 1923.) And that "there is no reasoned basis for judicial officers to apply a statute that simultaneously requires them to consider an arrestee's financial condition and prohibits them from considering the arrestee's ability to pay bail." (ECF No. 119-1 at PageID 1233.) Plaintiffs' further assert that HB 1719's "lack of guidelines" invites arbitrary enforcement. (*Id.* at PageID 1234.)

The Court disagrees. The analysis here largely begins and ends with "the words of the [law] itself." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 246 (6th Cir. 2018) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). The phrases "financial condition" and "ability to pay" to be exact. *See* Tenn. Code Ann. § 40-11-118(b)(2). These are common phrases, and "[t]he likelihood that anyone would not understand any of those common words seems quite remote." *Hill*, 530 U.S. at 732; *see Brown*, 136 F.4th at 345 ("When the challenged language is commonly used in both legal and common parlance, it

often will be sufficiently clear so that a reasonable person can understand its meaning." (internal quotation marks omitted) (quoting *Platt*, 894 F.3d at 246).

As the State reads it, "'financial condition' refers to a wholistic view of a defendant's finances, including the defendant's status as indigent." (ECF No. 125 at PageID 1769 (citing Merriam-Webster and *In re Joelson*, 307 B.R. 689, 696 (B.A.P. 10th Cir. 2004), *aff'd,* 427 F.3d 700 (10th Cir. 2005).) And "ability to pay" "refers not only to the specific amount of money available to the defendant at a moment in time to pay bail, but also to the defendant's 'physical, mental, or legal power to access' that money." (*Id.* at PageID 1770 (citing Meriam-Webster).) Pulling this together, a Judicial Officer may consider an arrestee's total finances when setting bail but must avoid basing the amount of bail on the arrestee's current liquidity.

There is nothing vague lurking in this language—an arrestee of ordinary intelligence reading those words would understand the statute's parameters. And despite this being a facial challenge, the record shows that the Shelby County defense bar understands these terms. (*See* ECF No. 126-1 at PageID 1824 ("Defense counsel do not make arguments that their clients cannot afford bail as often as they did before.").) *See Platt*, 894 F.3d at 246–47 ("The fact that a law is 'marked by "flexibility and reasonable breadth, rather than meticulous specificity"' does not render it unduly vague." (quoting *Grayned*, 408 U.S. at 110)).

Although Plaintiffs note that the bail statute does not define the terms "financial condition" or "ability to pay," (ECF No. 119-1 at PageID 1233), that alone does not render the statute vague. *See Brown v. City of Albion*, 136 F.4th 331, 345 (6th Cir. 2025) ("[W]hen the common meaning of a term makes clear what conduct is prohibited, failure to further define the term will not render the statute void for vagueness." (citing *Platt*, F.3d at 247)). Nor does Plaintiffs' disagreement with the statutory language itself render the law vague—the doctrine

does not render laws unconstitutional based on mere disagreement. Its purpose "is to ensure that both those who enforce a statute and those who must comply with it 'know what is prohibited[.]'" *Green Party of Tennessee*, 700 F.3d at 825 (citation omitted). And HB 1719 clearly prohibits a judicial officer from considering an arrestee's ability to pay.

Although this Court agrees that HB 1719 is not a model of clarity, "the Constitution's 'prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *See White Oak Prop. Dev., LLC v. Washington Twp., Ohio*, 606 F.3d 842, 848 (6th Cir. 2010) (quoting *Rose v. Locke*, 423 U.S. 48, 49 (1975)). This is especially true when the Court must construe HB 1719 in a way, if possible, that avoids a violation of the Fourteenth Amendment. *See Bevan & Assocs., LPA*, 929 F.3d at 374. And given the State's reading, Plaintiffs have not met their burden of showing that HB 1719 fails to provide fair notice or invites arbitrary enforcement in *all* its applications.

Plaintiffs argue that the record here supports their vagueness claim. In that regard, Plaintiffs cite Commissioner Marshall's deposition where he testified that "determining how to consider financial condition without considering ability to pay is 'an individual decision' for 'each magistrate and judicial official.'" (ECF No. 119-1 at PageID 1234.) He added that "ability to pay . . . means different things to different people." (*Id.*) And that "financial condition" is a "very broad, vague term." (*Id.*) Despite this testimony, the record does not change the Court's conclusion.

To be sure, Commissioner Marshall's testimony shows sincere confusion on the part of the Judicial Commissioners who are setting bail. But his testimony alone does not mean that the law itself is vague. *See 600 Marshall Ent. Concepts, LLC v. City of Memphis*, 705 F.3d 576, 587 (6th Cir. 2013) ("Therefore, although we find it disturbing that city officials demonstrated such

confusion regarding the straightforward Ordinance they were responsible for implementing, 600 Marshall has not shown that the Ordinance itself is unconstitutionally vague."). Because the Court finds that HB 1719 is not unconstitutionally vague in *all* its applications, it **GRANTS** summary judgment in Defendants' favor for this claim.

### B. Procedural Due Process Claim

Plaintiffs next argue that HB 1719 is facially invalid because it violates procedural due process by "depriv[ing] arrestees of a meaningful opportunity to be heard by prohibiting judicial officers from considering their ability to pay bail when setting bail." (ECF No. 119-1 at PageID 1236.) The State and Defendants again disagree. (ECF No. 125 at PageID 1753–59; ECF No. 129 at PageID 1889–95.) For the reasons below, the Court finds that HB 1719 does not violate arrestees' procedural due process.

"The Fourteenth Amendment's Due Process Clause bars States from 'depriv[ing] any person of life, liberty, or property, without due process of law[.]'" *Novak v. Federspiel*, 140 F.4th 815, 821 (6th Cir. 2025) (quoting U.S. Const. amend. XIV, § 1). But not all State deprivations of one's rights are unconstitutional. Rather, "what is unconstitutional is the deprivation of [] an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citations omitted). In that sense, procedural due process guarantees fair treatment. *Id.* "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted).

Courts consider the three *Mathews* factors when determining whether a particular procedure complies with due process:[15] "First, the private interest that will be affected by the

---

[15] The State argues that the standard in *Medina v. California*, 505 U.S. 437 (1992) controls this analysis. (*See* ECF No. 125 at PageID 1746–53.) Plaintiffs disagree. (ECF No. 134 at PageID 1925.) And Defendants did not address the issue. To be sure, *Medina* "'provide[s] the

official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335 (citation omitted; *see United States v. Brandon*, 158 F.3d 947, 953 (6th Cir. 1998) (citing *Mathews*, 424 U.S. at 335); *see also Cooperrider v. Woods*, 127 F.4th 1019, 1042 (6th Cir. 2025) (listing three factors) (quoting *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)).

Arrestees have an interest in pretrial liberty.[16] *See Salerno*, 481 U.S. at 748; *Hill v. Hall*, No. 19-0452, 2019 WL 4928915, at *9 (M.D. Tenn. Oct. 7, 2019) ("The liberty interest at stake is actual liberty—the right of a person who has not been convicted of a crime to be free from detention prior to trial."). And the State has a substantial interest in ensuring an arrestee's reappearance and protecting community safety. *See Salerno*, 481 U.S. at 749 ("The government's interest in preventing crime by arrestees is both legitimate and compelling." (citation omitted)); *Stack v. Boyle*, 342 U.S. 1, 4 (1952) ("The right to release before trial is

---

appropriate framework for assessing the validity of state procedural rules' that 'are part of the criminal process.'" *Nelson v. Colorado*, 581 U.S. 128, 134 (2017) (quoting *Medina*, 505 U.S. at 443); *see also United States v. McShan*, 757 F. App'x 454, 466 n.6 (6th Cir. 2018) ("The Court in *Nelson* explained that its ruling in that case was governed by the 'familiar procedural due process inspection instructed by *Mathews v. Eldridge*,' which governs when 'no further criminal process is implicated.'" (quoting *Nelson*, 581 U.S. at 135)). But this lawsuit—a civil challenge to the "collateral issue of []pretrial deprivation"—appears to fit neatly in the *Mathews*-style framework. *See Kaley v. United States*, 571 U.S. 320, 350 n.4 (2014) (Roberts, C.J. dissenting); *see also White v. Hesse*, No. 19-1145, 2024 WL 5202511, at *14 n.14 (W.D. Okla. Dec. 23, 2024) ("This civil challenge to the implementation of an administrative order regarding first court appearances is properly assessed under the *Mathews* test."); *Schultz v. Alabama*, 42 F.4th 1298, 1332 (11th Cir. 2022) (applying *Mathews* in the pretrial detention context). The Court therefore applies *Mathews* here.

[16] Plaintiffs also argue that HB 1719 "threatens to inhibit an arrestee's rights . . . against wealth-based detention, against excessive bail, [] to bail under the Tennessee constitution" and the "First Amendment right to petition the court for release on a lower, affordable bail amount." (ECF No. 119-1 at PageID 1232.)

conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.") (citation omitted)).

The issue here is whether Tennessee bail-setting laws provide arrestees fair process before depriving them of their pretrial liberty. Although Plaintiffs focus on Tennessee Code Annotated section 40-11-118(b)(2) as amended by HB 1719 for this analysis, that provision reflects only one part in the State's bail-setting scheme. To answer the question Plaintiffs pose here, the Court looks to the statutory scheme as a whole.

Remember that before a judicial officer sets an arrestee's bail amount in Tennessee, it has already found that monetary bail is "the least restrictive condition[] of release that will reasonable ensure the[ir] appearance . . . and the safety of the community." Tenn. Code Ann. § 40-11-115(b); *see id.* at § 40-11-117. Part of that assessment includes the judicial officer considering the "defendant's financial resources." *Id.* at § 40-11-115(b). And then again, "[b]ail must be set as low as the court determines is necessary to reasonable ensure the safety of the community and the appearance of the defendant as required." *Id.* at § 40-11-118(a)(2).

To set that amount, judicial officers consider nine factors, including the one at issue: "[t]he defendant's employment status and history and financial condition; provided, that, the defendant's ability to pay shall not be considered."[17] *Id.* at § 40-11-118(b)(2). What is more,

---

[17] The full statutory factors that guide the judicial officer's decision are:

(1) The defendant's length of residence in the community;
(2) *The defendant's employment status and history and financial condition; provided, that, the defendant's ability to pay shall not be considered*;
(3) The defendant's family ties and relationships;
(4) The defendant's reputation, character and mental condition;
(5) The defendant's prior criminal record, record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;
(6) The nature of the offense and the apparent probability of conviction and the likely sentence;

indigent arrestees are appointed counsel at the formal bail hearing. (ECF No. 126-1 at PageID 1823.) And Tennessee law explicitly permits arrestees to challenge their bail amounts "in circuit or criminal court if the defendant feels that the bail is excessive." *Id.* at § 40-11-105(a)(1); *id.* at § 40-11-143. An arrestee who disagrees with that court's decision can then appeal to the State's higher courts. *Id.* at § 40-11-144.

The Court finds that these procedures—hearing, representation, and the opportunity to appeal—satisfy due process. *See Salerno*, 481 U.S. at 750–52 (finding that the Bail Reform Act's "extensive safeguards" afforded adequate process because arrestees had a right to counsel, could testify on their own behalf, and the "judicial officer charged with the responsibility of determining the appropriateness of detention is guided by statutorily enumerated factors, which include the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community"); *Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) ("Notice and an evidentiary hearing, as provided under the statute, are the touchstones of procedural due process." (first citing *Mathews*, 424 U.S. at 333, then citing *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970)). Considering that Tennessee's bail statutes are replete with references to an arrestee's "financial condition," the Court finds that the risk of erroneous deprivation of liberty is low.

---

(7) The defendant's prior criminal record and the likelihood that because of that record the defendant will pose a risk of danger to the community;

(8) The identity of responsible members of the community who will vouch for the defendant's reliability; however, no member of the community may vouch for more than two (2) defendants at any time while charges are still pending or a forfeiture is outstanding; and

(9) Any other factors indicating the defendant's ties to the community or bearing on the risk of the defendant's willful failure to appear, including, but not limited to, whether the defendant is lawfully present in this state.

*Id.* at § 40-11-118(b) (emphasis added).

Plaintiffs' position is even less persuasive when considered in light of the caselaw on indigent detention. Consider two cases addressing an indigent defendant's inability to pay fines. In *Williams v. Illinois*, a State statute required a defendant to remain in jail until he could "work off" fines and court costs. 399 U.S. 235, 236 (1970). Because the appellant could not pay that fine, he remained in prison "for 101 days beyond the maximum period of confinement fixed by the statute." *Id.* at 237. The Court found that the statute was unconstitutional and held "that the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status." *Id.* at 244. That was because the statute had in effect made "the maximum confinement contingent upon one's *ability to pay*" and thus "visited different consequences of persons." *Id.* at 242 (emphasis added).

Just a year later, the Court in *Tate v. Short* struck down a "fine[] only" statute that permitted a defendant to be jailed if he could not pay the fine. 401 U.S. 395, 399 (1971). The Court reasoned that, as in *Williams*, "the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Id.* at 398 (quoting *Morris v. Schoonfield*, 399 U.S. 508, 509 (1970)). But the case here is unlike *Williams* or *Tate* where indigent defendants are imprisoned until they can work off fines.

Those cases found that the statutes at issue furthered no State objective. *See Tate*, 401 U.S. at 399 (discussing *Williams*, 399 U.S. at 244). Yet here, while arrestee's have a "strong" interest in pretrial liberty, Tennessee's interest in public safety and the defendant's appearance in court are "compelling." *Salerno*, 481 U.S. at 750. And Plaintiffs have cited no cases, nor has the

Court found any binding cases suggesting that an arrestee's interest in a judicial officer considering both his ability to pay and his financial condition outweighs the State's interests. Nor have Plaintiffs identified any similar district court opinions. True, many district courts in Tennessee have addressed challenges to the State's bail scheme. *See Torres v. Collins*, No. 20-0026, 2023 WL 6166523, at *2 (E.D. Tenn. Sept. 21, 2023) ("[B]ail is set solely based on the arrestee's charges and criminal history [in an ex parte proceeding]; bail-setters do not know the arrestee's employment status, financial condition, family ties and relationships, or ties to the community."); *McNeil, LLC*, 2019 WL 633012, at *15 (finding that the bail system "constitutionally deficient in failing to provide notice and an opportunity for the arrestee to be heard, and for failing to provide oral and written findings regarding the arrestee's ability to pay, alternative conditions of release, and the need for pre-revocation detention."); *Weatherspoon v. Oldham*, No. 17-2535, 2018 WL 1053548, at *7 (W.D. Tenn. Feb. 26, 2018) (finding that the "state trial court violated [the habeas petitioner's] procedural Due Process rights by failing to consider non-monetary conditions of release" even though it considered the other factors of Tenn. Code Ann. § 40-11-118).

But as the Court explained in an earlier Order, "the Tennessee cases Just City cites relate to bail schemes or procedural postures quite different from the one challenged here because HB 1719 had not been enacted at the time those cases arose." *Just City, Inc.*, 758 F. Supp. 3d at 812. Although these cases refer to an indigent arrestee's "ability to pay," the consensus is that "state laws setting a particular monetary bail amount for a person's release from detention without *individualized considerations* of indigency violate the Due Process Clause." *Weatherspoon*, 2018 WL 1053548, at *6 (emphasis added) (collecting district court cases). Yet here, individual considerations are present because judicial officers consider an indigent arrestee's "financial

condition" throughout the entire bail-setting process. So this is not a case like *Torres*, where "bail [was] set ex parte without participation of the arrestee." 2023 WL 6166523, at *10. Nor is it a case like *McNiel*, where judicial officers failed to consider meaningful alternatives other than unaffordable secured bail. 2019 WL 633012, at *13. And it is not like *Weatherspoon*, where a judicial officer set monetary bail before "determining whether a non-monetary condition or combination of conditions of release could assure [the arrestee's] appearance at trial and the safety of the public." 2018 WL 1053548, at *7.

On balance, the Court finds that Tennessee's bail-setting statutes meet Due Process. All arrestees under HB 1719—whether rich or poor—have the chance to explain their financial condition. That opportunity arises first when an individual is arrested. Then again at a bail hearing. And if the arrestee is still aggrieved, they may then seek further judicial review. *Cf. Stack v. Boyle*, 342 U.S. 1, 6 (1951) ("The proper procedure for challenging bail as unlawfully fixed is by motion for reduction of bail and appeal to the Court of Appeals from an order denying such motion.").

Even still, Plaintiffs argue that without considering an arrestee's ability to pay, judicial officers cannot determine whether the bail amount is the lowest amount necessary to ensure reappearance and public safety as required by Tennessee law. (ECF No. 119-1 at PageID 1237.) *See* Tenn. Code Ann. § 40-11-118(a)(2). They assert that after the passage of HB 1719, the record shows an increase in pretrial detention in Shelby County. They note that "bail amounts have increased and fewer defendants have been able to afford release"; and the "risk of excessive bails also increased." (ECF No. 119-1 at PageID 1239–40; *see* ECF No. 134 at PageID 1926.)

The Court is not convinced. "The test for excessiveness is not whether defendant is financially capable of posting bond but whether the amount of bail is reasonably calculated to

assure the defendant's appearance at trial." *United States v. Beaman*, 631 F.2d 85, 86 (6th Cir. 1980) (citation omitted). In sum, bail must not be set "higher than an amount reasonably calculated" to assure a defendant's reappearance. *Stack v. Boyle*, 342 U.S. 1, 5 (1951) (citation omitted). Tennessee's bail statutes serve this purpose by allowing an arrestee at many different hearings to provide evidence related to the bail factors—including "employment status and history and financial condition." *See* Tenn. Code Ann. § 40-11-118(b)(2). Because the State's procedures provide arrestees a meaningful opportunity to be heard, the Court **GRANTS** summary judgment in Defendants' favor on this claim.

### C. Equal Protection Claim

Plaintiffs' final argument is that HB 1719 violates *Bearden v. Georgia*, 461 U.S. 600 (1983) because it causes "discriminatory wealth-based detention." (ECF No. 119-1 at PageID 1214.) Put differently, Plaintiffs claim that "[d]etention under an unaffordable bail order, without any inquiry into or determination of ability to pay or meaningful consideration of alternatives, is discriminatory wealth-based detention in violation of the . . . Equal Protection Clause[] of the Fourteenth Amendment." (ECF No. 75-2 at PageID 755–56.) The State and Defendants argue to the contrary. (ECF Nos. 125, 129.) For the reasons below, the Court finds that HB 1719 does not violate the Equal Protection Clause.

The Fourteenth Amendment bars States from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause in this context asks, "whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants." *Bearden*, 461 U.S. at 665. And the analysis overlaps with the procedural due process claim above. *See id.* ("Due process and equal principles converge in the Court's analysis in these cases." (citation omitted).

Rational basis review applies here. *See, e.g.*, *Fowler v. Benson*, 924 F.3d 247, 261 (6th Cir. 2019) ("We review equal protection challenges to laws on grounds of 'wealth-based classification' only to see if they have a rational basis." (citations omitted)); *Torres*, 2023 WL 6166523, at *7 ("Because Plaintiffs were not absolutely deprived of their pretrial liberty to justify heightened scrutiny under *Bearden*, the Court applies rational-basis review to Defendants' bail practices to determine whether their actions are rationally related to a legitimate government interest." (citing *Shultz v. Alabama*, 42 F.4th 1298, 1330 (11th Cir. 2022)); *Walker v. City of Calhoun*, 901 F.3d 1245, 1265 (11th Cir. 2018). To survive scrutiny under the rational basis test, HB 1719 "need only be 'rationally related to legitimate government interests.'" *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citation omitted).

The statutory framework for bail in Tennessee shows that HB 1719 has a rational basis. Tennessee's interest here is twofold: ensuring community safety and an arrestee's appearance at court proceedings. Tenn. Code Ann. § 40-11-118(a)(2). To deal with those interests, judicial officers set bail "as low as . . . necessary" by considering a range of statutory factors. Some relate to community safety, such as an arrestee's "prior criminal record and the likelihood that because of the records the defendant will pose a risk of danger to the community." *Id.* at § 40-11-118(b)(7). And others relate to an arrestee's flight risk, including their "record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings." *Id.* at § 40-11-118(b)(5). Other factors include "the defendant's financial resources," *Id.* at § 40-11-115(b), and the "defendant's employment status and history and financial condition." *Id.* at § 40-11-118(b)(2). Taking all this together, the statutory guidelines support the State's interest in securing reappearance and ensuring community safety.

So too does *Bearden*. The issue there was "whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution." *Bearden*, 461 U.S. at 661. The Supreme Court held that it did. As long as the defendant "made all reasonable efforts to pay . . . and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available." *Id.* at 668–69. "To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine." *Id.* at 672–73; *see also Powers v. Hamilton Cnty. Public Defender Com'n*, 501 F.3d 592, 608 (2007) ("The *Bearden* Court . . . h[e]ld that 'fundamental fairness' requires a court to inquire into whether a criminal defendant is able to pay a *fine*." (emphasis added) (citations omitted)).

*Bearden* made clear that courts have "long been sensitive to the treatment of indigents in our criminal justice system." *Id.* at 664. And in the end, States cannot treat an indigent defendant categorically differently from a non-indigent defendant. *See id.* at 665. But it also holds that States have "a fundamental interest in appropriately punishing persons—rich and poor—who violate its laws." *Id.* at 669. And "when determining initially whether the State's penological interests require imposition of a term of imprisonment, the sentencing court can consider the entire background of the defendant, including his employment history and financial resources." *Id.* at 669–70 (citation omitted).

Without rehashing the analysis above, Tennessee Code Annotated section 40-11-118 requires judicial officers setting bail to consider the exact same things the *Bearden* court required. And Plaintiffs have not shown that HB 1719 results in causes wealth-based detention. In other words they have not shown that HB 1719 requires bail setters to treat the indigent

"systematically worse 'solely because of [their] lack of financial resources'—and not for some legitimate State interest." *Walker*, 901 F.3d at 1260 (quoting *Bearden*, 461 U.S. at 661). Plaintiffs accordingly have not shown an equal protection violation. *See Vance v. Bradley*, 440 U.S. 93, 97 (1979) ("Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude the legislature's actions were irrational."). The Court therefore **GRANTS** summary judgment for Defendants on this claim.

## CONCLUSION

Plaintiffs have devoted considerable time and resources to explaining why they find Tennessee Code Annotated § 40-11-118(b)(2), as amended by HB 1719, to be misguided and confusing. They make some good points—the record shows that the Judicial Commissioners have had a hard time implementing the new statute. The Tennessee General Assembly's choice to prohibit judicial officers from considering an arrestee's "ability to pay" bail while at the same time requiring them to consider an arrestee's "employment status and history and financial condition" is puzzling for some. But puzzling does not always equal unconstitutional. And for the reasons discussed in detail above, HB 1719 survives constitutional scrutiny. The Court therefore **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** summary judgment in Defendants' favor.

**SO ORDERED**, this 20th day of August, 2026.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE